**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____ )
                                 )
AMERICAN FOREIGN SERVICE         )
ASSOCIATION,                     )
                                 )
                    *Plaintiff*, )        Civil Action No. 25-cv-1030-PLF
                                 )
        v.                       )
                                 )
DONALD TRUMP, et al.,            )
                                 )
                    *Defendants*. )
_____ )

**MEMORANDUM OF POINTS AND AUTHORITIES SUPPORTING**
**PLAINTIFF AMERICAN FOREIGN SERVICE ASSOCIATION'S**
**MOTION FOR PRELIMINARY INJUNCTION**

Submitted by:

Richard J. Hirn                    Sharon L. Papp*
D.C. Bar No. 291849                papp@afsa.org
richard@hirnlaw.com                D.C. Bar No. 107992
5335 Wisconsin Ave., NW, Suite 440  Raeka Safai*
Washington, D.C. 20015             safai@afsa.org
(202) 274-1812                     D.C. Bar No. 977301
                                   American Foreign Service Ass'n
                                   2101 E Street, NW
Keith R. Bolek                     Washington, D.C. 20037
D.C. Bar No. 463129
kbolek@odonoghuelaw.com
April H. Pullium                   * Admissions Pending
D.C. Bar No. 198026
apullium@odonoghuelaw.com
O'Donoghue & O'Donoghue LLP
5301 Wisconsin Avenue, NW, Suite 800
Washington, D.C. 20015
(202) 362-0041

Counsel for Plaintiff AFSA

1

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ........................................................................................................ iii

TABLE OF ACRONYMS .......................................................................................................... xi

I.  INTRODUCTION .......................................................................................................... 1

II.  STATEMENT OF FACTS .............................................................................................. 4

    A.  Background on AFSA ......................................................................................... 4

    B.  AFSA's Collective Bargaining Agreements, Duties and Operations
          as the Exclusive Representative of Foreign Service Employees ................................ 6

    C.  AFSA's Challenges President Trump's Dismantling of USAID and
          USAGM by Pursuing Grievances, Filing Lawsuits, and Speaking
          to the Media ...................................................................................................... 10

          1.  AFSA's Speech and Petitioning Activity Regarding
                USAID ....................................................................................................... 10

          2.  AFSA's Speech and Petitioning Activity Regarding
                USAGM ..................................................................................................... 13

    D,  President Trump Issues an Executive Order to Exclude AFSA
          Members from Collective Bargaining in Response to AFSA's and
          Other Federal Employee Unions' Lawsuits .............................................................. 14

    E.  Defendants Withdraw Recognition of AFSA and Revoke Collective
          Bargaining Agreements, Inflicting Harm Upon Both AFSA and
          its Members ...................................................................................................... 16

III.  APPLICABLE LAW ...................................................................................................... 21

    A.  The Standard for a Preliminary injunction ............................................................... 21

    B.  AFSA's Right to Non-Statutory Review of
          *Ultra Vires* Executive Action ................................................................................. 21

IV.  ARGUMENT ................................................................................................................ 22

    A.  AFSA Has Established a Reasonable Likelihood of
          Success on the Merits .......................................................................................... 23

1.      The President Lacks Authority to Exempt Entire
        Departments from Coverage of the Foreign Service
        Labor-Management Relations Statute Because
        that Action Would be Tantamount to Repealing the Act ...............................23

2.      The Presumption of Regularity Has Been Rebutted
        by the Timing and Broad Scope of the Exclusions
        and by the President's own Words ................................................................27

3.      President Trump Revoked AFSA's Collective Bargaining
        Rights in Retaliation for the Exercise of its First Amendment
        Right to Oppose the President's Policies in the Courts
        and in the Press.............................................................................................31

B.      AFSA and its Membership Will Suffer Irreparable Harm .........................33

1.      The Defendants' Withdrawal of Recognition and
        Repudiation of the Framework Agreements Inflict
        Both Immeasurable and Irreparable Harm Upon
        AFSA and Foreign Service Members...........................................................33

2.      The Executive Order Further Irreparably Harms the
        First Amendment Rights of AFSA and Foreign
        Service Members...........................................................................................40

C.      The Balance of Harm Favors AFSA and the Public Interest
        Will be Served by the Issuance of an Injunction........................................42

V.      CONCLUSION..................................................................................................44

## TABLE OF AUTHORITIES

**Federal Cases**

*Amer. Fed'n of Govt. Emps. v. Reagan*,
  870 F.2d 723 (D.C. Cir. 1989)...........................................................................27, 29

*Asseo v. Centro Medico Del Turabo*,
  900 F.2d 445 (1st Cir. 1990) ...........................................................................35, 39

*Bailey v. Fed'l Bur. Of* Prisons,
  No. 24-1219, 2024 WL 3219207 (D.D.C. Jun. 28, 2024)........................................41

*Beattie v. Barnhart*,
  663 F. Supp. 2d 5 (D.D.C. 2009) .......................................................................33

*BE & K Constr. Co. v. NLRB*,
  536 U.S. 516 (2002)..........................................................................................32

*Bill Johnson's Restaurants, Inc. v. NLRB*,
  461 U.S. 731 (1983)..........................................................................................32

*Bloedorn v. Francisco Foods, Inc.*,
  276 F.3d 270 (7th Cir. 2001) .............................................................................40

*California Motor Transp. Co. v. Trucking Unlimited*,
  404 U.S. 508 (1972)..........................................................................................32

*Campagna v. Mass. Dep't of Envtl. Prot.*,
  206 F. Supp. 2d 120 (D. Mass. 2002), *aff'd*,
  334 F.3d 150 (1st Cir.)......................................................................................33

*Chamber of Commerce v. Reich*,
  74 F.3d 1322 (D.C. Cir. 1996).............................................................................22

*Cuomo v. Clearing House Assn.*,
  557 U.S. 519 (2009)..........................................................................................24

*Dart v. United States*,
  848 F.2d 217 (D.C. Cir. 1988).............................................................................22

*Davis v. District of Columbia*,
  158 F.3d 1342 (D.C. Cir. 1998)...........................................................................41

*Doe v. Mattis*,
  889 F.3d 745 (D.C. Cir.  2018)...........................................................................21

*Donohue v. Mangano,*
    886 F. Supp. 2d 126 (E.D.N.Y. 2012) ...................................................................40

*Elrod v. Burns,*
    427 U.S. 347 (1976).............................................................................................41, 42

*Fabiano v. Hopkins,*
    245 F. Supp. 2d 305 (D. Mass.), *aff'd,*
    352 F.3d 447 (1st Cir. 2003) ..................................................................................33

*Frank Bros. Co. v. NLRB,*
    321 U.S. 702 (1944).................................................................................................35

*Hartman v. Moore,*
    547 U.S. 250 (2006).................................................................................................29

* *International Union of Elec., Radio and Mach. Workers v. NLRB,*
    426 F.2d 1243 (D.C. Cir. 1970)..............................................................................35

*Karem v. Trump,*
    960 F.3d 656 (D.C. Cir. 2020).................................................................................42

*Kinney v. Cook County School Bus, Inc.,*
    No. 00 C 2042, 2000 WL 748121(N.D. Ill. 2000) ..................................................40

*League of Women Voters of U.S. v. Newby,*
    838 F.3d 1 (D.C. Cir. 2016)...............................................................................39, 43

*Levine v. C & W Mining Co.,*
    465 F. Supp. 690 (N.D. Ohio),
    *aff'd in relevant part, modified in other part,*
    610 F.2d 432 (6th Cir. 1979). ...........................................................................34, 35

*National Fed. of Fed. Emps. v. McDonald,*
    128 F. Supp. 3d 159 (D.D.C. 2015) ........................................................................25

*NLRB v. Electro-Voice, Inc.,*
    83 F.3d 1559 (7th Cir. 1996) ........................................................................34, 35, 39

*NLRB v. Jones & Laughlin,*
    301 U.S. 1 (1937)......................................................................................................35

*Pac. Gas & Elec. Co. v FERC,*
    113 F.4th 943 (D.C. Cir. 2024)................................................................................24

*Parsippany Hotel Mgmt. Co. v. NLRB*,
  99 F.3d 413 (D.C. Cir. 1996)............................................................................29

*\*Power, Inc. v. NLRB*,
  40 F.3d 409 (D.C. Cir. 1994)............................................................................32

*\*Rosenberger v. Rector & Visitors of Univ. of Va.*,
  515 U.S. 819 (1995)........................................................................................33

*SEIU Health Care Michigan v. Snyder*,
  875 F. Supp. 2d 710 (E.D. Mich. 2012)................................................34, 40, 42

*\*Sinclair Wyoming Ref. Co. LLC v. Env't Prot. Agency*,
  114 F.4th 693 (D.C. Cir. 2024)........................................................................24

*\*Singh v. Berger*,
  56 F.4th 88 (D.C. Cir. 2022) ...........................................................................42

*Small v. Avanti Health Sys., LLC*,
  661 F.3d 1180 (9th Cir. 2011) ................................................................35, 37, 39

*\*Spokane & Inland Empire R.R. Co. v. United States*,
  241 U.S. 344 (1916)........................................................................................25

*\*Sure–Tan, Inc. v. NLRB,*
  467 U.S. 883 (1984)........................................................................................32

*\*Suarez Corp. Indus. v. McGraw*,
  202 F.3d 676 (4th Cir. 2000)............................................................................33

*\*Thomas v. Collins*,
  323 U.S. 518 (1945)........................................................................................42

*Washington v. Reno*,
  35 F.3d 1093 (6th Cir. 1994)............................................................................43

*Washington v .Trump*,
  847 F.3d 1151 (9th Cir. 2017)..........................................................................22

*Wendt Corp. v. NLRB*,
  26 F.4th 1002 (D.C. Cir. 2022) ........................................................................29

*\*Wilmer Cutler Pickering Hale & Doerr v. Executive Office of the President*,
  Civ. Case No. 25-cv-917, 2025 WL 946979 (D.D.C. Mar. 28, 2025) .....................38

*Winter v. Natural Res. Def. Council, Inc.,
    555 U.S. 7 (2008) ........................................................................ 21, 33

*Youngstown Sheet & Tube Co. v. Sawyer,
    343 U.S. 579 (1952) ..................................................................... 21, 22

## Agency Decisions

Dep't of the Army, Corps of Eng'rs, Memphis Dist.,
    52 F.L.R.A. 920 (1997); ...................................................................... 38

Nat'l Fed. of Fed'l Empls. Local 122,
    47 F.L.R.A. 1118 (1993) ..................................................................... 38

Nat'l. Treas. Emps. Union and Dept. of Treasury, IRS,
    64 F.L.R.A. 127 (2009) ...................................................................... 26

## Constitution & Statutes

*U.S. Const. art. 1, § 1 ................................................................................. 21

*U.S. Const. art. 2, § 3 ................................................................................. 21

5 U.S.C. § 7103(b) ....................................................................................... 24

22 U.S.C. § 3902(4) ..................................................................................... 23

22 U.S.C. § 4002(a) ....................................................................................... 8

*22 U.S.C. § 4101 ......................................................... 1, 5, 22, 26, 34, 43

*22 U.S.C. § 4101(1) .................................................................................. 24

*22 U.S.C. § 4101(1)(A) ...................................................................... 4, 34

*22 U.S.C. § 4101(1)(B) ...................................................................... 4, 34

*22 U.S.C. § 4101(1)(C) .............................................................................. 34

*22 U.S.C. § 4101(3) .................................................................................. 24

*22 U.S.C. § 4103(b) .................................................................................. 23

22 U.S.C. § 4105(a) ..................................................................................... 26

22 U.S.C. § 4106 ........................................................................................... 9

22 U.S.C. § 4107 .................................................................................................... 9

22 U.S.C. § 4107(b) .............................................................................................. 26

*22 U.S.C. § 4113(a) .............................................................................................. 6

22 U.S.C. § 4113(c) ................................................................................................ 6

22 U.S.C. § 4113(e) ................................................................................................ 6

22 U.S.C. § 4114(a) ................................................................................................ 9

22 U.S.C. § 4115(a) ................................................................................................ 9

*22 U.S.C. § 4118 .............................................................................................. 20, 22

*22 U.S.C. § 4118(a) .............................................................................................. 6

*22 U.S.C. § 4118(d) .............................................................................................. 7

*22 U.S.C. § 4133(b) ............................................................................................ 17

*22 U.S.C. § 4133(b)(2) ....................................................................................... 17

29 U.S.C. § 151 ..................................................................................................... 35

29 U.S.C. § 153 ..................................................................................................... 35

29 U.S.C. § 157 ..................................................................................................... 35

29 U.S.C. § 158 ..................................................................................................... 35

29 U.S.C. § 160 ..................................................................................................... 35

## Regulations

22 C.F.R. § 1423.4 .................................................................................................. 9

22 C.F.R. § 1423.26 ................................................................................................ 9

22 C.F.R. § 1423.29 ................................................................................................ 9

## Other

American Presidency Project, https://www.presidency.ucsb.edu/documents/trump-campaign-press-release-national-border-patrol-council-endorses-president-trump-joe/ ......... 31

Alexandra Marquez and Nnamdi Egwuonwu, *Firefighters Union IAFF Declines
    to Endorse a Candidate* https://www.nbcnews.com/politics/2024-election/
    firefighters-union-iaff-declines-endorse-presidential-candidate-rcna173918
    (last visited April 2, 2025) ...........................................................................30

Erich Wagner, *Trump order aims to outlaw most gov't unions on 'national security" grounds*,
    GOVT. EXEC., March 27, 2025. https://www.govexec.com/workforce/2025/03/trump-
    order-aims-outlaw-most-government-unions-national-security-grounds/404113/
    (last visited April 2, 2025) ...........................................................................29

*Exec. Order No. 11,636,
    36 Fed. Reg. 24,901 (Dec. 24, 1971) ..................................................4, 27

Exec. Order, 14,151,
    90 Fed. Reg. 8,339 (Jan. 20, 2025) ...........................................................7

Exec. Order, 14,169,
    90 Fed. Reg. 8,619 (Jan. 20, 2025) .........................................................10

Exec. Order, 14211,
    90 Fed. Reg. 9,831 (Feb. 18, 2025) .........................................................32

*Exec. Order 14,251, *Exclusions from Fed'l Lab.-Mgmt. Rels. Programs*,
    90 Fed. Reg. 14,553 (Mar. 27, 2025) .............................. 1, 2, 14, 30

Frat. Order of Police, https://fop.net/2024/09/fop-endorses-trump/ ...............................30

Hassan Ali Kanu, *Trump Moves to Strip Unionization Rights from Most Federal Workers*,
    Politico.com (Mar. 28, 2025), www.politico.com/news/
    2025/03/28/union-rights-federal-workers-donald-trump-00257010.......................................14

New York Times, https://www.nytimes.com/2025/02/12/us/politics/trump-foreign-
    service.html (last visited April 10, 2025)...................................................32

OPM, *Guidance on Exec. Order Exclusions from Fed'l Labor-Mgmt. Programs*,
    *available at*, https://www.chcoc.gov/content/guidance-executive-order-
    exclusions-federal-labor-management-programs (last visited Apr. 10, 2025).........................15

Martin Kaste, *Police Welcome Trump's Return to the White House*,
    NPR, https://www.npr.org/2024/11/14/nx-s1-5183142/police-welcome-trumps-return-
    to-the-white-house (last visited April 2, 2025) .......................................................30

*Press Center*, AFSA,
    https://afsa.org/press-center (last visited Apr. 10, 2025).......................................13

*Press Releases, AFSA Statement on Decision to Recall USAID Foreign Service
Officers from Overseas Posts*, AFSA,
https://afsa.org/afsa-statement-decision-recall-usaid-foreign-service-officers-overseas-posts
(last visited April 10, 2025) ...................................................................11

*Press Releases, AFSA Statement on DEI Foreign Svc. Exec. Mem.*,
AFSA, https://afsa.org/afsa-statement-dei-foreign-service-executive-memorandum
(last visited April 10, 2025) ...................................................................12

*Press Releases, AFSA Statement on Email Mandate Re. Fed'l Employees*,
AFSA, https://afsa.org/afsa-statement-email-mandate-regarding-federal-employees
(last visited April 10, 2025). ...................................................................11

*Press Releases, Statement by AFSA on Decision to Dismantle USAID*,
AFSA, https://afsa.org/statement-afsa-decision-dismantle-usaid
(last visited April 10, 2025) ...................................................................10

*Press Releases, AFSA Statement on Reports of USAID Directive to Destroy Classified
and Sensitive Documents*, AFSA,
https://afsa.org/afsa-statement-reports-usaid-directive-destroy-classified-and-sensitive-
documents (last visited April 10, 2025) ...................................................12

Rebecca Davis O'Brien, *Trump Order Could Cripple Fed'l Worker Unions Fighting DOGE
Cuts*, New York Times, https://www.nytimes.com/2025/03/29/us/politics/
federal-worker-unions-doge.html (Mar. 29, 2025) ..................................30

*State Dept. Claims It's Sparing Life-Saving Efforts from USAID Cuts, but Some Groups
Say It's "Not True"*, CBS News,
https://www.cbsnews.com/ news/state-dept-massive-usaid-cuts/
(last visited April 10, 2025) ...................................................................13

'*Thank you for Your Service': Trump Admin. Puts USAID Staff on Leave*,
https://www.npr.org/2025/02/04/nx-s1-5287053/usaid-trump-overseas-withdrawal
(last visited April 10, 2025) ...................................................................13

The Foreign Service Act, H.R. 4674, Hearings before the Subcomm. on Inter. Ops.
and Subcomm. on Civil Service, 96th Cong., 1st Sess., at 132 (1979) ....................28

*Union Chief on Suing Trump over Massive USAID Changes*, CNN,
https://www.cnn.com/ 2025/02/07/world/video/the-lead-thomas-yazdgerdi-usaid-employees-
abroad-union-president-trump-jake-tapper
(last visited April 10, 2025). ...................................................................12

*U.S.A.I.D. Official Orders Emps. to Shred or Burn Classified and Pers. Records*, N.Y. Times,
https://www.nytimes.com/2025/03/11/us/politics/usaid-shred-burn-documents.html
(last visited April 10, 2025) ...................................................................13

*Voice of America channels fall silent as Trump admin. guts agency and cancels contracts*,
    CNN, https://www.cnn.com/2025/03/15/media/voice-of-america-trump-cuts/index.html
    (last visited April 10, 2025) ...................................................................................................13

*White House, Fact Sheet: President Donald J. Trump Exempts Agencies
    with Nat'l Sec Missions from Fed'l Coll. Barg. Requirements
    (Mar. 27, 2025) ..................................................................................................2, 15, 26, 41

*With the Dismantling of USAID, is the Trump Admin. Defying the Constitution?*, 60 Minutes,
    https://www.cbsnews.com/news/usaid-dismantling-trump-60-minutes-transcript/
    (last visited April 10, 2025) ...................................................................................................12

## TABLE OF ACRONYMS

AFSA ........................................................................................... American Foreign Service Association

APHIS ................................................................................ Animal and Plant Health Inspection Service

Board ............................................................................................ National Labor Relations Board

EO ..................................................................................................................... Executive Order

FAS................................................................................................Foreign Agricultural Service

FCS...............................................................................................Foreign Commercial Service

FSA ....................................................................................................Foreign Service Act

FSGB........................................................................................Foreign Service Grievance Board

FSLRB .................................................................................. Foreign Service Labor Relations Board

FSLMRS .......................................................... Federal Service Labor-Management Relations Statute

NLRA..............................................................................................National Labor Relations Act

OPM.............................................................................................. Office of Personnel Management

RIF ...................................................................................................................Reduction in Force

State........................................................................................................ U.S. Department of State

USAGM ................................................................................................ U.S. Agency for Global Media

USAID ............................................................................. U.S. Agency for International Development

I.    **Introduction**

The American Foreign Service Association ("AFSA") is a labor union that represents over 18,000 Foreign Service members[1] in worldwide bargaining units with the U.S. Department of State ("State"), the U.S. Agency for International Development ("USAID"), the U.S. Department of Agriculture, the U.S. Department of Commerce, and the U.S. Agency for Global Media ("USAGM"), formerly the Broadcasting Board of Governors. AFSA's bargaining rights flow from the Foreign Service Labor Management Relations Statute ("FSLMRS"), which is Subchapter X of the Foreign Service Act of 1980, 22 U.S.C. § 4101 et seq.. This statute is similar to, but not to be confused with the Federal Service Labor Management Relations Statute, which governs collective bargaining in most of the rest of the civil service.

On March 27, 2025, President Trump upended decades of stable labor-management relations in the Foreign Service by issuing an Executive Order entitled *Exclusions from Federal Labor-Management Relations Programs*, Exec. Order 14,251, 90 Fed. Reg. 14,553 (Mar. 27, 2025). Invoking Section 4103(b) of the FSLMRS, the President declared in Section 1(b) of the Executive Order that "agency subdivisions" identified in Section 3 of the order "are hereby determined to have as a primary function intelligence, counterintelligence, investigative or national security work,"  and that the bargaining rights contained in the statute could no longer be applied "in a manner consistent with national security requirements and considerations." 90 Fed. Reg. at 14,553. Section 3 lists ten (10) subdivisions of State, which represents the entirety of that Department. *Id.* at 14555. Section 3 lists four subdivisions of USAID, which also constitutes the entire agency. *Id.* Taken together, Sections 1(b) and (3) of the Executive Order remove all State

---

[1] The phrases "Foreign Service members," "Foreign Service employees," and "employees" are used interchangeably to reference the individuals who work in the Foreign Service (including Foreign Service Officers and Foreign Service Specialists) and/or who are represented by AFSA.

and USAID Foreign Service members from the FSLMRS's coverage, a statute that has continuously provided these employees with the right to organize and bargain collectively since 1980.

The order further provides in Section 6 that "upon termination of the applicable collective bargaining agreement," the agency head shall reassign employees (*i.e.*, Foreign Service members) who performed non-agency business (*i.e.*, union representatives) "to performing solely agency business"; and cease participating in any dispute resolution process (*e.g.*, implementation disputes or unfair labor practices), that involves those members. *Id.* at 14556.

President Trump's White House released a companion "Fact Sheet" on March 27, 2025. *See* White House, *Fact Sheet: President Donald J. Trump Exempts Agencies with Nat'l Sec. Missions from Fed. Coll. Barg. Requirements* (Mar. 27, 2025) ("*Fact Sheet*"). The "Fact Sheet" explains the basis for excluding Foreign Service from the FSLMRS:

> **Foreign Relations.** Department of State, U.S. Agency for International Development, Department of Commerce's International Trade Administration, and U.S. International Trade Commission.
>
> ○ President Trump has demonstrated how trade policy is a national security tool.

White House, *Fact Sheet*, *supra.* The White House devotes more of its Fact Sheet to revealing the President's true reasons for the Executive Order: *viz.*, (a) that he needs to ensure agencies "operate efficiently" without union collective bargaining agreements; and, (b) that he "needs a responsive and accountable civil service to protect our national security," which he defines as unions that do what he wants, rather than unions who represent federal employees in grievances or litigation. *Id.*

The President's Executive Order constitutes an unlawful official action that is *ultra vires*. Although Section 4103(b) permits the President to exclude particular department subdivisions where bargaining is incompatible with national security requirements, he used that section to

exclude entire Departments and Agencies, along with all of their Foreign Service employees, from the statute. The Director of the Office of Personnel Management ("OPM"), Defendant Ezell, then issued *Guidance on Executive Order Exclusions from Federal Labor-Management Programs* ("Guidance") that relies upon the unlawful order to advise agencies on how to engage in further unlawful activity. The Secretary of State and Acting Administrator of USAID, Defendant Rubio, acted upon the unlawful Executive Order and Guidance to remove Foreign Service members from the FSLMRS's coverage.

In so doing, the Defendants inflict immeasurable and irreparable harm upon the Foreign Service members and AFSA, their exclusive bargaining representative. The Defendants deprived the employees of their statutory rights to organize and bargain collectively, which courts have repeatedly found to constitute irreparable harm. The deprivation has concrete, tell-tale signs of such harm in this case. AFSA's elected officers, who represent Foreign Service members on a daily basis, have had their official time (that is, time they could use for representing employees) taken away, which will force those officers to return to the field. Defendants have closed AFSA's offices, where its staff handled the day-to-day representation of employees. AFSA's dues revenue will be terminated on April 18, 2025. These actions were taken against AFSA because of its exercise of its First Amendment rights to free speech and to petition the government through its lawsuits, which, by definition, also constitutes irreparable harm.

But, most importantly, Foreign Service employees have been irreparably injured because they have lost the ability to bargain collectively over a wide range of employment conditions when it matters the most. The Defendants are implementing sweeping changes across State and USAID. The rights to organize and bargain collectively give Foreign Service members a voice in how decisions are implemented and how adverse effects can be mitigated. These rights provide AFSA

with the ability to hold State and USAID accountable when they fall short of their legal obligations. There is no adequate remedy to address this loss because union representation matters in real time. It cannot be recreated after-the-fact when the changes have been implemented and the harms to employees have become irremediable.

Given this irreparable harm, along with its substantial likelihood of success on the merits, AFSA seeks to enjoin the implementation and enforcement of Sections 1(b), 3 and (6) of the Executive Order, as well as the OPM's Guidance on the order. Such an order would preserve what has existed for over half a century: Foreign Service employees having the right to organize and bargain collectively with their employers with respect to employment conditions and to resolve disputes through established procedures. The Defendants will not suffer any injury by simply adhering to that status quo. Moreover, the order will further the public interest, given that Congress has already found the employees' rights to organize and bargain collectively "safeguard[ ] the public interest" and "contribute[ ] to the effective conduct of public business…." 22 U.S.C. § 4101(1)(A) & (B).   Thus, AFSA's requested preliminary injunction satisfies the four factors required by this Circuit's precedent. Accordingly, AFSA respectfully requests that the Court issue the proposed preliminary injunction that accompanies the motion.

## II.    **Statement of Facts**

### A.    **Background on AFSA**

The American Foreign Service Association ("AFSA") was founded in 1924 as a professional association to further the development of Foreign Service members. Declaration of AFSA President Thomas Yazdgerdi ("Yazdgerdi Decl.") ¶ 4. In 1973, AFSA was certified as the exclusive bargaining representative of all Foreign Service members at State and USAID pursuant to Exec. Order No. 11,636, 36 Fed. Reg. 24,901 (Dec. 24, 1971). *Id.*; *see also* Declaration of AFSA

State Vice President Tina Wong ("Wong Decl") ¶ 3; Declaration of AFSA USAID Vice President Randall Chester ("Chester Decl.") ¶ 3. That representation continued when Congress enacted the Foreign Service Act in 1980, in which Congress expressly recognized that "labor organizations and collective bargaining in the [Foreign] service are in the public interest and are consistent with the requirement of an effective and efficient government." 22 U.S.C. § 4101.

AFSA subsequently became the certified representative of Foreign Service members at the Foreign Commercial Service ("FCS"), Foreign Agricultural Service ("FAS"), Animal and Plant Health Inspection Service ("APHIS"), and USAGM. Yazdgerdi Decl. ¶ 4. In 1980, Congress passed the Foreign Service Act ("FSA").

Over the years, AFSA grew to represent over 18,000 Foreign Service members working for State, USAID, FAS, FCS, APHIS and USAGM. Yazdgerdi Decl. ¶ 3. Nearly 12,000 Foreign Service members work at State, Wong Decl. ¶ 5, and another 2,250 members work at USAID, Chester Decl. ¶ 4. AFSA uses its representative status to support the United States Foreign Service, which deploys worldwide to protect and serve America's people, interests, and values. Yazdgerdi Decl. ¶ 8.

AFSA serves as the principal advocate for the long-term institutional wellbeing of the professional career employees in the Foreign Service and safeguards the interests of AFSA members who serve overseas for much of their careers. *Id*. ¶ 7. AFSA advocates through collective bargaining, grievance assistance, and other representational activities as described further in Section II.B, below. This work includes advocacy on behalf of Foreign Service members for federal and state legislation. In light of Congress's longstanding recognition of AFSA's role as the exclusive representative and the "Voice of the Foreign Service," Congressional staff members seek AFSA's opinion on planned or pending legislation. *Id.* AFSA further seeks to increase

understanding among the American people about the vital role of the U.S. Foreign Service in sustaining American global leadership. *Id.* ¶ 8.

Over eighty percent (80%) of the active-duty Foreign Service members – 14,593 of the 17,618 members – voluntarily became dues-paying members of AFSA. Declaration of Asgeir Sigfusson ("Sigfusson Decl.") ¶ 7; Yazdgerdi Decl. ¶ 3. Around 13,478 of the 14,593 members pay their dues through payroll deductions, Yazdgerdi Decl. ¶ 3, which are authorized by the FSLMRS, 22 U.S.C. § 4118(a).

**B.    AFSA's Collective Bargaining Agreements, Duties, and Operations as the Exclusive Representative of Foreign Service Employees**

Congress established in the FSLMRS that the exclusive representative "is entitled to act for, and negotiate collective bargaining agreements covering," all employees in the bargaining unit. 22 U.S.C. § 4113(a). Congress also imposed a duty on both the Foreign Service agencies and the exclusive representative to bargain "in good faith" and enumerated a list of "obligations included in good faith bargaining." *Id.* § 4113(c) & (e).

Pursuant to this statutory mandate and as the officially recognized exclusive representative of Foreign Service members, AFSA has negotiated collective bargaining agreements, referred to as "Framework Agreements," with State and USAID. Yazdgerdi Decl. ¶ 6, Ex. 1 (AFSA-State Framework Agreement) & Ex. 2 (Extension of Framework Agreement), Chester Decl. ¶ 7, Ex. 1 (AFSA-USAID Framework Agreement). These Framework Agreements were in place when President Trump issued Exec. Order No. 14,251 on March 27, 2025.  Yazdgerdi Decl. ¶ 6; Wong Decl. ¶ 7; Chester Decl. ¶ 7. The Framework Agreements outline basic rights and responsibilities of the employees, AFSA, and the agencies. These rights include that of AFSA's presence at formal grievance discussions and investigatory interviews of employees that may result in discipline; that AFSA has the "right to act for and negotiate agreements covering all employees in the unit"; that

AFSA has rights to obtain information for purposes of collective bargaining; and that the parties have the duty to "conduct negotiations and other dealings in good faith and in such manner as will further the public interest." Yazdgerdi Decl., Exs. 1-2 (State Framework Agreement, Art. 4, 5, 7); *see also* Chester Decl., Ex. 1 (USAID Agreement, Art. 4, 5, 7). The Framework Agreements also provide AFSA with the right to use agency facilities, email access, and other resources to transmit communications to members and perform representational activities. Yazdgerdi Decl., Exs. 1-2 (State Framework Agreement, Art. 8-9); *see also* Chester Decl., Ex. 1 (USAID Agreement, Art. 8-9). And, in accordance with 22 U.S.C. § 4118(d), the Framework Agreements provide designated union representatives with official time to perform union representational duties. *See infra* at 9-10.

In addition to the Framework Agreements, AFSA meets with the agencies on a "rolling" or continuous basis, including meeting every two weeks with management at State, to discuss issues affecting the bargaining unit;[2] and where necessary, AFSA engages with State's Chief Labor Management Negotiator about negotiating relevant agreements. Wong Decl. ¶ 8. AFSA similarly met biweekly with USAID management before the Trump administration began dismantling USAID. Chester Decl. ¶ 9. AFSA has negotiated agreements on numerous topics relating to Foreign Service employees' conditions of employment, such as, by way of example, assignment procedures, tenure and promotion procedures, agency-level grievance and discipline procedures, time-in-class and time-in-service rules. Yazdgerdi Decl. ¶¶ 9, 13, Exs. 3, 5; Wong Decl. ¶¶ 13, 15-16, Ex. 1; Chester Decl. ¶ 8. For example, AFSA has negotiated agreements that include

---

[2] In these meetings, AFSA discussed the implementation of Executive Order 14,151, 90 Fed. Reg. 8,339 (Jan. 20, 2025), which ended Diversity, Equity, and Inclusion for government employees, conflicting with negotiated agreements. Wong Decl. ¶ 9. After State refused to negotiate over implementation, AFSA announced that it would take legal action. *Id.*

protections for employees who are subjected to recorded investigatory interviews and agreements regarding promotion procedures. Yazdgerdi Decl. ¶ 9, Ex. 3; Wong Decl. ¶ 13, Ex. 1.

AFSA has also negotiated "safeguard" agreements, which have been in place since the 1970s. Yazdgerdi Decl. ¶ 13, Ex. 5. These agreements ensure that Foreign Service promotions are based strictly on the rankings of selection boards, which consist of career Foreign Service members and members of the public, as required in 22 U.S.C. § 4002(a). *Id.* The safeguard agreements are critical checks on any attempt by management to promote favored employees who were not ranked high enough for promotion and to prevent leadership from skipping over disfavored employees who were recommended for promotion. *Id.* In other words, these agreements prevent politicization of the Foreign Service. *Id.* AFSA also annually negotiates Procedural Precepts for Foreign Service Selection Boards, which govern procedures for the tenure and promotion cycle in detail; and every three years, AFSA negotiates Core Precepts regarding promotion criteria. Wong Decl. ¶ 13, Ex. 1 (Procedural Precepts). These precepts provide predictability, transparency, and fairness for employees seeking tenure or promotions in the Foreign Service "up or out" system. *Id.*; Yazdgerdi Decl. ¶ 13.

AFSA also negotiates procedures governing the assignment process. Yazdgerdi Decl. ¶ 15. AFSA's membership is unique in that Foreign Service employees are assigned to work in more than 200 embassies and consulates across the world. *Id.* ¶ 14. The assignment locations vary dramatically, and are of paramount importance to employees and their families. *Id.* Employees at State typically serve for three-year tours of duty and must bid on new assignments ten months before their tour ends. Wong Decl. ¶ 6. Employees at USAID typically serve in two- to four-year tours of duty and must bid on new assignments six to nine months before their tour ends. Chester Decl. ¶ 5. The assignment procedures allow Foreign Service members to submit bids on positions

that best suit their professional and family needs, while allowing management to select their assignment from those bid lists. Yazdgerdi Decl. ¶ 15. AFSA also has agreements in place for employees to appeal their assignment. *Id.*

In addition to the collective bargaining process, Congress created the Foreign Service Labor Relations Board ("FSLRB"), "established within" the Federal Labor Relations Authority ("FLRA"), to resolve disputes between the union and management, including "complaints of alleged unfair labor practices," "issues relating to the obligation to bargain in good faith," and "disputes concerning the effect, the interpretation, or a claim of breach of a collective bargaining agreement." 22 U.S.C. §§ 4106, 4107. When agencies commit an unfair labor practice prohibited by 22 U.S.C. § 4115(a), AFSA files charges with the FLRA's General Counsel; exceptions to the FLRA's decision can be filed before the FSLRB. 22 C.F.R. §§ 1423.4, 1423.26, 1423.29; *see also* Chester Decl. ¶ 10. Congress has also established that grievances regarding the "effect, interpretation, or a claim of breach of a collective bargaining agreement," shall be resolved in the first instance through procedures negotiated with AFSA, with an appeal to the Foreign Service Grievance Board ("FSGB"). 22 U.S.C. § 4114(a); Declaration of Neera Parikh ("Parikh Decl.") ¶¶ 6. AFSA files these grievances, known as "implementation disputes," when the agencies violate a collective bargaining agreement, and assists with grievances filed directly by members. Chester Decl. ¶¶ 10, 20, Ex. 2; Parikh Decl. ¶¶ 2-4.

Finally, AFSA represents members facing agency investigations into alleged misconduct, disciplinary cases, and security clearance revocations. Yazdgerdi Decl. ¶ 9; Parikh Decl. ¶ 2. Members facing these issues receive legal and other assistance from AFSA at no additional cost (other than their membership dues). Yazdgerdi Decl. ¶ 19.

Under the collective bargaining agreements, six AFSA officers (the President, Vice Presidents for State, USAID, Commerce, Agriculture, and a State Representative) work on 100% official time, *i.e.*, they are employed and paid by the agencies but assigned to work full-time on union representational duties. Yazdgerdi Decl. ¶ 21, Exs. 1-2 (State Framework Agreement, Art. 5, Sec. 3); Chester Decl., Ex. 1 (USAID Framework Agreement, Art. 5, Sec. C). These officers use official time to handle a full workload of tasks involving the representation of members that they could not perform if assigned to full-time Foreign Service work. Yazdgerdi Decl. ¶ 2; Chester Decl. ¶ 15; Wong Decl. ¶¶ 19-20.

### C. AFSA Challenges President Trump's Dismantling of USAID and USAGM by Pursuing Grievances, Filing Lawsuits, and Speaking to the Media.

#### 1. *AFSA's Speech and Petitioning Activity Regarding USAID*

Since January 20, 2025,[3] President Trump has sought to demolish USAID, beginning with Executive Order No. 14,169, 90 Fed. Reg. 8,619 (Jan. 20, 2025). That Executive Order directed an immediate "90-day pause in United States foreign development assistance for assessment of programmatic efficiencies and consistency with United States foreign policy." *Id.* On February 3, AFSA issued a press release criticizing "[t]he abrupt placement of dozens of Foreign Service Officers on administrative leave without notice and proper justification," and "strongly object[ing] to the administration's decision to dismantle" USAID.[4] Soon thereafter, the administration announced it would recall all Foreign Service members working overseas for USAID. AFSA

---

[3] All dates in Section II.C. are in 2025 unless otherwise indicated.

[4] *Press Releases, Statement by AFSA on Decision to Dismantle USAID*, AFSA, https://afsa.org/statement-afsa-decision-dismantle-usaid (last visited April 10, 2025); Sigfusson Decl. ¶ 3.

responded on February 5 with another press release, calling the recall of the Foreign Service members a "reckless move" that "weakens America's presence abroad."[5]

To protect its members' interests, AFSA and another union filed a lawsuit in this Court on February 6 against President Donald Trump, State, USAID, and other governmental defendants. *Am. Foreign Serv. Ass'n et al. v. Trump*, No. 1:25-cv-00352 (Complaint, ECF No. 1). In that suit, AFSA seeks declaratory judgment that President Trump's dismantling of USAID is unconstitutional, as well as injunctive relief directing the defendants to cease shutting down USAID, to reopen the agency, and to recall employees to work. *See id.* at ECF Nos. 51, 51-25.

AFSA continued to speak out against the attacks on Foreign Service employees and the dismantling of USAID by Defendant Trump and his administration. AFSA issued a series of press releases criticizing the President and his administration, including the following:

- On February 22, AFSA criticized Defendant Ezell's requirement that Foreign Service members provide OPM with a weekly summary in "five bullets" of their work during the prior week. "To disparage public servants by making them prove their value through this OPM email exercise does a disservice to them and to the country they love and work tirelessly to represent," the release read. It concluded, "[w]e will not stand by while their careers are threatened. AFSA will vigorously oppose any unlawful effort to terminate or diminish the work and sacrifice of Foreign Service members."[6]

---

[5] *Press Releases, AFSA Statement on Decision to Recall USAID Foreign Service Officers from Overseas Posts*, AFSA, https://afsa.org/afsa-statement-decision-recall-usaid-foreign-service-officers-overseas-posts (last visited April 10, 2025).

[6] *Press Releases, AFSA Stmt. on Email Mandate Re. Fed'l Employees*, AFSA, https://afsa.org/afsa-statement-email-mandate-regarding-federal-employees (last visited April 10, 2025).

- On March 11, AFSA expressed "alarm[]" "that USAID has directed the destruction of classified and sensitive documents that may be relevant to ongoing litigation regarding the termination of USAID employees and the cessation of USAID grants."[7]

- On March 19, AFSA criticized the removal of Diversity, Equity, Inclusion, and Accessibility as factors used in performance evaluation and promotion in the Foreign Service. AFSA noted in its press release noted that the use of these factors had been negotiated in good faith between AFSA and State, and that "any changes to the tenure and promotion system must be subject to collective bargaining, as required by law." [8]

AFSA also has participated in media interviews to ensure that the public understands the attacks on USAID employees. Since January 20, AFSA USAID Vice President Randall Chester has repeatedly spoken to the media and the public about the devastating consequences of dismantling USAID. Chester Decl. ¶ 21. He has appeared in his capacity as a union officer on CNN, PBS, CBS 60 Minutes. *Id.* ¶¶ 21-23.[9] He has also given on the record interviews to Canadian Broadcasting Service, BBC, ABC, and NBC. *Id.* AFSA President Thomas Yazdgerdi similarly appeared for an interview with CNN about the lawsuit seeking to prohibit President Trump from dismantling USAID. Yazdgerdi Decl. ¶ 25.[10] National news media outlets, such as the *New York*

---

[7] *Press Releases, AFSA Stmt. on Reports of USAID Directive to Destroy Classified and Sensitive Docs.*, AFSA, https://afsa.org/afsa-statement-reports-usaid-directive-destroy-classified-and-sensitive-documents (last visited April 10, 2025).

[8] *Press Releases, AFSA Stmt. on DEI For. Svc. Exec. Mem.*, AFSA, https://afsa.org/afsa-statement-dei-foreign-service-executive-memorandum (last visited April 10, 2025).

[9] *See also, e.g.*, *With the Dismantling of USAID, is the Trump Admin. Defying the Const.?*, 60 Minutes, https://www.cbsnews.com/news/usaid-dismantling-trump-60-minutes-transcript/ (last visited April 10, 2025).

[10] *Union Chief on Suing Trump over Massive USAID Changes*, CNN, https://www.cnn.com/2025/02/07/world/video/the-lead-thomas-yazdgerdi-usaid-employees-abroad-union-president-trump-jake-tapper (last visited April 10, 2025).

*Times*, *CNN*, *CBS*, *USA Today*, and *NPR*, among many others, have reported on AFSA's advocacy for its members and its lawsuit over the dismantling of USAID.[11] Many of the dozens of articles on the subject have quoted AFSA's press releases or statements by its officers.[12]

### 2.    *AFSA's Speech and Petitioning Activity Regarding USAGM*

On March 21, AFSA and others filed suit against the administration in the U.S. District Court in the Southern District of New York to enjoin the disbandment of the U.S. Agency for Global Media ("USAGM"), which employs sixteen (16) AFSA-represented Foreign Service members. *See Widakusawara v. Lake*, No. 1:25-cv-02390 (S.D.N.Y). On March 28, U.S. District Judge Oetken issued a temporary restraining order prohibiting "any further attempt to terminate, reduce-in-force, place on leave, or furlough any USAGM employee." *Id.* at ECF No. 54.[13]

As with the administration's efforts to destroy USAID, AFSA has spoken out about the dismantling of USAGM. For example, AFSA issued a press release on March 15 announcing that it would "mount a vigorous defense of USAGM and the Foreign Service professionals whose expertise is indispensable to its mission," which was, in turn, quoted by CNN.[14]

---

[11] *See Press Center*, AFSA, https://afsa.org/press-center (last visited April 10, 2025) (collecting links to news articles referring to AFSA).

[12] *See U.S.A.I.D. Official Orders Emps. to Shred or Burn Classified and Pers. Records*, N.Y. Times, https://www.nytimes.com/2025/03/11/us/politics/usaid-shred-burn-documents.html (last visited April 10, 2025) (quoting press release); *State Dept. Claims It's Sparing Life-Saving Efforts from USAID Cuts, but Some Groups Say It's "Not True"*, CBS News, https://www.cbsnews.com/news/state-dept-massive-usaid-cuts/ (last visited April 10, 2025) (quoting Chester); '*Thank you for Your Service': Trump Admin. Puts USAID Staff on Leave*, https://www.npr.org/2025/ 02/04/nx-s1-5287053/usaid-trump-overseas-withdrawal (last visited April 10, 2025) (quoting press release).

[13] The case subsequently was transferred to the U.S. District Court for the District of Columbia, but the temporary restraining order remains in effect. Case No. 1:25-cv-887-RCL.

[14] *Voice of America Channels fall silent as Trump Admin. Guts Agency and Cancels Contracts*, CNN, https://www.cnn.com/2025/03/15/media/voice-of-america-trump-cuts/index.html (last visited April 10, 2025) (quoting *Press Releases, AFSA Stmt. on the Dismantling of the U.S. Agency for Global Media*, AFSA, https://afsa.org/afsa-statement-dismantling-us-agency-global-media).

**D.**    **President Trump Issues an Executive Order to Exclude AFSA Members from Collective Bargaining in Response to AFSA and Other Federal Employee Unions' Lawsuits.**

On March 27, 2025, President Trump issued an Executive Order terminating federal employees' collective bargaining rights in numerous offices, departments, and agencies across the Executive Branch. Executive Order No. 14,251, *Excl. from Fed'l Lab.-Mgmt. Rels. Programs* (Mar. 27, 2025) (the "Executive Order"). The President invoked § 4103(b) of the FSLMRS in the Executive Order to terminate the collective bargaining rights of all Foreign Service members who work for State and USAID. In so doing, President Trump stripped collective bargaining rights not only from those Foreign Service members, but also from three-quarters of union-represented, federal employees and two-thirds of all federal employees who work for numerous departments and agencies ranging from the Bureau of Land Management to the Department of Veterans Affairs. The broad nature of the exclusions demonstrates that the Executive Order is not based upon a targeted assessment of national security concerns.[15] *Id.*

The White House issued a "Fact Sheet" simultaneously with the Executive Order in which it candidly admits that the President issued the Executive Order to curtail the power of and to punish unions who, like AFSA, have ostensibly "obstructed" the President's efforts to dismantle parts of the Federal government and dismiss large segments of the Federal workforce:

> President Trump is taking action to ensure that agencies vital to national security can execute their missions without delay and protect the American people. The President needs a responsive and accountable civil service to protect our national security.
>
> Certain Federal unions have declared war on President Trump's agenda.

---

[15] *See* Hassan Ali Kanu, *Trump Moves to Strip Unionization Rights from Most Federal Workers*, Politico.com (Mar. 28, 2025), www.politico.com/news/ 2025/03/28/union-rights-federal-workers-donald-trump-00257010.

> The largest Federal union describes itself as "fighting back" against Trump. It is widely filing grievances to block Trump policies.
>
> For example, VA's unions have filed 70 national and local grievances over President Trump's policies since the inauguration—an average of over one a day.
>
> Protecting America's national security is a core constitutional duty, and President Trump refuses to let union obstruction interfere with his efforts to protect Americans and our national interests.
>
> President Trump supports constructive partnerships with unions who work with him; he will not tolerate mass obstruction that jeopardizes his ability to manage agencies with vital national security missions.

White House, *Fact Sheet: President Donald J. Trump Exempts Agencies with Nat'l Sec. Missions from Fed'l Coll. Barg. Reqs*, *available at:* https://www.whitehouse.gov/fact-sheets/2025/03/fact-sheet-president-donald-j-trump-exempts-agencies-with-national-security-missions-from-federal-collective-bargaining-requirements/ (last visited April 1, 2025) ("*Fact Sheet*").

Thereafter, Defendant OPM, through Defendant Ezell, issued a Memorandum to Heads and Acting Heads of Departments and Agencies on March 27, 2025. Relying upon the Executive Order, Ezell instructed the Heads and Acting Heads to: (1) discontinue participation in ongoing and future grievance procedures; (2) disregard existing collective bargaining agreements; (3) prohibit union representatives from using "official time" authorized by statute and collective bargaining agreements for representational purposes; (4) terminate the unions' use of agency resources such as office space; and (5) terminate employees' union dues allotments authorized by statute and collective bargaining agreements. OPM, *Guidance on Exec. Order Exclusions from Fed'l Labor-Mgmt. Programs*, *available at*, https://www.chcoc.gov/content/guidance-executive-order-exclusions-federal-labor-management-programs (last visited Apr. 10, 2025). ("OPM Guidance").

**E.** **Defendants Withdraw Recognition of AFSA and Revoke Collective Bargaining Agreements, Inflicting Harm Upon Both AFSA and its Members.**

On March 31, 2025, the State Department's Chief Labor Management Negotiator, Steven Polson, sent an email to AFSA officers following the OPM Guidance. Acting on behalf of State, Polson repudiated the AFSA's collective bargaining agreement and withdrew recognition of AFSA as the exclusive representative of State's Foreign Service members. Yazdgerdi Decl. ¶ 10, Ex. 4. Polson also wrote that State was immediately ceasing payroll deductions for members' dues; cancelling all recurring meetings with AFSA; ending official time for three AFSA officers who currently perform full-time union duties; encouraging the three officers to pursue other Department assignments; and instructing AFSA to vacate its offices on State's premises by April 4. *Id.* The full text of Polson's email reads:

> On Thursday, March 27, 2025, the President issued an Executive Order (EO), entitled "Exclusions from Federal Labor-Management Relations Programs." In compliance with the EO, effective immediately, the Department hereby terminates the Framework Agreement with AFSA and will no longer recognize AFSA as an exclusively recognized labor organization.
>
> The Department will cease all further payroll dues allotments immediately. Additionally, all recurring meetings between AFSA and the Department are cancelled. Official time for the AFSA President, AFSA State VP, and the additional AFSA representative on 100% official time under the terms of Article 5, Section 3(b) of the Framework Agreement will end at close of business today. We encourage these employees to be in contact with their CDO [Career Development Officers] to pursue appropriate follow-on assignments.
>
> AFSA elections may not proceed using agency space or government equipment (i.e., .gov messaging). AFSA must also remove all material from and vacate AFSA's Department-provided office suite in HST by COB April 4. AFSA's access to the suite will end no later than Friday, April 4.

*Id.*; *see also* Wong Decl. ¶ 12.[16]

---

[16] Although AFSA has not yet heard from USAID, it expects that USAID will rescind its recognition of AFSA and revoke the Framework Agreement in light of the Executive Order and the OPM-issued guidance on it. Chester Decl. ¶ 12.

The foregoing actions have created a catastrophic, existential crisis for AFSA and its Foreign Service membership. Bargaining unit members will lose the protections of their current collective bargaining agreements, as well as the opportunities to bargain through AFSA going forward. Yazdgerdi Decl. ¶¶ 13, 16; Chester Decl. ¶ 13; Wong Decl. ¶¶ 13-14. AFSA will be unable to file implementation disputes for breaches of these agreements, or to intervene in employee grievances challenging agency actions if Defendants refuse to recognize AFSA as the employees' representative. Chester Decl. ¶¶ 10, 20, Parikh Decl. ¶¶ 6, 8. The loss of this representation leaves Foreign Service members particularly vulnerable to Defendant Trump's extreme actions to reshape the federal workforce. Yazdgerdi Decl. ¶¶ 23-24, Chester Decl. ¶¶ 17-19.

The harm to AFSA and its membership has already manifested itself. For instance, AFSA could often resolve employee questions and issues informally at State and USAID by speaking with its agency counterparts and without the need to file a grievance. Wong Decl. ¶ 8; Chester Decl. ¶ 9. State has canceled all meetings to comply with the Executive Order and OPM Guidance, with other agency cancellations likely to follow. If issues cannot be resolved informally, employees will have to utilize the agency grievance systems, which were negotiated with AFSA. The second step of the process involves an appeal to the Foreign Service Grievance Board ("FSGB"). Parikh Decl. ¶ 6. Any employee may file a grievance appeal directly with the FSGB and use their own legal representation for such appeals. 22 U.S.C. § 4133(b).

Nevertheless, the Foreign Service Act provides that "the exclusive representative shall have the right to appear during the grievance proceedings" even when AFSA does not represent the employee. 22 U.S.C. § 4133(b)(2). To ensure that AFSA receives notice of all grievances affecting its members, FSGB's Policies and Procedures previously required parties to copy AFSA and agency representatives on all filings and ensured that AFSA received all FSGB orders and

decisions before they were posted on the Board's webpage. Parikh Decl. ¶ 6, Ex 1. Since the Executive Order, on April 2, 2025, the FSGB declared that it no longer considers AFSA to be the exclusive representative of Foreign Service employees at State and USAID.[17] Papp Decl. ¶ 2, Ex. 1. The FSGB further advised AFSA and grievants in pending cases that, with respect to State and USAID, it has amended its Policies and Procedures to remove the requirement that AFSA be included on pleadings and that AFSA receive advance copies of FSGB orders and decisions. Papp Decl. ¶¶ 2-3, Exs. 1-2; Parikh Decl. ¶ 7. Consequently, AFSA will not receive notice of its members' grievances unless the members request AFSA's assistance with those grievances. If AFSA is unaware of the problems its members are grieving, AFSA cannot ensure Foreign Service employees receive fair and consistent treatment with respect to employment conditions. Parikh Decl. ¶¶ 6, 8.

The FSGB's determinations lay the groundwork for a conclusion that AFSA's collective bargaining agreements with State and USAID are no longer effective, which is what the Defendants seek through the Executive Order. This outcome will affect the one hundred and fifty (150) employee grievances filed this year by USAID Foreign Service members.[18] Parikh Decl. ¶ 4. AFSA has also filed a notable implementation dispute against USAID over the failure to bargain over procedures and appropriate arrangements relating to an upcoming, widescale reduction in force ("RIF"). Chester Decl. ¶ 10, Ex. 2. AFSA also anticipates that more Foreign Service employees will be laid off or terminated by State and USAID in light of the administration's plans

---

[17] The FSGB clarified that AFSA remains the exclusive representative of Foreign Service employees at FCS, FAS, APHIS, and USAGM. Papp Decl. Ex. 1.

[18] AFSA typically handles over 500 grievances per year, with approximately 90 percent of those grievances relating to the Department of State; AFSA therefore is handling an unprecedented number of grievances from USAID at the moment. Parikh Decl. ¶¶ 3-4. This surge in grievances is a direct result of the administration's attack on USAID. *Id.* ¶ 4.

for additional RIFs. Chester Decl. ¶ 18; Yazdgerdi Decl. ¶¶ 23-24. State and USAID will invoke the Executive Order and OPM Guidance to refuse to negotiate procedures or appropriate arrangements for those RIFs. Yazdgerdi Decl. ¶ 23-24. AFSA will be unable to bargain over the effects of the RIFs for its members, who face sudden recalls from foreign assignments and unprecedented job losses, which are very disruptive to members' personal and family lives. *Id.*

The Defendants have also prevented AFSA from representing employees by taking away collectively bargained and statutorily provided resources with little notice. Under the Framework Agreements, the AFSA President, the Vice Presidents for State and USAID, and the State Representative are entitled to 100 percent official time for union duties. *See supra* at 9-10. These officers need that time to represent AFSA's members in collective bargaining and other activities, including legislative advocacy on Capitol Hill. Yazdgerdi Decl. ¶¶ 2, 7; Chester Decl. ¶ 15. But on March 31, the Department of State abruptly ended official time for the union officers it employs, with union officers receiving an email at 4:38 p.m. stating that official time would end at the close of business on that day. Yazdgerdi Decl. ¶ 12, Ex. 4. The loss of official time thwarts union officers' ability to continue representing the AFSA membership, as the officers will have to return to full-time Foreign Service work and not have adequate time for representational activities. Chester Decl. ¶¶ 15-16; Wong Decl. ¶¶ 20-22. The current State VP and State Representative already have returned to full-time Foreign Service work. Wong Decl. ¶¶ 20-22. The current President has no Department assignment in place because he, like other candidates for office in AFSA's upcoming July 2025 election, expected to use official time and did not bid for assignments. After the Executive Order issued, he made the difficult decision to retire because he is unable to find an acceptable assignment on such short notice. Yazdgerdi Decl. ¶¶ 11, 22.

Making matters worse, State also ordered AFSA to vacate its Department-provided office suite by Friday, April 4 and remove all of its materials from the office. Yazdgerdi Decl. Ex. 1. AFSA has forty staff members, including eight attorneys, some of whom who have worked out of the State office for decades. Sigfusson Decl. ¶ 7, Yazdgerdi Decl. ¶ 20. They have documents pertaining to bargaining history and the representation of AFSA members in the office or on their email and other electronic accounts. Sigfusson Decl. ¶¶ 11-12; Yazdgerdi Decl. ¶ 20. AFSA anticipates that State will lock its staff out of the system or disable its staff's .gov email accounts with little or no warning, and that important documents stored on the system may be irretrievably lost. Yazdgerdi Decl. ¶ 20. State will also cut off AFSA's primary revenue stream by ceasing payroll deductions of union dues from members who had authorized those deductions pursuant to 22 U.S.C. § 4118 and the Framework Agreement. *Id.* ¶ 10, Ex. 4.; Wong Decl. ¶ 17. Over ninety percent (90%) of AFSA's dues-paying members (13,478 out of 14,593) pay their dues through deductions. Yazdgerdi Decl. ¶ 3. Member dues constitute approximately 86 percent of AFSA's operational funding. Sigfusson Decl. ¶ 7. Cessation of dues deductions will eventually result in inability to cover costs and layoffs of AFSA staff. *Id.* ¶¶ 9-10.

Finally, the Executive Order has sown confusion amongst AFSA's membership and cast doubt on its ability to represent its members. Even before State announced that it would cease payroll deductions, members wrote to AFSA to cancel their dues deductions, expressing concern that continued membership in AFSA would be "illegal" in light of the Executive Order. Yazdgerdi Decl. ¶ 18. Many members also have asked if AFSA will be able to continue assisting them with ongoing representational matters. Parikh Decl. ¶¶ 5, 7. AFSA anticipates that confusion and loss of support among members will only worsen as time goes by and AFSA loses critical resources.

III.    **Applicable Law**

A.    **The Standard for a Preliminary Injunction**

The standard for a preliminary injunction is four-fold. AFSA must demonstrate that (1) it is likely to succeed on the merits of the action; (2) that it is likely to suffer irreparable harm without an injunction; (3) that the balance of equities tips AFSA's favor; and (4) whether an injunction would serve the public interest." *Doe v. Mattis*, 889 F.3d 745, 751 (D.C. Cir. 2018) (citing *Winter v. Natural Res. Def. Council, Inc.*¸ 555 U.S. 7, 20 (2008)).

B.    **AFSA's Right to Non-Statutory Review of *Ultra Vires* Executive Action**

AFSA seeks a preliminary injunction to enjoin a President's executive order. In this context, the President's authority is neither absolute nor unreviewable. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 645-46 (1952) (Jackson, J. concurring) (The President's "command power is not such an absolute as might be implied from that office in a militaristic system but is subject to limitations consistent with a constitutional Republic whose law and policy-making branch is a representative Congress").

Our Constitution embodies a system of checks and balances between the branches of government. On the one hand, it provides that "[a]ll legislative powers herein granted shall be vested in a Congress of the United States[.]" U.S. Const. art. 1, § 1. On the other hand, it vests the President with Executive power. U.S. Const., art. II, § 3. However, with respect to the executive, the Constitution expressly defines that power by in terms of the President "shall take Care that *the Laws be faithfully executed*[.]" *Id.* (emphasis added). Viewed together, Congress makes the laws and the President faithfully implements them.

When the President disrupts this balance, such as acting in a manner that conflicts with the express or implied will of Congress in a statute, his power is – as Justice Jackson astutely observed

– at its "lowest ebb." *Youngstown Sheet & Tube Co.*, 343 U.S. at 638, 644 (Jackson, J. concurring). "Courts can sustain exclusive presidential control in such a case only by disabling the Congress from acting on the subject. Presidential claim to a power at once so conclusive and preclusive must be scrutinized with caution, for what is at stake is the equilibrium established by our constitutional system." *Id.* In other words, the Constitution mandates a system of checks and balances as a safeguard against the arbitrary exercise of power. *Id.* at 629 (Douglas, J., concurring) ("The doctrine of the separation of powers was adopted by the Convention of 1787 not to promote efficiency but to preclude the exercise of arbitrary power.").

In light of the foregoing, AFSA can seek non-statutory review of *ultra vires* action by the President or any other Defendant in this Court. *Chamber of Commerce v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996). "When an executive acts *ultra vires*, courts are normally available to re-establish the limits on his authority." *Dart v. United States*, 848 F.2d 217, 224 (D.C. Cir. 1988). *See also Washington v. Trump*, 847 F.3d 1151, 1164 (9th Cir. 2017) ("It is beyond question that the federal judiciary retains the authority to adjudicate constitutional challenges to executive action.")

## IV.    **Argument**

This case presents the Court with *ultra vires* action, which takes the form of Executive Order No. 14,251, "Exclusions from Federal Labor-Management Relations Program." As it pertains to AFSA, the President did not faithfully implement the Foreign Service Act ("FSA") when he declared entire AFSA-represented worldwide bargaining units at the Department of State ("State") and United States Agency for International Development ("USAID") to be excluded from the Foreign Service Labor-Management Relations Statute ("FSLMRS"). The Executive Order represents an exercise of authority that is irreconcilable with the action of Congress embodied in 22 U.S.C. §§ 4101-4118. Moreover, as the President's subordinates, such as Defendants Ezell and

22

Rubio, faithfully implement the order, they are inflicting immeasurable and irreparable injury upon both Foreign Service members and AFSA. Given the fundamental policies embodied in the FSLMRS, which Congress declared to be in the public's interest, the balance of harms as well as that public interest weigh heavily in favor of the requested injunctive relief.

A.    **AFSA Has Established a Reasonable Likelihood of Success on the Merits**

1.    ***The President Lacks Authority to Exempt Entire Departments from Coverage of the Foreign Service Labor-Management Relations Statute Because That Action is Tantamount to Repealing the Statute.***

The clear text of 22 U.S.C. § 4103(b), titled "Exclusion of subdivisions," only permits the President to exclude "any *subdivision* of the Department from coverage under this subchapter"[19] whose primary function involves national security work for which the FSLMRS cannot be applied consistently with the national security requirements and considerations. This language does not permit the exclusion of an entire Department. But that is exactly what Defendant Trump did in Executive Order No. 14,251. Section 3 of the Order, which addresses "Foreign Service Exclusions," exempts all ten subdivisions of the State Department (identified in subsection 1-501 (a) through (j)) and all four subdivisions of USAID (identified in subsection 1-502 (a) through (d)) that employ Foreign Service members.

If Congress intended to permit the President to revoke the collective bargaining rights in the entirety of the State Department or USAID, it would have used the same language as found in the corresponding section of the Federal Service Labor Management Relations Statute, also known

---

[19] "Department" is defined in the Subchapter I of the Foreign Service Act, of which the FSLMRS is a part, as the Department of State and any other agency that utilizes the Foreign Service personnel system. 22 U.S.C. § 3902(4). Thus, "Department" as used in § 4103(b) includes the U.S. Agency for International Development.

23

as "Chapter 71," which provides that "[t]he President may issue an order excluding any *agency or subdivision* thereof from coverage under this chapter." 5 U.S.C. § 7103(b) (emphasis supplied).

Subsection 4103(b) cannot be interpreted as permitting the exclusion of the ***entirety*** of State or USAID because it defies both the plain text and Congressional findings that collective bargaining by members of the Foreign Service "safeguards the public interest, contributes to the effective conduct of public business and facilitates and encourages the amicable settlement of disputes" and that "the unique conditions of Foreign Service employment requires a distinct framework for the development and implementation of modern, constructive, and cooperative relationships between management officials and organizations representing members of the Service." 22 U.S.C. §§ 4101(1), (3). The complete termination of AFSA's representation of Foreign Service members within State and USAID cannot be reconciled with Congress's finding that "labor organizations and collective bargaining in the Service are in the public interest and are consistent with the requirement of an effective and efficient Government." 22 U.S.C. § 4101. Congress would never have enacted the FSLMRS had it believed that, as a general rule, collective bargaining by Foreign Service members is inconsistent "with national security requirements and considerations."

As a matter of statutory construction, the authority to exclude particular subdivisions cannot be read to permit the exclusion of everyone covered by the statute because "[a] statutory exemption cannot swallow the rule." *Sinclair Wyoming Ref. Co. LLC v. Env't Prot. Agency*, 114 F.4th 693, 711 (D.C. Cir. 2024); *accord, Cuomo v. Clearing House Assn.,* 557 U.S. 519, 530 (2009); *Pac. Gas & Elec. Co. v FERC*, 113 F.4th 943, 949 (D.C. Cir. 2024). Section 3 of the Executive Order is "in plain disregard of the elementary rule requiring that exceptions from a general policy which a law embodies should be strictly construed; that is, should be so interpreted as not to destroy

24

the remedial processes intended to be accomplished by the enactment." *Spokane & Inland Empire R.R. Co. v. United States*, 241 U.S. 344, 350 (1916).

Judge Contreras's reasoning in *Nat'l Fed. of Fed. Emps. v. McDonald*, 128 F. Supp. 3d 159 (D.D.C. 2015), identifies the risk posed by an expansive reading of an exemption in a collective bargaining statute. The labor act for the Veterans Administration excludes from bargaining proposals that implicate "professional conduct or competence" – defined to include "direct patient care." The VA Secretary refused to bargain over nurses' overtime assignment proposals because they ostensibly concerned "direct patient case." In vacating and remanding the VA Secretary's decision, Judge Contreras wrote:

> [T]he Court expresses its reservations about overly broad constructions of "direct patient care." The purpose of the Department of Veterans Affairs Labor Relations Improvement Act of 1991 was to provide VA healthcare professionals with collective bargaining rights. Against the backdrop of this general rule, the Act created certain exceptions, including one for "direct patient care." But because almost everything a nurse does touches on "direct patient care," construing that phrase to encompass even matters that are peripheral to that issue (or procedural proposals) risks allowing the exception to swallow the rule, thereby undermining the purpose of the statute itself. If any proposals touching on how nurses do their job would be excluded from collective bargaining, then what would be left for unions and the VA to bargain over?

128 F. Supp. 3d at 172 (internal citation omitted).

President Trump based his determination to exclude all Foreign Service members from the coverage of the FSLMRS on nothing more than a belief that collective bargaining and the contractual obligations that flow from it are *per se* threats to national security. In the so-called "Fact Sheet" issued simultaneously with the Executive Order, the White House stated that collective bargaining "is dangerous in agencies with national security responsibilities" because "Agencies cannot modify policies in collective bargaining agreements until they expire" and "Agencies cannot make most contractually permissible changes until after finishing 'midterm'

bargaining."[20] These statements are contrary to Congressional findings contained in the first section of the FSLMRS, 22 U.S.C. § 4101, and ignore both the strict limits that Congress placed on the scope of collective bargaining and the preservation of management's prerogatives. The "Management's Rights" section of the statute exempts from bargaining and preserves the State Department's and USAID's authority

> to determine the mission, budget, organization, and internal security practices of the Department, and the number of individuals in the Service or in the Department;

> to hire, assign, direct, lay off, and retain individuals in the Service or in the Department, to suspend, remove, or take other disciplinary action against such individuals, and to determine the number of members of the Service to be promoted and to remove the name of or delay the promotion of any member . . .

> to conduct reductions in force, and to prescribe regulations for the separation of employees pursuant to such reductions in force  . . .

> to assign work, to make determinations with respect to contracting out, and to determine the personnel by which the operations of the Department shall be conducted;

> to fill positions from any appropriate source;

> to determine the need for uniform personnel policies and procedures between or among the agencies to which this subchapter applies;

> and to take whatever actions may be necessary to carry out the mission of the Department during emergencies.

22 U.S.C. § 4105(a). Furthermore, agencies may make changes before completing bargaining when necessary to the functioning of the agency. *Nat'l Treasury Emps. Union and Dept. of Treasury, IRS,* 64 F.L.R.A. 127, 129-30 (2009).[21]

---

[20] https://www.whitehouse.gov/fact-sheets/2025/03/fact-sheet-president-donald-j-trump-exempts-agencies-with-national-security-missions-from-federal-collective-bargaining-requirements/ (last visited April 10, 2025).

[21] The Foreign Service Labor Relations Board's decisions must be consistent with the Federal Labor Relations Authority's decisions unless special circumstances require otherwise. 22 U.S.C. § 4107(b).

2.    *The Presumption of Regularity has been Rebutted by the Timing and Broad Scope of the Exclusions and by the President's own Words.*

There is a *rebuttable* presumption of regularity when a president determines that an agency or its subdivision is excluded from coverage pursuant to the national security exemption. *American Fed'n of Govt. Emps. v. Reagan*, 870 F.2d 723, 728 (D.C. Cir. 1989) ("*AFGE*"). This presumption can be rebutted by demonstrating that the President "was indifferent to the purposes and requirements of the Act, or acted deliberately in contravention of them." *Id.* at 728. In this case, the President's own words and deeds demonstrate that the exclusions were not a *bona fide* determination that the FSLMRS cannot be applied to the members of the Foreign Service "in a manner consistent with national security requirements and considerations."

Foreign Service members have collectively bargained for over a half-century "consistent with national security." In 1971, President Nixon issued an Executive Order, which formally granted union recognition and collective bargaining rights to the Foreign Service, finding that "the effective participation by the men and women of the Foreign Service in the formulation of personnel policies and procedures affecting the conditions of their employment is essential to the efficient administration of the Foreign Service." Exec. Order No. 11636, 36 Fed. Reg. 24,901 (Dec. 24, 1971).  Section 3(b) of the Executive Order permitted the head of a foreign affairs agency to suspend any provision of the Order "with respect to any post, bureau, office, or activity, in the United States or abroad … in emergency situations" when "necessary in the national interest." 36 Fed. Reg. at 24903. The record of the hearings which led to the enactment of the Foreign Service Act of 1980 (of which the FSLMRS is a part) contains a section-by-section analysis provided by AFSA which noted that "no agency head has felt the need to suspend any provision of Executive Order 11636 with respect to any element of this agency since the Order took effect in 1971, a period which has included several wars, evacuations, and other emergency situations." The

27

Foreign Svc. Act, H.R. 4674, Hearings before the Subcomm. on Inter. Ops. and Subcomm. on Civil Service, 96th Cong., 1st Sess., at 132 (1979).

The FSLMRS was based on and replaced Exec. Order No. 11636. Shortly after its enactment, the State Department considered whether any of its subdivisions should be excluded under the national security exemption contained in § 4103 of the Foreign Service Act. State concluded that there was no basis to exclude anyone. In a June 17, 1981 letter to AFSA, the Department of State wrote:

> Although section 1003(b) of the Act provides that the President may exclude any subdivision from coverage under Chapter 10, management has decided such a Presidential action would be unnecessary in implementing the Act.

Papp Decl. ¶ 4, Ex. 3.

Through ten presidencies (including the first Trump administration), seventeen Secretaries of State, along with twenty-one Administrators and acting Administrators of USAID, have recognized and bargained with the American Foreign Service Association. This bargaining has occurred during the Viet Nam War, the Cold War, and the fall of the Soviet Union, 9/11 and the War on Terror, as well as during the war in Afghanistan, the longest war the United States has ever fought. Nothing has changed, other than America is now at peace.

The sheer breadth of the exclusions contained in the March 27 Executive Order demonstrates that the President "was indifferent to the purposes and requirements of the Act, or acted deliberately in contravention of them." (*AFGE*, *supra*.) when he issued it. Before the Executive Order at issue here, no President had ever used the Statute's narrow national security exemption in Sections 7103(b)(1) or 4103(b) to exempt an entire Cabinet-level agency from the Statute. But this Executive Order exempts *six*, nearly one-half of all Cabinet-level agencies. President Trump's Executive Order strips collecting bargaining rights from three-quarters of the

28

federal employees who are currently represented by federal sector unions and over ninety-seven percent (97%) of the Foreign Service members in the bargaining unit represented by AFSA.[22] *Id.*; Yazdgerdi Decl. ¶ 3; Wong Decl. ¶ 5; Chester Decl. ¶ 4.

The President may not have been obligated to explain the reasons why he issued these exemptions. *AFGE*, 870 F.2d at 727. Nonetheless, he said the quiet part out loud – his motivation was simple anti-union animus, which is sufficient to rebut the presumption of regularity. *See Hartman v. Moore*, 547 U.S. 250, 263-264 (2006) (observing, in the context of the "longstanding presumption of regularity according to prosecutorial decision-making," that "[a] prosecutor's disclosure of retaliatory thinking on his part, for example, would be of great significance in addressing the presumption…."). *See also Wendt Corp. v. NLRB*, 26 F.4th 1002, 1010-11 (D.C. Cir. 2022) (quoting *Parsippany Hotel Mgmt. Co. v. NLRB*, 99 F.3d 413, 323 (D.C. Cir. 1996) for "[a] company's open hostility toward union activity," which included a manager's anti-union speech, was "clearly sufficient to establish anti-union animus on the part of the company").

The White House issued "Fact Sheet" explains – if not boasts – that the President terminated collective bargaining relationships with certain Federal unions, like AFSA, because they were "hostile" and because their actions were "dangerous" and "obstruct[ed] agency management." The fact sheet criticized the very act of collective bargaining by complaining that "agencies cannot modify policies in collective bargaining agreements (CBAs) until they expire." The fact sheet also complained that "[c]ertain Federal unions have declared war on President Trump's agenda" and that unions at the Veterans Administration had "filed over 70 national and local grievances over President Trump's policies since the inauguration," none of which ostensibly

---

[22] Erich Wagner, *Trump order aims to outlaw most gov't unions on 'national security" grounds*, Govt. Exec., March 27, 2025. https://www.govexec.com/workforce/2025/03/trump-order-aims-outlaw-most-government-unions-national-security-grounds/404113/ (last visited April 2, 2025).

implicated or impeded national security concerns. "President Trump refuses to let union obstruction interfere with his efforts," the fact sheet preened.

And the White House "Fact Sheet" does not stand alone in revealing the President's true motivations. Immediately following issuance of the Exclusion Order, a White House spokesperson confirmed that the Order was designed to cripple unions who were opposing the President's policies: "The goal [of the Exclusion Order] is to stop employees in certain security-related agencies from unionizing *in ways that disrupt the president's agenda*."[23]

The "Fact Sheet" also explained why not all unions lost their collective bargaining rights. "President Trump supports constructive partnerships with unions who work with him; he will not tolerate mass obstruction." In fact, the Executive Order selectively excluded from exemption police and firefighter unions. See Section 2, 1-499. The Fraternal Order of Police and other police unions endorsed President Trump for election in 2024.[24] The International Association of Fire Fighters ("IAFF") withheld an endorsement sought after by his opponent.[25] And, most notably, the U.S. Customs and Border Protection was *not* included among the numerous agencies and subdivisions of the Department of Homeland Security that were excluded from coverage of the labor statute. See Section 2, subsection 1-407. The CBP union also endorsed the President in last

---

[23] Rebecca Davis O'Brien, *Trump Order Could Cripple Fed'l Worker Unions Fighting DOGE Cuts*, New York Times, https://www.nytimes.com/2025/03/29/us/politics/federal-worker-unions-doge.html (Mar. 29, 2025) (emphasis added).

[24] *See* Frat. Order of Police, https://fop.net/2024/09/fop-endorses-trump/. *See also* Martin Kaste, *Police Welcome Trump's Return to the White House*, NPR, https://www.npr.org/2024/11/14/nx-s1-5183142/police-welcome-trumps-return-to-the-white-house (last visited April 2, 2025).

[25] Alexandra Marquez and Nnamdi Egwuonwu, *Firefighters Union IAFF Declines to Endorse a Candid.* https://www.nbcnews.com/politics/2024-election/firefighters-union-iaff-declines-endorse-presidential-candidate-rcna173918 (last visited April 2, 2025). The firefighters in IAFF locals on military bases retain their collective bargaining rights, but teachers in the Department of Defense dependent schools on those bases, who are represented by unions who are not supportive of the President's policies and who endorsed his opponent, do not. Exec. Order 14,251, Sec. 2.

year's election.[26] If those who are guarding the border do not have national security as a primary mission, then none of the employees excluded do. Thus, there can be no doubt that whether your union retains continued recognition depends not on whether it is consistent with national security requirements, but rather whether it is compliant and supportive of the President and his agenda.

### 3. President Trump revoked AFSA's Collective Bargaining Rights in Retaliation for the Exercise of its First Amendment Right to Oppose the President's Policies in the Courts and in the Press.

Although it was an overstatement, the White House was referring to AFSA in the "Fact Sheet" when it claimed that "[c]ertain Federal unions have declared war on President Trump's agenda." That agenda has included dismantling Foreign Service agencies and politicizing the Foreign Service, both of which AFSA has vigorously and vociferously opposed in the press and in the courts. *See supra* at pages 10-13; Yazdgerdi Decl. ¶ 26; Chester Decl. ¶¶ 21-23. The statement in the Fact Sheet that "President Trump refuses to let union obstruction interfere with his efforts" is an admission that he invoked the national security exemption in retaliation for the constitutionally protected activities of AFSA and other unions. *See supra* at pages 14-15.

The unnecessary invocation of the national security exemption to disable AFSA was not the President's first retaliatory attack on what he views as a disloyal Foreign Service. Immediately after his inauguration, President Trump began a wholesale assault on Foreign Service members and their work. Within days after AFSA obtained a temporary restraining order halting the placement of USAID employees on administrative leave and expedited evacuation of USAID employees overseas in *Am. Foreign Serv. Ass'n et al. v. Trump*, No. 1:25-cv-00352 (D.D.C.), President Trump issued another Executive Order, "One Voice for America's Foreign Relations," to

---

[26] American Presidency Project, https://www.presidency.ucsb.edu/documents/trump-campaign-press-release-national-border-patrol-council-endorses-president-trump-joe/

reshape the Foreign Service into a compliant "workforce of patriots." Exec. Order No. 14211, 90 Fed. Reg. 9831 (Feb. 18, 2025). This Order directed the Secretary of State to revamp the recruiting, performance, evaluation, and retention standards for the Foreign Service to ensure their fealty to the President. *Id.,* Sec. 5. The Order warns that "[f]ailure to faithfully implement the President's policy is grounds for professional discipline" and that the Secretary of State could choose to refer any offenders in the Foreign Service directly to the President in lieu of customary discipline. *Id.,* Sec. 2, 4. According to the *New York Times*, "[t]his Executive Order challenges the basic and longstanding Foreign Service principles: *viz.*, that career diplomats should be hired based on their qualifications and expertise, not their political views, and that dissent should be welcomed and not punished." The *Times* quoted AFSA in its reporting as saying that AFSA would "always defend the integrity and nonpolitical nature of the Foreign Service so that our members can continue to serve the American people."[27]

The White House's knowledge of the union's activities, its avowed hostility toward Federal employee unions, and the timing of his actions all demonstrate the President's retaliatory motive. *See Power, Inc. v. NLRB,* 40 F.3d 409, 418 (D.C. Cir. 1994).

Not only does AFSA have a right to criticize the President and his policies in the press, but the First Amendment protects its right to sue the President. "[T]he right of access to courts for redress of wrongs is an aspect of the First Amendment right to petition the government." *Sure–Tan, Inc. v. NLRB,* 467 U.S. 883, 896–897 (1984); *see also BE & K Constr. Co. v. NLRB,* 536 U.S. 516, 525 (2002); *Bill Johnson's Restaurants, Inc. v. NLRB,* 461 U.S. 731, 741 (1983); *California Motor Transp. Co. v. Trucking Unlimited,* 404 U.S. 508, 510 (1972). "Generally speaking,

---

[27] New York Times, https://www.nytimes.com/2025/02/12/us/politics/trump-foreign-service.html (last visited April 10, 2025).

the First Amendment guarantees the fundamental right to file a lawsuit, as well as to engage in constitutionally protected speech." *Campagna v. Mass. Dep't of Envtl. Prot.,* 206 F. Supp. 2d 120, 124 (D. Mass. 2002), *aff'd*, 334 F.3d 150 (1st Cir. 2003).

And the First Amendment protects "not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right." *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000). "[R]etaliation by the government that is motivated, at least in part, by a lawsuit or constitutionally protected speech may violate the First Amendment." *Fabiano v. Hopkins*, 245 F. Supp. 2d 305, 310 (D. Mass.), *aff'd,* 352 F.3d 447 (1st Cir. 2003), *quoting Campagna, supra.* Additionally, the President engaged in prohibited viewpoint discrimination by failing to exempt those unions with whom he has "constructive partnerships" and "who work with him" (*Fact Sheet*, *supra*); *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995) ("The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction.")

### B.    AFSA and its Membership Will Suffer Irreparable Harm

The second element of the standard focuses on whether AFSA will suffer irreparable harm without preliminary relief. *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008). "An irreparable harm is an imminent injury that is both great and certain to occur, and for which legal remedies are inadequate." *Beattie v. Barnhart*, 663 F. Supp. 2d 5, 9 (D.D.C. 2009).

### 1.    *The Defendants' Withdrawal of Recognition and Repudiation of the Framework Agreements Inflicts Irreparable Harm Upon AFSA and Foreign Service Members.*

Courts have recognized, in both the private and the public sector, that harms caused to employees by the loss of their rights to bargain collectively, as well as the harms caused to their

exclusive bargaining representative, are both immeasurable and irreparable. *NLRB v. Electro-Voice, Inc.*, 83 F.3d 1559, 1573 (7th Cir. 1996); *SEIU Health Care Michigan v. Snyder*, 875 F. Supp. 2d 710, 723-24 (E.D. Mich. 2012); *Levine v. C & W Mining Co.*, 465 F. Supp. 690, 694 (N.D. Ohio), *aff'd in relevant part, modified in other part*, 610 F.2d 432 (6th Cir. 1979). This case provides textbook examples of such harm.

As noted earlier, Congress explained the importance of these broad rights to organize and bargain collectively in the opening section of the FSA's labor management provisions:

> … experience in both private and public employment indicates that the statutory protection of the right of workers to organize, bargain collectively, and participate through labor organizations of their own choosing in decisions which affect them –
>
> (A)    safeguards the public interest,
>
> (B)    contributes to the effective conduct of public business, and
>
> (C)    facilitates and encourages the amicable settlement of disputes between workers and their employers involving conditions of employment….

22 U.S.C. § 4101(1)(A)-(C). In light of this experience, Congress found that "labor organizations and collective bargaining in the [Foreign] Service are in the public interest and are consistent with the requirement of an effective and efficient Government." 22 U.S.C. § 4101.

The "experience in both private and public employment," 22 U.S.C. § 4101, explains much more than the intrinsic value of the rights to organize and bargain collectively. It also gives a universal lesson about the nature and extent of the harm that arises when any employer wrongfully deprives employees of their statutory rights by withdrawing recognition from their exclusive bargaining representative and repudiating their collective bargaining agreements.

This lesson teaches that the resulting harm is immeasurable. Take, for example, the National Labor Relations Act ("NLRA"), which Congress passed to provide private sector

employees with the rights to organize and bargain collectively. 29 U.S.C. §§ 151, 157. The NLRA also established the National Labor Relations Board ("Board") to protect those rights. 29 U.S.C. §§ 153, 157, 158, 160. "Out of its wide experience, the Board many times has expressed the view that the unlawful refusal of an employer to bargain collectively with its employees' chosen representatives disrupts the employees' morale, deters their organizational activities, and discourages their membership in unions." *Frank Bros. Co. v. NLRB*, 321 U.S. 702, 704 (1944). *See also Int'l Union of Elec., Radio and Mach. Workers v. NLRB*, 426 F.2d 1243, 1249 (D.C. Cir. 1970) ("*IUE*") ("Employee interest in a union can wane quickly as working conditions remain apparently unaffected by the union or collective bargaining").

The withdrawal of recognition from a union and the failure to bargain in good faith deprives employees of the opportunity to resolve issues affecting their working conditions. *Small v. Avanti Health Sys., LLC*, 661 F.3d 1180, 1191 (9th Cir. 2011) ("a failure to bargain eliminates the possibility that the union will negotiate a collective bargaining agreement as long as that failure continues"). An exclusive bargaining representative is "essential" to enabling employees "to deal on an equality with their employer." *NLRB v. Jones & Laughlin*, 301 U.S. 1, 33 (1937). The representative unifies the employees' collective voice, through which the employees negotiate changes in working conditions and their employment in real time. *Avanti Health Sys., LLC*, 661 F.3d at 1192. "The value of the right to enjoy the benefits of union representation is immeasurable in dollar terms once it is delayed or lost." *Levine v. C & W Mining Co.*, 465 F. Supp. at 694 (N.D. Ohio). *See also Electro-Voice, Inc.*, 83 F.3d at 1573 ("The deprivation to employees from the delay in bargaining and the diminution of union support is immeasurable."); *Asseo v. Centro Medico Del Turabo*, 900 F.2d 445, 455 (1st Cir. 1990) ("there was a very real danger that if Turabo continued

to withhold recognition from the Union, employee support would erode to such an extent that the Union could no longer represent those employees").

Applying the foregoing experience to the facts of this case, the Defendants have inflicted immeasurable harm upon AFSA and Foreign Service members. The President issued an Executive Order that strips over ninety-seven percent (97%) of Foreign Service members represented by AFSA of their rights to organize and bargain collectively under the FSLMRS. OPM Director Ezell issued guidance to Departments and agencies with respect to the implementation of the EO. That guidance propelled those Departments, *i.e.*, State and USAID, to deprive Foreign Service members of their statutory rights to AFSA representation. This deprivation manifests itself in three distinct ways.

First, State expressly communicated to AFSA that it withdrew recognition from AFSA and terminated the Framework Agreements with AFSA, effective immediately. Yazdgerdi Decl. ¶ 10; Wong Decl. ¶ 12. As recounted in Section II.A above, Foreign Service members have exercised their rights to organize and be represented by AFSA since 1973. Yazdgerdi Decl. ¶ 4; Chester Decl. ¶ 3; Wong Decl. ¶ 3. AFSA represents over seventeen thousand (17,000) Foreign Service members who work for State and USAID. Wong Decl. ¶ 5; Chester Decl. ¶ 4. It has negotiated Framework Agreements with these Departments and Agencies that establish the terms by which AFSA represents the Foreign Service members. Yazdgerdi Decl. ¶ 6; Chester Decl. ¶ 7; Wong Decl. ¶ 7. AFSA further negotiates with State and USAID on a continuing basis over Foreign Service members' conditions of employment. Yazdgerdi Decl. ¶ 9; Chester Decl. ¶ 9; Wong Decl. ¶¶ 8. These negotiations cover a wide range of Foreign Service members' employment including but not limited to assignment procedures, tenure and promotion board procedures, agency-level grievance procedures, time-in-class and time-in-service rules and disciplinary procedures.

Yazdgerdi Decl. ¶ 9. *See also* Chester Decl. ¶ 7; Wong Decl. ¶¶ 8-9, 13, 15-16. All this work, created and maintained over decades, is lost when recognition is withdrawn.

By unlawfully freeing themselves of the duty to recognize and bargain with AFSA, the Defendants can act unilaterally with respect to Foreign Service members' working conditions. For example, at USAID, the Defendant has been implementing changes in working conditions. Chester Decl. ¶¶ 10, 17-19; Yazdgerdi Decl. ¶ 24. AFSA has been seeking to bargain with USAID on many issues, such as, by way of example, annual performance reports, recall of Foreign Service employees from overseas assignments, and the ongoing reductions in force. *Id.* Prior to the Executive Order, USAID had to deal with AFSA and bargain in accordance with the applicable provisions of the FSA. After the order, USAID does not even speak with AFSA about any of these issues. The Foreign Service members lost their unified voice through which they could bargain collectively over the current changes to their employment conditions. Such a loss is especially felt with changes that could determine whether the Foreign Service members will continue to have a career. Yazdgerdi Decl. ¶¶ 23-24; Chester Decl. ¶¶ 17-18.

Similar scenes will play out at State, which has withdrawn recognition from AFSA. For example, Defendant State will be able to rewrite the frameworks, processes, and guidelines that govern tenure and promotion processes of Foreign Service members. Yazdgerdi ¶¶ 13, 15-16, 23; Wong Decl. ¶¶ 13-14. All of these changes involve matters that AFSA previously negotiated with State. Foreign Service members would lose the ability to have input, through AFSA, on these vital matters while the Defendants refuse to recognize and adhere to their duty to bargain in good faith. *Avanti Health Sys., LLC*, 661 F.3d at 1192.

Second, the Defendants have taken additional steps to weaken AFSA by, among other things, ending official time for its officers and ceasing all payroll dues allotments. Yazdgerdi Decl.

¶¶ 10-11 & Ex. 4; Sigfusson Decl. ¶¶ 7, 8. AFSA's officers receive official time pursuant to their Framework Agreements, which enables them to represent employees during the workday. *See supra* at 9-10. By taking away their official time, the Defendants force AFSA's officers to return to their work assignments. Wong Decl. ¶ 20; Yazdgerdi Decl. ¶¶ 10-11. The Defendants also prevent AFSA's officers from representing employees and advocating for legislation before Congress during the workday. Wong Decl. ¶ 20; Chester Decl. ¶ 15. This is a legitimate and permissible use of official time. *See Dep't of the Army, Corps of Eng'rs, Memphis Dist.*, 52 F.L.R.A. 920, 933 (1997); *Nat'l Fed. of Fed'l Empls. Local* 122, 47 F.L.R.A. 1118, 1124 (1993). Similarly, the termination of dues allotment will further weaken AFSA, which relies upon such dues to pay for approximately eighty-six percent (86%) of its overhead costs, including staff salaries. Sigfusson Decl. ¶¶ 7, 9-10. Moreover, the evidence shows that AFSA faces a loss of confidence from its members, who are questioning whether union representation is available, and even terminating their dues based on the belief that it is unlawful to participate in union representation. Parikh Decl. ¶¶ 5, 7.

The sustained loss of this income represents more than the garden-variety economic harm; it constitutes the type of "crippling losses" that threaten AFSA's future as a labor organization. *Wilmer Cutler Pickering Hale & Dor v. Executive Office of the President*, Civ. Case No. 25-cv-917, 2025 WL 946979, at *1 (D.D.C. Mar. 28, 2025) ("While economic loss does not always warrant a TRO, this is not a typical situation because plaintiff faces more than economic harm – it faces crippling losses and its very survival is at stake"). Without the dues allotment, AFSA may need to lay off its professional staff, many of whom have years and decades of experience representing Foreign Service members. Yazdgerdi Decl. ¶ 18; Sigfusson Decl. ¶¶ 9-10. The ripple effects caused by the loss of dues reinforces the immeasurability of this harm.

Third, the Defendants are seeking to enforce the executive order during AFSA's *ongoing* election of officers, thereby interfering with the Union's internal processes. The Defendants specifically target those elections, stating in their March 31, 2025 email that, "AFSA elections may not proceed using agency space or government equipment (i.e. .gov messaging)." Yazdgerdi Decl. ¶ 10, Ex. 4. *See also* Yazdgerdi Decl. ¶ 22; Chester Decl. ¶ 16. The loss of official time, as discussed above, may impact who will choose to serve in AFSA's officer positions, because representational duties would have to be completed after working hours rather than during the workday. Chester Decl. ¶ 16. Such a loss of candidates for office would undermine any ability of AFSA to represent its employees when it prevails on the merits of its complaint.

The immeasurability of the foregoing harms that the Defendants have inflicted upon AFSA and Foreign Service members is overshadowed by the *irreparability* of those harms. *Avanti Health Sys., LLC*, 661 F.3d at 1191; *Electro-Voice, Inc.*, 83 F.3d at 1573; *Centro Medico Del Turabo*, 900 F.2d at 455. Collective bargaining derives its value when a union addresses, bargains and resolves issues in real time, because that is when it matters the most to the employees. *Avanti Health Sys., LLC*, 661 F.3d at 1191-92. *See also League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 8 (D.C. Cir. 2016) (explaining that an organization is harmed when the defendant's actions have "perceptively impaired the organization's programs and those actions directly conflict with the organization's mission"). It does nothing for Foreign Service members who have been laid off due to a reduction-in-force or who have had their assignments changed unilaterally to have their AFSA representation restored days, weeks, or months *after* the fact. A final decision on the merits by this Court may restore their exclusive bargaining representative going forward, but it will not address the lost ability to negotiate at the time when those layoffs or assignment changes took place. Nor will it remedy the lost opportunities to meet with the employer to proactively resolve grievances,

to intervene in grievance appeals for the benefit of AFSA's overall membership, to advocate for legislation as the exclusive representative, or to engage in other representational activities.

Even if AFSA ultimately prevails on the merits, the absence of injunctive relief *pendente lite* "may have cut the employees off from the union long enough to make it nearly impossible for the union to return." *Kinney v. Cook County School Bus, Inc.*, No. 00 C 2042, 2000 WL 748121, at *9 (N.D. Ill. 2000). The Defendants would be the real winners, "who may reap a second benefit" from their *ultra vires* conduct: a "union [that] is gone or … too weak to bargain effectively." *IUE*, 426 F.2d at 1249. *See also Bloedorn v. Francisco Foods, Inc.*, 276 F.3d 270, 299-300 (7th Cir. 2001) (noting how the passage of time while an employer refuses to bargain weakens a union when it is restored to its prior position, allowing the employer to still achieve its improper objective).

Findings of irreparable harm resulting from the loss of collective bargaining are not limited to the private sector; courts have found the irreparability of such harm in the public employee and other contexts as well. *Donohue v. Mangano*, 886 F. Supp. 2d 126, 152 (E.D.N.Y. 2012) ("Bargaining units such as the CESA can no longer represent their members in any meaningful way now that any negotiated provision they have endeavored to secure in the past can instantly be reduced to a nullity"); *SEIU Health Care Michigan*, 875 F. Supp. 2d at 723-24 ("By mandating that state officials refuse to recognize Plaintiff as a union representative and refuse to withhold union dues and fees, Plaintiff will be irreparably harmed by being deprived its contractual rights, its ability to advocate and bargain for its members, and the loss of revenue to operate effectively and exercise its First Amendment rights during an important time…").

> ### 2.   *The Executive Order Irreparably Harms the First Amendment Rights of AFSA and Foreign Service Employees*

Both the Supreme Court and the U.S. Court of Appeals for the District of Columbia Circuit recognize that an injury to any First Amendment right satisfies the irreparable harm requirement

for purposes of obtaining injunctive relief. *Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury"); *Davis v. District of Columbia*, 158 F.3d 1342, 1346 (D.C. Cir. 1998) ("Although a plaintiff seeking equitable relief must show a threat of substantial and immediate irreparable injury, a prospective violation of a constitutional right constitutes irreparable injury for these purposes"). AFSA can satisfy this burden by showing "First Amendment freedoms [that] are actually lost," or that "imminently will be." *Bailey v. Fed'l Bur. of* Prisons, No. 24-1219, 2024 WL 3219207, at *9 (D.D.C. Jun. 28, 2024). The Defendants' conduct inflicts irreparable harm upon the First Amendment rights of AFSA and Foreign Service members in two distinct ways.

First, President Trump issued Exec. Order No. 14,251 to retaliate against AFSA because of its exercise of its First Amendment rights of free speech and petitioning the government. As set forth in the Statement of Facts, AFSA has vocally opposed the Administration's attacks upon the Foreign Service in the press and the courts. *See supra*, Section II.C. *See also* Chester Decl. ¶¶ 21-23 (describing numerous interviews on news networks about the devastating toll of the Administration's actions upon USAID and its Foreign Service members). AFSA has filed two lawsuits, prior to this one, against the Administration protesting the unlawful dismantling of Foreign Service agencies and/or the mass reduction in Foreign Service members. The White House noted, in conjunction with the issuance of the Executive Order, that "[c]ertain Federal *unions* have declared war on President Trump's agenda" and that the Civil Service Reform Act (of which the FSLMRS is part) "enables hostile Federal unions to obstruct agency management." White House, *Fact Sheet*. President Trump used his Executive Order to retaliate against those unions, like AFSA, for their representation of Federal employees adversely affected by the administration's actions.

Second, by retaliating against AFSA, President Trump has also inflicted irreparable harm to the First Amendment rights of AFSA and Foreign Service members in connection with union representation. The Supreme Court has recognized that the right to organize and bargain collectively involve conduct and speech that falls within the scope of the First Amendment rights of free speech and free assembly. *Thomas v. Collins*, 323 U.S. 518, 532 (1945). Foreign Service members lose these rights as long as they are wrongfully excluded from the FSLMRS's coverage by the Defendants. The loss of official time, as well as being forced into the field (*see supra* IV.B.1), will inflict harm AFSA and its leadership's First Amendment rights to speak and advocate on behalf of themselves and Foreign Service employees, whether at the bargaining table or in a dispute resolution process. *Elrod*, 427 U.S. at 373. This loss coincides with a period of time where major changes are taking place with respect to their employment, and, as discussed above, when union representation is most important. *SEIU Health Care Michigan*, 875 F. Supp. 2d at 724-25.

## C.    The Balance of Equities Favors AFSA and the Public Interest Will Be Served by the Issuance of an Injunction

The remaining elements of the preliminary injunction standard "merge when, as here, the Government is the opposing party." *Singh v. Berger*, 56 F.4th 88, 107 (D.C. Cir. 2022) (quoting *Karem v. Trump*, 960 F.3d 656, 668 (D.C. Cir. 2020)). Both the balance and equities and the public interest unquestionably support the issuance of injunctive relief in this case.

First, the balance of the equities strongly favors granting injunctive relief in favor of AFSA. In stark contrast to the irreparable harm set forth in subsection B that will befall AFSA, the Defendants will not be injured by an injunction maintaining the status quo as it has been for the past five decades, including the first term of the current President. Injunctive relief will preserve the Framework Agreements, memoranda of understanding and other agreements that have guided the parties with respect to the working conditions of Foreign Service members. It will also permit

the dispute resolution processes established by the Foreign Service Act ("FSA") – namely, the Foreign Service Labor Relations Board and the Foreign Service Grievance Board – to continue operating as normal, resolving disputes between employer, union and/or worker as contemplated in Section 1 of the FSA. Therefore, the balance of harms tilts strongly toward the AFSA.

Second the public interest unquestionably supports injunctive relief. The FSLMRS recognizes that the right to organize and bargain collectively safeguard the public interest. 22 U.S.C. § 4101. The FSLMRS goes one step further to find that *unions*, like AFSA, are in the public interest. *Id.* Injunctive relief that preserves the status quo, the continuation of collective bargaining and union representation clearly furthers the public interest.

By contrast, "[t]here is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters*, 838 F.3d at 12. "To the contrary," as the D.C. Circuit observed, "there is substantial public interest 'in having government agencies abide by the federal laws that govern their existence and operations.'" *Id.* (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)). An injunction to prevent the Defendants' withdrawal of recognition from AFSA and their repudiation of collective bargaining agreements with the Union, along with an injunction preserving the ability of AFSA to represent Foreign Service members, simply requires the Defendants to do what they have been doing each and every day of each and every week, year after year, decade after decade over the past fifty years. Nothing has changed in the Foreign Service that requires the abolition of worldwide bargaining units working for the State Department or USAID. Historical events have come and gone – whether it involves the negotiation of trade treaties, the pursuit of wars against terror, or the diplomacy to bring about peace – AFSA's represented employees have successfully carried out their agency's mission against the backdrop

43

of protections and safeguards that ensures their dignity and respect as career civil servants. For these reasons, AFSA's requested injunctive relief stands strongly in the public interest.

## V.    <u>CONCLUSION</u>

For the foregoing reasons, the March 27 Executive Order constitutes unlawful action that is *ultra vires*. AFSA respectfully request that the Court enter a preliminary injunction with respect to the implementation and enforcement of the Executive Order.

DATED: April 14, 2025                    Respectfully submitted,

By:    */s/ Richard J. Hirn*
Richard J. Hirn
D.C. Bar No. 291849
5335 Wisconsin Ave., NW, Suite 440
Washington, D.C. 20015
(202) 274-1812
richard@hirnlaw.com

Keith R. Bolek
Bar No. 463129
April H. Pullium
Bar No. 198026
O'Donoghue & O'Donoghue LLP
5301 Wisconsin Avenue, Suite 800
Washington, D.C. 20015
(202) 362-0041
kbolek@odonoghuelaw.com
apullium@odonoghuelaw.com

Sharon L. Papp*
General Counsel
D.C. Bar No. 107992
Raeka Safai*
Deputy General Counsel
D.C. Bar No. 977301
American Foreign Service Association
2101 E Street, NW
Washington, DC 20037
(202) 338-4045
papp@afsa.org
safai@afsa.org

*D.D.C. Application Pending

*Counsel for Plaintiff American Foreign Service Association*