## IN TH E UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| AMERICAN FOREIGN SERVICE ASSOCIATION, et al., | ) ) ) ) |
| *Plaintiff,* | ) Civil Action No. 1:25-cv-1030 -PLF ) |
| v. | ) ) |
| DONALD J. TRUMP, et al., | ) ) |
| *Defendants.* | ) ) |

## DECLARATION OF THOMAS YAZDGERDI

I, Thomas Yazdgerdi, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1.      I am a member of the Senior Foreign Service at the Department of State. I joined the Foreign Service in October 1991 and have served abroad, mostly in southeastern Europe, including Albania, Greece, and Kosovo. I also served tours as a deputy political counselor at the U.S. Embassy in Baghdad; the consul general at the U.S. Consulate in Kirkuk, Iraq; and political counselor at the US Embassy in Kabul, Afghanistan. Members of the Foreign Service at the Department of State are professional, nonpartisan diplomats who perform a wide range of activities, including assisting individual U.S. citizens abroad; negotiating with representatives of foreign governments; processing visa applications; promoting U.S. business and economic interests globally; representing U.S. art and culture; communicating U.S. policy goals to international media; and many others. Foreign Service generalist members are assigned to one of five "cones" – management, consular, economic,

political, or public diplomacy – and their tasks vary widely even within each cone. The same holds true with Foreign Service specialist members, whose areas of specialty include facilities management, medical, information technology, office management, construction engineering, security, and many others.

2.    From July 2019 to July 2023, I served as the full-time Vice President of the American Foreign Service Association (AFSA), the exclusive representative for the State Department. In that capacity, I was the primary AFSA elected official who engaged in collective bargaining on behalf of Foreign Service employees with the Department of State. I was elected to the position of President of AFSA for a two-year term beginning on July 15, 2023. When I was Vice President and from the time I became President until March 31, 2025, I worked full-time performing union representational duties while on "official time." My union duties routinely required at least 40 hours of work per week, which I could not have performed if I had been working full-time in a Foreign Service assignment.

3.    AFSA represents 17,618 active-duty members of the Foreign Service at the Department of State, the United States Agency for International Development (USAID), the Foreign Commercial Service (FCS), the Foreign Agriculture Service (FAS), the United States Agency for Global Media (USAGM), and the Animal and Plant Health Inspectors Service (APHIS). 14,593 of the active-duty Foreign Service members are dues paying members of AFSA. Of this number, 13,478 pay dues by payroll deductions.

4.    AFSA was founded in 1924 as an unincorporated professional association to further the professional development of members of the Foreign Service. AFSA was incorporated in the District of Columbia in 1951. On January 22, 1973, AFSA was certified as the exclusive representative of all Foreign Service employees of the Department of State.

2

AFSA was subsequently certified as the exclusive representative at USAID, FCS, FAS, USAGM, and finally, APHIS.

5.    The bargaining units at each of the six agencies listed above is a single, world-wide bargaining unit, and includes all Foreign Service employees except for confidential employees, management officials, employees engaged in personnel work other than in a purely personal capacity, employees engaged in criminal or national security investigations and employees who audit the work of individuals to ensure that their functions are discharged with honesty and integrity.

6.    On July 15, 2019, AFSA and the State Department entered into a new, updated Framework Agreement, which is the collective bargaining agreement that covers the Foreign Service employees who work for that department. A true and correct copy of that agreement is provided as Exhibit 1 to this Declaration. The Framework Agreement covers issues relating to AFSA's and the Department's labor management relations, including 100 percent official time for the AFSA President and State Vice President, AFSA's use of office space in the Harry S. Truman building at no charge to AFSA, use of the Department's electronic mail systems to communicate with members, the union's right to information, union dues allotments, and the requirement that the Department provide AFSA with notice and the opportunity to bargain regarding changes to conditions of employment. The Framework Agreement was extended, without change, in January 2025, for three years. A true and correct copy of the January 2025 agreement to extend the Framework Agreement is attached as Exhibit 2 to this Declaration.

7.    AFSA is both the principal advocate for the long-term institutional well-being of the professional career Foreign Service and is responsible for safeguarding the

interests of AFSA members who serve overseas for the majority of their careers. AFSA advocates for federal and state legislation on behalf of Foreign Service members. Because over 80 percent of Foreign Service members are dues paying members of AFSA, Congressional staff members seek AFSA's opinion on planned or pending legislation, in recognition of AFSA's role as the exclusive representative and "the Voice of the Foreign Service." As AFSA's President, I routinely advocate for legislation on behalf of our members, especially on Capitol Hill.

8.      AFSA also seeks to increase understanding among the American people about the vital role of the U.S. Foreign Service in sustaining American global leadership. AFSA exists to support the United States Foreign Service, which deploys worldwide to protect and serve America's people, interests and values.

9.      As the exclusive representative for Foreign Service employees at the six foreign affairs agencies, AFSA negotiates or consults with the foreign affairs agencies on a wide range of personnel issues including: assignment procedures, tenure and promotion board procedures, agency-level grievance and discipline procedures, time-in-class and time-in-service rules, procedures for awarding Meritorious Service Awards, and procedures relating to when investigatory interviews of employees can be recorded, among many other issues. AFSA provides legal and other assistance to individual members facing allegations of misconduct by representing them in investigatory interviews conducted by the Offices of Inspector General, Offices of Civil Rights, and the Offices of Security, and with disciplinary proposals, security clearance issues, grievances, medical clearance issues, and a myriad of issues relating to their unique conditions of employment.  A true and

4

correct copy of an agreement that AFSA negotiated regarding procedures for recording of

investigatory interviews is attached as Exhibit 3 to this declaration.

10.     The March 27, 2025, Executive Order "Exclusions from Federal Labor-

Management Relations Programs" (Executive Order) already has had an immediate impact

on AFSA's ability to safeguard the interests and rights of Foreign Service members at the

State Department, USAID, FCS, and APHIS. On March 31, 2025, the State Department's

Chief Labor Management Negotiator sent me an email that stated:

> On Thursday, March 27, 2025, the President issued an Executive Order (EO),
> entitled "Exclusions from Federal Labor-Management Relations Programs." In
> compliance with the EO, effective immediately, the Department hereby terminates
> the Framework Agreement with AFSA and will no longer recognize AFSA as an
> exclusively recognized labor organization.

> The Department will cease all further payroll dues allotments
> immediately. Additionally, all recurring meetings between AFSA and the
> Department are cancelled. Official time for the AFSA President, AFSA State VP,
> and the additional AFSA representative on 100% official time under the terms of
> Article 5, Section 3(b) of the Framework Agreement will end at close of business
> today. We encourage these employees to be in contact with their CDO [Career
> Development Officers] to pursue appropriate follow-on assignments.

> AFSA elections may not proceed using agency space or government equipment
> (i.e., .gov messaging).   AFSA must also remove all material from and vacate
> AFSA's Department-provided office suite in HST by COB April 4.  AFSA's access
> to the suite will end no later than Friday, April 4.

A true and correct copy of the e-mail is provided as Exhibit 4 to this Declaration.

11.     I officially learned at 4:38 pm on Monday, March 31, that the State

Department would stop paying my salary as the AFSA President, as early as April 1, if I

chose to stay in my current position as the AFSA President. Because I was elected to serve

our members until July 15, the end date of the current AFSA Governing Board, and this

was reflected in my current Foreign Service assignment, I immediately reached out to the

Global Talent Management (GTM) Bureau to determine my options. I was told the next

5

administrative action to take place would be a change in assignment to "GTM over complement." This is the designation given when an individual has no assignment. As a result of the EO and the Department's immediate decision to stop paying those AFSA elected officials on 100% official time, I am forced to make significant decisions regarding my career for the well-being of my family. I am currently running for re-election as AFSA president. It is too late in the assignment process to find a suitable domestic assignment, and I am unable to serve overseas for family reasons. In addition, given the current administration's attacks on organized labor and the fact that I have been on the AFSA Governing Board since 2019, first as State Department VP and now as AFSA President, it would be unlikely for me to serve within the Department in an assignment that is commensurate with my experience as a Senior Foreign Service officer. As a result, I have made the difficult decision to retire two years earlier than expected to ensure an income stream for my family, through my annuity, which is approximately 50% of my current salary.

12.    If I am re-elected as AFSA President, absent an injunction or ruling in AFSA's favor, AFSA will need to pay the salary for the position. For over 50 years AFSA has counted on this full-time position as being paid by the Department. This change imposes a significant burden on AFSA at a time when we stand to lose a significant percentage of our dues paying members.

13.    Stripping AFSA of its right to serve as the exclusive representative takes away an essential check to prevent politicization of the Foreign Service. The Foreign Service personnel system was modeled after the Navy and is an "up or out" personnel system, meaning that employees who are not promoted or tenured within a certain amount

6

of time will be forced to separate from employment. Promotions are determined by selection boards consisting of career members of the Foreign Service and members of the public. *See* 22 U.S.C. §§ 4002 & 4003. AFSA has collective bargaining agreements in place to ensure that Foreign Service promotions are based strictly on the rankings of selection boards, as required in 22 U.S.C. § 4002(a). Our "safeguard" agreements, as they are called, provide a check on any attempt by management to change predetermined promotion numbers to capture favored employees who were not ranked high enough for promotion and to prevent leadership from skipping over disfavored employees who were recommended for promotion. A true and correct copy of a safeguard agreement between AFSA and the Department of State, which was entered on December 6, 1973, is attached as Exhibit 5 to this Declaration. This agreement has been maintained in the regular course of business in AFSA's files, where AFSA routinely stores copies of final collectively bargained agreements. To the best of my knowledge, there have not been any modifications to this agreement.

14.    Foreign Service employees spend two-thirds of their careers working overseas in the 200 plus embassies and consulates around the world. Many of these posts are extremely dangerous (such as Somalia, Syria, Ukraine, and Lebanon) while others, due to environmental factors, pose serious health risks to Foreign Service employees and their families (such as Bangkok, Beijing, and New Delhi).

15.    Overseas assignments typically involve three-year tours of duty; some assignments require language training before the assignment begins. While management retains the right to make assignments, AFSA has agreements in place governing the assignment processes, which allow Foreign Service members to submit bids on positions

7

that best suit their professional and family needs, while allowing management to select their assignment from those bids. The bidding system balances the needs of Foreign Service members and their families and the right of management to make assignment selections. AFSA also has agreements in place for employees to appeal their assignment to the Director General of the Foreign Service (or counterpart at the other foreign affairs agencies).

16.     Stripping AFSA of its right to negotiate conditions of employment, procedures, and appropriate arrangements for our members at State and USAID will harm members by allowing management to unilaterally discard safeguards that have balanced the rights of employees and management for over 50 years. I am especially concerned because the Department has just appointed an untenured employee to serve as the acting Director General (*i.e.*, the director of human resources). On April 4, I received a farewell notice from Catherine Rodriguez, senior bureau official (SBO) in the State Department's Global Talent Management bureau. She said that she would be succeeded by Lew Olowski as SBO. I am deeply concerned by the appointment of Mr. Olowski, who is an entry level officer (FS-04) and was untenured at the time of his appointment, and who will now take on the role of acting director general of the U.S. Foreign Service. This is one of the State Department's most senior leadership positions—traditionally filled by career members of the Senior Foreign Service with decades of Foreign Service experience and proven ability to do this demanding job. Having an inexperienced, untenured individual take on this role will negatively impact our members and the Foreign Service. It is akin to making a junior military officer the head of the Pentagon's personnel office. AFSA will have no ability to

8

push back against what we believe will be drastic and harmful changes to our members' conditions of employment.

17.     The immediate cessation of automatic dues deductions means that AFSA will potentially lose between $360,000 and $389,000 a month in revenue. Member dues pay for approximately eighty-six percent of AFSA operations.

18. The day after the Executive Order was issued, members wrote to AFSA to cancel their automatic dues allotment, expressing their concern that it is "now illegal" for them to be a member of the union and continue to pay dues to AFSA. If we are not able to collect dues for a prolonged period, it is likely we will have to lay off some of our professional staff. Many of our staff have been with AFSA for over 20 years and have a wealth of legal and other experience and knowledge representing Foreign Service members in what is a very specialized, niche area of law.

19.     AFSA provides legal and other assistance to members at no additional cost, outside of their monthly membership dues. If AFSA has to reduce its staff, Foreign Service members who need assistance with investigations, grievances, discipline cases, and security issues, will have to retain private counsel, which will be very costly as experienced lawyers in the Washington DC area charge upward of between $400 and $600 an hour. Most Foreign Service members, especially more junior members, will not be able to afford private legal representation. Even if members could afford outside legal representation, the Department of State has repudiated its Framework Agreement with AFSA and canceled all pending meetings with AFSA, suggesting that the agency does not intend to honor employees' collectively bargained rights to assistance with investigations and disciplinary cases, or rights to file grievances with the agencies.

9

20.     In addition, AFSA's Framework Agreements provide AFSA's attorneys and grievance staff access to the agencies' computer networks and office space for the AFSA Vice Presidents at State and USAID at no cost to the union. In addition, ten members of AFSA's legal and grievance staff, whose salaries are paid from union dues, have offices in the State Department. On March 31, 2025, the Chief Labor Management Negotiator for the Department of State notified me that AFSA must vacate AFSA's Department provided office suite by close of business on April 4. Many of AFSA's attorneys and professional staff have worked for AFSA for more than 20 or 30 years. They have documents pertaining to AFSA members' individual grievance and discipline cases, in addition to historical union documents, on their government computers.  AFSA anticipates that the Department of State is going to disable their .gov email accounts with little to no warning and that important documents stored on the .gov system will be forever lost.

21.     AFSA's collective bargaining agreements also provide 100% official time for the AFSA President, the Vice Presidents for State, USAID, Agriculture, and Commerce, and one of the State Representatives to perform full-time union work, and reasonable official time for the APHIS representative.

22.     The timing of the Executive Order creates additional hardships for AFSA and for members of the Foreign Service. AFSA is in the middle of elections for the governing board, which includes the 100% official time positions of President, State, USAID and FCS Vice Presidents. Some employees running for positions on the 2025-2027 AFSA governing board have foregone bidding on Foreign Service assignments. These employees will be prejudiced in finding assignments this late in the assignment cycle, which could in turn impact future promotion opportunities. Without the ability to use

10

official time for union work, the individuals who are elected may choose not to serve in these previously full-time AFSA positions.

23.    The timing of this executive order, in context with a memorandum from the Office of Personnel and Management (OPM), is particularly prejudicial to our members. In OPM's memorandum, government agencies were directed to present plans for reductions in force (RIF) by March 13, 2025, with implementation of those plans by September 30. By removing union representation of employees, removing the need to negotiate procedures and appropriate arrangements for employees who will be adversely impacted by RIFs, and invalidating collective bargaining agreements shortly before planned employee terminations, the administration is maximizing its chance to violate or reduce procedural protections for employees.

24.    USAID employees, members of AFSA, did in fact receive notices of termination on March 28, 2025, the day after the issuance of the Executive Order. As USAID employees edge closer to the first RIF date, July 2, 2025, they require clarity on the processes whereby they will be eligible to apply for positions involved with U.S. assistance programs in the new State Department structure as well as information on where they should plan to live, including schooling for their children and employment for their spouses. This is especially true for the nearly 1,400 Foreign Service employees who are being forced to return from overseas, but domestic Foreign Service employees also face similar uncertainties regarding where they will live and work.

25.    On February 7, 2025, I appeared in my capacity as AFSA President for an interview on *The Lead with Jake Tapper*, a CNN production, where I discussed President Trump's dismantling of USAID and AFSA's lawsuit to challenge President Trump's

actions. A video of the interview I provided is available online at: https://www.cnn.com/2025/02/07/world/video/the-lead-thomas-yazdgerdi-usaid-employees-abroad-union-president-trump-jake-tapper.

26.     This Executive Order represents the single greatest threat to the Foreign Service and to our union in AFSA's 100-year history. It opens the door to politicization, erodes due process, and strikes at the heart of the nonpartisan, merit-based system that has long safeguarded the integrity of America's diplomatic and development corps. It removes the mechanisms that ensure fairness, transparency, and accountability, and fundamentally weakens the rights of employees to have a voice in the policies that govern their professional lives.

27.     The injuries suffered by AFSA and its members are ongoing or imminent and will persist unless this Court intervenes.

Executed on April 14, 2025

Thomas Yazdgerdi

# EXHIBIT
# 1

# Framework Agreement
## *between*
# U.S. Department of State
# and American Foreign Service Association





**July 15, 2019**

## TABLE OF CONTENTS

PREAMBLE……………….………………..…………………………..2

**ARTICLE 1**
PARTIES TO THE AGREEMENT AND RECOGNITION OF THE
BARGAINING UNIT……………………..…………………………….3

**ARTICLE 2**
DEFINITIONS……………………………………………………..4

**ARTICLE 3**
DURATION AND RENEWAL OF AGREEMENT………………….................6

**ARTICLE 4**
EMPLOYEE RIGHTS AND RESPONSIBILITIES……………………………7

**ARTICLE 5**
UNION RIGHTS AND RESPONSIBILITIES……………………………….9

**ARTICLE 6**
MANAGEMENT RIGHTS AND RESPONSIBILITIES…………………….....12

**ARTICLE 7**
NEGOTIATIONS…………………………………………………14

**ARTICLE 8**
USE OF OFFICIAL FACILITIES AND SERVICES……………………….....18

**ARTICLE 9**
USE OF TELECOMMUNICATIONS SYSTEM………………………....……21

**ARTICLE 10**
DUES WITHOLDING…………………………………………………23

## PREAMBLE

Pursuant to the policy set forth by Chapter 10 of the Foreign Service Act of 1980 (FS Act) governing Labor-Management Relations, the following articles of this Framework Agreement ("Agreement"), together with any and all supplemental agreements and amendments which may be subsequently agreed to, constitute the total Agreement between the Foreign Service of the Department of State, (hereinafter called the "Department" or "Employer"), and the American Foreign Service Association (hereinafter called the "Union" or "AFSA").  The Department and the Union are collectively referred to as the "Parties."

The Parties agree that the statutory protection of the right of employees to organize, bargain collectively, and participate through the Union safeguards the public interest, contributes to the effective conduct of business, and facilitates and encourages the amicable settlement of disputes between the Parties involving conditions of employment.  The Parties also recognize that the unique conditions of Foreign Service employment require a distinct framework for the development and implementation of modern, constructive, and cooperative relationships between management officials and organizations representing members of the Foreign Service.  This Agreement should be interpreted and administered in a manner consistent with the requirement of an effective and efficient Government. The Parties hereby affirm their commitment to build a positive and cooperative bilateral relationship.

With the foregoing in mind, the Parties subscribe to the following statements of the respective rights and obligations of the Department and the Union:

# ARTICLE 1

## PARTIES TO THE AGREEMENT
## AND RECOGNITION OF THE BARGAINING UNIT

### Section 1.  Recognition

On January 22, 1973 AFSA was certified as the exclusive representative of all
Foreign Service employees of the Department of State, as reaffirmed by Chapter
10 of the FS Act.  The bargaining unit constitutes a single world-wide bargaining
unit, excluding confidential employees described in Section 1002(6) of the FS
Act,[1] management officials as described in Section 1002(12) of the FS Act,[2]
employees engaged in personnel work in other than a purely clerical capacity,
employees engaged in criminal or national security investigations and employees
who audit the work of individuals to ensure that their functions are discharged with
honesty and integrity.

The Parties agree that for purposes of domestic positions, there is a presumption
that management officials include Executive Directors and their Deputies within
each Bureau and DAS or equivalent positions and above.  This Agreement does
not preclude AFSA or a management employee from challenging that presumption
in the appropriate forum, i.e. before the Foreign Service Labor Relations Board.

---

[1]    22 USC §4102(6).

[2]    22 USC §4102(12).

## ARTICLE 2

## DEFINITIONS

For the purposes of this Agreement, the terms listed below are defined as follows:

**BOARD**: The Foreign Service Labor Relations Board (FSLRB).

**CONFIDENTIAL EMPLOYEE**: An employee who acts in a confidential capacity with respect to an individual who formulates or effectuates management policies in the field of labor-management relations.

**CONDITIONS OF EMPLOYMENT**: Personnel policies, practices, and matters, whether established by regulation or otherwise, affecting working conditions, but does not include policies, practices, and matters —

a) relating to political activities prohibited abroad or prohibited under subchapter III of chapter 73 of title 5, U.S. Code;

b) relating to the designation or classification of any position under section 501;

c) to the extent such matters are specifically provided for by Federal statute; or,

d) relating to Government-wide or multiagency responsibility of the Secretary affecting the rights, benefits, or obligations of individuals employed in agencies other than those which are authorized to utilize the Foreign Service personnel system.

**DAYS**: Unless otherwise indicated, use of the word "days" refers to business days. In computing any period of time prescribed in this Agreement, the day of the act from which the designated period of time begins to run shall not be included. For example, if a party receives a proposal on April 1st, the 15 business day response period would begin on April 2nd.

**EMPLOYEE**: A member of the Foreign Service who is a citizen of the United States, wherever serving.[3]

---

[3]    FS Act §1002(8), 22 USC §4102(8).

**FRAMEWORK AGREEMENT**: The articles of this Agreement, together with any and all supplemental agreements and amendments which may be subsequently agreed to.

**MANAGEMENT OFFICIAL**: An individual who—

a) is a chief of mission or principal officer;

b) is serving in a position appointed by the President, by and with the advice and consent of the Senate, or by the President alone;

c) occupies a position which in the sole judgment of the Secretary is of comparable importance to the offices mentioned in subparagraph (a) or (b);

d) is serving as a deputy to any individual described by subparagraph (a), (b), or (c);

e) is assigned to carry out functions of the Inspector General of the Department of State and the Foreign Service under section 209 of the FS Act; or,

f) is engaged in the administration of this subchapter or in the formulation of the personnel policies and programs of the Department.

# ARTICLE 3

## DURATION AND RENEWAL OF AGREEMENT

### Section 1.  Effective Date and Term

The effective date of this Agreement shall be the date the agreement is signed by both Parties, subject to the approval of the Secretary of State, or designated agency head, or the 31st calendar day after the date signed by the Parties, whichever comes sooner.

Subject to Section 2, this Agreement shall remain in effect for three years from the effective date.  Thereafter, the Agreement shall be renewed for additional one-year periods dating from the anniversary date, unless between 105 and 60 calendar days prior to such anniversary date either party gives written notice to the other of its desire to amend, supplement, or renegotiate the Agreement.  The other party must acknowledge the notice promptly upon receipt.  The current Agreement shall remain in full force and effect until all proposed changes have been negotiated and agreed to.

### Section 2.  Amendments and Supplements

This Agreement may be amended and/or supplemented as follows:

   a) The Parties will amend and supplement this Agreement if required to reflect changes mandated by law, Executive Order, or Government-wide regulations;

   b) Changes not mandated by law or Government-wide regulations may be proposed by either party at any time, but will only be negotiated if both Parties mutually agree to bargain over the proposals.

# ARTICLE 4

## EMPLOYEE RIGHTS AND RESPONSIBILITIES

**Section 1.  Union Membership**

a) An employee has the right to form, join, or assist a labor organization, or to refrain from any such activity, freely and without fear of penalty or reprisal.  No employee shall be required as a condition of employment, assignment, promotion or retention, to join or refrain from joining any labor organization.  Each employee shall be protected in the exercise of such right.  Except as otherwise provided by the FS Act, such right includes the right –

> 1.  To act for a labor organization in the capacity of a representative and, in that capacity, to present the views of the labor organization to the Secretary and other officials of the Government including Congress, or other appropriate authorities; and,

> 2.  To engage in collective bargaining with respect to conditions of employment through representatives chosen by the employees as provided by law.

b) No interference, restraint, coercion, discrimination, or reprisal will be practiced by the Employer against an employee for exercising any of the rights guaranteed by Chapter 10 of the FS Act or this Agreement; nor shall the Employer discourage or encourage employee membership in a labor organization.  Neither shall an employee be disciplined or otherwise discriminated against by the Employer because she/he participated in a grievance, appeal, unfair labor practice complaint or any other proceeding brought under the provisions of law.

c) Nothing in this Agreement shall require an employee to become or to remain a member of a labor organization.

d) This Agreement does not prevent any employee in the unit from bringing, on his/her own initiative, a grievance, complaint or any matter of personal concern to the attention of the appropriate officials without fear of penalty or reprisal.

## Section 2.  Representation Rights – Formal Discussions

a) An exclusive representative shall be given the opportunity to be present at:

> 1) Any formal discussion between one or more representatives of the Employer and one or more employees or their representatives concerning any grievance or any personnel policy, practice or other general condition of employment; and,

> 2) Any examination of the employee by a representative of the Employer in connection with an investigation if the employee reasonably believes that the examination may result in disciplinary action against the employee and the employee requests such representation.

b) The Department shall annually inform the AFSA bargaining unit employees of their Weingarten rights.  The Department Notice shall remind FS employees that AFSA is their exclusive representative.

## ARTICLE 5

## UNION RIGHTS AND RESPONSIBILITIES

### Section 1.  Recognition and Representation[4]

The Employer recognizes the Union's right to act for and negotiate agreements covering all employees in the unit.  The Union will represent all employees in the unit in those matters where it is acting as the exclusive representative without discrimination, and without regard to Union membership.

### Section 2.  Officers and Representation

The Department agrees to respect the rights of the Union and will recognize duly elected officers and other representatives of AFSA.  AFSA will provide the Department with a complete list of officers and representatives on a timely basis after each election of general officers and when new officers are appointed within the Union.

### Section 3.  Official Time[5]

a)  The AFSA President and State Vice President shall be granted 100% official time to perform representational activities.  Official time is not authorized for internal Union business.

b)  During the term of this Agreement, AFSA may submit a proposal for negotiation to the Department's Chief Labor Management Negotiator requesting up to 100% official time for an additional representative for a definitive period of time. The proposal should include a detailed description of the activities the representative will engage in and how he/she will engage with management.  The Department will negotiate the proposal in good faith.

c)  While AFSA seldom uses employees other than those described above to represent employees during negotiations, there may be times when this occurs.  When this occurs, the Parties agree that employees representing AFSA in the negotiations of a collective bargaining agreement or in union representational

---

[4]      FS Act §1013, 22 USC §4113.

[5]      FS Act §1018(d), 22 USC §4118(d).

activities shall be authorized a reasonable amount of official time when the employee would otherwise be in a duty status. The Department will so notify the supervisors of employees involved.

d) The Employer agrees to allow AFSA State Department representatives on 100% official time:

1. To be reviewed by a Selection Board for each year served; and,

2. To extend their time-in-class by time served in that capacity, but not to exceed two years in any position.

e) AFSA representatives on 100% official time shall be permitted to submit evaluative material (in the form of a self-evaluation memoranda) for inclusion in their official performance folders. These representatives may also obtain and submit a separate memorandum, for his/her OPF, from a Department employee that is at the same grade or higher than the representative.

## Section 4.  Post Representatives

The Department agrees to recognize AFSA's designation of Department employees as AFSA representatives at post. Upon timely written notice of an individual's designation from AFSA to the Department's Chief Labor Management Negotiator, he/she or designee will certify the designation and promptly notify post management of the designation and authorization to deal with the named individual. All dealings at post will be in compliance with applicable FAM/FAH sections.

## Section 5.  Changes in Bargaining Unit Status

When the Labor Management Office (HR/PC/LM), and/or Employer decides to change the Bargaining Unit Status (BUS) code of a position, the Union will be notified of the change prior to implementation.

## Section 6.  Listings of FS Personnel

The Department will provide the Union a list of FS personnel. This listing will be alphabetical with grade and include the post of assignment. The Department agrees to provide a full listing as of September 30 of the year that this Agreement goes into force, and then on a triannual basis, i.e. three times a year.

**Section 7.  Union Right to Information**

In accordance with the provisions of Section 1013(e)(4) of Chapter 10 of the FS Act, the Department agrees to provide the Union, upon request and to the extent not prohibited by law, data:

> a)  which is normally maintained by the Department in the regular course of business;
>
> b)  which is reasonably available and necessary for full and proper discussion, understanding, and negotiation of subjects which fall within the scope of collective bargaining; and,
>
> c)  which does not constitute guidance, advice, counsel or training provided for management officials or confidential employees, related to collective bargaining.

This data will be transmitted to the Union in a reasonable period of time, normally within seven (7) days of the request.

## ARTICLE 6

## MANAGEMENT RIGHTS AND RESPONSIBILITIES

### Section 1.  Management Rights[6]

Nothing in this section shall affect the authority of any management official, in accordance with applicable law to:

a) determine the mission, budget, organization, and internal security practices of the Department, and the number of individuals in the Foreign Service or in the Department;

b) hire, assign, direct, lay off, and retain individuals in the Foreign Service or in the Department, to suspend, remove, or take other disciplinary action against such individuals, and to determine the number of members of the Service to be promoted and to remove the name of or delay the promotion of any member in accordance with regulations prescribed under the FS Act;

c) conduct reductions in force, and to prescribe regulations for the separation of employees pursuant to such reductions in force conducted under Section 611 of the FS Act.[7]

d) assign work, to make determinations with respect to contracting out, and to determine the personnel by which the operations of the Department shall be conducted;

e) fill positions from any appropriate source;

f) determine the need for uniform personnel policies and procedures between or among the Foreign Affairs agencies; and,

g) take whatever action may be necessary to carry out the mission of the Department during emergencies.

---

[6]    FS Act §1005, 22 USC §4105.

[7]    FS Act §611, 22 USC §4010a.

## Section 2. Permissive and Mandatory Bargaining Authority

Nothing in this section shall preclude the Employer and the Union from negotiating:

a)  at the election of the Employer, on the numbers, types and classes of employees or positions assigned to any organizational subdivision, work project, or tour of duty, or on the technology, methods, and means of performing work;

b)  procedures which management officials will observe in exercising any function under this section; or

c)  appropriate arrangements for employees affected by the exercise of any function under this section by such management officials.

# ARTICLE 7

## NEGOTIATIONS

### Section 1. General

The Parties have the responsibility to conduct negotiations and other dealings in good faith and in such manner as will further the public interest.

### Section 2. Collective Bargaining

a)  The Parties recognize the right of either party to initiate bargaining where appropriate.  Although this Agreement covers many subjects, many other relevant rules, policies, and regulations are already codified within the Foreign Affairs Manual (FAM), Foreign Affairs Handbook (FAH), Annual Precepts, Standard Operating Procedures (SOPs), and other internal Department policy statements.  To the extent that such documents were bargained between the Employer and Union, they are considered collective bargaining agreements and may contain sunset provisions or expiration dates (i.e. term limits) as mutually agreed to by the parties.

b)  Where no term limits exist, such documents will remain in force until changes have been negotiated between and agreed to by the Parties.  AFSA may propose changes, at any time, to these documents that lack an existing term limit.  Proposed changes will be considered seriously by the Department and responded to with either agreement to the proposed changes, request to negotiate the proposed changes, or rejection of the proposed changes for specific reasons.  When the Parties agree to engage in negotiation over requested changes, these existing agreements will remain in force until agreement between the parties is reached or until the full spectrum of negotiations allowed under the statute is completed.  Ground rules establishing specific timeframes for negotiations may be requested by either party.

c)  Future changes to modify, terminate or amend existing agreements (e.g. FAM, FAH, SOPs) will require the full breadth of negotiation as contemplated under Section 3.  The parties hereby agree that all future agreements of this nature will have designated term limits unless mutually agreed to by the parties that a term limit on the agreement is not necessary.  Where a term limit exists, it will specifically indicate the length of the agreement, whether the parties will allow an agreement to rollover if not reopened in a timely manner, and as needed, the

window of opportunity to reopen an agreement by either party when its term is completed. Nothing prevents the parties from reopening an agreement at any time by mutual agreement.

**Section 3. Notice to the Union**

a) The Parties agree that the Union shall be given notice and the opportunity to negotiate with respect to changes in the conditions of employment of bargaining unit employees, to the extent consistent with Section 1005 of the FS Act,[8] and to the extent such changes in conditions of employment are greater than de minimis.

b) Notification may include a final date for the Union to request negotiations with respect to the proposed change. In no case shall such final date be less than ten (10) days from receipt of the notification of the proposed change. When notification does not include a final date for the Union to request negotiations, and the Union wishes to negotiate, the Union shall make a request to negotiate within thirty (30) calendar days from the date of receipt of the notification.

c) If the Union wishes to submit a request for clarification of the proposal, it must do so within seven (7) days. Management will respond within seven (7) days. The Union will then have seven (7) days from the receipt of the clarification to request negotiations. If the Union does not submit a timely request to negotiate or for further clarification, it shall be deemed to constitute acceptance of the change by the Union.

d) The Union will be required to submit its proposals within ten (10) days of requesting negotiations. Upon request, the Union will receive an extension of ten (10) additional days to submit proposals. Failure to submit timely proposals will allow the Department to implement the change.

e) The Department is precluded, upon the Union's request to negotiate and receipt of timely proposals, from implementing its proposed action until the Parties reach agreement or, if the Parties do not agree as to the obligation to negotiate, until the Board resolves the issue of whether the obligation to negotiate exists, unless required to carry out the mission of the Department in an emergency.

f) When good faith negotiations do not result in agreement, the Parties will first seek mediation to try and resolve the matter. If the Parties reach an impasse at

---

[8]    22 U.S.C. § 4105.

mediation, either Party may request the Foreign Service Impasse Disputes Panel (FSIDP) consider the impasse. While the impasse is before the FSIDP or a mediator, neither party will implement the proposed change except to the extent mutually agreed to or if an emergency requires the Department to take immediate action.

g) The Department will endeavor to provide the Union with documents that track all proposed changes and/or amendments to existing regulations, SOPs, and documents, clearly delineating the changes and/or amendments the Department proposes.

**Section 4.  Union Proposals**

a) If the Union is the party reopening an agreement with a term limit, it will be responsible for providing notification to the Department of its proposed changes. The Union shall transmit to the Department any proposed changes within ten (10) days from requesting to reopen an agreement.  The Department shall respond to the Union's proposed changes within fifteen (15) days from receipt of the proposed changes by agreeing to the proposed changes or requesting to negotiate over the proposed changes.  If the Department requests clarification of any proposed changes during the fifteen (15) day period from receipt of the change, the Union shall address the request for clarification within seven (7) days.  The Department will then have seven (7) days, from the receipt of the clarification to respond to the Union's proposed changes.

b) Where the Union wishes to propose changes to an agreement that does not contain a term limit, the Union may at any time transmit to the Department any proposed changes in personnel policies, practices, or matters, whether established by regulation or otherwise affecting working conditions of employees.  The Department shall respond to the Union proposal(s) within fifteen (15) days from receipt of the proposal(s).  If the Department requests clarification of any proposed changes during the fifteen (15) day period from receipt of the proposed change, the Union shall address the request for clarification within seven (7) days.  The Department will then have seven (7) days, from the receipt of the clarification to respond to the Union proposal(s).

c) For matters addressed in Section 2(b) and Section 4(b), (i.e. proposed changes to agreements that do not contain a term limit), in those cases where the Department has responded rejecting the proposed changes under the "covered by" doctrine, AFSA will have three (3) opportunities within two (2) years from the effective date

of this Agreement to request negotiations regardless of a "covered by" argument and the Department must honor that request to negotiate. AFSA will have two additional opportunities within three years of the effective date of this Agreement to request negotiations as described above (i.e. regardless of the Department's "covered by" argument). Thereinafter, during each year that this Agreement rolls over, AFSA will have one opportunity per year to request negotiations regardless of a "covered by" argument and the Department must honor that request to negotiate.

**Section 5.  Extension**

Nothing herein shall preclude the parties by mutual consent from extending any time limits imposed under this Article.

**Section 6.  Resolution of Implementation Dispute**

Any dispute between the Department and the Union concerning the effect, interpretation or a claim of breach of a collective bargaining agreement shall be resolved pursuant to 22 U.S.C. § 4114 or as an Unfair Labor Practice.

## ARTICLE 8

## USE OF OFFICIAL FACILITIES AND SERVICES

### Section 1.  Purpose

Unless otherwise specified, the services and facilities described in this article shall be provided by the Department to the Union free of charge.

### Section 2.  Space and Furniture

For the convenience and efficient servicing of employees within the bargaining unit, the Department agrees to provide adequate office space, containing individual offices and office furniture, to include a safe to hold classified material for the use of the Union.  Such space shall be limited to space available within the Harry S. Truman Building (HST).  The Department shall provide general services for any facility related issues under their authority to include office equipment provided by the Department.  The Department, with advance notice, also agrees to provide the Union with access to a cleared space, within HST, containing a computer and telephone for classified discussions and drafting on an as needed basis.

Additionally, the Department agrees to make reasonable efforts to provide conference rooms and/or auditoriums within HST to enable the Union to conduct general membership and other such meetings.  Requests for use of such space must be initiated by the Union in writing, at least three days' prior to the requested date. The Union understands that the Department may need to preempt the space, with little notice, for its own use.  The Department will make every effort to provide alternative arrangements when possible.

### Section 3.  Telephones

The Union may use Department telephones for all international and local calls in conducting its representational business.

### Section 4.  Submission to State Magazine

Articles that AFSA wishes to submit to be considered for publication will be submitted simultaneously to HR/PC/LM and the Editor of State Magazine.

**Section 5.  Bulletin Boards and Television**

a) Upon request, AFSA may have access to Department Bulletin Boards not to exceed four (4) total.  Currently, AFSA has access to a bulletin board in HST near the main cafeteria and at FSI.  AFSA may continue use of those two (2) bulletin boards if they desire to do so, with the understanding that use of those Bulletin Boards will count as two (2) of the four (4) total Department Bulletin Boards to which AFSA may have access.  If those bulletin boards are removed in any building renovation, AFSA may seek the use of alternative bulletin boards.

b) The Department will also grant AFSA space, outside of the Main Cafeteria, HST to display a television.

c) Bulletin board material must be properly identified as belonging to AFSA and relate to employees, their employment by the Department or AFSA's role as the exclusive representative.  AFSA assumes all responsibility incident to the preparation, reproduction, distribution, posting, and maintenance of material on bulletin boards.  Postings will be devoid of libelous, scandalous or scurrilous material.

d) When AFSA desires to post materials at Departmental display areas other than those listed in Section 5(a), AFSA will submit such material to the Department in accordance with applicable procedures.

e) The Department agrees to permit AFSA representatives at overseas posts to display AFSA material in an area where other organizational material is located, e.g., on the CLO Notice Board or in a similarly visible location.  Specific notices of AFSA events can be displayed in general use spaces, such as on a cafeteria notice board or other general use bulletin board.

**Section 6.  Correspondence to Members**

The use of the Department's facilities for registered mail is made necessary by AFSA's need to transmit documents between its Washington headquarters and its membership worldwide.

AFSA may use the Department's overseas pouch facilities on a reasonable basis for the distribution of general printed matter and individually addressed correspondence arising from AFSA's role as the exclusive representative.

**Section 7.  Electronic Mail Systems**

a) The Department shall provide AFSA e-mail access for representational purposes, such as communicating directly with employees on announcements of meetings, obtaining employee input on issue between Management and AFSA, and to assist employees with grievances, investigations, disciplinary and other similar employment related matters.

b) With the exception of three blast emails during AFSA's election season, the e-mail system shall not be used for internal union business, such as election and membership efforts.

c) Other than administrative proceedings, e.g. grievances, EEO, security clearance cases, the Union will not seek information or request meetings directly with management officials without the prior knowledge and approval of the Department's Chief Labor Management Negotiator or his/her designee.  Unless otherwise mutually agreed to, HR/PC/LM will be copied on any such emails.

d) Any Department issued fobs, iPads, BlackBerrys or related communication devices requested and issued to the elected AFSA President, State Vice President, and/or staff member, will be paid for by AFSA.

e) AFSA will abide by the provisions of 5 FAM 750 when using the Department's intranet and unclassified email system.

# ARTICLE 9

## USE OF TELECOMMUNICATIONS SYSTEM

Unless otherwise stated, AFSA's access to the Department's Cable/ALDAC and other telecommunications systems shall be confined exclusively to matters arising from the performance of its obligations as exclusive representative under Chapter 10 and 11 of the FS Act.

### Section 1.  Standard Procedures

a) AFSA will observe Department guidelines for the various types of correspondence it sends (i.e., telegrams, memorandums, letters, diplomatic notes, Department Notices, electronic messages, and invitations).

b) Cables and Department Notices (DN) will be written in the appropriate style and clearly identified to indicate that transmission is from AFSA through the Department.

c) Cables shall be unclassified except in extraordinary circumstances and by agreement of both parties.  Cables shall be sent routine unless there is mutual agreement for a higher priority.

d) Cables and DNs will be presented to the Department's Chief Labor Management Negotiator or designee for clearance.  A cable or DN must be cleared provided it is in compliance with the provisions of this Article and is devoid of libelous, scurrilous or scandalous material.  The clearer may disseminate the Cable or DN for wider input from management officials but is the sole clearer of the document.  Redrafting of the cable is not the prerogative of the clearing official.

e) Cables and DNs shall normally be transmitted within two days of presentation by the Union to the Department's Chief Labor Management Negotiator or designee.

### Section 2.  Overseas Procedures

Any communication presented by the AFSA representative for transmission to staff will be presented to the designated management official at post or regional management officer to be cleared for transmission.  Communication must be cleared provided it is in compliance with the provisions of this Article and is

devoid of libelous, scurrilous or scandalous material. Redrafting of the communication is not the prerogative of the clearing official.

## Section 3.  AFSA Elections and Awards

AFSA may use the cable system on a reasonable basis for distribution of material related to AFSA Awards, AFSA's Call for Nominations, and to announce the results of Governing Board elections.

## ARTICLE 10

## **DUES WITHHOLDING**

**Section 1.  General**

Payroll deductions for the payment of Union dues may be made from the pay of bargaining unit employees and non-bargaining unit employees, if authorized by the employee.

**Section 2.  Supply of Forms**

The Union will be responsible for the distribution of Standard Form 1187 for use by an eligible member of the Union who wishes to authorize the deduction of his/her dues.

**Section 3.  Changes in Dues Structure**

The AFSA President or authorized AFSA official (e.g. Chief Operating Officer or equivalent, or AFSA Member Services) shall notify the Department's Chief Labor Management Negotiator or designee when the dues structure changes.  HR/PC/LM will immediately notify the Department's Payroll Office of the change.  AFSA agrees that changes to dues structure can only occur once every calendar year.

**Section 4.  Bi-weekly deductions**

Authorized deductions will be made each bi-weekly pay period from the pay of an employee who has authorized such allotment.  No deduction will be made in any period for which the employee's net earnings after other deductions are insufficient to cover the full amount of the allotment for dues.

The Union will not be charged or assessed a fee for services rendered, by the Department, in connection with these deductions.

**Section 5.  Bi-weekly listings**

The Department will transmit to AFSA bi-weekly the total dues withheld each pay period along with a list of employees, the amount deducted for each employee, the total amount of the dues withheld for the year, and the amount of the check.  The

Department also agrees to provide a bi-weekly listing of discontinuance of the dues deduction.

## Section 6.  Annuity deductions

Annuity deductions for the payment of AFSA dues will be made from the annuity of retired Foreign Service members if authorized by the annuitant by completing Standard Form 1187A.  The Department will apprise retiring Employees of this option as part of the Department's ongoing retirement education and counseling efforts.

## Section 7.  Discontinuance of Dues

An employee may seek to cease payroll dues deduction by contacting the Members Services Division within AFSA and processing the necessary paperwork.  AFSA shall inform the Department to cease payroll dues deduction and send the necessary paperwork.  AFSA may also request that the Department automatically cease dues deduction of any member AFSA no longer considers to be in good standing.  Should AFSA no longer remain the exclusive representative of the Foreign Service bargaining unit, all related dues deduction shall cease on the effective date of that loss of recognition.

## SIGNATURES

The American Foreign Service Association and the Department of State hereby agree to this negotiated Framework Agreement on the 15th of July, 2019.

**FOR THE DEPARTMENT OF STATE**

Steve Polson
Chief Labor Management Negotiator

Chris Klemm
Deputy Labor Management Negotiator

Patty McCabe
Labor Relations Specialist

**APPROVAL**

Brian Bulatao
Under Secretary for Management

8/12/2019
Date

**FOR AFSA**

Ken Kero-Mentz
State Vice President

Sharon Papp, Esq.
General Counsel

Raeka Safai, Esq.
Deputy General Counsel

James Yorke
Senior Labor Management
Representative



Cover Design and Printing by A/GIS/GPS
November 2019

# EXHIBIT

# 2

# MEMORANDUM OF AGREEMENT

## AMERICAN FOREIGN SERVICE ASSOCIATION

### AND

### U.S. DEPARTMENT OF STATE

The American Foreign Service Association (AFSA) and the U.S. Department of State, collectively referred to as the Parties, recognize and affirm that the unique conditions of Foreign Service employment require a distinct framework for the development and implementation of modern, constructive, and cooperative relationships between management officials and organizations representing members of the Foreign Service. A Framework Agreement between the Parties has existed since at least 1987. The Parties entered into a new Framework Agreement on July 15, 2019. The Parties engaged in good faith negotiations regarding an extension of the Framework Agreement between October 8, 2024, and December 27, 2024.

The Parties affirm their commitment to build a positive and cooperative bilateral relationship and agree as follows:

The Parties' July 15, 2019, Framework Agreement shall remain in effect for three (3) years from the effective date of this Memorandum of Agreement (MOA). Thereafter, the Framework Agreement shall be renewed for additional one-year periods dating from the anniversary date of this MOA, unless between 105 and 60 calendar days prior to the anniversary date of this MOA either party gives written notice to the other of its desire to amend, supplement, or renegotiate the Framework Agreement.

The July 15, 2019, Framework Agreement shall remain in full force and effect until all proposed changes have been negotiated and agreed to.

The effective date of this MOA shall be the date it is signed by both Parties.

**DEPARTMENT OF STATE**                               **AFSA**

_Richard R. Verma_  1/3/2025                          _[signature]_  1/8/25

Richard Verma                                        Thomas Yazdgerdi
Deputy Secretary of State                            AFSA President

# EXHIBIT 3

## MEMORANDUM OF AGREEMENT (MOA)

The parties to this MOA are the American Foreign Service Association (AFSA), the American Federation of Government Employees (AFGE), Local 1534, and the Department of State (Agency). The parties have had the opportunity to exchange proposals and discuss matters related to the Agency's right to audio/visual record all voluntary and compelled subject interviews conducted by the Bureau of Diplomatic Security's Office of Special Investigations (DS/DO/OSI) domestically and have agreed to the following provisions as it relates to those investigative interviews and said recordings:

1. DS/DO/OSI (previously known as DS/ICI/SID) is authorized to conduct overt domestic audio and visual recording of all voluntary and compelled subject interviews.

2. In addition to this audio and visual recording, DS/DO/OSI will record the interview via audio only on a separate device. This will serve as a redundant capability, in the unlikely event that the primary recording system fails.

3. For compelled interviews, DS will provide an employee at least 24 hours' advance notice of any interview unless such notification could jeopardize the investigation. If asked by the employee or by the Union representative on behalf of the employee, DS will advise whether the employee is the subject of the investigation unless such notification could jeopardize the investigation.

4. Interview recordings will begin prior to the subject's entrance into the interview room. At the outset of the interview, an investigator will inform the individual verbally that the interview is being recorded, that the recording will continue until the conclusion of the interview (even if the investigators or employee temporarily leave the room), and, the possible uses of the recording (e.g. in a criminal action, administrative action and/or security clearance revocation action). In addition, DS may post signage saying "Recording in Progress" either in or immediately outside the interview room.

5. Also at the outset of the interview, the investigators will remind the individual that it is an unclassified discussion. If there is a need to address any classified information, it will be done at the end of the interview - after the recorder is turned off.

6. DS will strive to ensure that all recordings have sufficient volume.

7. Investigators will provide the subject of the investigation with appropriate warnings at the beginning of the interview. When that person is a U.S. Government employee the investigator will administer a DS-7619 (warning form required for voluntary interviews) or a DS-7618 (warning form for a compelled interview). The employee may have representation in such an interview if he or she so elects.

1

8. Upon request from the employee or representative of the employee, the person being interviewed and his/her representative may adjourn to a private setting established by DS/OSI for a reasonable period of time mutually agreed to by the parties involved. The use of a private room will depend upon the nature and/or needed length of the conversation.

9. Upon the conclusion of the interview, investigators will preserve the recording via Department approved electronic media. The original copy of the interview recording(s) will remain in the OSI case file. The recording(s) will become an attachment to the Report of Investigation (ROI).

10. If the Union did not represent the employee during prior investigative interview(s), but the Union is representing the employee during a subsequent investigative interview in the same case, a Union representative will be allowed an opportunity to review the previous recording(s), prior to DS conducting the subsequent interview, in an appropriate setting if requested unless such review could create a conflict of interest. DS will make the recording(s) available to the Union representative within two (2) business days after the representative's request. In the event DS finds that a review of the recording(s) from the prior interview(s) would create a conflict of interest, DS will provide the Union representative with the basis for its position and provide the representative with the opportunity to mitigate the concerns within five (5) business days from when the Union representative is notified, by DS, of the basis for the conflict of interest. If the conflict of interest is mitigated, DS will make the recording(s) available to the representative within two (2) business days after the conflict of interest is mitigated. The Union representative may take non-verbatim notes, and DS reserves the right to have a DS agent present to witness said review of the recording.

11. If DS offers the employee an opportunity to resign in lieu of prosecution, DS will afford the employee's Union representative an opportunity, upon request, to listen/view the recording(s) unless such a review could create a conflict of interest or if the Department of Justice does not approve of such a review. DS will make the recording(s) available to the Union representative no more than two (2) business days after the Union representative's request. In the event DS finds that a review of the recording(s) from the prior interview(s) would create a conflict of interest, DS will provide the Union representative with the basis for its position and provide the Union representative with the opportunity to mitigate the concerns as soon as possible but no later than two (2) business days from when the Union representative is notified, by DS, of the basis for the conflict of interest. If the conflict of interest is mitigated, DS will make the recording(s) available to the Union representative within two (2) business days after the conflict of interest is mitigated. The review will not be allowed if the Department of Justice specifically rejects such a review.

2

12. When the ROI provided to HR/ER/CSD for appropriate action or to DS/PSS for security clearance review makes any reference to the recording or directly quotes from the recording, the ROI will indicate where in the recording that reference or quote occurs. DS is not obligated to transcribe the entire recording. However, DS may transcribe portions of the recording for inclusion in the ROI and will, in those instances, note the relevant location within the recording and include the transcript of those portions as attachments that are made available to the employee as appropriate.

13. The parties will send a joint message announcing the implementation of this policy to include a summary of the procedural protections negotiated into this agreement stating that this policy will go into effect ten (10) business days after the date of that joint notice.

14. Should the Department propose an expansion of this policy; the Department will notify the Unions of this proposal and bargain as appropriate.

15. As it pertains to employees represented by AFSA on Foreign Service appointments including those employed by other Foreign Affairs agencies, this agreement applies to both positions within the bargaining unit and those out of the bargaining unit.

FOR THE AGENCY

Steven J. Polson
Chief Labor Management Negotiator

FOR THE UNION

Angle Bryan
AFSA State Vice President
1 JUNE 2016

Anthony Bishop
AFGE State Vice President

3

## IMPLEMENTATION OF OVERT DOMESTIC AUDIOVISUAL RECORDINGS OF INVESTIGATIVE INTERVIEWS

On November 25, 2013, then Deputy Secretary Burns approved a policy that authorized the Bureau of Diplomatic Security's Office of Special Investigations (DS/DO/OSI) to conduct overt domestic audiovisual recording of subject interviews in both compelled and voluntary settings in routine criminal and administrative investigations. After careful consideration of Union concerns, Deputy Secretary Higginbottom upheld the Burns' approval and the parties moved forward to bargain impact and implementation of said policy. This policy does not apply to bargaining unit employees of Passport Services represented by the National Federation of Federal Employees (NFFE) Local 1998.

The Department, the American Federation of Government Employees (AFGE) Local 1534, and the American Foreign Service Association (AFSA) concluded bargaining and agree on the following procedural protections:

- Employees are entitled to representation at said interviews at their election. For compelled interviews, DS will provide at least 24 hours notice of any interview unless such notification could jeopardize the investigation.
- Employees will be advised when a recording begins and when it ends.
- Subjects of interviews will be given appropriate warnings and assurances prior to the commencement of the interview.
- Employees and/or their representative will be entitled to a copy of the recording at the appropriate opportunity should formal action (disciplinary action or revocation of the employee's security clearance) be pursued.
- An employee's Union representative will be given the opportunity to listen/view the recording in an appropriate setting if the Union is now representing an employee prior to a second interview unless such review could create a conflict of interest.
- If the Department proposes an expansion of the policy, it must notify the Unions and bargain as appropriate.

- This policy shall go into effect 10 business days from the issuance of this notice. Prior to the effective date of the policy, DS/DO/OSI is required to obtain written consent from an employee in order to audio/video record the interview.

Should anyone have questions or concerns about this policy, they should contact the DS Office of Special Investigations via email at DS-OSIDutyAgent@state.gov or their respective Union.

# EXHIBIT

# 4

| | |
|---|---|
| **From:** | Polson, Steven J |
| **To:** | Thomas Yazdgerdi |
| **Cc:** | floyd@afsa.org; Tina Wong; Bradley, Patrick G; Phillips, Bradley Aaron; Klemm, Christopher G |
| **Subject:** | [EXTERNAL]Recent EO on Unions |
| **Date:** | Monday, March 31, 2025 4:38:53 PM |

On Thursday, March 27, 2025, the President issued an Executive Order (EO), entitled "Exclusions from Federal Labor-Management Relations Programs." In compliance with the EO, effective immediately, the Department hereby terminates the Framework Agreement with AFSA and will no longer recognize AFSA as an exclusively recognized labor organization.

The Department will cease all further payroll dues allotments immediately. Additionally, all recurring meetings between AFSA and the Department are cancelled. Official time for the AFSA President, AFSA State VP, and the additional AFSA representative on 100% official time under the terms of Article 5, Section 3(b) of the Framework Agreement will end at close of business today. We encourage these employees to be in contact with their CDO to pursue appropriate follow-on assignments.

AFSA elections may not proceed using agency space or government equipment (i.e., .gov messaging). AFSA must also remove all material from and vacate AFSA's Department-provided office suite in HST by COB April 4. AFSA's access to the suite will end no later than Friday, April 4.

Steven J. Polson

Chief Labor Management Negotiator

Policy, Planning and Communication Staff

Labor Management (GTM/PPC/LM)

Room 1239, HST

Department of State

202-647-4285

SENSITIVE BUT UNCLASSIFIED

EXHIBIT

5

## AGREEMENT UNDER EXECUTIVE ORDER 11636

12/6/7

This agreement between the Department of State and the American Foreign Service Association (AFSA) under Executive Order 11636 is effective as between the parties when signed by the Deputy Under Secretary of State for Management and the AFSA Board Chairman. As a result of consultation and mediation pursuant to Sections 8 and 9 of the Order, respectively, the Department and AFSA, recognizing the importance to the Service of maintaining a high degree of confidence in the integrity of the promotion process, and wishing to institutionalize a number of the highly beneficial reforms put into effect by the Director General and his staff, agree to the following provisions concerning the promotion process:

1)  After a selection board has submitted a rank-order list to the Director General, no alteration shall be made in the order of names on the list, and, without the consent of the individual concerned, no name falling within the promotion zone shall be excluded from the promotion list except for one of the following reasons:

   a.  Death, retirement, resignation, or separation from the Service;

   b.  Language probation requirements;

   c.  Referral to a Selection Review Board on grounds that an individual is the subject of investigation or of proceedings involving loyalty, security, suitability, misconduct or malfeasance.

   d.  The absence of certification of an available position at the higher rank, in the case of an individual in the Resident and Limited Indefinite Resident Employee and Departmental Employee Standards (DES) pay categories in which promotion may be dependent upon such certification.

In each such case any employee still in the Service whose name has been excluded shall be officially notified in writing of the particulars. Management shall notify AFSA of the numbers (but not the names) of individuals excluded and the reasons for each such exclusion. Such information shall be held in confidence.

2)  No person subject to review by the selection boards whose name was not rank-ordered by a board such that he fell within the promotion zone shall have his name placed on a promotion list except in the case of an individual:

2.

    a.  recommended for promotion by the Secretary in
         accordance with a recommendation of the Foreign
         Service Grievance Board or by an EEO appeals
         examiner; or

    b.  whose name had previously been excluded in accordance
         with paragraph (1) of this agreement and the reason
         for that exclusion has ceased to exist; or

    c.  who is the next highest individual on the rank-order
         list and therefore moves into the promotion zone
         as the result of the proper exclusion from the promotion
         list of another name from within that zone in accordance
         with paragraph (1) of this agreement.

Management shall notify AFSA of the numbers of individuals placed
on a promotion list in accordance with each of these exceptions,
and the rationale for each such addition.

3) The number of promotions to Class I and below, by
class and by each category as competed within each class, which
Management expects to recommend or make shall be established
prior to the submission of findings and recommendations by the
selection board or staff review panel concerned. The percentage
of promotions which shall be made on an interfunctional basis
shall also be established prior to submission of the findings
of the first of the selection boards concerned in any annual
promotion cycle. It is recognized that change of circumstances
may dictate changes in these numbers. Management shall provide
AFSA with a copy of the memoranda establishing these numbers
and any changes therein. AFSA shall hold these memoranda in
confidence until Management publishes them. If there is any
discrepancy between the previously established numbers and the
actual number of promotions by class and category, as competed,
Management shall provide to AFSA a confidential briefing which
shall include a full explanation of that discrepancy.

4) The Director General may accept the rank-order lists
of the selection boards or return any or all of them for review
if he questions procedures or conformity with the precepts. In
each such case the Director General shall give the board chairman,
in writing, his reasons for returning the rank-order lists and
shall provide a copy of his statement of reasons to AFSA.

5) In the event that members of selection boards or others
privy to information concerning the promotion process have
reason to question whether the above provisions have been adhered
to, they should address their inquiry in writing to the Director

3.

General.  A copy of the inquiry and the reply shall be provided
to AFSA in confidence.

6)   Either party may publish the contents of this agreement.

7)   Any grievance concerning the application or interpre-
tation of the Department's practices, policies or regulations
based on this agreement may be resolved by the filing of a
grievance under the Foreign Service grievance system.

8)   This agreement shall be valid unless changed by con-
sultation between the parties, but shall be terminated in the
event that AFSA loses its certification as exclusive repre-
sentative.  Either party may propose consultation on the imple-
mentation of this agreement at any time.

In witness whereof, the representatives of the respective parties
have hereunto affixed their signatures on this  **6th** day of
December 1973.

FOR THE DEPARTMENT                    FOR THE AMERICAN FOREIGN
OF STATE                              SERVICE ASSOCIATION

_____               _____

_____               _____

_____
        APPROVED                              APPROVED

_____               _____
Acting Deputy Under Secretary         Chairman of the Board, AFSA
of State for Management

DATE   12/6/73                        DATE   12/6/73

## MEMORANDUM OF UNDERSTANDING

### October 18, 1973

The following memorandum of understanding has been reached between the parties concerning the Agreement on procedural safeguards for the promotion process, hereafter referred to as "the Agreement."

    1.  AFSA hereby expresses its intent to publish the entirety of the contents of the Agreement, (excepting only the signatory line), and will not publish portions of the Agreement until AFSA or management has published the Agreement in its entirety.

    2.  Nothing in the Agreement shall be interpreted by AFSA as precluding promotions pursuant to 3 FAM 568.3(i). However, upon the submission of a written proposal by either AFSA or the Department with respect to 3 FAM 568.3(i), both parties agree to meet in accordance with E. O. 11636 as a matter of priority as soon as both the new Director General and the new Deputy Under Secretary for Management have taken office.

    3.  Both parties agree that the intent of paragraph 3 of the Agreement is to guard against the hypothetical possibility of arbitrary action to adjust the numbers of promotions, or of promotions within a given category, for the purpose of excluding or including particular individuals within the promotion zone.

    4.  The parties agree that nothing contained in paragraph 7 of the Agreement creates new rights for AFSA or derogates from existing rights of the organization under the Interim Grievance Procedures presently in effect.

Alexander J. Davit
Acting Special Assistant

Richard L. Williamson
AFSA, Counselor