# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____
                                        )
AMERICAN FOREIGN SERVICE                )
ASSOCIATION,                            )
                                        )
                    *Plaintiff*,          )        Civil Action No. 1:25-cv-1030-PLF
                                        )
v.                                      )
                                        )
DONALD J. TRUMP, et al.,                )
                                        )
                    *Defendants*.         )
_____ )

## DECLARATION OF RANDALL CHESTER

I, Randall Chester, declare under the penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1.      I am a Vice President (VP) for the American Foreign Service Association (AFSA), representing members of the Foreign Service at the United States Agency for International Development (USAID). I have held this position since July 15, 2023.

2.      Prior to my election as AFSA USAID VP, I served as a Foreign Service Officer in Afghanistan, Bosnia Herzegovina, Ethiopia, Pakistan, Tanzania, Madagascar, and Washington, D.C. I joined USAID in 2004 as an Agriculture Officer.

3.      On January 22, 1973, AFSA was certified as the exclusive representative of all Foreign Service employees at USAID. The bargaining unit consists of one single world-wide bargaining unit, excluding confidential employees as described in Section 1002(6) of the Foreign Service Act (FSA), management officials as described in Section 1002(12) of the FSA, employees engaged in personnel work in other than a purely clerical capacity,

employees engaged in criminal or national security investigations, and employees who audit the work of individuals to ensure that their functions are discharged with honesty and integrity.

4.      Over 80 percent of active-duty members of the Foreign Service across six foreign affairs agencies, including USAID, are dues-paying members of AFSA. There are 2,254 dues-paying AFSA members at USAID, out of 2,465 Foreign Service members (including Foreign Service limited employees) in the bargaining unit at USAID. A USAID Foreign Service member, also known as a "development diplomat," designs, implements, and evaluates development projects and programs, often working with local communities, organizations, and governments to deliver effective development results. Members working for USAID are primarily focused on promoting development and humanitarian assistance in partner countries. Development projects they design, implement, and evaluate may include providing humanitarian aid, supporting infrastructure development, strengthening healthcare systems and improving health outcomes, improving education opportunities, promoting private sector development and small businesses, increasing agriculture productivity, linking US business to new market opportunities, and improving delivery of government services in host countries. USAID Foreign Service members often have technical expertise in specific areas like public health, economic growth, democracy and governance, education, or agriculture, which allows them to design and manage complex projects worth tens of millions of dollars, ensuring that funds are used effectively and efficiently. Finally, FSOs work closely with local communities, organizations, and governments to develop strategies and partnerships that ensure effective development outcomes. They coordinate the programs and portfolios in different offices within USAID

Missions and across US Government Agencies in an embassy to ensure that the activities they design meet congressional mandated requirements and serve the communities they work in.

5.      Foreign Service members working at USAID typically serve in 2- to 4-year long tours of duty and must bid on new assignments 6-9 months before the end of their tour.

6.       AFSA bargaining unit members pay voluntary membership dues to AFSA, which is the union's overwhelming source of operational funding. The vast majority of AFSA members have elected to have their dues deducted by USAID.  Approximately 86 percent of AFSA's overhead costs are paid for by union dues.

7.      On December 7, 2022, AFSA and USAID signed a new Framework Agreement governing such things as timelines for conducting negotiations, use of official time by the AFSA USAID Vice President and Representative, the union's right to information, office space, and dues withholding. As the AFSA USAID Vice President, my job duties require me to be familiar with the contents of the Framework Agreement; I routinely rely on the Framework Agreement when I meet and negotiate with USAID management and perform other union representational duties. A true and accurate copy of the Framework Agreement is provided as Exhibit 1 to this Declaration.

8.      AFSA also has negotiated a series of Memoranda of Understanding with USAID on a variety of topics relating to the unique conditions of service of Foreign Service members.

9.      AFSA and USAID Human Capital Talent Management (HCTM), Employee Labor Relations (ELR) engage in rolling negotiations, all year long, on a wide

variety of topics relating to terms and conditions of Foreign Service employees' employment. Up until January 22, 2025, AFSA and ELR met on a bi-weekly basis. I participated in these meetings. The last AFSA – ELR meeting was held on January 22, 2025. Since then, the Agency has made significant changes to conditions of employment, with no notice, consultation, or negotiation with AFSA. On March 17, 2025, I received a "canceled event" email for our bi-weekly AFSA/ELR meeting, with a note that read, "ELR has been instructed by leadership *not to communicate with the Unions*." Before management stopped meeting with AFSA, we were often able to informally resolve employee questions and issues by speaking with our management counterparts. These meetings reduced the need to file grievances.

10.     AFSA legal and grievance staff represent members in individual cases, such as grievances, discipline cases, and investigations.  AFSA also files implementation disputes and unfair labor practices against USAID when it violates one of our agreements or unilaterally changes our members' conditions of employment. We recently filed two implementation disputes against USAID relating to our displacement from the union's office at the Ronald Reagan Building and the Agency's failure to bargain over procedures and appropriate arrangements relating to USAID's widescale reduction in force. Along with AFSA's President, I filed the implementation dispute regarding the reduction in force by sending a memorandum to USAID HCTM-ELR on March 26, 2025. A true and correct copy of the implementation dispute is attached as Exhibit 2 to this Declaration.

11.     The March 27, 2025, Executive Order titled "Exclusion from Federal Labor-Management Relations Programs" will have an immediate and devastating impact

on AFSA's ability to safeguard the interests and rights of USAID Foreign Service members and upon AFSA's finances and existence.

12.     USAID has not contacted me or reached out to AFSA about the actions it is taking in response to the Executive Order. However, AFSA anticipates that USAID will rescind its recognition of AFSA as the exclusive representative and will revoke the Framework Agreement, in light of the Executive Order.

13.     Stripping AFSA of its right to negotiate conditions of employment, procedures, and appropriate arrangements for our members at USAID will harm members by allowing management to unilaterally discard negotiated agreements and safeguards that have balanced the rights of employees and management for over 50 years.

14.     In addition, AFSA's collective bargaining agreements grant office space to the AFSA USAID Vice President and AFSA staff. This provides bargaining unit members a place to meet with their exclusive representative and for AFSA to maintain its documents and files. AFSA Offices in the Ronald Reagan Building were vacated on March 19, 2025, after USAID gave up its lease on the building and forcibly removed AFSA from the premises. While AFSA has its headquarters office at 2101 E Street, NW, Washington, DC, there is not sufficient suitable space for the AFSA Vice Presidents, legal and grievance staff. To rent space for these AFSA officials and staff in the Washington, DC area will be costly.

15.     AFSA's collective bargaining agreement with USAID also provides 100% official time for the USAID Vice President and "reasonable official time" for the AFSA USAID Representative. Official time permits AFSA representatives to perform union representational duties during the workday, such as negotiating agreements with USAID

and meeting with employees about grievances or disciplinary issues. My full-time union duties as USAID Vice President have consistently required at least 40 hours per week. If AFSA elected representatives are not permitted to use official time and are required to return to agency duties full-time, there will be no elected union representatives who can advocate during the workday, including on Capitol Hill. This will remove a crucial advocate for members facing extreme negative actions by the current administration, at the very time that they need AFSA most.

16.    The timing of the Executive Order creates additional hardships for AFSA and for members of the Foreign Service. AFSA is in the middle of elections for the 2025-2027 governing board, which includes the 100% official time position of USAID VP. The new board begins its two-year term on July 15. Eliminating official time will reduce or possibly eliminate the number of candidates who are able to serve in the USAID VP position, since union representational duties will have to be performed outside of working hours.

17.    Since January 20, 2025, the administration has been engaged in an unconstitutional effort to shutter USAID.  On Sunday, February 23, 2025, without any prior notice, USAID announced that, with limited exceptions, all direct hire employees would be placed on administrative leave by the end of the day, and that the agency would implement a Reduction in Force (RIF) that would terminate approximately 1,600 USAID personnel. That evening, USAID issued individual RIF notices, with a termination date of April 24 for domestic employees and May 26 for overseas employees, hitting an estimated 600 Foreign Service members. AFSA has engaged in legal efforts to prevent this action by

filing a lawsuit which seeks an injunction ordering the recall of all USAID employees on administrative leave and preventing further RIFs or mass terminations.

18.     In recent days, USAID has made moves to terminate even more staff. Specifically, on March 28 a new RIF notice was sent to most of the workforce, with the exception of a handful of individuals including myself, who remained on administrative leave. Since March 28, the AFSA member email account and my USAID VP email account have been receiving over 100 emails per day with questions, asking for support, and other issues relating to the RIFs. On April 7, I received a RIF letter stating that my last date with USAID will be July 1, 2025. I will no longer be employed as of July 2, 2025. I will be forced to look for new employment opportunities as of that time. Many USAID Foreign Service members' RIF dates have been extended to September 2.

19.     Eliminating AFSA's presence and the AFSA USAID Vice President will hamper AFSA's ability to challenge these unconstitutional actions and support its members.  I have attempted to engage with USAID leaders and counterparts in its HCTM office on a number of unresolved, contentious issues impacting members.  These issues include USAID's refusal to:  1) certify tenure approval recommendations from the Winter Tenure Board; 2) collect annual performance reports as required by USAID policy; 3) meet with AFSA and have meaningful discussions about the recall of USAID Foreign Service Officers from their overseas assignments; 4) provide AFSA with date and information, including Reduction in Force registers, as required by our Framework Agreement; and 5) meet with AFSA and provide information as part of any actions related to the on-going Reduction in Force as required by USAID policy that was negotiated with AFSA. USAID has refused to communicate with me about these issues.

20.     AFSA's professional staff provide critical advice and guidance to members on all facets of their employment, including during investigatory interviews or with grievances pending before the Foreign Service Grievance Board (FSGB). Removing AFSA as the exclusive representative will harm individual members by limiting their access to a vital resource during an especially critical time. Terminating union dues deductions may result in layoffs at AFSA, further harming Foreign Service employees who are seeking redress for negative actions taken by USAID.

21.     As the representative of nearly 2,500 Foreign Service employees, I have been in regular contact with a variety of media sources to discuss the negative actions of the Administration and the profound impact on the personal and professional lives and families of AFSA's constituents. Due to the nature of their positions, employees are unable to talk to the media, making AFSA the only voice to the public. Since January 20, I have appeared on CNN, PBS, CBS 60 Minutes, given on the record interviews to Canadian Broadcasting Service, BBC, ABC, NBC, and have given multiple interviews on background to various print and electronic media. Without this access, the impact and true story of what is happening to USAID employees would not be in the public record.

22.     A video of the interview I gave to CBS 60 Minutes can be found here: https://www.cbsnews.com/news/usaid-dismantling-trump-60-minutes-transcript/.

23.     A video of the interview I gave to PBS News Hour can be found here: https://www.youtube.com/watch?v=dVRnSOvvBXI.

24.     On April 8, 2025, my USAID electronic accounts were deactivated. This includes my .gov email account and access to electronic files, which I previously used for union representational duties.

25.    The injuries suffered by USAID Foreign Service employees, AFSA elected officials, and AFSA staff members are ongoing or imminent and will persist unless this Court intervenes.


Executed on April 14, 2025

Randall Chester

# EXHIBIT
# 1

# AFSA-USAID FRAMEWORK AGREEMENT

# Table of Contents

**PREAMBLE** ..................................................................................................**3**

**ARTICLE 1:  PARTIES TO THE AGREEMENT AND RECOGNITION OF THE BARGAINING UNIT** ..........................................................................**4**

**ARTICLE 2:  DEFINITIONS** ....................................................................**5**

**ARTICLE 3:  EFFECTIVE DATE, DURATION, AND GROUNDS TO REOPEN** ..........................................................................................................**7**

**ARTICLE 4:  EMPLOYEE RIGHTS AND RESPONSIBILITIES** ................**8**

**ARTICLE 5:  UNION RIGHTS AND RESPONSIBILITIES** ........................**10**

**ARTICLE 6:  MANAGEMENT RIGHTS AND RESPONSIBILITIES** ........**13**

**ARTICLE 7:  NEGOTIATIONS** ..................................................................**14**

**ARTICLE 8:  USE OF OFFICIAL FACILITIES AND SERVICES** ............**18**

**ARTICLE 9:  USE OF TELECOMMUNICATIONS SYSTEM** ....................**20**

**ARTICLE 10:  DUES WITHHOLDING** ......................................................**21**

**Attachment A - AFSA Service Memo Template** ................................................**23**

**SIGNATURES** ..........................................................................................**24**

AFSA-USAID Framework Agreement
Preamble

# PREAMBLE

Pursuant to the policy set forth by Chapter 10 of the Foreign Service Act of 1980 (FS Act) governing Labor-Management Relations, the following articles of this Framework Agreement ("Agreement"), together with any and all supplemental agreements and amendments to this Agreement that may be subsequently agreed to, constitute the total Agreement between the Foreign Service of the United States Agency for International Development, (hereinafter called "USAID" or the "Agency" or "Employer"), and the American Foreign Service Association (hereinafter called the "Union" or "AFSA"). The Agency and the Union are collectively referred to as the "Parties."

The Parties agree that the statutory protection of the right of employees to organize, bargain collectively, and participate through the Union safeguards the public interest, contributes to the effective conduct of business, and facilitates and encourages the amicable settlement of disputes between the Parties involving conditions of employment. The Parties also recognize that the unique conditions of Foreign Service employment require a distinct framework for the development and implementation of modern, constructive, and cooperative relationships between management officials and organizations representing members of the Foreign Service. This Agreement should be interpreted and administered in a manner consistent with the requirement of an effective and efficient Government. The Parties hereby affirm their commitment to build a positive and cooperative bilateral relationship.

With the foregoing in mind, the Parties subscribe to the following statements of the respective rights and obligations of the Agency and the Union:

## ARTICLE 1:  PARTIES TO THE AGREEMENT AND RECOGNITION OF THE BARGAINING UNIT

On January 22, 1973, AFSA was certified as the exclusive representative of all Foreign Service employees of the United States Agency for International Development, as reaffirmed by Chapter 10 of the FS Act.  The bargaining unit constitutes a single world-wide bargaining unit, excluding confidential employees described in Section 1002(6) of the Foreign Service Act (FS Act),[1] management officials as described in Section 1002(12) of the FS Act,[2] employees engaged in personnel work in other than a purely clerical capacity, employees engaged in criminal or national security investigations and employees who audit the work of individuals to ensure that their functions are discharged with honesty and integrity.

The Parties agree that for purposes of domestic positions, there is a presumption that management officials include Assistant Administrators, Assistants to the Administrator, and their Deputies within each Bureau and Independent Office or equivalent positions and above.  This Agreement does not preclude AFSA or a management employee from challenging that presumption in the appropriate forum, i.e., before the Foreign Service Labor Relations Board.

---

[1] 22 USC §4102(6).
[2] 22 USC §4102(12).

# ARTICLE 2:  DEFINITIONS

For the purposes of this Agreement, the terms listed below are defined as follows:

**BARGAINING UNIT:**  The group of USAID employees for whom AFSA has been designated the exclusive representative, subject to the exclusions detailed in Article 1.

**CONDITIONS OF EMPLOYMENT:**  Personnel policies, practices, and matters, whether established by regulation or otherwise, affecting working conditions, but does not include policies, practices, and matters:

1) Relating to political activities prohibited abroad or prohibited under subchapter III of chapter 73 of title 5, U.S. Code;

2) Relating to the designation or classification of any position under section 501 of the FS Act;

3) To the extent such matters are specifically provided for by Federal statute; or

4) Relating to Government-wide or multiagency responsibility of the Secretary affecting the rights, benefits, or obligations of individuals employed in agencies other than those which are authorized to utilize the Foreign Service personnel system.

**CONFIDENTIAL EMPLOYEE:**  An employee who acts in a confidential capacity with respect to an individual who formulates or effectuates management policies in the field of labor-management relations.

**DAYS:**  Unless otherwise indicated, use of the word "days" refers to calendar days.  In computing any period of time prescribed in this Agreement, the day of the act from which the designated period of time begins to run shall not be included.  For example, if a party receives a proposal on April 1st, a 14-day response period would begin on April 2nd.  Where the day the response is due falls on a weekend or federal holiday, the due date is the next business day.

**EMPLOYEE:**  A member of the Foreign Service who is a citizen of the United States, wherever serving as further described in the Foreign Service Act.[3]

**FRAMEWORK AGREEMENT:**  The articles of this Agreement, together with any and all supplements and amendments to this Framework Agreement.

**MANAGEMENT OFFICIAL:**  An individual who:

1) Is a chief of mission or principal officer;

2) Is serving in a position appointed by the President, by and with the advice and consent

---

[3] FS Act §1002(8), 22 USC §4102(8).

AFSA-USAID Framework Agreement
Article 2

of the Senate, or by the President alone;

3) Occupies a position which in the sole judgment of the Secretary is of comparable importance to the offices mentioned in subparagraph (a) or (b);

4) Is serving as a deputy to any individual described by subparagraph (a), (b), or (c);

5) Is assigned to carry out functions of the Inspector General of the Agency and the Foreign Service under section 209 of the FS Act; or

6) Is engaged in the administration of this subchapter or in the formulation of the personnel policies and programs of the Agency.

## ARTICLE 3:  EFFECTIVE DATE, DURATION, AND GROUNDS TO REOPEN

### Section A.  Effective Date and Duration

The effective date of this Agreement shall be the date of Agency Head Approval or thirty days after the last date of signature on page 24.

Subject to Section B, this Agreement shall remain in effect for three years from the effective date.  Thereafter, the Agreement shall be renewed for additional one-year periods dating from the anniversary of the effective date, unless between 120 and 60 days (the reopener window) prior to that date either party gives written notice to the other of its desire to reopen the Agreement.  The other party must acknowledge the notice promptly upon receipt.  The Parties will meet in a timely manner to begin negotiations over that reopening, including ground rules if any.  The current USAID-AFSA Framework Agreement shall remain in full force and effect until all proposed changes have been negotiated and agreed to.

### Section B.  Grounds for Reopening the Agreement Outside the Reopener Window

This Agreement may be amended or supplemented outside the reopener window by mutual agreement.

The Parties are governed by existing and future statutory law.  In the event of a perceived conflict between the law and this Agreement, either party may give written notice to the other of their intent to reopen the Agreement outside the reopener window to address the conflict.

The Parties are governed by existing government-wide rules and regulations.  Should any conflict arise between the terms of this Agreement and any government-wide rules or regulations issued after the effective date of this agreement, the Agreement will govern.  The Parties may reopen the Agreement by mutual agreement or unilaterally during the next reopener window.

To the extent that provisions of the Agency's current or future policies are in specific conflict with this Agreement, the provisions of this Agreement will govern.  The Parties may reopen the agreement by mutual agreement or unilaterally during the next reopener window.

## ARTICLE 4:  EMPLOYEE RIGHTS AND RESPONSIBILITIES

**Section A.  Union Membership**

1) An employee has the right to form, join, or assist a labor organization, or to refrain from any such activity, freely and without fear of penalty or reprisal.  No employee shall be required as a condition of employment, assignment, promotion, or retention, to join or refrain from joining any labor organization.  Each employee shall be protected in the exercise of such right.  Except as otherwise provided by the FS Act, such right includes the right:

   a. To act for a labor organization in the capacity of a representative and, in that capacity, to present the views of the labor organization to the Secretary and other officials of the Government including Congress, or other appropriate authorities; and

   b. To engage in collective bargaining with respect to conditions of employment through representatives chosen by the employees as provided by law.

2) No interference, restraint, coercion, discrimination, or reprisal will be practiced by the Agency against an employee for exercising any of the rights guaranteed by Chapter 10 of the FS Act or this Agreement; nor shall the Agency discourage or encourage employee membership in a labor organization.  Neither shall an employee be disciplined or otherwise discriminated against by the Agency because they participated in a grievance, appeal, unfair labor practice complaint or any other proceeding brought under the provisions of law.

3) Nothing in this Agreement shall require an employee to become or to remain a member of a labor organization.

4) This Agreement does not prevent any employee in the bargaining unit from bringing, on their own initiative, a grievance, complaint, or any matter of personal concern to the attention of the appropriate officials without fear of penalty or reprisal.

AFSA-USAID Framework Agreement
Article 4

**Section B.  Representation Rights - Formal Discussions**

1)  An exclusive representative shall be given the opportunity to be present at:

    a.  Any formal discussion between one or more representatives of the Employer and one or more employees or their representatives concerning any grievance or any personnel policy, practice, or other general condition of employment; and

    b.  Any examination of the employee by a representative of the Employer in connection with an investigation if the employee reasonably believes that the examination may result in disciplinary action against the employee and the employee requests such representation.

2)  The Agency shall annually inform all USAID personnel via Agency Notice of the requirement to give the Union the opportunity to be present at all formal discussions (as defined in Section B(1)(a) above).  In addition, the Agency shall annually inform AFSA bargaining unit employees via Agency Notice of their Weingarten rights and identify AFSA as the exclusive representative for FS employees.  Prior to sending these annual Notices, the Agency will provide AFSA with a draft Notice.  AFSA has five days to provide comments or suggested changes to the Agency.

AFSA-USAID Framework Agreement
Article 5

# ARTICLE 5:  UNION RIGHTS AND RESPONSIBILITIES

## Section A.  Recognition and Representation[4]

The Agency recognizes the Union's right to act for and negotiate agreements covering all employees in the unit.  The Union will represent all employees in the unit in those matters where it is acting as the exclusive representative without discrimination and without regard to Union membership.

## Section B.  Officers and Representation

While the Agency reserves the right to assign work, including the issuance of a directed reassignment where appropriate, the Agency will respect the statutory rights of the Union and will recognize duly elected or appointed AFSA officers and other representatives of AFSA, including their rights to act freely and without fear of penalty or reprisal.  As such, the elected or appointed AFSA Vice President will, upon request, be excepted from participation in the assignments processes.  However, where the AFSA Vice President will have served continuously in the United States for any period of continuous service exceeding eight years, they must seek an extension from the Administrator.  AFSA service will normally be considered a special circumstance warranting approval pursuant to 22 USC 3984(a).

AFSA will provide the Agency with a complete list of officers and representatives on a timely basis after each election of general officers and when new officers are appointed within the Union.

## Section C.  Official Time,[5] Time-in-Class, and Telework

1)  The AFSA USAID Vice President shall be granted 100% official time to perform representational activities.  Official time is not authorized for internal Union business.

    The Agency agrees to provide an outgoing AFSA USAID Vice President 100% official time for a two-week period after the end of the official term so that the outgoing Vice President can orient the incoming AFSA USAID Vice President on matters relating to representational activities.

2)  The Parties agree that employees designated by AFSA as representatives in advance shall be authorized a reasonable amount of official time when the employee would otherwise be in a duty status to perform representational duties.  Reasonable amounts of official time may include requests for 100% official time for an additional representative for a definitive period of time.  Such requests must include a description of the activities the representative will engage in.  When approved, the Agency will so notify the supervisors of employees involved.

---

[4] FS Act §1013, 22 USC §4113.
[5] FS Act §1018(d), 22 USC §4118(d).

AFSA-USAID Framework Agreement
Article 5

3)  The Agency will extend the time-in-class limitation of the AFSA VP for the period served as AFSA VP, not to exceed a cumulative extension of four years.

4)  The AFSA VP may request regular and recurring telework of up to eight (8) days per pay period, which shall be approved barring prohibition by the Telework Enhancement Act or its successor.

**Section D.  Participation in Promotion Process**

1)  While serving as the AFSA VP, the AFSA VP may elect to participate in the promotion process.

2)  The promotion evaluation file or equivalent of a current or former AFSA VP will include the most recent five years of their USAID service excluding their time as AFSA VP.

3)  The Agency will include an AFSA Service Memo (see Attachment A) in the AFSA VP's eOPF.  The Agency will include the AFSA Service Memo in a current or former AFSA VP's promotion evaluation file or equivalent for all years where their service as AFSA VP is part of a promotion board's review.

**Section E.    Post Representatives**

The Agency agrees to recognize AFSA's designation of Agency employees as AFSA representatives at post.  Upon timely written notice of an individual's designation from AFSA to the Agency's Labor Management point of contact, they or their designee will certify the designation and promptly notify post management of the designation and authorization to deal with the named individual.  The Parties agree that all dealings at post shall be consistent with 3 FAH-1H-5120.

**Section F.  Changes in Bargaining Unit Status**

When the Agency decides to change the Bargaining Unit Status (BUS) code of a position coded as 2283, the Union will be notified of the change prior to implementation.

**Section G.  Listings of FS Personnel**

The Agency will provide the Union a list of Foreign Service personnel, both bargaining unit and non-bargaining unit employees.  This listing will be alphabetical with grade, email address, and current post of assignment.  The Agency agrees to provide a full listing as of September 30 of the year that this Agreement goes into force, and then at least on a monthly basis.

AFSA shall be advised of the schedule for orientation sessions for new USAID employees.  The Agency shall provide new bargaining unit members the opportunity to attend an AFSA orientation session at AFSA headquarters or virtually.  A listing of employees for orientation showing their name, position, Bureau/Office, and back stop and bio will be provided to the Union in advance of the sessions.

AFSA-USAID Framework Agreement
Article 5

**Section H.  Union Right to Information**

In accordance with the provisions of Section 1013(e)(4) of Chapter 10 of the FS Act, the Agency agrees to provide the Union, upon request and to the extent not prohibited by law, data:

1) Which is normally maintained by the Agency in the regular course of business;

2) Which is reasonably available and necessary for full and proper discussion, understanding, and negotiation of subjects which fall within the scope of collective bargaining; and,

3) Which does not constitute guidance, advice, counsel, or training provided for management officials or confidential employees, related to collective bargaining.

USAID will acknowledge receipt and will furnish data to the extent not prohibited by law, which is compliant with 22 USC 4113(e)(4), in a timely manner, normally within seven (7) days.  If the Agency is not able to furnish appropriate data within this timeframe, it will provide estimates on data production timelines.  The Agency is encouraged to provide partial responses as data becomes available.

AFSA-USAID Framework Agreement
Article 6

# ARTICLE 6: MANAGEMENT RIGHTS AND RESPONSIBILITIES

## Section A.  Management Rights

Nothing in this section shall affect the authority of any management official, in accordance with applicable law to:

1) Determine the mission, budget, organization, and internal security practices of the Agency, and the number of individuals in the Foreign Service or in the Agency;

2) Hire, assign, direct, lay off, and retain individuals in the Foreign Service or in the Agency, to suspend, remove, or take other disciplinary action against such individuals, and to determine the number of members of the Service to be promoted and to remove the name of or delay the promotion of any member in accordance with regulations prescribed under the FS Act;[6]

3) Conduct reductions in force, and to prescribe regulations for the separation of employees pursuant to such reductions in force conducted under Section 611 of the FS Act;[7]

4) Assign work, to make determinations with respect to contracting out, and to determine the personnel by which the operations of the Agency shall be conducted;

5) Fill positions from any appropriate source;

6) Determine the need for uniform personnel policies and procedures between or among the Foreign Affairs agencies; and

7) Take whatever action may be necessary to carry out the mission of the Agency during emergencies.

## Section B.  Permissive and Mandatory Bargaining Authority

Nothing shall preclude the Agency and the Union from negotiating:

1) At the election of the Agency, the numbers, types and classes of employees or positions assigned to any organizational subdivision, work project, or tour of duty, or on the technology, methods, and means of performing work;

2) Procedures which management officials will observe in exercising any function under this section; or

3) Appropriate arrangements for employees affected by the exercise of any function under this section by such management officials.

---

[6] FS Act §1005, 22 USC §4105.
[7] FS Act §611, 22 USC §4010a.

# ARTICLE 7:  NEGOTIATIONS

## Section A.  General

The Parties have the responsibility to conduct negotiations and other dealings in good faith and in such manner as will further the public interest.  While this article is predominantly focused on formal bargaining procedures, the Parties believe that pre-decisional involvement over matters that impact the bargaining unit can further that public interest, without regard to whether those matters are negotiable subjects of bargaining under 22 USC 4105(b)(1).  This is not intended to have AFSA involved in day-to-day matters of the Agency but reflects an effort to work collaboratively on issues of mutual concern.  Pre-decisional involvement does not, however, waive Management's or Union's statutory rights.

## Section B.  Notice of Proposed Changes to Conditions of Employment

The Parties recognize the right of either party to propose changes to conditions of employment not covered by this Framework Agreement, where appropriate.  Until the Parties satisfy their obligations under Chapter 10 of the Foreign Service Act, current conditions of employment will remain in effect, barring exigent circumstances.  Written notices of proposed changes to conditions of employment may be made by either party at any time, unless there is a memorandum of agreement governing when such proposals may be made.

1)  The written notice of the proposed change shall include:

    a.  The nature and scope of the proposed change;

    b.  Identification of the employees impacted by the proposed change;

    c.  A description of the change;

    d.  For changes that require revisions to existing documents, the proposing party will clearly indicate the proposed revisions using "track changes" or a similar function;

    e.  An explanation of the proposing party's plans for implementing this change;

    f.  An explanation of why the proposed change is necessary;

    g.  The proposed implementation date;

    h.  The proposing party's Point of Contact; and,

    i.  Any other relevant information that is necessary to facilitate bargaining, as required by law.

AFSA-USAID Framework Agreement
Article 7

2) Notification may include a final date for the Parties to request negotiations with respect to the proposed change. In no case shall such final date be less than fourteen (14) days from receipt of the notification of the proposed change. When notification does not include a final date for the receiving party to request negotiations, and the Parties wish to negotiate, they shall make a request to negotiate within thirty (30) days from the date of receipt of the notification.

3) Should the receiving party wish to request to bargain over the proposed change, they must respond in writing by the deadline with their request and initial proposals, unless they have requested a briefing or clarification pursuant to Part 4 below.

4) If the receiving party wishes to request a briefing, written clarification, or both prior to determining whether to submit a request to bargain and submit initial proposals, it must do so within seven (7) days of receipt of the written notice. Requests for written clarification may include, but are not limited, requests for data covered by 22 USC 4111.

5) If the receiving party requests a briefing, the briefing will be conducted within seven (7) days of receipt of the written request. Briefings may be held using the Agency's teleconference, video conference, or web conference equipment in lieu of in-person meetings. The receiving party may request written clarification within seven (7) days of any briefing.

6) If the receiving party requests written clarification before or after any briefing, the proposing party shall respond in writing normally within seven (7) days of receipt of the written request. If the receiving party is not able to provide a complete response within this timeframe, it will provide estimates on response timelines. The receiving party is encouraged to provide partial responses as data becomes available.

7) The receiving party must submit its request to bargain and initial proposals as soon as possible, but no later than seven (7) days after the briefing or receipt of the proposing party's response to the request for written clarification, whichever is later.

8) Each party at the request of the other, shall be required to meet virtually or in person for good faith negotiations no sooner than seven (7) days after the proposing party has received a request to bargain and initial proposals.

9) The Union may, at any time, request data that is reasonably available and necessary for full and proper discussion, understanding, and negotiation of subjects within the scope of collective bargaining pursuant to 22 USC 4111(e)(4), as outlined in Article 5, Section H. Prior to implementation of any proposed changes, the Agency will satisfy its statutory and contractual obligations associated with that request.

**Section C. Ground Rules for Negotiations**

The Parties may by mutual agreement establish ground rules for negotiations that differ from the procedures outlined in Article 7, Section B and that dictate the labor-management engagement to

follow.  All engagements will be in compliance with the Foreign Service Act's labor management provisions.

## Section D.   Extensions

Either party may request a 10-day extension to submit bargaining proposals and such requests shall be granted.  In addition, nothing herein shall preclude the Parties by mutual consent from extending any time limits imposed under this Article.

## Section E.  Conclusion of Negotiations

1) To the extent conditions of employment are negotiated to agreement with AFSA, the terms of that agreement will be documented by a Memorandum of Agreement (MOA). The Parties may document the conclusion of their engagement through other means, by mutual agreement.

2) The Parties hereby agree that all future MOAs will include a section that addresses the term limits of that MOA, to include if the MOA is intended to continue indefinitely. Where a term limit is set, the section will specify the length of the MOA, whether the Parties will allow an MOA to rollover if not reopened in a timely manner, and as needed, the window of opportunity to reopen an MOA by either party at the end of its term. Nothing prevents the Parties from reopening an MOA at any time by mutual agreement.

3) If the agreement is intended to serve as a supplement to this Framework Agreement, the agreement must state so explicitly and the Framework Agreement must be amended accordingly.

4) In the event a party is unable to implement the agreement in a timely manner, that party will provide written notice and the justification for the delay.

## Section F.  Negotiability Disputes and Impasse

1) If a party believes a proposal by the other party is not negotiable because it is inconsistent with or contrary to applicable law, rule, or regulation, or because it otherwise does not believe it has a duty to bargain, the Parties are encouraged to explore alternative language that will achieve the purpose of the proposal and would not render the proposal non-negotiable if unsuccessful, the Parties may submit the issue for resolution in an appropriate forum, such as the Foreign Service Labor Relations Board.

2) When good faith negotiations do not result in agreement and the Parties are at impasse over negotiable proposals, the Parties will first seek mediation to try and resolve the matter.  If the Parties are unable to reach agreement through mediation, either party may request that the Foreign Service Impasse Disputes Panel (FSIDP) consider the impasse. While the impasse is before the FSIDP or a mediator, neither party will implement the proposed change except to the extent mutually agreed to or if the change is necessary to the effective functioning of the Agency.

AFSA-USAID Framework Agreement
Article 7

**Section G.  Implementation Disputes and Unfair Labor Practices**

1) Any dispute between the Agency and the Union concerning the effect, interpretation, or a claim of breach of a collective bargaining agreement may be resolved as an implementation dispute or as an Unfair Labor Practice.

2) The Parties mutually agree to make reasonable, good faith, efforts to resolve disputes concerning the effect, interpretation, or a claim of breach of a negotiated agreement informally prior to initiating any formal proceeding.

3) Prior to filing an Unfair Labor Practice concerning any matter, the filing party shall give the other party at least seven (7) days advance notice.

## ARTICLE 8:  USE OF OFFICIAL FACILITIES AND SERVICES

**Section A.  Purpose**

Unless otherwise specified, the services and facilities described in this article shall be provided by the Agency to the Union free of charge.  AFSA's use of these services and facilities shall be confined exclusively to matters arising from the performance of its obligations as exclusive representative under Chapter 10 and 11 of the FS Act unless expressly authorized below.

**Section B.  Space and Furniture**

For the convenience and efficient servicing of employees within the bargaining unit, the Agency agrees to provide suitable office space, containing individual offices, meeting space, and surplus office furniture, if available, for the use of the Union.  Such space shall be within the facility considered USAID Headquarters, currently the Ronald Reagan Building (RRB).  The Agency shall provide appropriate signage for AFSA's office space as well as general services, including a reasonable amount of toner and paper for provided printers, for any facility related issues under their authority to include office equipment provided by the Agency.  The Agency, with advance notice, also agrees to provide the Union with access to a cleared space, within RRB, containing a computer and telephone for classified discussions and drafting on an as needed basis.

Additionally, the Agency agrees to make reasonable efforts to provide conference rooms and auditoriums within RRB to enable the Union to conduct general membership and other such meetings.  Requests for use of such space must be initiated by the Union in writing, at least three days prior to the requested date.  The Union understands that the Agency may need to preempt the space, with little notice, for its own use.  The Agency will make every effort to provide alternative arrangements when possible.

**Section C.   Telephones, IT Equipment, and Other Equipment**

The Union may use Agency telephones for all international and local calls in conducting its representational business.  The Agency will provide office-standard computer equipment, to include a scanner/printer/multi-function device if requested and available.

**Section D.  Submission to USAID Official News Media**

Materials that AFSA wishes to submit for publication in official Agency media outlets will be submitted simultaneously to HCTM/ELR and the appropriate point of contact (e.g., Editor, Frontlines; Point of Contact, Global Announcement).

**Section E.  Bulletin Boards**

1) AFSA may have access to Agency Bulletin Boards.  Bulletin board material must be properly identified as belonging to AFSA and relate to employees, their employment by the Agency or AFSA's role as the exclusive representative.  AFSA assumes all

responsibility incident to the preparation, reproduction, distribution, posting, and maintenance of material on bulletin boards.  Postings will be devoid of libelous, scandalous, or scurrilous material.

2)  The Agency agrees to permit AFSA representatives at overseas posts to display AFSA material in an area where other organizational material is located, e.g., on the CLO Notice Board, USAID Mission break area or in a similarly visible location.  Specific notices of AFSA events can be displayed in general use spaces, such as on a cafeteria notice board or other general use bulletin board.

## Section F.  Correspondence to Members

The use of the Agency's facilities for registered mail is made necessary by AFSA's need to transmit documents between its Washington headquarters and its membership worldwide.

AFSA may use the Agency's facilities on a reasonable basis for the distribution of general printed matter and individually addressed correspondence arising from AFSA's role as the exclusive representative.

## Section G.  Electronic Mail Systems

1)  The Agency shall provide AFSA e-mail access for representational purposes, such as communicating directly with employees on announcements of meetings, obtaining employee input on issue between Management and AFSA, and to assist employees with grievances, investigations, disciplinary and other similar employment related matters.

2)  Normally, USAID does not consider communications between and among AFSA and its members about exclusively AFSA representational activities and AFSA business to be Agency records subject to the Freedom of Information Act.  If the Agency receives a request under the Freedom of Information Act for e-mails or other communications to or from AFSA, and upon review of the responsive information concludes that the request includes government records, prior to producing any such documents, the Agency shall contact AFSA to make them aware of the request and the Agency's planned response.

3)  Any Agency issued mobile devices requested and issued to the AFSA Vice President or staff member, will be paid for by AFSA.

4)  AFSA will abide by all relevant provisions of the ADS when using the Agency's intranet and unclassified email system.

5)  As an exception to the general prohibition on the use of email systems for internal union business, AFSA may transmit no more than three broadcast emails during AFSA's election season related to that election using the USAID e-mail system.

## ARTICLE 9:  USE OF TELECOMMUNICATIONS SYSTEM

Unless otherwise stated, AFSA's access to the Agency's Notice and other telecommunications systems shall be confined exclusively to matters arising from the performance of its obligations as exclusive representative under Chapter 10 and 11 of the FS Act.

### Section A.  Standard Procedures

1) AFSA will observe Agency transmittal guidelines for the various types of correspondence it sends through Agency systems.

2) AFSA-submitted Agency Notices will be written in the appropriate style and clearly identified to indicate that transmission is from AFSA through the Agency.  AFSA-submitted Agency Notices must be devoid of libelous, scurrilous, or scandalous material.

3) AFSA-submitted Agency Notices shall be unclassified except in extraordinary circumstances and by agreement of both Parties.  AFSA-submitted Agency Notices shall be sent routine unless there is mutual agreement for a higher priority.

4) An AFSA-submitted Agency Notice must be published provided it is in compliance with the provisions of this Article and is devoid of libelous, scurrilous, or scandalous material. The Agency may disseminate the notice for wider input from management officials; however, redrafting of the Agency Notice is not the prerogative of the Agency.

### Section B.  Overseas Procedures

Any communication presented by a USAID AFSA representative at post for transmission to staff will be presented to the designated management official at post or regional management officer to be cleared for transmission.  Communication must be cleared provided it is in compliance with the provisions of this Article and is devoid of libelous, scurrilous, or scandalous material. Redrafting of the communication is not the prerogative of the clearing official.

## ARTICLE 10:  DUES WITHHOLDING

**Section A.  General**

Payroll deductions for the payment of Union dues may be made from the pay of bargaining unit employees and non-bargaining unit employees, if authorized by the employee.

**Section B.  Supply of Forms**

The Union will be responsible for the distribution of Standard Form 1187 for use by an employee who wishes to authorize the deduction of their dues.

**Section C.  Changes in Dues Structure**

The AFSA President or authorized AFSA official (e.g., AFSA Member Services) shall notify the Agency's Director, HCTM/ELR or designee when the dues structure changes.  HCTM/ELR will immediately notify the Agency's Payroll Office of the change.  AFSA agrees that changes to dues structure can only occur once every calendar year.

**Section D.  Bi-Weekly Deductions**

Authorized deductions will be made each bi-weekly pay period from the pay of all employees who have authorized such allotment.  The deduction will normally be effective the next full pay period following the receipt by HCTM/ELR of the SF1187.  No deduction will be made in any period for which the employee's net earnings after other deductions are insufficient to cover the full amount of the allotment for dues.

On or about June of each year, USAID will review the dues withholding amounts of all AFSA members to ensure the correct amount of dues is being withheld.  USAID will share the results of that review with AFSA.

USAID will address and correct in a timely manner errors identified by either party.

The Union will not be charged or assessed a fee for services rendered, by the Agency, in connection with these deductions.

**Section E.  Bi-Weekly Listings**

The Agency will transmit to AFSA on a bi-weekly basis:

1) A list of all employees for the previous period.

2) A list of employees who are enrolled in payroll deductions for the previous pay period and the amount of dues they paid; and,

3) A list of all accessions and separations of bargaining unit members during the previous pay period, if any, as well as any changes to the bargaining unit status of employees.

These reports shall include all relevant information, to include nature of action codes and unique identifiers such as the social security numbers where appropriate.

### Section F.  Annuity Deductions

Annuity deductions for the payment of AFSA dues will be made from the annuity of retired Foreign Service members if authorized by the annuitant by completing Standard Form 1187A. The Agency will apprise retiring Foreign Service members of this option as part of the Agency's ongoing retirement education and counseling efforts.

### Section G.  Discontinuance of Dues

An employee may seek to cease payroll dues deduction by contacting HCTM directly or by contacting AFSA Member Services and processing the necessary paperwork (SF-1188).  In the event the employee contacts AFSA, AFSA shall inform the Agency to cease payroll dues deduction and send the necessary paperwork to HCTM.  The Agency shall process the SF-1188 within 14 days of receipt.  AFSA may also request that the Agency automatically cease dues deduction of any member AFSA no longer considers to be in good standing.  Should AFSA no longer remain the exclusive representative of the Foreign Service bargaining unit, all related dues deduction shall cease on the effective date of that loss of recognition.  If an employee is no longer a member of the Foreign Service, the Agency shall discontinue the automatic dues deduction.

AFSA-USAID Framework Agreement
Attachment A

## Attachment A - AFSA Service Memo Template

The following employee served as the Vice President for USAID of the American Foreign Service Association (AFSA) during the time period listed.

_____    _____    _____
Employee Name                             Start of Service                       End of Service

AFSA is both the professional association and exclusive representative for the U.S. Foreign Service.  AFSA's over 16,000 members include active-duty and retired members of the Foreign Service at USAID, the Department of State, Foreign Commercial Service, Foreign Agricultural Service, Animal and Plant Health Inspection Service and U.S. Agency for Global Media.

AFSA is both the principal advocate for the long-term institutional wellbeing of the professional career Foreign Service and responsible for safeguarding the interests of AFSA members. AFSA also seeks to increase understanding among the American people about the vital role of the U.S. Foreign Service in sustaining American global leadership.

The Vice President serves as the primary labor negotiator for employees in the Foreign Service bargaining unit at USAID. They advise the AFSA president and other board members on workforce policies affecting their constituencies. They have a duty of fair representation as the exclusive employee representative of all employees within their bargaining units and negotiate collective bargaining agreements covering all employees in each unit described in Sections 1012 and 1013 of the Foreign Service Act. In coordination and with guidance from the president, they represent their constituents with the public, including the Congress.

Service in this role safeguards the public interest, contributes to the effective conduct of public business, facilitates and encourages the amicable settlement of disputes between employees and their employers involving conditions of employment.

Per 22 USC 4003, no negative inference is permitted as a result of an employee's service in this capacity.

AFSA-USAID Framework Agreement
Signature Page

## SIGNATURES

The American Foreign Service Association and the U.S. Agency for International Development hereby agree to this negotiated Framework Agreement on December 7, 2022. This Agreement is executed to become effective within thirty (30) days or upon approval by the Agency Head, whichever is earlier.

| For USAID | For AFSA |
|---|---|
| Nicholas M. Gottlieb<br>Director, Employee and Labor Relations | Jason K. Singer<br>Vice President, USAID |
| Kenneth M. Bledsoe, Esq.<br>Attorney Advisor, Office of General Counsel | Sharon L. Papp, Esq.<br>General Counsel |
| Joseph L. Easter III<br>Deputy Director, Employee and Labor Relations | Sue L. Bremner<br>Labor-Management Adviser |
| James Truong<br>HR Specialist | LORRAINE SHERMAN  Digitally signed by LORRAINE SHERMAN Date: 2022.12.07 16:19:07 -05'00'<br>Lorraine Sherman<br>AFSA Representative |

| Agency Head Approval | |
|---|---|
| Paloma Adams-Allen<br>Deputy Administrator, Management and Resources | 1/4/2023<br>Date |

# EXHIBIT
# 2



March 26, 2025

**To:**        Employee Labor Relations, HCTM/USAID

**From:**    Tom Yazdgerdi, AFSA President
Randy Chester, AFSA USAID Vice President

**Subject:**  Implementation Dispute
Violations of Framework Agreement Related to Reduction in Force

Pursuant to 3 FAM 4470, the American Foreign Service Association (AFSA) files the following implementation dispute against the United States Agency for International Development (USAID) for violations of the parties' January 24, 2023, Framework Agreement ("Framework Agreement"), as detailed below.  Attachment A, AFSA – USAID Framework Agreement, Article 6.A.3.

An implementation dispute is one which directly concerns the rights and obligations of an agency and labor organization toward each other … as set forth in a collective bargaining agreement. *See* Foreign Service Act ("FS Act" or "the Act"), Section 1014 (22 USC §4114), *see also* 3 FAM 4471.[1]

Pursuant to the parties Framework Agreement, "any dispute between the Agency and the Union concerning the …claim of breach of a collective bargaining agreement may be resolved as an implementation dispute *or* as an Unfair Labor Practice." Attachment A at 7(G)(1). The party's agreement further states, "the Parties mutually agree to make reasonable, good faith, efforts to resolve disputes concerning … a claim of breach of a negotiated agreement informally prior to initiating any formal proceeding." *Id*. at 7(G)(2). As the facts show, despite numerous attempts by AFSA to engage with the Agency and to resolve any disputes, AFSA has been met with complete silence. It is for this reason that AFSA has no other choice but to pursue this implementation dispute.

---

[1] Section 1014 of the Act, as amended establishes procedures for resolving such cases in which AFSA and the Agencies have a dispute about the "effect, interpretation, or a claim of breach of a collective bargaining agreement." Among other things, the statutory provision states that such implementation disputes will be resolved through procedures negotiated by the Foreign Affairs agencies and AFSA. AFSA and the Foreign Affairs agencies negotiated such procedures in 3 FAM 4470. The statute also provides for an appeal to the Foreign Service Grievance Board if the parties cannot bilaterally resolve their dispute. *See* FSGB 2014-028 (September 3, 2015).

1



Implementation disputes must be filed within 120 days of the alleged breach of the collective bargaining agreement. As the first of several breaches by the Agency occurred on February 1, 2025, AFSA's implementation dispute is timely.

## I.    Relevant Facts

*1. Issuance of RIF Notices to Foreign Service Employees*

On Sunday, February 23, 2025, without any prior notice, USAID announced that, with limited exceptions, all direct hire employees would be placed on administrative leave by the end of the day, and that the agency would implement a Reduction in Force (RIF) that would terminate approximately 1,600 USAID personnel ***stationed in the United States***. That evening, USAID employees began receiving individual RIF notices, with a termination date of April 24 for domestic employees and May 26 for overseas employees, despite the prior statement that the RIF would be implemented for employees that are domestic.

The "Specific Notice of Reduction in Force" (RIF Notice) was a form letter distributed to FS employees. It was not tailored to the individual in that it did not properly address specific competitive areas, grades, service dates or veterans' preference.[2] The RIF Notice provided the following:

> I regret to inform you that you are affected by a Reduction in Force (RIF) action. This RIF is necessary to ***restructure USAID's operations*** to better reflect Agency priorities and the foreign policy priorities of the United States.
>
> This is your ***specific*** notice of RIF. In accordance with RIF procedures specified in ADS 454, you are being ***released from your competitive level because your competitive area is being eliminated***. Consequently, you will be separated from the Federal service effective [April 24, 2025 or May 26, 2025.... (Emphasis added). Attachment B, Redacted sample RIF notices.

USAID's ADS Chapter 454 on Reduction in Force in the Foreign Service provides the agency's procedures for conducting RIFs. Attachment C, ADS 454. Section 454.3.1

---

[2] The RIF notice stated "[t]he above information did not affect your standing or treatment in this RIF action, which eliminated your entire competitive area."

2



provides that "at the time management decides a Reduction in Force is necessary, and after ***appropriate consultation with Foreign Service employee representatives***, the Director of the Office of Human Capital and Talent Management (DAA/HCTM) ***will issue*** an ***Agency-wide announcement*** of the RIF." In this case, AFSA was not consulted, and no agency-wide announcement was made. This ADS section also states that the RIF will contain "information on the ***number of employees*** to be released, the ***Competitive Levels affected***, and the probable timing of the RIF as proposed at the time of the Agency's decision." This information was not provided, signifying a unilateral change in the Agency's RIF procedures.

With respect to the retention registers for RIFs, ADS 454.3.3 clearly states that the "competitive area for the Senior Foreign Service and the Foreign Service ***is service wide and world-wide***." [Emphasis added]. The RIF notices do not apply the correct definition of 'competitive area' and incorrectly notes, in all the RIF notifications, that the individual employee's "competitive area is being eliminated." The RIF notifications also violate the order of separation, which is extensively detailed in ADS 454.3.4. USAID, pursuant to its own regulations, must consider veteran's preference, career status, and retention standing of Senior Foreign Service (SFS) and FS employees. This was not done, once again signifying a unilateral change in the Agency's RIF procedures.

The Agency's issuance of these RIF notifications similarly violated the FS Act and the party's Framework Agreement, as it did not provide AFSA, the exclusive representative of Foreign Service employees at USAID, prior notice or an opportunity to negotiate. *See* FS Act Section 1005(b)(2),(3), 22 U.S.C. 4105(b)(2),(3), *see also* Framework Agreement, Article 6(b)(2),(3). Not surprisingly given the events that have unfolded at USAID to date, AFSA later learned that these notices were also issued without the knowledge of USAID Human Capital Talent Management [HCTM] personnel. Attachment D, HCTM Statement.[3]

As AFSA had no prior notice of the Agency's intent to reduce its FS workforce, on February 24, 2025, AFSA sent representatives for USAID an information request on the reduction in force and corresponding notices. *See generally* Attachment A at Article 5(H)(in line with 22 USC 4113(e)(4)); Attachment E, February 24, 2025, AFSA Information Request.

---

[3] It is also worth noting that the Agency's own ADS on RIFs provides for notice and consultation with the Union.  *See* ADS 454.2b. And ADS 454.3.1. The agency's RIF notifications failed to comply with multiple provisions of its own ADS 454 on RIFs.



The Agency's unilateral change in policy resulting in a significant change in conditions of employment, without prior notice, deprived AFAS of its right to negotiate procedures and/or appropriate arrangements for employees adversely impacted by this change.

### 2. Formal Requests for Information

In January of 2025 the parties longstanding professional and collaborative relationship changed. The change resulted from a series of unilateral actions by the Agency, without prior notice, consultation or negotiation with AFSA. As a result, AFSA submitted multiple formal information requests to gather information regarding the Agency's actions.

The first information request was sent to the Agency on January 25, 2025, as a follow up to an unanswered letter regarding the placement of Foreign Service employees on administrative leave. Attachment F, January 23, 2025, AFSA Letter to USAID Administrator.[4]

The second information request was sent to the Agency on February 24, 2025, in response to the RIF notifications sent to AFSA's constituents. *See supra* at 3. Attachment E, February 24, 2025, AFSA Information Request.

The third and fourth information requests were sent to the Agency on March 11 and March 17 respectively. These requests were regarding the Agency's orders, without guidance or explanation, for all overseas FS personnel to log into the Permanent Change of Station (PCS) portal and fill out information, including dates, for their PCS. Attachment G, March 11, 2025, and Attachment H, March 17, 2025, AFSA Information Requests.

The fifth information request was sent to the Agency on March 24, 2025, and pertains to violations of ADS 463, on the annual performance review cycle. Attachment I, March 24, 2025, AFSA Information Requests.

Despite to 7-day response time in the Framework Agreement, to date, the agency has not acknowledged receipt, let alone respond to a single one of these requests for information.

---

[4] As AFSA USAID VP is on administrative leave, he is unable to access his USAID email and system, from which he sent the information request on administrative leave.



### 3. Refusal to Engage with Union

For the last decade, AFSA and USAID Human Capital Talent Management [HCTM], Employee Labor Relations [ELR] met on a bi-weekly and/or regularly scheduled basis. These meetings included notices of upcoming events and/or changes to policies and procedures, status updates of ongoing grievances and/or disciplinary cases. In line with the Framework Agreement, it was used as a forum for pre-decisional involvement of the union, regardless of the negotiability of an issue. Finally, it served as a forum for consultation and/or negotiation when needed.

The last AFSA – ELR meeting was held on January 22, 2025. Since then, the Agency has made significant changes to conditions of employment, with no notice, consultation or negotiation with AFSA. Actions include, but are not limited to, placing Foreign Service employees on administrative leave, shutting them out of USAID headquarters and USAID systems, and perhaps most significantly, the issuance of Reduction in Force notices that violate the ADS. As a result of these significant actions, AFSA has drafted multiple emails requesting information and the opportunity meet, as well as several information requests. AFSA has countless unanswered emails and letters it can produce as evidence. As noted above, all of these communications and requests have gone unanswered.

To date, USAID continues to ignore AFSA and engage in conduct that makes clear it no longer intends to engage with the union.  This intentional violation of an established labor management practice is irrefutably evidenced by the "canceled event" notification AFSA received on March 17, 2025, for the parties bi-weekly AFSA/ELR meeting, with a note that read, "ELR has been instructed by leadership ***not to communicate with the Unions***." Attachment J, March 17th Statement from ELR to AFSA.[5]

### II.    Violation of AFSA-USAID Framework Agreement

The preamble of the party's Framework Agreement begins with:

> The Parties agree that the statutory protection of the right of
> employees to organize, bargain collectively, and participate through

---

[5] Unfortunately, once you 'accept' the cancelled event to be removed from your calendar, the email disappears. As such, we have attached AFSA USAID VP Randy Chester's follow up email to management in response to the cancelled event and accompanying message.



the Union ***safeguards the public interest, contributes to the effective conduct of business***, and facilitates and encourages the amicable settlement of disputes between the Parties involving conditions of employment. The Parties also recognize that the unique conditions of Foreign Service employment require a distinct framework for the development and implementation of modern, constructive, and ***cooperative relationships between management officials and organizations representing members of the Foreign Service***. This Agreement should be interpreted and administered in a manner consistent with the requirement of an effective and efficient Government. The ***Parties hereby affirm their commitment to build a positive and cooperative bilateral relationship***.

Attachment A at Preamble.  The parties also affirmed their commitment "to conduct negotiations and other dealings in good faith and in such manner as will further the public interest." *Id*. at Article 7(a). In drafting its Framework Agreement, the parties memorialized, in writing, their firm belief that "pre-decisional involvement over matters that impact the bargaining unit can further that public interest, ***without regard to whether those matters are negotiable*** subjects of bargaining under 22 USC 4105(b)(1)."

The parties agreed to a Framework Agreement that provides clear guidance on how to engage with one another. Unfortunately, despite this the Agency has opted to blatantly violate its obligations and has openly refused to engage with AFSA.

### 1. Reduction in Force Notices

As clearly stated in the Framework Agreement, the parties have a 'responsibility' to deal with one another in good faith. In line with this, Article 7(B) of the Framework Agreement provides for the notice of proposed changes to conditions of employment, with an explicit list of information that ***must*** be included in a written notice of the proposed change. Attachment A at 7(B)(1).[6] Article 6(b)(2),(3) of the Framework

---

[6] The written notice "shall" include:

    a. The nature and scope of the proposed change;
    b. Identification of the employees impacted by the proposed change;
    c. A description of the change;



Agreement provides that nothing in the section on Management Rights, "shall preclude the Department and the exclusive representative from *negotiating—(2) procedures which management officials will observe in exercising any function under this section; or (3) appropriate arrangements for employees adversely affected by the exercise of any function under this section by such management officials*." (Emphasis added). Attachment A at Article 6(B)(2),(3), Article 7(a),[7] *see generally* 22 U.S.C. 4105(b)(2),(3).

On February 23, 2025, with no prior notice to AFSA, the Agency issued RIF notices to AFSA bargaining unit members. The notices evidenced clear, significant and unilateral changes to the Agency's RIF policies and procedures. This action was taken in violation of Articles 6 and 7 of the Framework Agreement.

The intentional failure to provide AFSA notice of this critical change prevented AFSA from exercising its right to negotiate changes to procedures and/or appropriate arrangements, prior to the issuance of RIF notices, to ensure minimal disruption and hardship to FS employees, especially those assigned overseas.

USAID's actions not only violate its own ADS RIF procedures, the Framework Agreement and the FS Act, but it ignores explicit guidance issued by the current administration. The Office of Personnel Management's March 12, 2025, Guidance on Collective Bargaining in Connection with RIFs, confirms management's obligation to negotiate procedures and appropriate arrangements and reinforces that agencies must "*fulfill their labor obligations and incorporate those activities into their*

---

d. For changes that require revisions to existing documents, the proposing party will clearly indicate the proposed revisions using "track changes" or a similar function;

e. An explanation of the proposing party's plans for implementing this change;

f. An explanation of why the proposed change is necessary;

g. The proposed implementation date;

h. The proposing party's Point of Contact; and,

i. Any other relevant information that is necessary to facilitate bargaining, as required by law.

[7] Article 7(a) states: The Parties have the responsibility to conduct negotiations and other dealings in good faith and in such manner as will further the public interest. While this article is predominantly focused on formal bargaining procedures, the Parties believe that pre-decisional involvement over matters that impact the bargaining unit can further that public interest, without regard to whether those matters are negotiable subjects of bargaining under 22 USC 4105(b)(1).



***planning processes***. (emphasis added)." *See* <u>Guidance on Collective Bargaining in Connection with RIFs</u>, *see also* ADS 454.3.1, 454.2.[8]

### 2. Formal Requests for Information

Article 5(H) of the Framework Agreement gives AFSA the right to information from the Agency that is normally maintained in the regular course of business, reasonably available and necessary for full and proper discussion, understanding, and negotiation of subjects which fall within the scope of … bargaining; which does not constitute guidance, advice, counsel, or training…. The Agency is given seven (7) calendar days to furnish the data or, if the Agency cannot furnish data within this timeline, it must provide estimates on the production timelines. Attachment A at Section 5(H).

As stated above, as of the date of this filing, the Agency has failed to respond to any of AFSA's requests for information and has ignored requests by AFSA to meet.

### 3. Refusal to Engage with Union

USAID continues to ignore AFSA and engage in conduct that makes clear it no longer intends to engage with the union. In doing so, the Agency is violating several foundational articles of the Framework Agreement.

Section 4(A) (Union Membership) makes clear that the Agency cannot interfere with or restrain an employee from exercising any of the rights guaranteed by Chapter 10 of the FS Act or this Agreement." Attachment A at Section 4(A). Section 5(A)(Union Rights and Responsibilities) affirms the Agency's recognition of AFSA's right to act for and negotiate agreements covering employees in its bargaining unit. *Id*. at Section 5(A). In failing to communicate with or respond to AFSA, the exclusive representative of USAID Foreign Service employees, on significant changes to conditions of employment, the Agency is interfering with and restraining the ability of AFSA's bargaining unit members, and its full time USAID Vice President, from exercising their rights under the FS Act and the Framework Agreement.

---

[8]  ADS 454.2 requires the Agency to consult with AFSA, as the exclusive representative of Foreign Service employees ***prior*** to issuance of a RIF notice. Specifically, ADS 454.2(b) requires the Office of Human Capital and Talent Management (HCTM) "implements a RIF … when it has been authorized by the Administrator, and ***in consultation with*** the bureaus, field missions, and the ***exclusive representatives of the Foreign Service employees***…."



The Framework Agreement makes clear that the parties have a "responsibility to conduct negotiations and other dealings in good faith." The parties respected their relationship enough to explicitly extend these good faith dealings to pre-decisional involvement over matters that impact AFSA's bargaining unit, without regard to whether "those matters are negotiable…." *Id.* at Section 7(A). The Agency has knowingly and willfully violated these terms. There is, arguably, not a more direct way to violate the Framework Agreement than by explicitly stating, in writing, "ELR has been instructed by leadership ***not to communicate with the Unions***."

These significant and irrefutable violations of the Agency's obligations towards the union cannot be ignored.

### III.    Request for Relief

For the reasons set forth herein, AFSA requests an expedited decision on this grievance and the following relief:

1.  A finding that the Agency has violated the Parties' Framework Agreement.

2.  That the Agency provide AFSA with a point of contact within the Agency who will respond to AFSA communications and engage with AFSA as the exclusive representative of USAID Foreign Service employees;

3.  That the Agency ceases and desists from changing conditions of employment for AFSA's bargaining unit employees without providing AFSA notice and an opportunity to procedures and appropriate arrangements.

4.  That the Agency rescind all RIF Notices to Foreign Service employees that have been issued and cease and desist from the issuance of new RIF Notices to Foreign Service employees;

5.  That the Agency reinstate any employees who have been separated as a result of the RIF, with back pay and interest;

6.  That the Agency comply with the requirements in the parties' Framework Agreement as it relates to Information Requests;

7.  Reimbursement of attorney fees and expenses, if warranted; and



8.  All other appropriate relief.

Please note that AFSA General Counsel, Sharon Papp (papp@afsa.org) and Deputy General Counsel, Raeka Safai (safai@afsa.org) are representing AFSA in this implementation dispute. Please send all correspondence regarding this dispute to Mrs. Papp and Mrs. Safai.