UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN FOREIGN SERVICE ASSOCIATION, <br><br> *Plaintiff,* <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States, et al., <br><br> *Defendants*. | Civil Action No. 25-1030 (PLF) |

**DEFENDANTS' OPPOSITION TO
<u>PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION</u>**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................... 1

BACKGROUND ................................................................................................................... 3

I.    The President's Authority to Control the Conduct of Federal Employees ............................. 3

II.   The Statutory Framework and Related Executive Orders ..................................................... 4

III.  Office of Personnel Management Guidance and Agency Implementation of
      Executive Order 14,251 .................................................................................................... 6

IV.   The Statutory Channeling Requirement .............................................................................. 8

V.    Procedural History .............................................................................................................. 9

LEGAL STANDARD ........................................................................................................... 9

ARGUMENT ...................................................................................................................... 10

I.    The Association Cannot Show Irreparable Harm Absent a Preliminary Injunction ............. 10

II.   The Association Cannot Show Likelihood of Success on the Merits of its Claims .............. 15

      A.   The Foreign Service Act precludes district court jurisdiction over Plaintiff's claims ... 15

      B.   The Association is unlikely to succeed on its *ultra vires* claims. .................................. 21

      C.   Executive Order 14,251 is valid .................................................................................. 22

      D.   The Association is unlikely to succeed on its First Amendment claim. ........................ 36

III.  The Balance of The Equities and The Public Interest Favor the Government ..................... 39

IV.   The Association Should Be Ordered to Post Security in connection with any
      Injunctive Relief…………………………………………………………………………....41

CONCLUSION .................................................................................................................... 41

**<u>TABLE OF AUTHORITIES</u>**

**Cases**                                                                                                          **Page(s)**

*AFGE v. Reagan*,
  870 F.2d 723 (D.C. Cir. 1989) ........................................................................................ 24, 25
*AFL-CIO v. Dept. of Labor*,
  No. 25-0339 (JDB), 2025 U.S. Dist. LEXIS 23840 (D.D.C. Feb. 7, 2025) ........................... 11
*Air Line Emps. Ass'n Int'l. v. Nat'l Mediation Bd.*,
  1981 WL 2391 (D.D.C. May 18, 1981) ............................................................................... 24
*Am. Butterfly Ass'n v. Wolf*,
  977 F.3d 1244 (D.C. Cir. 2020) .......................................................................................... 22
*Am. Fed'n of Gov't Emps. v. Sec'y of Air Force*,
  716 F.3d 633 (D.C. Cir. 2013) ........................................................................... 9, 15, 17, 19
*Am. Fed'n of Gov't Emps., ALF-CIO v. Loy*,
  281 F. Supp. 2d 59 (D.D.C. 2003) ...................................................................................... 14
*Am. Foreign Serv. Ass'n v. Trump*,
  No. 25-0352 (CJN), 2025 U.S. Dist. LEXIS 31748 (D.D.C. Feb. 21, 2025) .......................... 5
*American Federation of Government Employees, AFL-CIO v. Trump*,
  929 F.3d 748 (D.C. Cir. 2019) ..................................................................................... passim
*American Foreign Service Association v. Baker*,
  895 F.2d 1460 (D.C. Cir. 1990) .................................................................................... passim
*Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*,
  897 F.3d 314 (D.C. Cir. 2018) .............................................................................................. 9
*Aref v. Lynch*,
  833 F.3d 242 (D.C. Cir. 2016) ............................................................................................ 37
*Arlington Heights v. Metropolitan Housing Development Corp.*,
  429 U.S. 252 (1977) ............................................................................................................ 36
*Army Corps of Eng'rs,*
  53 FLRA 79 (1997) .............................................................................................................. 31
*Axon Enterprises v. Fed. Trade Comm'n*,
  598 U.S. 175 (2023) ............................................................................................... 17, 18, 20
*Babbitt v. United Farm Workers Nat'l Union*,
  442 U.S. 289 (1979) ............................................................................................................ 14
*Baltimore Sun Co. v. Ehrlich*,
  437 F.3d 410 (4th Cir. 2006) .............................................................................................. 38
*Bauer v. DeVos*,
  325 F. Supp. 3d 74 (D.D.C. 2018) ...................................................................................... 25
*Bd. of Governors of Fed. Reserve Sys. v. MCorp*,
  502 U.S. 32 (1991) .............................................................................................................. 21
*Black Lives Matter D.C. v. Trump*,
  544 F. Supp. 3d 15 (D.D.C. 2021) ...................................................................................... 37
*Building & Construction Trades Department, AFL-CIO v. Allbaugh*,
  295 F.3d 28 (D.C. Cir. 2002) ................................................................................................ 3
*Bureau of Alcohol, Tobacco and Firearms v. FLRA*,
  464 U.S. 89 (1983) ......................................................................................................... 4, 21

*Changji Esquel Textile Co. v. Raimondo,*
  40 F. 4th 716 (D.C. Cir. 2022) ................................................................ 22, 26
*Chaplaincy of Full Gospel Churches v. England,*
  454 F. 3d 290 (D.C. Cir. 2006) ...................................................................... 10
*Chicago & Southern Air Lines, Inc. v. Waterman S.S. Corp.,*
  333 U.S. 103 (1948) ........................................................................................ 30
*Citizens to Pres. Overton Park, Inc. v. Volpe,*
  401 U.S. 402 (1971) ........................................................................................ 36
*Cole v. Young,*
  351 U.S. 536 (1956) ........................................................................................ 27
*Constantine v. Rectors & Visitors of George Mason Univ.,*
  411 F.3d 474 (4th Cir. 2005) .......................................................................... 38
*Davis v. Pension Benefit Guar. Corp.,*
  571 F.3d 1288 (D.C. Cir. 2009) ...................................................................... 39
*DCH Reg. Med. Ctr. v. Azar,*
  925 F.3d 503 (D.C. Cir. 2019) ........................................................................ 21
*Def. Logistics Agency,*
  5 FLRA 126 (1981) .......................................................................................... 12
*Dep't of Com. v. New York,*
  588 U.S. 752 (2019) ........................................................................................ 36
*Dep't of Def. v. FLRA,*
  685 F.2d 641 (D.C. Cir. 1982) ........................................................................ 25
*Dep't of Energy, Oak Ridge Operations, & Nat'l Ass'n of Gov't Emps. Local R5-181,*
  4 FLRA 644 (1980) .......................................................................................... 27
*Dep't of the Navy v. Egan,*
  484 U.S. 518 (1988) ................................................................................ 26, 33
*DSE, Inc. v. United States,*
  169 F.3d 21 (D.C. Cir. 1999) .......................................................................... 41
*Elgin v. Dep't of Treasury,*
  567 U.S. 1 (2012) ............................................................................................ 19
*Fed. Express Corp. v. Dep't of Com.,*
  39 F.4th 756 (D.C. Cir. 2022) ........................................................................ 22
*Fed. Law Enf't Officers Ass'n v. Ahuja,*
  62 F.4th 551 (D.C. Cir. 2023) ........................................................................ 19
*Food & Drug Admin. v. Wages & White Lion Invs., L.L.C.,*
  No. 23-1038, 2025 WL 978101 (Apr. 2, 2025) .............................................. 36
Foreign Affairs Manual,
  Exec. Order 14,211 .................................................................................. 13, 32
*Fraternal Order of Police v. Bd. of Governors of the Fed. Reserve Sys.,*
  391 F. Supp. 2d 1 (D.D.C. 2005) .................................................................... 14
*Free Enter. Fund v. Public Co. Accounting Oversight Bd.,*
  561 U.S. 477 (2010) ........................................................................................ 37
*Gilligan v. Morgan,*
  413 U.S. 1 (1973) ............................................................................................ 33
*Heckler v. Ringer,*
  466 U.S. 602 (1984) ........................................................................................ 20

*Holder v. Humanitarian Law Project*,
  561 U.S. 1 (2010).................................................................... 25, 26, 40
*Holy Land Found. For Relief & Dev. v. Ashcroft*,
  219 F. Supp. 2d 57 (D.D.C. 2002) ...................................................... 40
*Kim v. FINRA*,
  698 F. Supp. 3d 147 (D.D.C. 2023) ..................................................... 39
*Kleindienst v. Mandel*,
  408 U.S. 753 (1972)...................................................................... 37
*Lineback v. Irving Ready-Mix, Inc.*,
  653 F.3d 566 (7th Cir. 2011) ............................................................ 14
*Local 1498, AFGE v. AFGE, AFL/CIO*,
  522 F.2d 486 (3d Cir. 1975)............................................................... 4
*Manhattan-Bronx Postal Union v. Gronouski*,
  350 F.2d 451 (D.C. Cir. 1965) ............................................................ 3
*Media Matters for Am. v. Bailey*,
  2024 WL 3924573 (D.D.C. Aug. 23, 2024) ............................................. 38
*Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*,
  429 U.S. 274 (1977)...................................................................... 38
*Myers v. United States*,
  272 U.S. 52 (1926)........................................................................ 3
*National Federal of Federal Employees v. Weinberger*,
  818 F.2d 935 (D.C. Cir. 1987) .......................................................... 19
*National Federation of Federal Employees v. McDonald*,
  128 F. Supp. 3d 159 (D.D.C. 2015)..................................................... 28
*Nat'l Mining Ass'n v. Jackson*,
  768 F. Supp. 2d 34 (D.D.C. 2011) ...................................................... 11
*Nat'l Treasury Emps. Union v. Reagan*,
  No. 80-606, 1981 WL 150530 (D.D.C. Sept. 3, 1981)............................... 14, 24
*Nat'l Treasury Emps. Union v. United States*,
  927 F.2d 1253 (D.C. Cir. 1991) ......................................................... 14
*Nieves v. Barlett*,
  587 U.S. 391 (2019)...................................................................... 38
*Nken v. Holder*,
  556 U.S. 418 (2009)...................................................................... 39
*NLRB v. Electro-Voice, Inc.*,
  83 F.3d 1559 (7th Cir. 1996) ............................................................ 13
*Nyunt v. Chairman, Broad. Bd. of Governors*,
  589 F.3d 445 (D.C. Cir. 2009)........................................................... 22
*S. Dep't of Def., Ohio Nat'l Guard*,
  71 FLRA 829 (2020)...................................................................... 12
*Smith v. Ark. State Highway Emps., Local*,
  *1315*, 441 U.S. 463 (1979).............................................................. 14
*Stein v. FEC*,
  77 F. 4th 868 (D.C. Cir. 2023)........................................................... 39
*Thunder Basin Coal Co. v. Reich*,
  510 U.S. 200 (1994)...................................................................... 18

iv

*TikTok Inc. v. Trump*,
  490 F. Supp. 3d 73 (D.D.C. 2020) ................................................................ 40
*Trump v. Hawaii*,
  585 U.S. 667 (2018) ..................................................................... 25, 33, 37
*Trump v. Thompson*,
  20 F.4th 10 (D.C. Cir. 2021) ................................................................... 9, 10
*U.S. Dep't of Lab., Wash., D.C.*,
  37 FLRA 25 (1990) ............................................................................... 12
*U.S. Dep't of the Treasury, U.S. Mint*,
  35 FLRA 1095 (1990) ........................................................................... 12
*United States v. Chemical Found.*,
  272 U.S. 1 (1926) ............................................................................... 36
*Webster v. Doe*,
  486 U.S. 592 (1988) ............................................................................ 25
*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ................................................................................ 9
*Wis. Gas Co. v. Fed. Energy Regul. Comm'n*,
  758 F.2d 669 (D.C. Cir. 1985) .............................................................. 10, 11
*Youngstown Sheet & Tube Co. v. Sawyer*,
  343 U.S. 579 (1952) ............................................................................ 23

## Statutes

5 U.S.C. § 7101 ......................................................................................... 4
5 U.S.C. § 7103 ....................................................................................... 37
5 U.S.C. § 7103(b)(1) ......................................................................... passim
5 U.S.C. § 7301 ......................................................................................... 4
22 U.S.C. § 3901(a)(2) ............................................................................. 35
22 U.S.C. § 3902(4) .............................................................................. 5, 27
22 U.S.C. § 3902(6) ................................................................................. 29
22 U.S.C. § 4019(a) ................................................................................. 18
22 U.S.C. § 4101 .................................................................................. 4, 34
22 U.S.C. § 4102(8) ................................................................................... 4
22 U.S.C. § 4103(b) ........................................................................... passim
22 U.S.C. § 4103(b)(1) ............................................................................. 23
22 U.S.C. § 4103(b)(2) .................................................................... 25, 30, 34
22 U.S.C. § 4104(a) ................................................................................... 5
22 U.S.C. § 4105(b) ................................................................................... 7
22 U.S.C. § 4106(a) ................................................................................... 8
22 U.S.C. § 4109(a) ................................................................................... 9
22 U.S.C. § 4113(c) ................................................................................. 20
22 U.S.C. § 4114 ....................................................................................... 9
22 U.S.C. § 4115(a)(5) ....................................................................... 8, 9, 20
22 U.S.C. § 4116(a) .......................................................................... 8, 18, 20
22 U.S.C. § 4118 ................................................................................ 12, 20
22 U.S.C. § 4301(b) ................................................................................. 35

**Rules**

Federal Rule of Civil Procedure 65(c) ............................................................................ 41

**Other Authorities**

Exec. Order No. 10,988, 27 Fed. Reg. 551 (Jan. 19, 1962) ........................................... 4
Exec. Order No. 11,616, 36 Fed. Reg. 17,319 (Aug. 28, 1971) ..................................... 4
Exec. Order No. 11,636, 36 Fed. Reg. 24,901 (Dec. 24, 1971) ..................................... 4
Exec. Order No. 11,838, 40 Fed. Reg. 5,743 (corrected) (Feb. 7, 1975) ....................... 4
Exec. Order No. 11,491, 34 Fed. Reg. 17,605 (Oct. 31, 1969) ...................................... 4
Exec. Order No. 12,171, 44 Fed. Reg. 66,565 (Nov. 20, 1979) ..................................... 5
Exec. Order No. 13,039, 62 Fed. Reg. 12,529 (Mar. 14, 1997) ..................................... 5
Exec. Order No. 13,252, 67 Fed. Reg. 1,601 (Jan. 7, 2002) .......................................... 5
Exec. Order No. 13,480, 73 Fed. Reg. 73,991 (Dec. 4, 2008) ....................................... 5
Exec. Order No. 13,760, 73 Fed. Reg. 73,991 (Jan. 17, 2017) ...................................... 5
Exec. Order No. 14,151, 90 Fed. Reg. 8339 (Jan. 20, 2025) ......................................... 32
Exec. Order No. 14,251, 90 Fed. Reg. 14,553 (Mar. 27, 2025) .............................. passim

## INTRODUCTION

Plaintiff American Foreign Service Association (the "Association"), a professional association representing current and former employees of the United States Foreign Service, has filed the present lawsuit seeking to second guess a lawful exercise of the President's authority. The federal statute that governs bargaining with Foreign Service employees, the Foreign Service Labor-Management Relations Statute (the "Foreign Service Act"), authorizes the President to exempt from its coverage "any subdivision" of the Department of State or other agencies authorized to utilize the Foreign Service personnel system if the President determines that "the subdivision has as a primary function intelligence, counterintelligence, investigative, or national security work," and that the provisions of the statute "cannot be applied to that subdivision in a manner consistent with national security requirements and considerations." 22 U.S.C. § 4103(b). A related statute governing bargaining in the context of the Federal civil service, the Federal Service Labor-Management Relations Statute (the "Civil Service Act"), has a similar provision.  5 U.S.C. § 7103(b)(1).

Since 1979, when President Carter exempted more than forty-five agencies or subdivisions under the authority of section 7103(b)(1), Presidents have issued executive orders exempting additional agencies and subdivisions from that statute's coverage as they have assessed the Nation's changing needs. On March 27, 2025, President Trump issued such an order under the authority of both section 7103(b)(1) and section 4103(b).

In Executive Order 14,251, *Exclusions from Federal Labor Management Relations Program*, the President made the determinations specified in the governing statutes. As relevant here, in Section 3 of the Executive Order, the President made specific foreign service exclusions exempting subdivisions of the Department of State and the U.S. Agency for International Development ("USAID") that employ foreign service officers from Foreign Service Act coverage.

In this case, the Association seeks to enjoin Defendants—the President, the Office of Personnel Management ("OPM") and its Director, the Department of State and its Secretary, and the U.S. Agency for International Development ("USAID")—from implementing Executive Order 14,251 as it relates to the Foreign Service employees that the Association represents. Although the President made the determinations required of section 4103(b), as reflected by the terms of Section 3 of the Executive Order, the Association nevertheless alleges that the President acted "*ultra vires*" in doing so.  Mem. of P.&A. in Supp. of Pl. Mot. for a Prelim. Inj. ("Mot.") (ECF No. 10-1) at 23-26.  In addition, the Association asserts that the Executive Order, and the determinations reflected therein, constitute retaliation for lawsuits the Association has filed against the Administration and its public criticism of the Administration. Based on such speculative and unsubstantiated allegations, the Association seeks the extraordinary remedy of a preliminary injunction enjoining the Defendants from implementing a duly issued Executive Order.

The Association's request for a preliminary injunction should be denied for multiple reasons. To start, the Association fails to establish irreparable harm absent the immediate relief it seeks. The harms alleged in the Association's motion are all either remediable on a favorable ruling later in this case, or insufficiently certain and imminent to justify the extraordinary relief of a preliminary injunction.

Nor can the Association establish a likelihood of success on the merits of its claims, which broadly allege that the President impermissibly exceeded lawful authority delegated to him by Congress and that the President, in exercising this authority, retaliated against the Association. First, this Court lacks jurisdiction to hear the Association's claims.  Congress intended claims under the Foreign Service Act to be covered by the comprehensive remedial scheme set forth in that statute. The Association's claims, which turn on its unfair labor practices assertion that

Defendant agencies remain covered by the Act and are violating their obligations under the Act, do not fall within the narrow exception to such preclusion articulated in *Thunder Basin* and its progeny. Second, the Foreign Service Act precludes *ultra vires* review and the Association has not identified a clear and mandatory prohibition that the President is alleged to have violated. Third, the Court lacks authority to review the President's national security determination, as Congress expressly recognized. And in any event, the President's exercise of discretion here is readily supported by the facts and the law. Finally, the President's decision is entitled to a presumption of regularity as a facially valid executive action that the Association has not, and cannot, overcome by way of its deficient First Amendment claim.

Likewise, the balance of the equities and the public interest favor Defendants, as the Association's requested preliminary injunction would interfere with the President's lawfully delegated authority to ensure the relevant segments of the federal workforce are able to meet a primary purpose of theirs: protecting the national security of the United States.

Accordingly, because the Association cannot establish any element required for the extraordinary relief requested, its motion should be denied.

## BACKGROUND

### I.    The President's Authority to Control the Conduct of Federal Employees

Article II of the Constitution provides that "[t]he executive Power shall be vested in a President of the United States of America." U.S. Const., art. II, § 1, cl. 1. This power "necessarily encompasses 'general administrative control of those executing the laws,' throughout the Executive Branch of government," *Building & Construction Trades Department, AFL-CIO v. Allbaugh*, 295 F.3d 28, 32 (D.C. Cir. 2002) (quoting *Myers v. United States*, 272 U.S. 52, 164 (1926)), and includes the authority to make "improvement[s] in the efficiency of federal employment." *Manhattan-Bronx Postal Union v. Gronouski*, 350 F.2d 451, 456 (D.C. Cir. 1965).

Congress has further recognized this aspect of Executive power by enacting, *inter alia*, 5 U.S.C. § 7301, which provides that "[t]he President may prescribe regulations for the conduct of employees in the executive branch."

Before Congress enacted the Civil Service Act in 1978, the President routinely "regulate[d] labor relations in the federal government and internal matters of unions representing federal government employees[]" by Executive Order. *See, e.g., Local 1498, AFGE v. AFGE, AFL/CIO*, 522 F.2d 486, 491 (3d Cir. 1975). "This was a project of the Executive, and not of the Congress." *Manhattan-Bronx Postal Union*, 350 F.2d at 452. Indeed, President Kennedy took the first formal measure to regulate federal-sector labor relations when he issued Executive Order No. 10,988, in 1962. Exec. Order No. 10,988, 27 Fed. Reg. 551 (Jan. 19, 1962); *see Bureau of Alcohol, Tobacco and Firearms v. FLRA*, 464 U.S. 89, 91–92 (1983) ("*BATF*"). Multiple Presidents subsequently amended that Order. *See* Exec. Order No. 11,491, 34 Fed. Reg. 17,605 (Oct. 31, 1969), as amended by Exec. Orders No. 11,616, 36 Fed. Reg. 17,319 (Aug. 28, 1971), Exec. Order 11,636, 36 Fed. Reg. 24,901 (Dec. 24, 1971), and Exec. Order No. 11,838, 40 Fed. Reg. 5,743, 7,391 (corrected) (Feb. 7, 1975).

## II.    The Statutory Framework and Related Executive Orders

Against this backdrop, Congress in 1978 passed the Civil Service Act, 5 U.S.C. § 7101 *et seq*., and in 1980 the Foreign Service Act, 22 U.S.C. § 4101, *et seq*.  The Civil Service Act excludes from its coverage "an officer or employee in the Foreign Service of the United States employed in the Department of State, the International Communication Agency, the Agency for International Development, the Department of Agriculture, or the Department of Commerce."  5 U.S.C. § 7103(a)(2)(B)(iv). Foreign Service employees instead are covered by the Foreign Service Act. 22 U.S.C. § 4102(8).

The Foreign Service Act, the statute applicable to this action, establishes the right of federal

employees in the Foreign Service to form or join a labor union, among other protections.  22 U.S.C. § 4104(a).  However, the Act empowers the President to exempt "any subdivision" of the State Department, or "any subdivision" of any other agency authorized to employ Foreign Service personnel, from its requirements.  The Act provides that "[t]he President may by Executive order exclude any subdivision of the Department[1] from coverage under this subchapter if the President determines that—(1) the subdivision has as a primary function intelligence, counterintelligence, investigative, or national security work, and (2) the provisions of this [statute] cannot be applied to that subdivision in a manner consistent with national security requirements and considerations."  *Id.* § 4103(b)(1) and (b)(2).  A similar provision is contained in the Civil Service Act.  5 U.S.C. § 7103(b)(1).  *See Am. Foreign Serv. Ass'n v. Trump*, No. 25-0352 (CJN), 2025 U.S. Dist. LEXIS 31748, at *27 (D.D.C. Feb. 21, 2025) ("the Foreign Service Act of 1980 . . . was passed as a 'companion measure'" to the Civil Service Act).

Pursuant to the authority in section 7103(b)(1), President Carter issued an executive order in 1979 excluding from Civil Service Act coverage more than forty-five agencies or agency subdivisions, precluding those agencies' and subdivisions' employees from collective bargaining. Exec. Order No. 12,171, 44 Fed. Reg. 66,565 (Nov. 20, 1979). Every President since then, with the sole exception of President Biden, has issued similar executive orders adding to that list in response to changing circumstances and the evolving investigative and national security responsibilities of federal agencies.  *See, e.g.*, Exec. Order No. 13,039, 62 Fed. Reg. 12,529 (Mar. 14, 1997); Exec. Order No. 13,252, 67 Fed. Reg. 1,601 (Jan. 7, 2002); Exec. Order No. 13,480, 73 Fed. Reg. 73,991 (Dec. 4, 2008); Exec. Order No. 13,760, 73 Fed. Reg. 73,991 (Jan. 17, 2017).

---

[1]    The term "Department" means the "Department of State, except that with reference to the exercise of functions under this chapter with respect to another agency authorized by law to utilize the Foreign Service personnel system, such term means that other agency."  22 U.S.C. § 3902(4).

Like these other Presidents, on March 27, 2025, President Trump issued another such Executive Order. *See* Exec. Order No. 14,251, 90 Fed. Reg. 14,553 (Mar. 27, 2025).  In Section 2 of the Executive Order, and based on the authority of section 7103(b)(1), the President determined that certain agencies and subdivisions—including the State Department and USAID—have as a primary function intelligence, counterintelligence, investigative, or national security work, and that the Civil Service Act cannot be applied to those agencies and subdivisions in a manner consistent with national security requirements and considerations.

In Section 3 of the Executive Order—the section relevant to this action—the President determined based on the authority of section 4103(b) that the subdivisions of the Department of State employing Foreign Service Officers, and the subdivisions of USAID employing Foreign Service Officers, have as a primary function intelligence, counterintelligence, investigative, or national security work, and that the Foreign Service Act cannot be applied to those subdivisions in a manner consistent with national security requirements and considerations.

## III.    Office of Personnel Management Guidance and Agency Implementation of Executive Order 14,251

On March 27, 2025, the Office of Personnel Management ("OPM") issued guidance to federal agencies regarding Executive Order 14,251. *See* Ezell Mem., filed in *Nat'l Treasury Emps. Union v. Trump*, No. 25-cv-0935 (D.D.C.) (ECF No. 26-1).  In that guidance, OPM expressed the legal position of the Administration that under a lawful implementation of the President's Executive Order the covered agencies would be "no longer required to collectively bargain with Federal unions" and that "the statutory authority underlying the original recognition of the relevant unions no longer applies." *Id.* at 3. Consequently, those unions are no longer exclusive representatives of the agency employees and the relevant agency would not have to select or recognize an exclusive bargaining representative. OPM directed covered agencies to "consult with

their General Counsels as to how to implement the President's directive" in the Executive Order, and to consider and implement changes that are "consistent with the President's national security determination." *Id.*

Under the Foreign Service Act, the Department, at its election, may negotiate with the labor organization certified under the Act as having exclusive representation of Foreign Service employees over certain job-related procedures and other employment-related matters. 22 U.S.C. § 4105(b), § 4111(a). In that regard, the Department has previously executed multiple collective bargaining agreements with the Association, which had been certified as the exclusive representative for Foreign Service employees, including a Framework Agreement dated July 2019 and various Memoranda of Understanding. Framework Agmt. (ECF No. 10-2) at 14-39; MOUs (ECF No. 10-2) at 42-46. The Association also has previously executed a collective bargaining agreement with USAID. USAID Agmt. (ECF No. 10-4) at 10-34. The collective bargaining agreements impose demanding burdens on the Department and USAID—both agencies with a primary function of advancing the country's national security—and undermine the President's authority to supervise and direct subdivisions of these agencies employing Foreign Service Officers.

On March 28, 2025, based on the President's determination in the Executive Order excluding the subdivisions of the State Department with Foreign Service employees from the Foreign Service Act, the Association was notified by the State Department that the Department was terminating the Framework Agreement with the Association, no longer recognizing the Association as the exclusive representative for Foreign Service employees of the Department, was ceasing all automatic payroll deductions authorized by employees for the payment of Association dues, and was ending official time for Association officers. Compl. (ECF No. 1) ¶ 39.

The Association asserts that it "has not yet heard from USAID" but "it expects that USAID will rescind recognition of [the Association] and revoke the Framework Agreement [with USAID] in light of the Executive Order and the OPM-issued guidance on it." Mot. (ECF No. 10-1) at 16 n.16.

## IV.    The Statutory Channeling Requirement

In the Foreign Service Act, Congress established a dedicated mechanism for resolving disputes regarding alleged unfair labor practices for failing to bargain in good faith or comply with the provisions of the Act. An employee or a union alleging that an agency has "refuse[d] to consult or negotiate in good faith with a labor organization, as required by [the Foreign Service Act]," or that an agency has "otherwise fail[ed] or refuse[d] to comply with any provision of [the Foreign Service Act]," 22 U.S.C. § 4115(a)(5) and (a)(8), may file a charge of an unfair labor practice with the Federal Labor Relations Authority (the "Authority"). *Id*. § 4116(a). The Authority's General Counsel "shall investigate the charge and may issue and cause to be served upon the Department . . . a complaint."[2] *Id.* The Foreign Service Labor Relations Board shall conduct a hearing on the complaint, and determine whether an unfair labor practice exists. *See id.* § 4116(b) and (f).[3] The Board issues the final agency decision on the unfair labor practices complaint and can order appropriate relief. *Id.* § 4116(g).

The Board's final orders, including orders resolving negotiability disputes and unfair labor

---

[2]    "In any case in which the General Counsel does not issue a complaint because the charge fails to state an unfair labor practice, the General Counsel shall provide the person making the charge a written statement of the reasons for not issuing a complaint." 22 U.S.C. § 4116(a).

[3]    The Chairman of the Authority serves as the Chairperson of the Foreign Service Labor Relations Board, and the Board also consists of two members whom the Chairperson appoints. 22 U.S.C. § 4106(a). The Authority is a quasi-judicial body comprised of three full-time members who the President appoints for fixed five-year terms. *See The Authority: About Us*, https://www.flra.gov/components-offices/components/authority (last visited Apr. 20, 2025).

practice charges, are, with few exceptions not relevant here, subject to specified judicial review

"in the United States Court of Appeals for the District of Columbia." 22 U.S.C. § 4109(a).[4]

## V.      Procedural History

The Association filed this lawsuit on April 7, 2025.  On April 14, the Association moved

for a preliminary injunction. ECF No. 10. On April 16, the Court ordered Defendants to file a

response to that motion on or before April 25. Minute Order (Apr. 16, 2025). Defendants hereby

oppose the motion.

On the afternoon of April 25, 2025, this Court issued a preliminary injunction regarding

Section 2 of the Executive Order. *Nat'l Treasury Emps. Union v. Trump ("NTEU")*, 25-cv-0935

(PLF) (ECF No. 32).  That order does not resolve the issues in this case. Here, unlike in *NTEU*,

the Association challenges only Section 3 of the Executive Order with respect to subdivisions of

two specific agencies that employ Foreign Service officers.  As explained below, the Court should

not disturb the President's determinations in Section 3 of the Executive Order under the Foreign

Service Act.

## LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter*

*v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Accordingly, the moving party must "make

a 'clear showing that four factors, taken together, warrant [such] relief'": (1) likely success on the

merits; (2) likely irreparable harm in the absence of preliminary relief; (3) a balance of the equities

---

[4]      The union also can elect to address disputes concerning "the effect, the interpretation, or a claim of breach of a collective bargaining agreement" through a grievance procedure that is appealable to the Foreign Service Labor Relations Board under 22 U.S.C. § 4114. *Id.* § 4115(d); *see also Am. Fed'n of Gov't Emps. v. Sec'y of Air Force*, 716 F.3d 633, 637 (D.C. Cir. 2013) ("*AFGE v. Air Force*") (observing that the similar Civil Service Act "provides several alternative mechanisms to challenge management actions," but the "remedial regime is exclusive").  If addressed through a grievance procedure, the Board's decision is final and not subject to judicial review. *Id.* § 4114(d).

in its favor; and (4) accord with the public interest. *Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*, 897 F.3d 314, 321 (D.C. Cir. 2018) (citation omitted). "The likelihood of success and irreparability of harm 'are the most critical' factors." *Trump v. Thompson*, 20 F.4th 10, 31 (D.C. Cir. 2021) (citation omitted). And the third and fourth factors "merge when the government is the opposing party." *Id.*

## ARGUMENT

### I.    The Association Cannot Show Irreparable Harm Absent a Preliminary Injunction

The D.C. Circuit "has set a high standard for irreparable injury." *Chaplaincy of Full Gospel Churches v. England*, 454 F. 3d 290, 297 (D.C. Cir. 2006). The moving party must demonstrate an injury "both certain and great" and "of such *imminence* that there is a 'clear and present' need for equitable relief in order to prevent irreparable harm." *Id.* (quoting *Wis. Gas Co. v. Fed. Energy Regul. Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985)). To qualify as irreparable, the injury must also "be beyond remediation," meaning that the possibility of corrective relief "at a later date . . . weighs heavily against a claim of irreparable harm." *Id.* at 297-98. The alleged harms to the Association fail to meet this high standard.

As the Association recognizes, the Executive Order does not preclude Foreign Service employees with the State Department or USAID from maintaining membership with the Association or from paying dues to the Association through methods other than automatic payroll deductions. Mot. (ECF No. 10-1) at 20.  Nor does it preclude employees from individually filing grievances, from choosing to notify the Association of a grievance and seeking guidance from the Association in pursuit of a grievance, or from having the Association provide representation in a grievance.  *Id.* at 18; Email (ECF No. 10-7) at 4-5.  The Association maintains that it currently "is handling an unprecedented number of grievances from USAID [employees] at the moment."  *Id.* at 18 n.18.  The Executive Order also does not prevent the Association from advocating for Foreign

Service employees, including through litigation, or from performing its function as a professional association for current and former employees. Indeed, the Association has not argued that any specific individual member has been irreparably harmed by the Executive Order and instead focuses on alleged harm to itself. *Cf. AFL-CIO v. Dept. of Labor*, No. 25-0339 (JDB), 2025 U.S. Dist. LEXIS 23840, at *8-9 (D.D.C. Feb. 7, 2025) ("more than generalizations about the organization's members" is needed to establish standing; "[t]he organization must point to a particular member and establish she would have standing if she were a plaintiff herself").

The alleged harm that the Association anticipates for itself from the Executive Order is economic, specifically, a potential loss of revenue from the Defendants' refusal to withhold union dues from employees' paychecks, loss of "official time" for the Association's officers, and a potential loss of membership. Mot. (ECF No. 10-1) at 37-38. As an initial matter, it is black letter law in this Circuit that "economic loss does not, in and of itself, constitute irreparable harm." *Nat'l Mining Ass'n v. Jackson*, 768 F. Supp. 2d 34, 50 (D.D.C. 2011) (citing *Wis. Gas Co.*, 758 F.2d at 674). The loss of "official time" for a handful of Association officers is precisely the type of garden-variety economic harm that cannot support a preliminary injunction.

The Association's fear of a "sustained loss of income" that would "threaten [its] future as a labor organization," moreover, is entirely speculative. Mot. (ECF No. 10-1) at 38. That is because the termination of automatic withholding of employee dues is merely a procedural move. Union members remain free to pay their dues directly to the union, rather than through payroll deductions. And the Association has failed to demonstrate that its members—whose union membership is entirely voluntary—will cease paying union dues in the wake of Executive Order 14,251. The Association asserts only that it "faces a loss of confidence from its members, who are questioning whether union representation is available," not that it has experienced substantial

membership loss.  Mot. (ECF No. 10-1) at 38.  Although the Association claims that some members are "even terminating their dues," *id*., the support cited (Parikh Decl. (ECF No. 10-6) ¶¶ 5, 7) makes no such assertion.

And in any event, contrary to the Association's assertion, the Foreign Service Labor Relations Board has broad latitude to fashion appropriate remedies to make a union whole, *American Foreign Service Association v. Baker*, 895 F.2d 1460, 1463 (D.C. Cir. 1990), including by requiring the relevant agency to compensate for revenues lost due to improperly failing to withhold dues. Indeed, when an unfair labor practice causes employees or unions to suffer monetary losses, the Federal Labor Relations Authority requires the offending party to pay backpay, restore leave, or otherwise reimburse them. *U.S. Dep't of Lab., Wash., D.C.*, 37 FLRA 25, 39-41 (1990). And when agencies have violated the dues deduction requirements of section 7115 of the Civil Service Act (which is similar to the dues deduction requirement of the Foreign Service Act, 22 U.S.C. § 4118), the Authority routinely orders agencies to reinstate the dues allotments of individuals in the unit whose allotments were unlawfully terminated, and to reimburse the union in an amount equal to the amount of dues it would have received but for the agency's unlawful conduct. *See, e.g., U.S. Dep't of the Treasury, U.S. Mint*, 35 FLRA 1095, 1100 (1990); *Def. Logistics Agency*, 5 FLRA 126, 131-33 (1981); *see U.S. Dep't of Def., Ohio Nat'l Guard,* 71 FLRA 829, 873, 875 (2020) (upholding ALJ decision finding that requiring agencies to reimburse unions when the agency's unlawful conduct prevented dues withholding is "routine[]" and ordering such reimbursement). For these reasons, the Association's asserted economic loss fails to establish the substantial, certain, and unrecoverable injury necessary to justify a preliminary injunction.

The Association next argues that the product of its negotiations with the State Department

over several decades will be "lost" now that its recognition has been withdrawn.  Mot. (ECF No. 10-1) at 36-37. But that is hyperbole.  Matters related to assignment procedures, tenure and promotion, grievance procedures, time-in-class and time-in service rules, and disciplinary procedures—the claimed product of the Association's past efforts—are reflected in the Foreign Affairs Manual.  *See generally* https://fam.state.gov/ (last visited Apr. 20, 2025).  Although the President has in an earlier Executive Order directed the Secretary of State to revise or replace the Foreign Affairs Manual, Exec. Order 14,211, 90 Fed. Reg. 9831 (Feb. 18, 2025), the Association has made no showing that any wholesale changes to the Manual are imminent.  Mot. (ECF No. 10-1) at 37.  That direction also preceded the Executive Order at issue here and is not challenged in this action.

As to USAID, the Association's argument for irreparable harm from the Executive Order is even more convoluted.  The Association admits that it has not yet heard from USAID as to what actions USAID intends to take, and its arguments about USAID's possible future actions are speculative.  Mot. (ECF No. 10-1) at 16 n.16.  If anything, the Association's motion makes clear that the Executive Order has not impeded its advocacy for its members, including by handling "an unprecedented number of grievances from USAID," Parikh Decl. (ECF No. 10-6) ¶ 4, as well as the filing of a lawsuit seeking an "injunction ordering the recall of all USAID employees on administrative leave and preventing further [reductions-in-force] or mass terminations."  Chester Decl. (ECF No. 10-4) ¶ 17.

The Association also overstates case authority to contend that "harms caused to employees by the loss of their rights to bargain collectively, as well as the harms caused to their exclusive bargaining representative, are both immeasurable and irreparable."  Mot. (ECF No. 10-1) at 34. The principal case cited by the Association, *NLRB v. Electro-Voice, Inc*., 83 F.3d 1559 (7th Cir.

1996), concerned a claim for the unlawful suppression of a unionization effort. In determining

that irreparable harm had been shown, the Court observed that it could take "years" for the National

Labor Relations Board to issue a decision on the merits of the claim and that, in the interim, "the

spark to organize" might be "extinguished." *Id*. at 1573; *see also Lineback v. Irving Ready-Mix,*

*Inc.*, 653 F.3d 566, 570 (7th Cir. 2011) (recognizing "the 'notoriously glacial' pace of [National

Labor Relations] Board proceedings"). These proceedings, by contrast, are moving with dispatch,

and these cases do not support a finding that the Association will suffer irreparable harm before

final judgment absent interim relief.

The Association's First Amendment argument also fails to highlight any harm, let alone an

irreparable one. In the First Amendment context, "[a] preliminary injunction is not appropriate . . .

unless the party seeking it can demonstrate that First Amendment interests [are] either threatened

or in fact being impaired at the time relief [is] sought." *Nat'l Treasury Emps. Union v. United*

*States*, 927 F.2d 1253, 1254 (D.C. Cir. 1991) (citation omitted) (alteration in original). The

Association has shown neither. Indeed, the Supreme Court has explained that "the First

Amendment does not impose any affirmative obligation on the government . . . to recognize [a

public employee union] and bargain with it." *Smith v. Ark. State Highway Emps., Local 1315*, 441

U.S. 463, 465 (1979); *see also Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 313

(1979). As a result, "[t]here is . . . no constitutionally protected right to bargain collectively."

*Fraternal Order of Police v. Bd. of Governors of the Fed. Reserve Sys.*, 391 F. Supp. 2d 1, 8-9

(D.D.C. 2005); *see also Am. Fed'n of Gov't Emps., ALF-CIO v. Loy*, 281 F. Supp. 2d 59, 65

(D.D.C. 2003), *aff'd on other grounds*, 367 F.3d 932 (D.C. Cir. 2004). This is precisely why courts

have uniformly rejected First Amendment challenges to Presidents' executive orders issued under

5 U.S.C. § 7103(b)(1)—a provision similar to 22 U.S.C. § 4103(b)—denying segments of the

Federal Government collective bargaining rights. *See, e.g.*, *Nat'l Treasury Emps. Union v. Reagan*, No. 80-606, 1981 WL 150530, at *3 (D.D.C. Sept. 3, 1981) (rejecting such a challenge and noting an identical holding in *Police Ass'n of the District of Columbia v. Dep't of the Treasury*, No. 78-0236 (D.D.C. May 19, 1980)).

As already established above, moreover, the Association claims to be actively advocating on behalf of its members.  Thus, it has disclaimed any actual chilling effect. In the absence of demonstrated injury to the Association's purported First Amendment rights, the Association fails to show that it will suffer irreparable harm, and on that basis alone, its motion should be denied.

## II.    The Association Cannot Show Likelihood of Success on the Merits of its Claims

The Association cannot establish likelihood of success on the merits for at least two reasons: its claims are statutorily channeled away from district court review, and it would not prevail on the merits in any event.

### A.  The Foreign Service Act precludes district court jurisdiction over the Association's claims.

The Association cannot show that its claims may be heard in district court. By the Association's account, Executive Order 14,251 is invalid, meaning the subdivisions identified in the Executive Order remain subject to the Foreign Service Act, and the collective bargaining agreements with the State Department and USAID are therefore valid and binding. Indeed, the Association's proposed preliminary injunction order would preclude Defendants from "[r]efusing to recognize and bargain with [the Association] as the certified exclusive bargaining representative of bargaining unit employees at Defendants State and USAID" to include, among other things, precluding any termination or suspension of voluntary dues deductions from paychecks.  Proposed Order (ECF No. 10-8).

Under that theory, the Association's claims must be channeled to the administrative process

provided in the Foreign Service Act, and the D.C. Circuit's decisions in *American Foreign Service Association v. Baker*, 895 F.2d 1460, 1463 (D.C. Cir. 1990), which arose under that Act, and *American Federation of Government Employees, AFL-CIO v. Trump*, 929 F.3d 748, 752 (D.C. Cir. 2019) ("*AFGE v. Trump*") and *AFGE v. Air Force*, 716 F.3d at 637-640, which arose under a similar provision of the Civil Service Act, compel dismissal of this case on jurisdictional grounds.

In *American Foreign Service Association,* the Association claimed that the State Department's decision to cease subsidizing overseas health benefits packages for Foreign Service employees without notifying the Association constituted an unfair labor practice in violation of the Foreign Service Act and the applicable collective bargaining agreement. The D.C. Circuit rejected the Association's attempt to circumvent the comprehensive administrative-judicial review scheme under the Foreign Service Act. The Court held that the Foreign Service Labor Relations Board could afford adequate relief were a breach of the "duty to bargain imposed by the Foreign Service Act" established and that the Association needed to proceed administratively against the Department and then, following a decision by the Foreign Service Labor Relations Board, could seek judicial review in the Court of Appeals not district court. *Am. Foreign Serv. Ass'n*, 895 F.2d at 1462-63. In so holding, the D.C. Circuit noted the parallels between the administrative-judicial review procedures under the Foreign Service Act and the "identical" statutory language in the Civil Service Act. *Id*. at 1461.

In *AFGE v. Trump*, numerous federal unions asserted broad constitutional and statutory challenges to a set of three Executive Orders issued by President Trump during his first term. The orders would have enacted substantial changes to the way federal unions operated. The D.C. Circuit reversed a district court decision in favor of the unions on jurisdictional grounds, holding that the comprehensive administrative-judicial review scheme set forth by the Civil Service Act

channeled jurisdiction from federal district courts. *AFGE v. Trump*, 929 F. 3d at 753, 762. The D.C. Circuit emphasized that most federal labor disputes must be heard through the statutory review scheme with any judicial review occurring in the relevant federal court of appeals. *Id.* at 754-61.

Likewise, in *AFGE v. Air Force*, the D.C. Circuit observed that "to the extent that [federal] management enforces a policy that violates a collective bargaining agreement predating the policy, 'any person' can lodge an unfair labor practice charge with the [Federal Labor Relations Authority]." *AFGE v. Air Force*, 716 F.3d at 637 (quoting 5 U.S.C. §§ 7116(a)(7), 7118(a)(1)). The D.C. Circuit held that this statutory review regime "is exclusive," and therefore the union "cannot circumvent this regime by instead bringing a suit in district court." *Id.* at 637. In so holding, the D.C. Circuit expressly considered and rejected the union's argument that the district court has jurisdiction because "it can more efficiently adjudicate" the union's claims that the federal policy at issue is "contrary to statute on a nationwide, rather than local-by-local, basis." *Id.* at 639.

The particular Association claims here require the same jurisdictional outcome. Similar to the broad challenges in the above cases, the Association here alleges that Executive Order 14,251 and OPM guidance will result in financial harm and loss of bargaining power. Specifically, the Association claims that the State Department repudiated the relevant collective bargaining agreements, refused to recognize and bargain with it, and ceased withholding dues, and expects the same from USAID. These claims turn on the Association's argument that its members are covered by the Foreign Service Act's statutory requirements. They therefore fall within the statute's exclusive review scheme and may not be heard in federal district court. Notably, the Association's motion does not address these jurisdictional issues.

The Supreme Court's decision in *Axon Enterprises* does not change the calculus. *See Axon Enterprises v. Fed. Trade Comm'n*, 598 U.S. 175 (2023). As the Court explained in *Axon Enterprises*, "[a] special statutory review scheme . . . may preclude district courts from exercising jurisdiction over challenges to federal agency action." *Id.* at 185. The D.C. Circuit in *AFGE v. Trump* held that the Civil Service Act (and thus by virtue of identical language the Foreign Service Act) is such a scheme. And the Association's claims are not like the "wholly collateral" challenge the *Axon* plaintiff brought to the Federal Trade Commission's structure. Rather, the crux of the Association's claim is that Defendant agencies are violating the Foreign Service Act by implementing the President's Executive Order—precisely the sort of claims that the D.C. Circuit found precluded in *AFGE v. Trump*.

The *Thunder Basin* factors that the Court applied in *Axon*—the existence of meaningful relief without district court review, whether a claim is "wholly collateral," and the relevance of agency expertise—establish that the Foreign Service Act precludes district court jurisdiction over the Association's claims. *See Axon*, 598 U.S. at 186 (citing *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 212-13 (1994)); *see also Am. Foreign Serv. Ass'n*, 2025 U.S. Dist. LEXIS 31748, at *36-37 (finding jurisdiction lacking in district court over the Association's claims over the alleged "dismantling" of USAID under the *Thunder Basin* factors).

First, a finding of preclusion in this case does not foreclose meaningful judicial review of the Association's claims. The Association can submit an unfair labor practice charge to the Authority's General Counsel, who can bring a complaint before the Foreign Service Labor Relations Board, and any arguments that the Board cannot resolve will be addressed by the D.C. Circuit through the administrative-judicial review process Congress crafted in the Foreign Service Act. *See* 22 U.S.C. § 4019(a) and (c); *id.* § 4116(a) and (f); *Am. Foreign Serv. Ass'n*, 895 F.2d at

1462-63; *AFGE v. Trump*, 929 F.3d at 759.    Unsupported efficiency concerns with the administrative process, moreover, are insufficient to establish the absence of meaningful judicial review. *Am. Foreign Serv. Ass'n*, 2025 U.S. Dist. LEXIS 31748, at *32-33 (rejecting argument that "no later judicial review [by the Courts of Appeal] could be effectual . . . because 'the administrative forums cannot act with the needed dispatch'").

Nor does the Association's invocation of constitutional claims excuse it from the requirement that it first seek relief before the agency adjudicator. The Supreme Court has previously held that whether a claim is precluded under the Civil Service Reform Act does not "turn on its constitutional nature . . .  but rather on the type of the employee and the challenged employment action." *Elgin v. Dep't of Treasury*, 567 U.S. 1, 15 (2012).    So too here, the Association cannot escape the Foreign Service Act's preclusive review scheme by framing its breach of contract arguments in constitutional terms. In short, the Association can still receive meaningful judicial review of its claims by bringing them before the Authority in the first instance followed by an appeal in the D.C. Circuit. *AFGE v. Trump*, 929 F.3d at 758 (observing that "'it is of no dispositive significance' whether the agency 'has the authority to rule' on constitutional claims so long as the claims 'can eventually reach 'an Article III court fully competent to adjudicate' them'" and "see[ing] no reason why the statutory scheme . . . would prevent us from resolving the unions' constitutional or statutory challenges even if the [Federal Labor Relations Authority] could not");[5] *see also AFGE v. Air Force*, 716 F.3d at 637 ("Because the [Civil Service

---

[5]    In *American Foreign Service Association*, the D.C. Circuit had referenced a footnote in *National Federation of Federal Employees v. Weinberger*, 818 F.2d 935 (D.C. Cir. 1987), to question whether administrative relief would be adequate when a constitutional violation is asserted. *Am. Foreign Serv. Ass'n*, 895 F.2d at 1462.  The D.C. Circuit, however, has since recognized that the suggestion in that footnote "cannot survive the Supreme Court's decision in *Thunder Basin*." *AFGE v. Trump*, 929 F.3d at 758-59.

Act's] remedial regime is exclusive, . . . AFGE cannot circumvent this regime by instead bringing a suit in district court.").

Second, the Association's claims are within the statutory scheme and not collateral to it. The Court must "examine whether the action 'at bottom' seeks a substantive determination that falls within the statutory regime's exclusive scope." *Fed. Law Enf't Officers Ass'n v. Ahuja*, 62 F.4th 551, 563 (D.C. Cir. 2023) (quoting *Heckler v. Ringer*, 466 U.S. 602, 615 (1984)). As the Supreme Court recently explained, a claim may be sufficiently collateral when the "claims do not relate to the subject of the [administrative] actions." *Axon*, 598 U.S. at 193. There, the Court noted that "separation-of-powers claims" brought against the administrative agency were entirely unrelated to the "auditing practices" and "business merger" that constituted the subject matter of the agency actions. *See id.* Nor were they related to the "procedural or evidentiary matters an agency often resolves on its way to a merits decision." *Id.*

No such separation exists here. The Association challenges Defendant agencies' refusal to abide by provisions of their collective bargaining agreements and the Foreign Service Act, including to negotiate with the Association and to deduct union dues from paychecks. *See* 22 U.S.C. §§ 4113(c); *id.* § 4118. These issues concern a "refus[al] to consult or negotiate in good faith" with the Association or a "fail[ure] or refus[al] otherwise to comply with any provision" of the Foreign Service Act and thus fall within the province of the Board to resolve. *See id.* § 4115(a), (d); *id.* § 4116(a); *Am. Foreign Serv. Ass'n*, 2025 U.S. Dist. LEXIS 31748, at *27 (describing the Foreign Service Labor Relations Board as the administrative body that "hears union complaints" and that is "charged with resolving grievances brought under the Act" by the union). When an unfair labor practice claim is pursued, the General Counsel for the Federal Labor Relations Authority will investigate and determine whether a complaint should issue. 22 U.S.C. § 4116(a).

These are the kinds of issues central to the Authority's work and are in no way collateral to the statutory review provisions.

For similar reasons, the Association's claims are clearly within the expertise of the Federal Labor Relations Authority and by extension the Foreign Service Labor Relations Board. *See supra* n.3. As the FLRA is the federal authority on labor relations within the federal civil service, the Board is the federal authority on matters of labor relations within the foreign service. *See Bureau of Alcohol, Tobacco & Firearms v. FLRA*, 464 U.S. 89, 97 (1983). In concluding that the unions had to first bring their constitutional claims before the Authority and the Merit System Protection Board in *AFGE v. Trump*, the D.C. Circuit noted that those agencies, despite having less expertise on constitutional issues, may be able to "offer an interpretation of the [statutes] in the course of the proceeding that might alleviate or shed light on the constitutional concerns." *AFGE*, 929 F.3d at 761. So too here, the Board may well offer an interpretation of the statute or Executive Order 14,251 that obviates a need to address some of the Association's broader constitutional arguments. For the foregoing reasons, the Association's claims must be channeled through the administrative-judicial review scheme of the Foreign Service Act. The Association has not alleged that it has made any attempt to follow that scheme.

### B. The Association is unlikely to succeed on its *ultra vires* claims.

The Association may not escape the Act's channeled jurisdiction by characterizing its claims as *ultra vires*. The mere characterization of the Association's claims as an attack on the President and Defendant agencies' authority is insufficient to overcome the statutory bar. When, as here, "the statute provides us with clear and convincing evidence that Congress intended to deny" judicial review, the characterization of a claim as *ultra vires* is insufficient to confer subject matter jurisdiction. *Bd. of Governors of Fed. Reserve Sys. v. MCorp*, 502 U.S. 32, 44 (1991); *accord DCH Reg. Med. Ctr. v. Azar*, 925 F.3d 503, 509 (D.C. Cir. 2019) ("Following *MCorp*,

there is not much room to contend that courts may disregard statutory bars on judicial review just because the underlying merits seem obvious.").

In any event, "[*u*]*ltra vires* review is . . . only available in extraordinary circumstances." *See DCH Reg. Med. Ctr.*, 925 F.3d at 509 (noting "extremely limited scope" and "extraordinarily narrow" nature of *ultra vires* claims). Indeed, the bar for asserting an *ultra vires* claim is high: the Association must meet a heightened standard "confined to 'extreme'" errors. *See Fed. Express Corp. v. Dep't of Com.*, 39 F.4th 756, 763-64 (D.C. Cir. 2022). Accordingly, a claim based on *ultra vires* review requires a violation of a "specific prohibition in the statute that is clear and mandatory," a violation that was "obviously beyond the terms of the statute," or action that was "far outside the scope of the task that Congress gave it." *N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1263 (D.C. Cir. 2020) (citations omitted). As a result, *ultra vires* claims "rarely succeed." *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009), and are incompatible with a statutory provision based on national security considerations that are necessarily undefined by their nature. *Changji Esquel Textile Co. v. Raimondo*, 40 F. 4th 716, 723 (D.C. Cir. 2022) (recognizing that the already "demanding *ultra vires* standard" is "even more difficult" to satisfy with respect to statutes bearing on national security). As explained below, Executive Order 14,251 was a lawful exercise of the President's statutory authority that cannot be second-guessed by courts. Because the President's decision does not contravene any clear and specific statutory mandate, the Association fails to demonstrate a likelihood of success on the merits of an *ultra vires* claim.

### C.    Executive Order 14,251 is valid.

The Association also is unlikely to succeed on the merits in its *ultra vires* challenge to the validity of Executive Order 14,251. The Court lacks authority to review the President's national security-related determinations under section 4103(b). But in any event, the President's

determinations are supported.

### 1.    The President's § 4103(b) determinations are not subject to judicial review.

Executive Order 14,251 represents the President's exercise of his authority under 5 U.S.C. § 7103(b)(1) to exclude certain agencies or subdivisions from the provisions of the Civil Service Act and under 22 U.S.C. § 4103(b) to exclude "any subdivision" of the State Department (or any agency authorized to utilize the Foreign Service personnel system) from the coverage of the Foreign Service Act.

Section 7103(b)(1) provides:

The President may issue an order excluding any agency or subdivision thereof from coverage under this chapter if the President determines that—

> (A) the agency or subdivision has as a primary function intelligence, counterintelligence, investigative, or national security work, and

> (B) the provisions of this chapter cannot be applied to that agency or subdivision in a manner consistent with national security requirements and considerations.

5 U.S.C. § 7103(b)(1).

Section 4103(b) provides:

The President may by Executive Order exclude any subdivision of the Department from coverage under this subchapter if the President determines that—

> (A) the subdivision has as a primary function intelligence, counterintelligence, investigative, or national security work, and

> (B) the provisions of this subchapter cannot be applied to that subdivision in a manner consistent with national security requirements and considerations.

22 U.S.C. § 4103(b)(1) and (2).

As Executive Order 14,251 makes plain, the President determined that each covered agency or subdivision in Section 2 of the Order, including the State Department and USAID, and each covered subdivision of the Department and USAID that employed Foreign Service Officers

23

in Section 3 of the Order, has a relevant primary function, and he determined that the statutes' provisions could not be applied to that agency or subdivision in a manner consistent with national security requirements and considerations. And as the statutes make plain, Congress vested the President—and the President alone—with the authority to make both determinations and thereby exclude agencies or subdivisions from the Acts' coverage. *Cf. Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring) ("When the President acts pursuant to an express or implied authorization of Congress, his authority is at its maximum."). This Court lacks authority to second guess the President's determinations in Section 3 of the Executive Order as the Association requests (the Association does not challenge the determinations made in Section 2 of the Executive Order).

The type of determination to be made under section 4103(b) is similar to that in 5 U.S.C. § 7103(b)(1), and courts have repeatedly recognized that section 7103(b)(1) entrusts the relevant determinations to the President alone, without interference from courts or other actors. This Court held decades ago that a section 7103(b)(1) exclusion by President Carter was "not reviewable" because "Congress intended the chief executive to act 'in his or her sole discretion'" when making section 7103(b)(1) determinations. *Nat'l Treasury Emps. Union v. Reagan*, 1981 WL 150530, at *2 (D.D.C. Sept. 3, 1981) (quoting 124 Cong. Rec. H.9633 (daily ed. Sept. 13, 1978)). There, the Court concluded that "Congress granted the President complete discretion in determining the agencies to be excluded from the labor relations provisions," *id.*, leaving judicial review of the President's determinations available only in "instances of constitutional dimension or gross violation of the statute." *Id.* at *2-3 (quotation omitted).[6]

---

[6]    *Reagan* suggested that this exception *may* exist, but did not apply it. But in other contexts, courts have suggested that when judicial review is available only for "gross violations," that "narrow" exception applies only where the action is "plainly beyond the bounds" of the governing

The D.C. Circuit has echoed that conclusion, observing that "Section 7103(b)(1) makes clear that the President may exclude an agency from the Act's coverage whenever he 'determines' that the conditions statutorily specified exist." *AFGE v. Reagan*, 870 F.2d 723, 727 (D.C. Cir. 1989). And the D.C. Circuit has cautioned that others must not "arrogate … the President's power in this regard"; instead, section 7103(b)(1) "is for the President alone to invoke." *Dep't of Def. v. FLRA*, 685 F.2d 641, 650 (D.C. Cir. 1982).

Indeed, the President need not even "insert written findings in an exempting order[]" under section 7103(b)(1). *AFGE*, 870 F.2d at 727. If the President's order can be sustained without *any* findings, neither that statute nor 22 U.S.C. § 4103(b) could permit second-guessing or flyspecking of findings actually made. Any other conclusion would be flatly inconsistent with the deference regularly due to the President's national security-related determinations. *See, e.g.*, *Trump v. Hawaii*, 585 U.S. 667, 686 (2018) (dismissing as "inconsistent with the broad statutory text and the deference traditionally accorded the President in th[e national security] sphere" an argument "for a searching inquiry into … the President's justifications" for a finding about national interests); *Webster v. Doe*, 486 U.S. 592, 600 (1988) (concluding that a statute authorizing the CIA Director to terminate an employee when the Director "shall deem such termination necessary or advisable in the interests of the United States" forecloses "any meaningful judicial standard of review"); *Bauer v. DeVos*, 325 F. Supp. 3d 74, 103 (D.D.C. 2018) (*Webster* retains vitality in "the context of national security"). In sum, "[w]hen it comes to collecting evidence and drawing factual inferences" on questions of national security, "the lack of competence on the part of the courts is

---

statute. *Air Line Emps. Ass'n Int'l. v. Nat'l Mediation Bd.*, 1981 WL 2391 at *1-3 (D.D.C. May 18, 1981). And the President's exercise of authority here plainly falls within the scope of the statute.

marked," and judicial review of those determinations is thus sharply constrained. *Holder v. Humanitarian Law Project*, 561 U.S. 1, 34 (2010) (citation omitted).

The President's determination under the statute's second prong—whether the provisions of the Act "cannot be applied … in a manner consistent with national security requirements and considerations," 22 U.S.C. § 4103(b)(2)—is especially ill-suited to judicial second-guessing. When the President adopts "a preventive measure … in the context of … national security," he is "not required to conclusively link all of the pieces in the puzzle before [courts] grant weight to [his] empirical conclusions." *Holder*, 561 U.S. at 35. Determining the "national security requirements and considerations" of the Nation is not a task for which this Court or any other is well-equipped. *See id.* at 34 ("the lack of competence on the part of the courts is marked" (citation omitted)); *Dep't of the Navy v. Egan*, 484 U.S. 518, 530 (1988) (refusing to review denial of security clearance because "it is not reasonably possible for an outside nonexpert body to review the substance of such a judgement … [n]or can such a body determine what constitutes an acceptable margin of error in assessing the potential risk"). Rather, the President is entitled to reach a national security-based finding before the national security is jeopardized. As with the exemption's first prong, this Court is ill situated to second guess that determination.

Ultimately, "*ultra vires* review is limited to ''facial' violations' of statutes" and "[c]onsidering the adequacy of the [government's] explanation, or the degree of support for its factual findings, would contravene these basic principles." *Changji Esquel Textile Co.,* 40 F. 4th at 726. *Ultra vires* review thus "presents no occasion to flyspeck an order's factual findings or explanation." *Id.* Because the President's determinations comport with the applicable statutory provisions, the Court's inquiry should end there.

### 2.    The identified subdivisions meet the Act's statutory criteria.

In any event, the President's determinations withstand scrutiny. As detailed below, the

subdivisions of the Department of State and USAID identified in Section 3 of the Executive Order "ha[ve] as a primary function intelligence, counterintelligence, investigative, or national security work[.]" 22 U.S.C. § 4103(b).

The statute's first three categories of primary functions require no further explanation. As for "national security work," that term has long and consistently been interpreted in the federal labor relations context to refer to work "directly related to protection and preservation of the military, economic, and productive strength of the United States[.]" *Dep't of Energy, Oak Ridge Operations, & Nat'l Ass'n of Gov't Emps. Local R5-181*, 4 FLRA 644, 655-56 (1980).

That interpretation is not inconsistent with *Cole v. Young*, 351 U.S. 536 (1956), where the Supreme Court interpreted the undefined term "national security" in the context of a statute that "specified 11 named agencies to which [that statute] should apply." *Id.* at 544. As the examples that Congress specified were "directly concerned with the national defense," the Supreme Court concluded that the term "national security" in that specific statute was used in a "definite and limited sense"—namely, confined by the role of the specified agencies to refer to "those activities which are directly concerned with the Nation's safety, as distinguished from the general welfare." *Id*. at 543-44. Importantly, the Court observed that "had Congress intended the term in a sense broad enough to include all activities of the Government, it would have granted the power to terminate employment 'in the interest of the national security' to all agencies of the Government" instead of the eleven that were specified. *Id*. at 544.

The national security exemption in Section 7103(b)(1), however, is not limited to any specific agency but to those that the President "determines" have as a primary function national security work. Thus, there is no basis to conclude that the term "national security" in section 7103(b)(1)—or its counterpart in section 4103(b)—was intended by Congress to be used in the

"limited sense" applied in *Cole*. Moreover, under the analysis in *Cole*, the frame of reference in section 4103(b) is the Department of State, or any other "agency authorized by law to utilize the Foreign Service personnel system." 22 U.S.C. § 4103(b); 22 U.S.C. § 3902(4). Thus, to the extent the term "national security" in section 4103(b) is used in any definitive sense, it would be with respect to the Nation's foreign policy, which is the function of the State Department. The Association's reliance on *National Federation of Federal Employees v. McDonald*, 128 F. Supp. 3d 159 (D.D.C. 2015), to argue against an "expansive reading of an exemption in a collective bargaining statute" is misplaced because the operative language in the statute there did not involve national security. Mot. (ECF No. 10-1) at 25.

In Section 2 of the Executive Order, the President determined, pursuant to 5 U.S.C. § 7103(b)(1), that the Department of State and USAID have as a primary function intelligence, counterintelligence, investigative or national security work and that the provisions of the Civil Service Act cannot be applied to it in a manner consistent with national security requirements and considerations. Exec. Order 14,251 § 2(b)(1-401 and 1-413). The Association does not challenge those determinations in this case.[7]

The Association instead challenges the similar determination made in Section 3 of the Executive Order, which pertains to the subdivisions of the Department and USAID that employ Foreign Service Officers. In that Section, the President determined that the subdivisions of the Department and USAID that employ Foreign Service Officers likewise fall within the similarly-worded exemption in 22 U.S.C. § 4103(b) of the Foreign Service Act. Exec. Order 14,251

---

[7]    Section 2 of the Executive Order, as it relates to various federal agencies, including the State Department and USAID, is currently being challenged in a lawsuit filed on April 3, 2025, in the Northern District of California, *American Federation of Government Employees, et al. v. Trump, et al*., 25-cv-3070 (N.D. Cal.). The Association is not a plaintiff in that action.

§ 3(c)(1-501 and 1-502).  There is clearly a basis for the President to make such a determination with respect to subdivisions of these two agencies.

The mission of the Department of State is to "protect and promote U.S. security, prosperity, and democratic values." *See* https://www.state.gov/about/ (last visited Apr. 24, 2025).  Since the passage of the Civil Service Act and the Foreign Service Act, the Department's role has evolved to include "fight[ing] terrorism" in addition to "protect[ing] U.S. interests abroad, and implement[ing] foreign policy initiatives." *Id.*    That is reflected in the work of the subdivisions reporting to the Secretary, Deputy Secretaries, and Under Secretaries identified in the Executive Order.  Exec. Order § 3(c).  That work focuses on, among other things, critical and emerging technology (Secretary of State, Deputy Secretary of State and Deputy Secretary of State for Management and Resources), global health security (same), intelligence (same), diplomatic security (Under Secretary for Management), arms control and international security (Under Secretary for Arms Control and International Security), civilian security (Under Secretary for Civilian Security, Democracy, and Human Rights), economic growth, energy, and environment (Under Secretary for Economic Growth, Energy, and Environment), counterterrorism (Under Secretary for Political Affairs), and public diplomacy (Under Secretary for Public Diplomacy). *See* https://www.state.gov/bureaus-and-offices-list (last visited Apr. 24, 2025).

For its part, USAID "is the principal U.S. agency responsible for extending development assistance to countries around the world" and its "programs aim to support economic growth, combat the spread of disease, promote democratic reform, and address food insecurity." *See* https://oig.usaid.gov/USAID?page=0 (last visited Apr. 24, 2025). USAID frequently operates in fragile states, conflict zones, and areas where the U.S. has strategic intelligence interests, including supporting counterterrorism efforts and democratic movements. USAID partners closely with the

Department of Defense, the State Department, and other agencies protecting U.S. interests abroad.

The President thus has acted well within his discretion to conclude that the identified subdivisions of the Department and USAID employing Foreign Service Officers are engaged in "national security work" as "a primary function." As defined in the Foreign Service Act, the term function "includes any duty, obligation, power, authority, responsibility, right, privilege, discretion, or activity," 22 U.S.C. § 3902(6), and thus the work of a subdivision can entail multiple "primary" functions—for instance, one related to a "duty," another related to a "discretion," and another related to an "activity," among others.

Foreign Service Officers are at the frontline of the nation's foreign policy, and are "asked to serve at one of any of the more than 270 embassies, consulates and other diplomatic missions" throughout the world, some of which "are in difficult and even dangerous environments." *See* https://careers.state.gov/career-paths/foreign-service/officer/ (last visited Apr. 20, 2025). Foreign Service personnel "practice diplomacy to advance America's interests, solve global challenges, build alliances, counter adversaries, promote peace, and find new opportunities for our nation." *See* https://careers.state.gov/career-paths/foreign-service/ (last visited Apr. 20, 2025). Their role, and that of their employing subdivisions, is inextricably intertwined with a national security function.

The President also properly determined that the provisions of the Foreign Service Act cannot be applied to any of the exempted subdivisions "consistent with national security requirements and considerations." 22 U.S.C. § 4103(b)(2). As detailed already, each subdivision employing Foreign Service officers has a significant national security function. When it comes to national security, the needs of the mission dictate working conditions. By nature, national security work may and does, at any time, require changes in working conditions or employee status to be

accomplished without hesitation, advanced notice, or opportunity to bargain with labor organizations. The President's "executive decisions" in the national-security realm require "delicate, complex" assessments and rapid responses from agencies and employees. *Chicago & Southern Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948).

But collective bargaining agreements negotiated under the Foreign Service Act, including those of the State Department and USAID, are by nature designed to reduce the control of the agency or subdivision over its personnel and operations. For example, under the Framework Agreement, the State Department must postpone operational changes that substantively affect working conditions until they have offered the Association an opportunity to bargain. Framework Agmt. (ECF No. 10-2) § 3. The Federal Labor Relations Authority routinely pauses agency attempts to implement changes before this midterm bargaining process has concluded. *See, e.g.*, *Army Corps of Eng'rs,* 53 FLRA 79, 81 (1997). This process often imposes delays of months or years before operational changes can take effect; for example, the Department of Energy spent over 14 months negotiating the comparatively minor issue of office-sharing for employees on partial telework. *See NTEU Ch. 213 & 228 and U.S. Dep't of Energy*, 2023 FSIP 041 (2023). The President has permissibly concluded that requiring lengthy delays before agencies employing Foreign Service personnel can ordinarily adjust their operations is incompatible with national security considerations.

Employee performance and criteria for promotion are also critical in agencies with important national security roles. As the Association acknowledges, the collective bargaining agreements afford the Association input into "numerous" aspects of Foreign Service employees' job-related procedures, including "assignment procedures, tenure and promotion procedures, agency-level grievance and discipline procedures, time-in-class and time-in-service rules." Mot.

(ECF No. 10-1) at 6-8.  In accordance with those provisions, the Association negotiated recent revisions to the Core Precept for Promotion and Retention.  Noting on its website that these recent revisions were the first "significant overhaul [of the precepts] since 2015," the Association emphasized its success in obtaining the "addition of the precept on [Diversity, Equity, Inclusion and Accessibility]," characterized as "the most significant change" to the precepts in the last decade. *See* https://afsa.org/new-core-precepts-and-what-they-mean (last visited Apr. 24, 2025). The purpose of that precept was to "require every employee" who sought advancement in the Foreign Service "to roll up their sleeves and play a direct role in advancing DEIA." *See* https://afsa.org/case-foreign-service-core-precept-deia (last visited Apr. 24, 2025).  The President has issued an Executive Order to end DEIA programs,[8] and, on March 18, 2025, issued a memorandum directing the Secretary of State to remove the DEIA Core Precept from Foreign Service tenure and promotion criteria to focus hiring and advancement "solely on merit." *See* https://www.whitehouse.gov/fact-sheets/2025/03/fact-sheet-president-donald-j-trump-removes-dei-from-the-foreign-service/ (last visited Apr. 24, 2025). The President permissibly concluded that the Association's insistence on factors other than merit as key for promotion in the foreign service is incompatible with national security considerations.

And, in a separate Executive Order issued two months ago, the President determined that it was necessary to reform the Foreign Service to implement the United States's foreign policy effectively.  Exec. Order 14,211, *One Voice for America's Foreign Relations*, 90 Fed. Reg. 9831 (Feb. 18, 2025). Those reforms will be directed to, among other things, recruiting, performance, evaluation and retention standards, as well as revisions to the Foreign Affairs Manual. *Id.* § 5.

---

[8]    See Exec. Order 14,151, *Ending Radical And Wasteful Government DEI Programs And Preferencing*, 90 Fed. Reg. 8339 (Jan. 20, 2025).

The President thus permissibly concluded in Executive Order 14,251 that collective bargaining agreements operating under the provisions of the Foreign Service Act that impede assignment, promotion, and discipline decisions are inconsistent with national security considerations.

The Association protests that the State Department and USAID have thus far been able to operate subject to the collective bargaining agreements without imperiling national security. That assertion ignores the President's determination, consistent with his authority to conduct foreign policy, that reform is necessary within the Foreign Service to effectively implement the country's foreign policy. *Id.*  The Association's mischaracterization of the President's stated efforts at reform also ignores that national-security determinations inherent to the conduct of foreign policy inevitably involve the exercise of "[p]redictive judgment" about risks to national security. *Egan*, 484 U.S. at 529; *see Hawaii*, 585 U.S. at 708 (national-security judgments "involve large elements of prophecy"). They also involve policy determinations about what level of risk is tolerable in any given set of circumstances. The Court should not second-guess the President's determinations about the relevant "national security requirements and considerations" at all, 22 U.S.C. § 4103(b), because—to reiterate—"it is difficult to conceive of an area of governmental activity in which the courts have less competence." *Gilligan v. Morgan*, 413 U.S. 1, 10 (1973); *see supra* Section II(C)(1). But the Court certainly must not second-guess those determinations in a retrospective manner, based on the agencies, threats, and union behavior of yesteryear.

The Association's contrary arguments are unavailing.

*First*, the Association contends that section 4103(b) cannot be interpreted as permitting the exclusion of the "entirety" of the State Department or USAID from the Foreign Service Act because that would be contrary to the language of the Act and its purpose. Mot. (ECF No. 10-1) at 24.  As an initial matter, this argument ignores the actual language of Executive Order 14,251

as it relates to section 4103(b), which specifies State Department and USAID subdivisions for exclusion. *See* Exec. Order § 3(c). The Association is not challenging in this case the Executive Order's exclusion of the State Department and USAID under section 7103(b). *Id.* § 2(b).

The President's determinations under section 4103(b), moreover, are both specific and specifically authorized by statute. The Act authorizes the President to exempt "any subdivision" of the State Department and USAID that employ Foreign Service Officers without limitation provided the determinations required by the Act have been made (which they indisputably have).

And, although the Act states that "labor organizations and collective bargaining in the [Foreign] Service are in the public interest," it also recognizes as a competing public interest the "requirement of an effective and efficient Government," *id.* § 4101, and, in particular, the discretion of the President to exempt "any subdivision" that engages in "national security work" as "a primary function" when the President determines that it is in the interest of national security to do so. *Id.* § 4103(b). Whether the exclusion of any subdivisions of these agencies from the Act was unnecessary four decades ago is of no moment. Mot. (ECF No. 10-1) at 28 (referencing a 1981 letter that the Association characterizes as suggesting that the exclusion of subdivisions was considered unnecessary at that time) The world has changed dramatically since that time, and Congress—in recognition that threats to the Nation may evolve—afforded the President the flexibility to exempt "any subdivision" without limitation when the President determines it to be called for by national security considerations.

The Association likewise accuses the President of improper and retaliatory motives in promulgating Executive Order 14,251. Mot. (ECF No. 10-1) at 32. But section 4103(b) does not suggest or authorize a searching inquiry into the President's motives, and neither it nor any other source of law the Association identifies requires the President to ignore larger policy objectives in

deciding whether to exercise his authority to exclude agencies or subdivisions as section 7103(b)(1) and section 4103(b) allow.

Specifically, the Association suggests that the White House "Fact Sheet" regarding the Executive Order—which notes that certain federal-sector unions have taken actions hostile to the President's "agenda"—offers evidence of retaliatory motive. But that fails to pass muster. As the Fact Sheet explains at length, the President signed Executive Order 14,251 in service of two of his top policy priorities: protecting Americans from threats to our national security and improving the efficiency and efficacy of the federal workforce. Compl. (ECF No. 1) ¶ 37 (quoting Fact Sheet). It cites actions Federal unions have taken using powers granted them by the Civil Service Act to block reforms to agency management.

The Association's attempt to characterize the "Fact Sheet" as somehow dispositive of the Court's inquiry because it references union efforts that seek to impede the President's agenda misunderstands 22 U.S.C. § 4301(b), which, by its very existence, is a recognition by Congress that union activity—in any manner encompassed by the collective bargaining rights afforded under the statute—can impede agency operations. When such activity, as here, impacts national security considerations, the President can act to restrict it by exempting agency subdivisions that have national security work as a primary function from the Act's coverage. As the function of the foreign service is to implement the "foreign affairs interests of the United States" as determined by the President, the impact of union activity on the President's foreign policy agenda is a proper consideration for the determinations made in the Executive Order concerning the State Department and USAID. *See* 22 U.S.C. § 3901(a)(2) (describing the "professional foreign service" as "serv[ing] the foreign affairs interests of the United States" and "provid[ing] a resource of qualified personnel for the President, the Secretary of State, and the agencies concerned with foreign

affairs"). The cited portion of the Fact Sheet concludes with the statement that the President "will not tolerate mass obstruction that jeopardizes his ability to manage agencies with vital national security missions." Compl. (ECF No. 1) ¶ 37. Section 4103(b) exists to allow the President to address such concerns.

Ultimately, the Association's baseless and speculative suggestions of retaliation sound in a retaliation claim, not an improper determination under the statute, and fail for the additional reasons explained below.

### D. The Association is unlikely to succeed on its First Amendment claim.

The Association next asserts that Executive Order 14,251 was issued in retaliation for the Association's lawsuits challenging President Trump's actions and public criticism of them. Mot. (ECF No. 10-1) at 31. This claim is unlikely to succeed for two reasons: (1) courts cannot look behind a facially legitimate presidential action to search for allegedly illicit motives; and (2) the Association cannot meet the high bar to establish that retaliation occurred.

Executive actions that are facially valid—that is, within the lawful authority of the executive—are entitled to a presumption of regularity. That courts traditionally defer to the Executive Branch in areas committed to its discretion, especially in matters of national security, is well-established. "The presumption of regularity supports the official acts of public officers, and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties." *United States v. Chemical Found.*, 272 U.S. 1, 14 (1926). Indeed, "judicial inquiry into 'executive motivation' represents 'a substantial intrusion' into the workings of another branch of Government and should normally be avoided." *See Dep't of Com. v. New York*, 588 U.S. 752, 781 (2019) (quoting *Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 268, n.18 (1977)); *see also id.* at 787 (Thomas, J., concurring in part) ("[W]e have often stated that courts reviewing agency action owe the Executive a 'presumption of regularity.'"

36

(citation omitted)). That presumption imposes a bar to review that is difficult to surmount. Overcoming it requires a "strong showing of bad faith or improper behavior." *Food & Drug Admin. v. Wages & White Lion Invs., L.L.C.*, No. 23-1038, 2025 WL 978101, at *18 (Apr. 2, 2025) (quoting *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971)). The Association cannot clear that bar.

As courts have held time and again, the Court's review of a presidential decision is limited to "whether the Executive gave a 'facially legitimate and bona fide' reason for its action." *Hawaii*, 585 U.S. at 703 (citing *Kleindienst v. Mandel*, 408 U.S. 753, 769 (1972)). The President wields significant authority over both matters of national security and federal labor-management relations—authority assigned to him both by the constitutional structure and by numerous federal statutes. *See e.g.,* 5 U.S.C. § 7103. Given that authority, "when the Executive exercises this [delegated] power negatively on the basis of a facially legitimate and bona fide reason, the courts will neither look behind the exercise of that discretion, nor test it by balancing its justification" against a plaintiff's asserted constitutional interests. *Mandel*, 408 U.S. at 770.

As explained above, the President has acted within the bounds of his clear authority over Executive Branch employees. *See, e.g., Free Enter. Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477, 496-97 (2010) ("Article II makes a single President responsible for the actions of the Executive Branch." (internal quotation marks and citation omitted)). The President provided legitimate reasons for exempting the covered agencies and subdivisions from coverage under the Foreign Service Act, grounded in his statutory and constitutional responsibility to direct the actions of the Executive Branch. The Court's inquiry should stop here.

And even if the Court could properly look behind the President's stated justification, the Association's claim fails on the merits. To state a claim for First Amendment retaliation, a plaintiff

37

must allege that: "(1) [it] engaged in conduct protected under the First Amendment; (2) the defendant took some retaliatory action sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again; and (3) a causal link exists between the exercise of a constitutional right and the adverse action taken against [it]." *Black Lives Matter D.C. v. Trump*, 544 F. Supp. 3d 15, 46 (D.D.C. 2021) (quoting *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016)). The Association has not established that it is likely to succeed on such a claim here.

Most fundamentally, the Association fails to show that the President's allegedly retaliatory motive was the cause of its alleged injury. *See Nieves v. Barlett*, 587 U.S. 391, 398-99 (2019). The Association's primary contention is that Executive Order 14,251 must be retaliatory because the exemptions are broader than the Foreign Service Act permits. Mot. (ECF No. 10-1) at 28. But that argument is both circular and incorrect—as explained in detail above, the President's exemption decision was plainly consistent with his statutory authority to exempt agencies with a primary national security purpose under 22 U.S.C. § 4103(b), and it was adopted for facially legitimate national security reasons. But on the Association's theory, its retaliation claim must fail if its substantive objections to the exemptions fail.

Moreover, when the Federal Government can show that it would have taken the challenged action absent the asserted First Amendment activity, a retaliation claim must fail. *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977). That is precisely the case here, where the President acted consistent with the Administration's longstanding policy priorities and with the motive of ensuring he can efficiently supervise agencies that have a primary purpose implicating national security and investigative functions. *See supra* Section II(C)(2).

Finally, the Association has also failed to establish any chilling effect. "Not every government restriction … is sufficient to chill the exercise of First Amendment rights, nor is every

restriction actionable, even if retaliatory," *Baltimore Sun Co. v. Ehrlich*, 437 F.3d 410, 416 (4th Cir. 2006) (citation omitted). Although a court must consider the alleged retaliatory action against a person of ordinary firmness, "the plaintiff's actual response to the retaliatory conduct provides some evidence of the tendency of that conduct to chill First Amendment activity." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 500 (4th Cir. 2005); *see also Media Matters for Am. v. Bailey*, 2024 WL 3924573, at *11 (D.D.C. Aug. 23, 2024) (considering plaintiffs' "actual response" to alleged retaliatory conduct to determine whether chilling effect occurred). Evidently Executive Order 14,251 has not had any actual chilling effect on the Association, which chronicles in its motion its continued advocacy against the Administration. Mot. (ECF No. 10-1) at 11-13.

The Association has not established that it is likely to succeed on the merits of its First Amendment claim.[9] So that claim likewise cannot support a preliminary injunction here.

## III.   The Balance of The Equities and The Public Interest Favor the Government

A preliminary injunction also is not appropriate because the balance of the equities and the public interest weigh in Defendants' favor. *See Nken v. Holder*, 556 U.S. 418, 435 (2009) (holding that "[t]hese factors merge when the Government is the opposing party"). As an initial matter, given that the Association cannot establish the first two factors necessary to obtain a preliminary injunction, "it is clear [it] cannot make the corresponding strong showings [on the second two factors] required to tip the balance in its favor." *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1295 (D.C. Cir. 2009).

---

[9]     To the extent the Association asserts a claim of "viewpoint discrimination" (Compl. (ECF No. 1) ¶ 62), the Association fails to address that as a distinct claim in its motion, referencing it instead as part of its deficient First Amendment retaliation claim. Mot. (ECF No. 10-1) at 33. *See Stein v. FEC*, 77 F. 4th 868, 872 (D.C. Cir. 2023) (undeveloped arguments are forfeited).

The remaining factors, however, also weigh in Defendants' favor. *See Kim v. FINRA*, 698 F. Supp. 3d 147, 172 (D.D.C. 2023) ("[A] court can deny preliminary injunctive relief solely on the balance of equities and public interest factors even in cases, like this, involving constitutional claims."), *appeal dismissed*, 2025 WL 313965 (D.C. Cir. Jan. 27, 2025). It is vital that agencies with a primary purpose of national security are responsive and accountable to the American people. The clear congressional purpose of § 7103(b)(1) is to allow the President to guarantee the effective operation of agencies relevant to national security without the constraints of collective bargaining. Moreover, the public has an interest in ensuring that agencies with a primary intelligence, counterintelligence, investigative, or national security function operate effectively and without delay to protect the American people. A preliminary injunction would displace and frustrate the President's decision about how to best address issues of national security, matters on which the courts typically defer to the President's judgment. Indeed, courts must "give deference to the Executive Branch's 'evaluation of the facts' and the 'sensitive and weighty interests of national security[,]' including 'the timing of those . . . decisions.'" *TikTok Inc. v. Trump*, 490 F. Supp. 3d 73, 85 (D.D.C. 2020) (quoting *Humanitarian Law Project*, 561 US. at 33-34, then *Holy Land Found. For Relief & Dev. v. Ashcroft*, 219 F. Supp. 2d 57, 74 n.28 (D.D.C. 2002)).

The Association contends that there is a public interest in "the right to organize and bargain collectively." Mot. (ECF No. 10-1) at 43. The balance of equities and the public interest point in the opposite direction, however: the President has long been charged with directing the Executive Branch workforce, and he has determined that agencies with a primary national security focus are being hamstrung by restrictive terms of collective bargaining agreements that frustrate his ability to safeguard the interests of the American people. The democratically-elected President's determination regarding the public interest in that sphere is entitled to deference.

**IV.    The Association Should Be Ordered to Post Security in Connection with Any Injunctive Relief.**

For the reasons stated above, Defendants submit that the Court can and should deny the Association's motion in its entirety. However, should the Court be inclined to order any injunctive relief, the Court should also order the Association to post security.  Under Federal Rule of Civil Procedure 65(c), the Court may issue a preliminary injunction "only if the movant gives security" for "costs and damages sustained" by Defendants if they are later found to "have been wrongfully enjoined." Fed. R. Civ. P. 65(c).  In the event the Court issues an injunction here, the Court should require the Association to post an appropriate bond commensurate with the scope of any injunction.  *See DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999) (stating that Rule 65(c) places "broad discretion in the district court to determine the appropriate amount of an injunction bond").

### CONCLUSION

For these reasons, the Court should deny the Association's motion for a preliminary injunction.

Dated: April 25, 2025

<div style="margin-left:40%">

YAAKOV M. ROTH
Acting Assistant Attorney General
EMILY M. HALL
SARAH E. WELCH
Counsel to the Assistant Attorney General
Civil Division

ERIC HAMILTON
Deputy Assistant Attorney General
Civil Division, Federal Programs Branch

ALEXANDER K. HAAS
Director
JACQUELINE COLEMAN SNEAD
Assistant Branch Director
LISA ZEIDNER MARCUS
Senior Counsel
LYDIA JINES
JEREMY MAURITZEN
Trial Attorneys

</div>

U.S. Department of Justice, Civil Division
Federal Programs Branch

EDWARD R. MARTIN, JR., D.C. Bar #481866
United States Attorney

By:  _/s/ Jeremy S. Simon_
JEREMY S. SIMON, D.C. BAR #447956
Assistant United States Attorney
601 D. Street, N.W.
Washington, D.C. 20530
(202) 252-2528
Jeremy.simon@usdoj.gov

*Attorneys for the United States of America*