UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                        )
                                        )
AMERICAN FOREIGN SERVICE                )
ASSOCIATION,                            )
                                        )
            Plaintiff,                  )
                                        )
      v.                                )          Civil Action No. 25-1030 (PLF)
                                        )
DONALD J. TRUMP et al.,                 )
                                        )
            Defendants.                 )
_____)


OPINION

        This matter is before the Court on plaintiff American Foreign Service

Association's ("AFSA") Motion for a Preliminary Injunction ("Pl.'s Mot.") [Dkt. No. 10].  On

March 27, 2025, the President issued an executive order that removed various agencies and

agency subdivisions from coverage of the Foreign Service Labor-Management Relations Statute

and Federal Service Labor-Management Relations Statute.  Both statutes – which protect federal

employees' rights to "organize, bargain collectively, and participate through labor organizations

of their own choosing," 22 U.S.C. § 4101(1); 5 U.S.C. § 7101(a)(1) – provide nearly identically

worded provisions that permit the President to exclude components of the federal government

from coverage of the statutes.  To invoke these exclusionary provisions, the President must

determine that "the subdivision has as a primary function intelligence, counterintelligence,

investigative, or national security work," and that the statutes' provisions "cannot be applied to

that subdivision in a manner consistent with national security requirements and considerations."

22 U.S.C. § 4103(b); see 5 U.S.C. § 7103(b)(1) (same except refers to "any agency or

subdivision"). The effect of the Executive Order was substantial: it removed collective bargaining rights from approximately two-thirds of the federal workforce.

On April 25, 2025, in a related case, the Court issued a preliminary injunction enjoining implementation of Section 2 of the Executive Order, which excluded numerous agencies and subdivisions from the Federal Service Labor-Management Relations Statute. See Nat'l Treasury Emps. Union v. Trump, Civil Action No. 25-0935 (PLF), 2025 WL 1201696 (D.D.C. Apr. 25, 2025) (Order); Nat'l Treasury Emps. Union v. Trump, Civil Action No. 25-0935 (PLF), 2025 WL 1218044 (D.D.C. Apr. 28, 2025) (Opinion).

In the instant case, AFSA, a federal labor union, challenges Section 3 of the Executive Order, which excludes subdivisions of the Department of State and United States Agency for International Development from coverage of the Foreign Service Labor-Management Relations Statute. The Court held oral argument on the motion on May 5, 2025. Upon careful consideration of the parties' written submissions, arguments made at the oral argument, and the relevant authorities, the Court grants AFSA's motion for a preliminary injunction.[1]

---

[1] The papers reviewed by the Court in connection with this matter include: Complaint for Declaratory and Injunctive Relief ("Compl.") [Dkt. No. 1]; Plaintiff American Foreign Service Association's Motion for a Preliminary Injunction ("Pl.'s Mot.") [Dkt. No. 10]; Memorandum of Points and Authorities Supporting Plaintiff American Foreign Service Association's Motion for Preliminary Injunction ("Pl.'s Mem.") [Dkt. No. 10-1]; Defendants' Opposition to Plaintiff's Motion for Preliminary Injunction ("Opp.") [Dkt. No. 23]; Reply Brief in Support of Plaintiff American Foreign Service Association's Motion for Preliminary Injunction ("Pl.'s Reply") [Dkt. No. 25]; Declaration of Thomas Yazdgerdi ("Yazdgerdi Decl.") [Dkt. No. 10-2]; Declaration of Tina Wong ("Wong Decl.") [Dkt. No. 10-3]; Declaration of Randall Chester ("Chester Decl.") [Dkt. No. 10-4]; Declaration of Asgeir Sigfusson ("Sigfusson Decl.") [Dkt. No. 10-5]; Declaration of Neera Parikh ("Parikh Decl.") [Dkt. No. 10-6]; Declaration of Sharon Papp ("Papp Decl.") [Dkt. No. 10-7]; and Supplemental Declaration of Thomas Yazdgerdi ("Yazdgerdi Supp. Decl.") [Dkt. No. 31].

# I. BACKGROUND

## A. Statutory Background

The Foreign Service Labor-Management Relations Statute (the "Statute"), 22 U.S.C. §§ 4101-4140, set forth in Chapter 10 of Title 1 of the Foreign Service Act of 1980, provides certain protections of the "right of workers to organize, bargain collectively, and participate through labor organizations of their own choosing in decisions which affect them . . . ." 22 U.S.C. § 4101(1).  In passing the statute, Congress found that based on "experience in both private and public employment," the protections were necessary to "safeguard[] the public interest," "contribute[] to the effective conduct of public business," and "facilitate[] and encourage[] the amicable settlement of disputes between workers and their employers involving conditions of employment."  Id.  In sum, Congress found that "labor organizations and collective bargaining in the Service are in the public interest and are consistent with the requirement of an effective and efficient Government."  22 U.S.C. § 4101.  The protections of the Statute apply "only with respect to the Department of State, the Broadcasting Board of Governors, the Agency for International Development, the Department of Agriculture, and the Department of Commerce."  22 U.S.C. § 4103(a).

Among other things, the Statute protects employees right "to engage in collective bargaining with respect to conditions of employment through representatives chosen by employees under this subchapter."  22 U.S.C. § 4104(b)(2).  The statute provides a role for "labor organizations" in this collective bargaining process, stating:

> A labor organization which has been accorded exclusive recognition is the exclusive representative of, and is entitled to act for, and negotiate collective bargaining agreements covering, all employees in the unit described in section 4112 of this title.  An exclusive representative is responsible for representing the interests of all

> employees in that unit without discrimination and without regard to
> labor organization membership.

22 U.S.C. § 4113(a).

Despite extending collective bargaining rights broadly to employees of the foreign service, Congress granted the President the authority to "exclude any subdivision of the Department from coverage" of the Statute.  <u>See</u> 22 U.S.C. § 4103(b).[2]  Section 4103(b) provides:

> The President may by Executive order exclude any subdivision of
> the Department from coverage under this subchapter if the President
> determines that –
>
>> (1) the subdivision has as a primary function intelligence,
>> counterintelligence, investigative, or national security work,
>> and
>>
>> (2) the provisions of this subchapter cannot be applied to that
>> subdivision in a manner consistent with national security
>> requirements and considerations.

22 U.S.C. § 4103(b).  The exclusion in Section 4103(b) has never been invoked.  Compl. ¶ 34.

The exclusionary provision in Section 4103(b) is nearly identical to the exclusionary provision contained in Federal Service Labor-Management Relations Statute ("FSLMRS"), 5 U.S.C. §§ 7101-35, which, <u>inter alia</u>, protects collective bargaining rights for federal employees outside of the foreign service.  In that statute, the exclusion states:

> (1) The President may issue an order excluding any agency or
> subdivision thereof from coverage under this chapter if the President
> determines that –
>
>> (A) the agency or subdivision has as a primary function
>> intelligence, counterintelligence, investigative, or national
>> security work, and

---

[2]    The term "Department" means the "Department of State, except that with reference to the exercise of functions under this chapter with respect to another agency authorized by law to utilize the Foreign Service personnel system . . . ."  22 U.S.C. § 3902(4); <u>see</u> Pl.'s Mem. at 23 n.19; Opp. at 5 n.1.

(B) the provisions of this chapter cannot be applied to that agency or subdivision in a manner consistent with national security requirements and considerations.

5 U.S.C. § 7103(b)(1); see Opp. at 24 ("The type of determination to be made under section 4103(b) is similar to that in 5 U.S.C. § 7103(b)(1) . . . .").

Indeed, the statutory text and structure of the Statute at issue in this case and the FSLMRS are similar in many material respects.  See Am. Foreign Serv. Ass'n v. Trump, Civil Action No. 25-0352 (CJN), 2025 WL 573762, at *8 (D.D.C. Feb. 21, 2025) ("[T]he Foreign Service Act of 1980 (FSA) was passed as a 'companion measure' to the [Civil Service Reform Act] . . . .") (quoting U.S. Info. Agency v. Krc, 989 F.2d 1211, 1217 (D.C. Cir. 1993)).  Both the Statute and the FSLMRS protect the rights of federal employees to collectively bargain.  Compare 22 U.S.C. § 4101(1) with 5 U.S.C. § 7101(a)(1).  The statutes provide the President a provision to make exclusions to the coverage of the statutes.  Compare 22 U.S.C. § 4103(b) with 5 U.S.C. § 7103(b)(1).  And both statutes reflect the same Congressional intent of extending the protections of collective bargaining broadly because "labor organizations and collective bargaining . . . are in the public interest."  22 U.S.C. § 4101; 5 U.S.C. § 7101(a).

## B.  Factual Background

### 1.  The Executive Order

On March 27, 2025, President Trump issued an executive order titled "Exclusions from Federal Labor-Management Relations Programs."  Exec. Order No. 14251, 90 Fed. Reg. 14553 (Mar. 27, 2025) ("Executive Order").  Section 3 of the Executive Order amends a previous executive order – Executive Order 12171 of November 19, 1979 – which had excluded various agencies and subdivisions from the FSLMRS pursuant to Section 7103(b).  See Exec. Order No. 12171, 44 Fed. Reg. 66565, 66565 (Nov. 19, 1979).  The March 27, 2025 Executive

Order states that "[t]he agency subdivisions set forth in section 3 of this order are hereby determined to have as a primary function intelligence, counterintelligence, investigative, or national security work," and that it has been "determined that Subchapter X of Chapter 52 of title 22, United States Code, cannot be applied to these subdivisions in a manner consistent with national security requirements and considerations." Executive Order § 1(b).

As is relevant to AFSA, the Executive Order excludes from the Statute "agency subdivisions" of the Department of State ("State Department") and the United States Agency for International Development ("USAID"). Executive Order §§ 1(b), 3. According to AFSA, the Executive Order "remove[s] all State [Department] and USAID Foreign Service members from the [Statute]'s coverage," Pl.'s Mem. at 1-2, which constitutes ninety-seven percent "of the Foreign Service members in the bargaining unit represented by AFSA." Id. at 29.

A "Fact Sheet" was issued by the White House the same day that the Executive Order was issued. See Fact Sheet: President Donald J. Trump Exempts Agencies with National Security Missions from Federal Collective Bargaining Requirements (Mar. 27, 2025), https://www.whitehouse.gov/fact-sheets/2025/03/fact-sheet-president-donald-j-trump-exempts-agencies-with-national-security-missions-from-federal-collective-bargaining-requirements/ [https://perma.cc/Y7HR-4W3H] ("Fact Sheet"). The Fact Sheet is divided into three parts. First, it lists eight "national security missions" – "National Defense," "Border Security," "Foreign Relations," "Energy Security," "Pandemic Preparedness, Prevention, and Response," "Cybersecurity," "Economic Defense," and "Public Safety" – and provides descriptions of each of these missions. See Fact Sheet. Second, in a section titled "Ensuring that Agencies Operate Effectively," the Fact Sheet explains that the Civil Service Reform Act "enables hostile Federal unions to obstruct agency management," and that this "is dangerous in agencies with national

security responsibilities." See id.  Finally, in a section titled "Safeguarding American Interests,"

the Fact Sheet explains:

> President Trump is taking action to ensure that agencies vital to national security can execute their missions without delay and protect the American people.  The President needs a responsive and accountable civil service to protect our national security.
>
> - Certain Federal unions have declared war on President Trump's agenda.
>
>   - The largest Federal union describes itself as "fighting back" against Trump.  It is widely filing grievances to block Trump policies.
>
>   - For example, VA's unions have filed 70 national and local grievances over President Trump's policies since the inauguration –an average of over one a day.
>
> - Protecting America's national security is a core constitutional duty, and President Trump refuses to let union obstruction interfere with his efforts to protect Americans and our national interests.
>
> - President Trump supports constructive partnerships with unions who work with him; he will not tolerate mass obstruction that jeopardizes his ability to manage agencies with vital national security missions.

Fact Sheet at 3.

On the same day, the Office of Personnel Management ("OPM") issued a

memorandum titled "Guidance on Executive Order Exclusives from Federal Labor-Management

Programs."  See Charles Ezell, Guidance on Executive Order Exclusions from Federal Labor-

Management Programs, OPM, Mar. 27, 2025, https://www.opm.gov/policy-data-oversight/latest-

memos/guidance-on-executive-order-exclusions-from-federal-labor-management-programs.pdf

[https://perma.cc/QH4A-MQ9F] ("OPM Guidance").  The OPM Guidance states that pursuant to

the Executive Order, "covered agencies and subdivisions are no longer subject to the collective-

bargaining requirements" of the Statute and "are no longer required to collectively bargain with federal unions."  OPM Guidance at 3.  The document also states that "Federal unions" "lose their status as the 'exclusively recognized' labor organizations for employees of the agencies and agency subdivisions covered by Exclusions" in the Executive Order.  Id. (alterations omitted) (referencing 5 U.S.C. § 7111(a)); see 5 U.S.C. § 7111(a) ("An agency shall accord exclusive recognition to a labor organization if the organization has been selected as the representative . . . by a majority of the employees in an appropriate unit who cast valid ballots in the election.").

### 2.   The Instant Litigation

On April 7, 2025, AFSA filed this lawsuit.  See Compl.  AFSA brings three counts:  (1) Section 3 of the Executive Order is ultra vires because it is "tantamount to repealing the entire statute," thereby violating separation of powers principles; (2) Section 3 of the Executive Order is ultra vires because it was not based on the criteria in Section 4103(b); and (3) Section 3 of the Executive Order reflects retaliation against AFSA in violation of its First Amendment rights.  See Compl. ¶¶ 40-64.[3]  AFSA seeks, inter alia, an injunction enjoining all the defendants – excluding the President – from "implementing" Section 3 of the Executive Order and OPM Guidance related to the Executive Order.

---

[3]        AFSA also argues that Sections 1(b) and 6 of the Executive Order are unlawful.  See Pl.'s Mem. at 1-2; see also Executive Order § 1(b) (stating that the agency subdivisions in Section 3 of the Executive Order satisfy the criteria in 22 U.S.C. § 4103(b)); id. § 6 (providing guidance for the "[i]mplementation" of the Executive Order).  Both sections of the Executive Order are inextricably linked to the Court's analysis of Section 3 of Executive Order because they raise of the same issue of whether the President's determinations related to the agency subdivisions listed in Section 3 were ultra vires.

## II.  JURISDICTION

The government's first argument is that that the Court lacks jurisdiction over this case.  See Opp. at 15-21.  In support, the government contends that Congress created a "special statutory review scheme" in the Statute, and that such a scheme precludes this Court's review under Thunder Basin Coal Co. v. Reich, 510 U.S. 200 (1994).

The Supreme Court has recognized that "[a] special statutory review scheme . . . may preclude district courts from exercising jurisdiction over challenges to federal agency action."  Axon Enter., Inc. v. FTC, 598 U.S. 175, 185 (2023) (citing Thunder Basin Coal Co. v. Reich, 510 U.S. at 207).  While Congress may create such a "statutory review scheme" explicitly, it may also do so implicitly by "specifying a different method to resolve claims about agency action," such as by providing for "review in a court of appeals following the agency's own review process."  Id.; see Vape Cent. Grp., LLC v. U.S. Food & Drug Admin., Civil Action No. 24-3354 (RDM), 2025 WL 637416, at *4 (D.D.C. Feb. 27, 2025).  To determine whether district court review is precluded, courts apply a two-step approach.  At the first step, the court determines whether Congress has "preclude[d] district court jurisdiction by establishing an alternative statutory scheme for administrative and judicial review."  Am. Fed'n of Gov't Emps., AFL-CIO v. Trump, 929 F.3d 748, 754 (D.C. Cir. 2019).  Congress can be found to have done so "when (i) such intent is fairly discernible in the statutory scheme, and (ii) the litigant's claims are of the type Congress intended to be reviewed within [the] statutory structure."  Id. (citation and quotation marks omitted).

At the second step, courts consider whether the plaintiff's claim falls within this "alternative statutory scheme for administrative and judicial review."  Am. Fed'n of Gov't Emps., AFL-CIO v. Trump, 929 F.3d at 754.  To answer this question, courts consider three

factors:  (1) whether precluding district court jurisdiction would "foreclose all meaningful judicial review" of the claim; (2) whether the claim is "wholly collateral to [the] statute's review provisions"; and (3) whether the claim is "outside the agency's expertise."  Axon Enter., Inc. v. Fed. Trade Comm'n, 598 U.S. at 186 (quoting Thunder Basin Coal Co. v. Reich, 510 U.S. at 212-13); see Nat'l Ass'n for the Advancement of Colored People v. United States Postal Serv., 496 F. Supp. 3d 1, 14 (D.D.C. 2020) (subsequent history omitted).  "When the answer to all three questions is yes, '[the Court] presume[s] that Congress does not intend to limit jurisdiction.'"  Axon Enter., Inc. v. Fed. Trade Comm'n, 598 U.S. at 186 (quoting Free Enter. Fund v. Pub. Co. Acct. Oversight Bd., 561 U.S. 477, 489 (2010)).  In the event the factors "point in different directions," "[t]he ultimate question is how best to understand what Congress has done – whether the statutory review scheme, though exclusive where it applies, reaches the claim in question."  Id.; see Vape Cent. Grp., LLC v. U.S. Food & Drug Admin., 2025 WL 637416, at *5 ("[I]f the factors point in different directions . . . . courts must return to the lodestar of whether Congress intended the type of claim at issue to be swept into the statutory enforcement scheme.") (internal citation and quotation marks omitted).

In the instant case, the government argues that this Court's jurisdiction is precluded because the Statute provides a "special statutory review scheme."  See Opp. at 15-21.  Specifically, the government contends that the Statute requires AFSA to bring its claims to the Federal Labor Relations Authority ("FLRA").  See Opp. at 8; 22 U.S.C. § 4116(a); see also Am. Foreign Serv. Ass'n v. Baker, 895 F.2d 1460, 1461 (D.C. Cir. 1990) (outlining administrative review scheme for allegedly unfair labor practices).[4]  The FLRA's General Counsel will then

---

[4]    The FLRA also provides review of alleged violations of the Federal Service Labor-Management Relations Statute.  See 22 U.S.C. § 4102(1) (defining "Authority" in the

investigate the claims and "may issue and cause to be served upon the Department . . . a complaint." 22 U.S.C. § 4116(a).  The Foreign Service Labor Relations Board ("FSLRB") will conduct a hearing on the complaint, id. §§ 4116(b), (f), and can subsequently order any appropriate relief.  Id. § 4116(g).[5]  In the event AFSA does not obtain the relief it seeks, it can appeal a final order from FSLRB to the United States Court of Appeal for the District of Columbia Circuit.  Id. § 4109(a).

       The government's arguments related to jurisdiction fail because the "special statutory review scheme" it contends precludes this Court's jurisdiction is unavailable to AFSA. As the Court recently explained in rejecting a similar jurisdictional argument made in the context of the FSLMRS, "the administrative process of the FSLMRS cannot and does not govern here because the Executive Order at issue removed the agencies and subdivisions in question from coverage of the FSLMRS."  Nat'l Treasury Emps. Union v. Trump, 2025 WL 1218044, at *6. The analysis is identical here:  the Executive Order "exclude[s]" the agency subdivisions at issue in this case "from coverage" of the Statute, and thus the Statute's administrative review scheme cannot be used to challenge that exclusion.  The administrative review scheme established by Congress was intended to remedy failures of the agency to "comply with provisions of the [Statute]."  See Opp. at 8; see also id. ("An employee or a union alleging that an agency has 'refuse[d] to consult or negotiate in good faith with a labor organization, as required by [the Statute],' or that an agency has 'otherwise fail[ed] or refuse[d] to comply with any provision of [the Statute]," 22 U.S.C. § 4115(a)(5) and (a)(8), may file a charge of an unfair labor practice

---

Statute to mean "the Federal Labor Relations Authority, describe in" Section 7104(a) of the Federal Service Labor-Management Relations Statute).

     [5]     The FSLRB was created within the FLRA.  See Am. Foreign Serv. Ass'n v. Baker, 895 F.2d at 1461 (citing 22 U.S.C. § 4106).

with the [FLRA].") (emphasis added).  But because the Executive Order excludes the agency

subdivisions from the Statute, AFSA cannot seek enforcement of the Statute's provisions

through the administrative review scheme established by Congress.  See Nat'l Treasury Emps.

Union v. Trump, 2025 WL 1218044, at *5-6.

Furthermore, the FSLRB – which applies FLRA precedent, see 22 U.S.C.

§ 4107(b) – likely will lack jurisdiction to review AFSA's claims as a result of the Executive

Order excluding the agency subdivisions from coverage of the Statute.  See Nat'l Treasury

Emps. Union v. Trump, 2025 WL 1218044, at *5-6.  FLRA precedents related to the analogous

exclusion provision in the FSLMRS strongly suggest that the FLRA lacks jurisdiction over a

case brought by AFSA challenging the President's invocation of Section 4103(b).  See United

States Att'ys Off. S. Dist. of Texas Houston, Texas (Respondent) & Am. Fed'n of Gov't Emps.

Loc. 3966 (Charging Party), 57 F.L.R.A. 750 (Apr. 25, 2002).  The government provides no

reason why the FSLRB's analysis of its jurisdiction in the context of Section 4103(b) would

result in a different outcome.  The cases the government relies on to support its contention that

the Court's jurisdiction is precluded therefore are inapposite because those cases involved

circumstances where the aggrieved union had "several administrative options for challenging the

executive orders . . . ."  See Am. Fed'n of Gov't Emps., AFL-CIO v. Trump, 929 F.3d at 757

(internal quotation marks omitted); see also Am. Foreign Serv. Ass'n v. Baker, 895 F.2d at 1462

("Were we to accept AFSA's plea for immediate access to a court of first instance, we would be

establishing that court as a parallel enforcement mechanism to the [FSLRB], a result Congress

did not intend."); Am. Fed'n of Gov't Emps. v. Sec'y of Air Force, 716 F.3d 633, 637 (D.C.

Cir. 2013) ("Because the FSLMRS's remedial regime is exclusive, providing [plaintiff] with

multiple options to challenge the [policy], [plaintiff] cannot circumvent this regime by instead

bringing a suit in district court."); Widakuswara v. Lake, No. 25-5144, 2025 WL 1288817, at *3 (D.C. Cir. May 3, 2025) (concluding district court likely lacked jurisdiction over plaintiffs' APA claims because "Congress has [ ] established comprehensive statutory schemes for adjudicating employment disputes with the federal government"); cf. Am. Foreign Serv. Ass'n v. Trump, Civil Action No. 25-0352 (CJN), 2025 WL 573762, at *10 (D.D.C. Feb. 21, 2025) ("Where plaintiffs are entitled to review before the MSPB, FLRA, FSGB, or FSLRB and subsequent judicial review, there is no reason to fear that plaintiffs' constitutional claims could wholly evade consideration.") (emphasis in original).

At oral argument, the government referenced the D.C. Circuit's decision in Sandpiper Residents Ass'n v. United States Dep't of Hous. & Urb. Dev., for the proposition that the Court must "assume that [AFSA] will prevail on the merits of [its] claim" when addressing whether the Court's jurisdiction is precluded.  See Sandpiper Residents Ass'n v. United States Dep't of Hous. & Urb. Dev., 106 F.4th 1134, 1141 (D.C. Cir. 2024); see also Transcript ("Tr.") [Dkt. No. 34] at 30:02-16.  Put differently, the government argues that the Court's jurisdiction is precluded because under AFSA's theory, the Executive Order is invalid and thus the provisions of the Statute – including the requirement that AFSA seek redress from the FSLRB – apply to AFSA.  This argument is unavailing for at least two reasons.  First, the D.C. Circuit in Sandpiper held that a court must "assume that Plaintiffs will prevail on the merits of their claims" "in evaluating mootness."  Sandpiper Residents Ass'n v. United States Dep't of Hous. & Urb. Dev., 106 F.4th at 1141.  The government provides no reason why Sandpiper's holding should be applied to the issue presented in this case related to whether an administrative review scheme precludes judicial review.  Second, and more importantly, "assum[ing] that [AFSA] will prevail on the merits of [its] claim" does not change the fact that there is no dispute between the parties

that the agency subdivisions at issue in this case <u>currently</u> are excluded from the Statute as a result of the Executive Order.  While the government contends that the Court's jurisdiction is still precluded notwithstanding the exclusion from the Statute, this contention is an issue the Court must decide irrespective of the parties' positions on the issue.

The administrative process of the Statute cannot and does not govern here because the Executive Order at issue removed the agencies and subdivisions in question from coverage of the Statute.  Because there is no "special statutory review scheme" that is actually available to AFSA for reviewing its claim, this Court is not deprived of jurisdiction.  <u>Nat'l Treasury Emps. Union v. Trump</u>, 2025 WL 1218044, at *6; <u>see</u> <u>Am. Fed'n of Gov't Emps., AFL-CIO, Loc. 446 v. Nicholson</u>, 475 F.3d 341, 348 (D.C. Cir. 2007) (holding that the district court had jurisdiction because the claims brought by the plaintiff were "expressly outside of the FLRA's purview"); <u>see also</u> <u>Lamb v. Holder</u>, 82 F. Supp. 3d 416, 422-23 (D.D.C. 2015) (exercising subject matter jurisdiction over plaintiff's constitutional claims regarding termination where plaintiff was not entitled to review under the Civil Service Reform Act).

## III. PRELIMINARY INJUNCTION

### A.  *Legal Standard*

A movant seeking preliminary injunctive relief must make a "clear showing that four factors, taken together, warrant relief:  likely success on the merits, likely irreparable harm in the absence of preliminary relief, a balance of the equities in its favor, and accord with the public interest."  <u>Archdiocese of Washington v. Wash. Metro. Area Transit Auth.</u>, 897 F.3d 314, 321 (D.C. Cir. 2018) (quoting <u>League of Women Voters v. Newby</u>, 838 F.3d 1, 6 (D.C. Cir. 2016)); <u>see also</u> <u>Sherley v. Sebelius</u>, 644 F.3d 388, 392 (D.C. Cir. 2011) (noting that a preliminary injunction "may only be awarded upon a clear showing that the plaintiff is entitled to

such relief" (quoting <u>Winter v. Nat. Res. Def. Council, Inc.</u>, 555 U.S. 7, 22 (2008))).  Of these, the most important factor is whether a movant has established a likelihood of success on the merits.  <u>See</u> <u>Aamer v. Obama</u>, 742 F.3d 1023, 1038 (D.C. Cir. 2014); <u>Bailey v. Fed. Bureau of Prisons</u>, Civil Action No. 24-1219 (PLF), 2024 WL 3219207, at *3 (D.D.C. June 28, 2024)

Before the Supreme Court's decision in <u>Winter</u>, courts in this Circuit weighed these four factors on a "sliding scale," under which the movant need not "make as strong a showing" on one factor if they "make[ ] an unusually strong showing" on another.  <u>Davis v. Pension Benefit Guar. Corp.</u>, 571 F.3d 1288, 1291-92 (D.C. Cir. 2009) (quoting <u>Davenport v. Int'l Bhd. of Teamsters</u>, 166 F.3d 356, 361 (D.C. Cir. 1999)); <u>accord</u> <u>Damus v. Nielsen</u>, 313 F. Supp. 3d 317, 326 (D.D.C. 2018).  This Circuit has suggested, however, that "a likelihood of success" and "a likelihood of irreparable harm" are "independent, free-standing requirement[s] for a preliminary injunction."  <u>Sherley v. Sebelius</u>, 644 F.3d at 392-93 (quoting <u>Davis v. Pension Benefit Guar. Corp.</u>, 571 F.3d at 1296 (Kavanaugh, J., concurring)); <u>see</u> <u>Archdiocese of Washington v. Wash. Metro. Area Transit Auth.</u>, 897 F.3d at 334 (declining to resolve whether the "sliding scale" approach is still valid after <u>Winter</u>); <u>Nat'l Treasury Emps. Union v. Vought</u>, Civil Action No. 25-0381 (ABJ), 2025 WL 942772, at *19 (D.D.C. Mar. 28, 2025).  Regardless, "a failure to show a likelihood of success on the merits alone is sufficient to defeat a preliminary-injunction motion."  <u>Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs</u>, 205 F. Supp. 3d 4, 26 (D.D.C. 2016) (citing <u>Ark. Dairy Coop. Ass'n v. U.S. Dep't of Agric.</u>, 573 F.3d 815, 832 (D.C. Cir. 2009)); <u>see</u> <u>also</u> <u>M.G.U. v. Nielsen</u>, 325 F. Supp. 3d 111, 117-18 (D.D.C. 2018).

For each of its claims, AFSA bears the burden of persuasion.  <u>Chaplaincy of Full Gospel Churches v. England</u>, 454 F.3d 290, 297 (D.C. Cir. 2006).  AFSA also "bears the burden

of producing credible evidence sufficient to demonstrate [its] entitlement to injunctive relief."
Workman v. Bissessar, 275 F. Supp. 3d 263, 267 (D.D.C. 2017).

### B. Likelihood of Success on the Merits

The core of the parties' dispute centers on whether the President exceeded the authority afforded to him in the Statute when he excluded the agency subdivisions of the State Department and USAID under Section 4103(b).  AFSA contends that the President's Executive Order was ultra vires, arguing that the agency subdivisions listed in Section 3 of Executive Order do not meet the criteria listed in Section 4103(b).  See Pl.'s Mem. at 23-30.  AFSA argues in part that the sheer scope of the Executive Order alone – which as a whole removes collective bargaining rights from approximately two-thirds of the federal workforce – negates any possibility that the President validly invoked the narrow exception in Section 4103(b).  See Pl.'s Reply at 10-11.  The government makes two general arguments in response.  First, the government maintains that the Court lacks the authority to review the President's "national security-related determinations under" Section 4103(b) or, at a minimum, that it owes significant deference to the President's conclusion that the particular agencies and subdivisions subject to the Executive Order are excludable from the Statute.  See Opp. at 15-25.  Second, in the event the Court does review the President's determination, the government contends that the identified agencies and subdivisions meet the criteria listed in Section 4103(b).  See id. at 26-36.

The Court recently analyzed the President's invocation of Section 7103(b) of FSLMRS in the same Executive Order at issue here.  See Nat'l Treasury Emps. Union v. Trump, 2025 WL 1218044.  In that case, the Court reasoned that D.C. Circuit precedent made clear that the validity of the President's invocation of Section 7103(b) centered around two issues: "(1) whether the 'presumption of regularity' applies to the President's exercise of authority; and

(2) whether the President's exercise of authority was <u>ultra vires</u>." <u>Id</u>. at *8; <u>see</u> <u>Am. Fed'n of</u>

<u>Gov't Emps., AFL-CIO v. Reagan</u>, 870 F.2d 723 (D.C. Cir. 1989) (holding that "the presumption

of regularity [was] pivotal" to the issue of whether the President validly invoked

Section 7103(b)).  As to the first issue, the Court concluded that the plaintiff union had "rebutted

the presumption of regularity by presenting clear evidence that 'the President was indifferent to

the purposes and requirements of the [FSLMRS], or acted deliberately in contravention of

them.'" <u>Nat'l Treasury Emps. Union v. Trump</u>, 2025 WL 1218044, at *9 (quoting <u>Am. Fed'n of</u>

<u>Gov't Emps., AFL-CIO v. Reagan</u>, 870 F.2d at 728).  Specifically, the Court reached this

conclusion for three reasons:

> (1) the Executive Order and the Administration's surrounding
> statements are at odds with Congress's findings in the FSLMRS;
> (2) the White House Fact Sheet reflects retaliatory motive; and
> (3) the Administration's guidance related to the Executive
> Order – specifically, the OPM Guidance – suggests that the
> invocation of Section 7103(b)(1) was in furtherance of unrelated
> policy goals rather than based on the statutory criteria.

<u>Id</u>.  The Court therefore determined that it was not required to "presume that the President has

'properly discharged [his] official duties' in the absence of justification for the Executive Order"

because presumption of regularity had been rebutted.  <u>Id</u>. at *12 (quoting <u>United States v.</u>

<u>Chemical Foundation</u>, 272 U.S. 1, 14-15).

      The Court next addressed the issue of whether the President exceeded his power

to exclude agencies and subdivisions from the FSLMRS pursuant to Section 7103(b)(1).  <u>See</u>

<u>Nat'l Treasury Emps. Union v. Trump</u>, 2025 WL 1218044, at *12-16.  The Court concluded that

the President's Executive Order likely was <u>ultra vires</u> because he appeared to either disregard or

apply an overly broad interpretation of two terms within the statutory text of Section 7103(b)(1):

(1) "primary function" and (2) "national security." See id. As to "primary function," the Court

reasoned that the President disregarded the statutory term, reasoning:

> While the government never explicitly states how it interprets
> "primary function," its arguments related to each of the agencies and
> subdivisions reflect either an overly broad interpretation of the term
> or a disregard of the term entirely. The government's arguments
> related to each of the agencies and subdivisions illustrate this point
> by either pointing to generalized mission statements of the agencies
> referencing national security, or by pointing to individual functions
> that segments of the agencies or subdivisions perform that have a
> national security valence, and then concluding that the entire
> agencies' or subdivisions' "primary function" is national security.

Id. at *14. As to the term "national security," the Court concluded that the President applied an

overly broad interpretation of the term "national security," both contrary to the Congressional

intent in passing the FSLMRS and Supreme Court precedent. In relevant part, the Court

reasoned:

> In passing the FSLMRS, Congress clearly expressed a desire to
> extend collective bargaining rights broadly because it determined
> that those rights were "in the public interest." 5 U.S.C. § 7101(a)
> ("[L]abor organizations and collective bargaining in the civil service
> are in the public interest"). Congress provided a narrow exception
> that allowed the President to exclude agencies and subdivisions
> from these protections if the provisions of the law "cannot be
> applied . . . in a manner consistent with national security
> requirements and considerations." 5 U.S.C. § 7101(b)(1)(B). And
> as in Cole v. Young, it is "clear from the statute" that the term
> "national security" "comprehend[s] only those activities . . . that are
> directly concerned with the protection of the Nation from internal
> subversion or foreign aggression . . . ." Cole v. Young, 351 U.S.
> [536, 544 (1956)]. But President Trump instead has applied a
> startlingly broad application of "national security," which – directly
> contrary to the Supreme Court's definition in Cole v. Young –
> encompasses "those activities of Government . . . which contribute
> to the strength of the Nation only through their impact on the general
> welfare." Cole v. Young, 351 U.S. at 544. This interpretation of
> "national security" therefore is inconsistent with the statute and
> "risks allowing the exception to swallow the rule, thereby
> undermining the purpose of the statute itself." Nat'l Fed'n of Fed.
> Emps. v. McDonald, 128 F. Supp. 3d 159, 172 (D.D.C. 2015). "[I]f

> Congress intended the term to have such a broad meaning that all positions in the Government could be said to be affected with the 'national security,' the result would be that the [FSLMRS], though in form but an exception to the general personnel laws, could be utilized effectively to supersede those laws." Cole v. Young, 351 U.S. at 548.

Nat'l Treasury Emps. Union v. Trump, 2025 WL 1218044, at *16. In sum, the Court concluded that the plaintiff union was likely to succeed on the merits of its claim that the Executive Order was ultra vires. Id.

In the instant case, the government acknowledges that "[t]he type of determination to be made under section 4103(b) is similar to that in 5 U.S.C. § 7103(b)(1)." Opp. at 24. As a result, the Court will analyze the issue of whether the Executive Order's invocation of Section 4103(b) was ultra vires in the same way that it did in Nat'l Treasury Emps. Union v. Trump. The Court concludes that the President's invocation of Section 4103(b) was ultra vires for the same reasons outline in Nat'l Treasury Emps. Union v. Trump.

### 1. Presumption of Regularity

Turning first to the presumption of regularity, AFSA has rebutted the presumption by clear evidence. As discussed above, see supra Section III.B, the Court concluded in Nat'l Treasury Emps. Union v. Trump that the Executive Order – specifically, its unprecedented scope that seemingly conflicts with Congress's intent – coupled with the contemporaneous statements contained in the White House Fact Sheet and OPM Guidance reflected that the President was either indifferent to or acted in contravention of the requirements of the FSLMRS. See Nat'l Treasury Emps. Union v. Trump, 2025 WL 1218044, at *9-11. The analysis is identical here

because this case implicates the exact same Executive Order, White House Fact Sheet, and OPM Guidance.[6]

In addition to the reasons explained in Nat'l Treasury Emps. Union v. Trump, AFSA provides further argument and evidence that demonstrates a retaliatory motive for the Executive Order.  See Hartman v. Moore, 547 U.S. 250, 263-64 (2006) (concluding that "prosecutor's disclosure of retaliatory thinking on his part" was significant in determining whether the presumption of regularity should be applied).  For example, AFSA highlights the fact that the Executive Order – despite excluding two-thirds of the federal workforce from coverage of the statutes – does not strip collective bargaining rights from the United States Customs and Border Protection ("CBP"), whose union "endorsed the President in last year's election."  See Pl.'s Mem. at 30.  AFSA argues that "[i]f those who are guarding the border do not have national security as a primary mission, then none of the employees excluded do," and that therefore the President's decision to exempt CBP – which is represented by a union that endorsed him – from the Executive Order offers further evidence of a retaliatory motive.  Id. at 30-31.

---

[6]    At oral argument, the government asserted that the White House Fact Sheet was not relevant to the Court's analysis in this case since the Fact Sheet only dealt with exclusions from the Civil Service Reform Act – i.e., exclusions pursuant to Section 7103(b) of the FSLMRS – not exclusions made pursuant to Section 4103(b) of the Statute.  See Tr. at 33:19-34:05.  This contention directly conflicts with the government's arguments made in its opposition memorandum, where the government argued that the statements in the Fact Sheet support the President's Section 4103(b) determinations.  See Opp. at 36 ("The cited portion of the Fact Sheet concludes with the statement that the President 'will not tolerate mass obstruction that jeopardizes his ability to manage agencies with vital national security missions.'  Section 4103(b) exists to allow the President to address such concerns.") (internal citations omitted). Moreover, notwithstanding the explicit references to the Civil Service Reform Act, the White House Fact Sheet was published in support of the same Executive Order at issue in this case, and it reflects retaliatory motive towards federal unions broadly, not just those falling under the FSLMRS.  The Court therefore considers the White House Fact Sheet relevant to its adjudication of this case.

AFSA also argues that a recent implementation of Section 4 of the Executive Order – which, among other things, delegates authority to the Secretary of Veterans Affairs "to issue orders suspending the application" of the Executive Order as applied to the Department of Veterans Affairs ("VA"), see Executive Order § 4 – reflects a retaliatory motive.  See Pl.'s Reply at 15.  Specifically, AFSA points to the Secretary of Veterans Administration Doug Collins's recent decision to restore collective bargaining rights – pursuant to the authority delegated to him under Section 4 of the Executive Order – "not to particular subdivisions [of the Department of Veterans Affairs], but to particular unions in the Department."  Id. (emphasis in original).  In justifying the decision, VA Press Secretary Pete Kasperowicz stated that the decision to restore the statutory protections to certain unions was based on the fact that those unions "have filed no or few grievances against VA and [ ] have not proved an impediment to the department's ability to effectively carry out its mission . . . ."  Id. at 15 (quoting Erich Wagner, VA is selectively enforcing Trump's order stripping workers of union rights, GOVERNMENT EXECUTIVE (April 18, 2025), available at https://www.govexec.com/workforce/2025/04/va-selectively-enforcing-trumps-order-stripping-workers-union-rights/404694/ (quoting VA Press Secretary Pete Kasperowicz)).  The additional evidence and argument provided by AFSA bolsters the Court's earlier conclusion in Nat'l Treasury Emps. Union v. Trump that the White House Fact Sheet and other contemporaneous evidence "reflects retaliatory motive towards certain unions."  Nat'l Treasury Emps. Union v. Trump, 2025 WL 1218044, at *10.

Accordingly, the Court concludes that AFSA has successfully rebutted the presumption of regularity.

2. Statutory Interpretation

Having successfully rebutted the presumption of regularity, the Court turns to the

issue of whether the Executive Order was <u>ultra vires</u>.  <u>See</u> <u>Nat'l Treasury Emps. Union v. Trump</u>,

2025 WL 1218044, at *12-17.  To remind, Section 4103(b) provides that:

> The President may by Executive order exclude any subdivision of
> the Department from coverage under this subchapter if the President
> determines that –
>
>> (1) the subdivision has as a primary function intelligence,
>> counterintelligence, investigative, or national security work,
>> and
>>
>> (2) the provisions of this subchapter cannot be applied to that
>> subdivision in a manner consistent with national security
>> requirements and considerations.

22 U.S.C. § 4103(b).  Section 4103(b) is identical to Section 7103(b)(1) of the FSLMRS, except

that Section 4103(b) only refers to "any subdivision," whereas Section 7103(b)(1) refers to "any

agency or subdivision."  <u>Compare</u> 22 U.S.C. § 4103(b) <u>with</u> 5 U.S.C. § 7103(b)(1).  As the Court

explained in <u>Nat'l Treasury Emps. Union v. Trump</u>, the President applied overly broad

interpretations of Section 7103(b)(1)'s terms "primary function" and "national security" in the

context of Section 2 of the Executive Order.  <u>See</u> <u>Nat'l Treasury Emps. Union v. Trump</u>, 2025

WL 1218044, at *12-17.  The government's arguments in this case reflect that the same

interpretations were applied in excluding agency subdivisions from the Statute pursuant to

Section 4103(b).

a.  <u>"Primary Function"</u>

Turning first to the term "primary function" in Section 4103(b)(1), the

government's arguments reflect either an overly broad interpretation of the term or a disregard of

the term entirely.  As the Court explained in <u>Nat'l Treasury Emps. Union v. Trump</u>:

> While the government never explicitly states how it interprets
> "primary function," its arguments related to each of the agencies and
> subdivisions reflect either an overly broad interpretation of the term
> or a disregard of the term entirely.  The government's arguments
> related to each of the agencies and subdivisions illustrate this point
> by either pointing to generalized mission statements of the agencies
> referencing national security, or by pointing to individual functions
> that <u>segments</u> of the agencies or subdivisions perform that have a
> national security valence, and then concluding that the <u>entire</u>
> agencies' or subdivisions' "primary function" is national security.

<u>Nat'l Treasury Emps. Union v. Trump</u>, 2025 WL 1218044, at *14.  The government takes the

same approach here, arguing that the State Department's and USAID's "work focuses on, among

other things," a plethora of areas such as "critical and emerging technology . . ., global health

security . . ., intelligence . . ., diplomatic security . . ., arms control and international security . . .,

civilian security . . ., economic growth, energy, and environment . . ., counterterrorism . . ., and

public diplomacy . . . ."  Opp. at 29; <u>see id</u>. ("USAID is the principal U.S. agency responsible for

extending development assistance to countries around the world and its programs aim to support

economic growth, combat the spread of disease, promote democratic reform, and address food

insecurity.") (citation and internal quotation marks omitted).  Setting aside for the moment

whether the broad areas of work the government identifies constitute "national security work" as

is used in Section 4103(b), the government's approach of pointing to different categories of work

that segments of the State Department and USAID perform and concluding that the "primary

function" of the <u>entire</u> State Department and USAID is "national security" was the exact

approach rejected in <u>Nat'l Treasury Emps. Union v. Trump</u>.  <u>See</u> <u>Nat'l Treasury Emps. Union v. Trump</u>, 2025 WL 1218044, at *14.

   The government argues that because the Foreign Service Act defines the term "function" as "any duty, obligation, power, authority, responsibility, right, privilege, discretion, or activity," 22 U.S.C. § 3902(6), a subdivision can have "multiple 'primary' functions – for instance, one related to a 'duty,' another related to a 'discretion,' and another related to an 'activity,' among others."  Opp. at 30.  The government's argument misses the point of the Court's analysis in <u>Nat'l Treasury Emps. Union v. Trump</u>:  the issue there was not whether an agency can have multiple "primary functions;" rather, the issue was whether the government's approach of pointing to "<u>some work</u> that implicates national security" was sufficient to conclude that the agency's "primary function" is "national security work."  <u>See</u> <u>Nat'l Treasury Emps. Union v. Trump</u>, 2025 WL 1218044, at *14 (emphasis in the original).  The Court concluded that this approach was deficient, reasoning that the government omitted the critical step of explaining why each of those categories of work are the "primary function" of the agency.  <u>See</u> <u>id</u>.  The lack of argument connecting the identified work to the "primary function" of the agency made clear that the government's interpretation of "primary function" was either overly broad, or that the government's interpretation disregarded the statutory term entirely.  Because the government takes the same approach here, the Court must again reject the government's interpretation of "primary function" as overly broad.  <u>See</u> <u>Nat'l Treasury Emps. Union v. Trump</u>, 2025 WL 1218044, at *14.

   b. <u>"National Security" and "National Security Work"</u>

   Turning next to the term "national security," the government in this case stands by the same interpretation the Court rejected in <u>Nat'l Treasury Emps. Union v. Trump</u>.  Specifically,

the government contends that "national security" in Section 4103(b) "refer[s] to work 'directly related to protection and preservation of the military, economic, and productive strength of the United States."  Opp. at 27 (quoting Dep't of Energy, Oak Ridge Operations, & Nat'l Ass'n of Gov't Emps. Local R5-181, 4 FLRA 644, 655-56 (1980)).  In rejecting this interpretation of "national security" in Nat'l Treasury Emps. Union v. Trump, the Court explained:

> [T]his Court must conclude that the President's interpretation of "national security" exceeds the scope of the meaning intended by Congress.  In passing the FSLMRS, Congress clearly expressed a desire to extend collective bargaining rights broadly because it determined that those rights were "in the public interest."  5 U.S.C. § 7101(a) ("[L]abor organizations and collective bargaining in the civil service are in the public interest").  Congress provided a narrow exception that allowed the President to exclude agencies and subdivisions from these protections if the provisions of the law "cannot be applied . . . in a manner consistent with national security requirements and considerations."  5 U.S.C. § 7101(b)(1)(B).  And as in Cole v. Young, it is "clear from the statute" that the term "national security" "comprehend[s] only those activities . . . that are directly concerned with the protection of the Nation from internal subversion or foreign aggression . . . ."  Cole v. Young, 351 U.S. at 544.  But President Trump instead has applied a startlingly broad application of "national security," which – directly contrary to the Supreme Court's definition in Cole v. Young – encompasses "those activities of Government . . . which contribute to the strength of the Nation only through their impact on the general welfare."  Cole v. Young, 351 U.S. at 544.  This interpretation of "national security" therefore is inconsistent with the statute and "risks allowing the exception to swallow the rule, thereby undermining the purpose of the statute itself."  Nat'l Fed'n of Fed. Emps. v. McDonald, 128 F. Supp. 3d 159, 172 (D.D.C. 2015).  "[I]f Congress intended the term to have such a broad meaning that all positions in the Government could be said to be affected with the 'national security,' the result would be that the [FSLMRS], though in form but an exception to the general personnel laws, could be utilized effectively to supersede those laws."  Cole v. Young, 351 U.S. at 548.

Nat'l Treasury Emps. Union v. Trump, 2025 WL 1218044, at *16.  The same analysis applies here:  the government's interpretation of "national security" covers everything from "global health security" to "civilian security" to "economic growth, energy, and [the] environment."  See

Opp. at 29.  Because this expansive interpretation would allow "an exception to the general personnel laws" to be utilized to "effectively to supersede those laws," it must be rejected.  Cole v. Young, 351 U.S. at 548.

The government makes several arguments in response to the Court's analysis in Nat'l Treasury Emps. Union v. Trump.  First, the government contends that its interpretation "is not inconsistent with Cole v. Young" because the statute at issue in that case is materially different from the statute at issue here.  Opp. at 27.  More specifically, the government argues that the Supreme Court's conclusion that the term "national security" should be interpreted narrowly rested heavily on the fact that the eleven named agencies in the statute were "directly concerned with the national defense."  Id. (quoting Cole v. Young, 351 U.S. at 544).  In the instant case, however, "[t]he national security exemption in Section 7103(b)(1)" – and "its counterpart in section 4103(b)" – "is not limited to any specific agency but to those that the President 'determines' have as a primary function national security work."  Opp. at 27.

As an initial matter, the government's suggestion that Cole v. Young's interpretation of "national security" is not relevant to the instant case is belied by the fact that the government's lone support for its expansive interpretation is essentially a truncated citation to an FLRA decision that applies Cole v. Young's interpretation of "national security."  See Dep't of Energy, Oak Ridge Operations, & Nat'l Ass'n of Gov't Emps. Local R5-181, 4 FLRA at 655-56; see also Nat'l Treasury Emps. Union v. Trump, 2025 WL 1218044, at *15 (explaining Oak Ridge's reliance on Cole v. Young).  Moreover, while the Supreme Court in Cole v. Young found relevant Congress's decision to include in the statute agencies with a specific "character" of "national security," the Supreme Court's holding was also motivated by the concern that an expansive interpretation of "national security" may allow the President to "supersede" the law.

Cole v. Young, 351 U.S. at 547.  The government's expansive interpretation of "national

security" creates the risk that Section 4103(b) could be used to supersede the Statute, and

therefore must be rejected.[7]

Next, the government asserted at oral argument that the Supreme Court's analysis

in Cole v. Young makes clear that the State Department has a primary function of "national

security work."  See Tr. at 37:04-25.  Specifically, the government points to language in Cole v.

Young where the Supreme Court stated that the particular agencies covered by the statute at

issue in that case – which included the State Department, see Cole v. Young, 351 U.S. at 538

n.1 – were "without a doubt . . . directly concerned with the national defense . . . ."  Id. at 544.

Relatedly, the government argues that the foreign policy valence of the State Department and

USAID means that both agencies perform "national security work" because "foreign policy

inevitably involve[s] the exercise of predictive judgment about risks to national security."  Opp.

at 33 (citation omitted).

The "national defense" and "foreign policy" character of the State Department

and USAID does not support the government's broad interpretation of "national security" in this

case.  The Supreme Court in Cole v. Young made clear that, notwithstanding an agency's

relationship to "national security," the term "national security" in the statute must be interpreted

---

[7]    The government's reliance on Trump v. Hawaii, 585 U.S. 667 (2018), is
unavailing.  See Opp. at 25.  In that case, the Supreme Court stated that "a searching inquiry into
the persuasiveness of the President's justifications is inconsistent with the broad statutory text
and the deference traditionally accorded the President in" the national security sphere.  Trump v.
Hawaii, 585 U.S. at 686.  The Court, however, is not questioning whether the President's actions
are justified from "a policy perspective;" rather, the Court is considering "the scope of" the
President's powers under Section 4103(b).  See id.; see also Ctr. for Biological Diversity v.
Mattis, 868 F.3d 803, 827 (9th Cir. 2017) ("When confronting a statutory question touching on
subjects of national security and foreign affairs, a court does not adequately discharge its duty by
pointing to the broad authority of the President and Congress and vacating the field without
considered analysis.").

in light of Congress's intent in passing the statute, and that a federal employees' "relationship to the 'national security'" could not simply "follow from the very fact of employment." <u>Cole v. Young</u>, 351 U.S. at 543-44, 547.  Indeed, the government's sole authority in support of its interpretation of "national security" expressly acknowledges that the term "national security" must be understood in light of Congress's determination that "[l]abor organizations and collective bargaining in the civil service have been determined by the Congress to be 'in the public interest.'"  <u>See</u> <u>Dep't of Energy, Oak Ridge Operations, & Nat'l Ass'n of Gov't Emps. Local R5-181</u>, 4 F.L.R.A. at 655-56 (citation omitted).  To apply an expansive interpretation of "national security" that does not account for Congress's intent, the Supreme Court reasoned, would mean that an "exception to the general personnel laws[] could be utilized effectively to supersede those laws."  <u>Cole v. Young</u>, 351 U.S. at 547.

Congress could not have been clearer in passing the Statute that it intended for the protections of the Statute to extend broadly to the covered departments and agencies in the foreign service.  <u>See</u> <u>supra</u> Section I.A; <u>see also</u> 22 U.S.C. § 4101.  It therefore is plainly unreasonable to conclude that the exclusion in Section 4103(b) can be satisfied merely by pointing to the general national security and foreign policy "character" of the departments and agencies that Congress included in the Statute.  To do so would essentially render Section 4103(b) meaningless since an agency subdivision necessarily would satisfy the provision by nature of their inclusion in the Statute.

In light of its analysis above, the Court concludes that AFSA is likely to succeed on its claim that the Executive Order is <u>ultra</u> <u>vires</u>. This conclusion is reached in light of the

strong evidence rebutting the "presumption of regularity" and the Court's interpretation of Section 4103(b).[8]

### C.  *Irreparable Harm*

The next factor to consider is whether AFSA will suffer irreparable injury without the requested preliminary injunction.  See Archdiocese of Washington v. Wash. Metro. Area Transit Auth., 897 F.3d at 321.  The D.C. Circuit "has set a high standard for irreparable injury." Chaplaincy of Full Gospel Churches v. England, 454 F.3d 290, 297 (D.C. Cir. 2006).  "Not only must the injury 'be both certain and great,' and 'actual and not theoretical,' but 'the injury must be beyond remediation.'"  Brennan Ctr. for Just. at NYU Sch. of L. v. Dep't of Com., 498 F. Supp. 3d 87, 101 (D.D.C. 2020) (quoting Chaplaincy of Full Gospel Churches v. England, 454 F.3d at 297).  Importantly, "obstacles [that] unquestionably make it more difficult for the [plaintiff] to accomplish [its] primary mission . . . provide injury for purposes . . . [of establishing] irreparable harm."  League of Women Voters v. Newby, 838 F.3d at 9.

AFSA advances two primary bases by which it argues it will face irreparable harm absent a preliminary injunction.  First, it argues that the Executive Order significantly diminishes its bargaining power by "strip[ping] ninety-seven percent (97%) of Foreign Service members represented by AFSA of their rights to organize and bargain collectively under the [Statute]."  Pl.'s Mem. at 36.  This loss of bargaining power and the statutory protections of collective bargaining "have weakened AFSA's ability to represent Foreign Service employees." Pl.'s Reply at 18.  For example, the State Department and USAID "have ceased all

---

[8]    Because the Court concludes that AFSA is likely to succeed on its ultra vires claims, see Compl. ¶¶ 40-56 (Counts One and Two), the Court does not reach the issue of whether AFSA has satisfied the requirements for a preliminary injunction on its First Amendment retaliation claim.

communications and meetings with union representatives about Foreign Service members' employment conditions," <u>see</u> Yazdgerdi Decl. ¶ 10; Wong Decl. ¶¶ 8, 12; Chester Decl. ¶¶ 9, 19, "eliminated the ability of AFSA's officers to represent employees during work hours," <u>see</u> Wong Decl. ¶ 20; Chester Decl. ¶ 15; Sigfusson Decl. ¶¶ 14, 15, "limited AFSA's involvement before the Foreign Service Grievance Board," Parikh Decl. ¶ 6; Papp Decl. ¶ 3, "excluded AFSA representatives from their offices, limiting AFSA's access to members and collective bargaining records," Sigfusson Decl. ¶¶ 11, 12, and "terminated dues deduction."  Pl.'s Reply at 18.

AFSA argues that these significant obstructions to representing its members have come at a critical moment where both the State Department and USAID have signaled – and have begun – large-scale reorganization efforts and reductions-in-force.  <u>See</u> Pl.'s Reply at 19-21.  As to USAID, the agency has already begun to implement reductions-in-force where employees will be terminated on July 1, 2025, and September 2, 2025.  <u>See</u> Chester Decl. ¶ 18.  As for the State Department, Secretary of State Marco Rubio announced on April 22, 2025, that "Defendant State will reorganize itself by decreasing the number of bureaus or offices from 734 to 632 and downsizing of the domestic staff by fifteen percent."  Pl.'s Reply at 18; <u>see</u> Exs. 1 and 2, Yazdgerdi Supp. Decl. ¶¶ 2-3.  Absent preliminary relief, AFSA contends that its members will be severely disadvantaged during the reductions-in-force and reorganization by "hav[ing] to navigate that process without their bargained-upon frameworks and without their collective bargaining representative," which in turn "will further erode the employees' confidence and trust in the collective bargaining process and their bargaining representative." Pl.'s Reply at 20 (citing <u>Moore-Duncan ex rel. NLRB v. Horizon House Developmental Svcs.</u>, 155 F. Supp. 2d 390, 396-97 (E.D. Pa. 2001) ("The impotence of the union and the loss of employee interest can create a mutually reinforcing cycle, as lack of support among employees

further diminishes the union's strength and, consequently, its ability to press for improvements that would demonstrate its worthiness to members of the bargaining unit.")).

Second, AFSA argues that it is currently suffering "crippling losses" – approximately 86% of its monthly operational revenue, see Yazdgerdi Decl. ¶ 17 – caused by the loss of dues revenue. Pl.'s Reply at 21. AFSA's Executive Direct, Asgeir Sigfusson, states that the loss of dues revenue "will cause immediate cash flow issues," making it so that "AFSA will not be able to pay utilities, vendor costs, and most concerning, employee salaries and benefits." Sigfusson Decl. ¶ 9; see id. ¶ 10 ("The loss of membership dues could cause immediate layoffs for AFSA staff in addition to cuts in salaries and benefits."). AFSA's President, Thomas Yazdgerdi, illustrates the lasting harm that such layoffs would have on AFSA, stating that "[m]any of [AFSA's] staff have been with AFSA for over 20 years and have a wealth of legal and other experience and knowledge representing Foreign Service members in what is a very specialized, niche area of law." Yazdgerdi Decl. ¶ 18; see also Yazdgerdi Supp. Decl. ¶ 1.

As the Court has recently described in depth, each of the injuries suffered by AFSA represent irreparable harm warranting a preliminary injunction. See Nat'l Treasury Emps. Union v. Trump, 2025 WL 1218044, at *17-19. As to the loss of bargaining power, the Court explained the lasting harms that an employer's refusal to collectively bargain have on employees' morale and interest in union membership, stating:

> Courts have long recognized that "the unlawful refusal of an employer to bargain collectively with its employees' chosen representatives disrupts the employees' morale, deters their organizational activities, and discourages their membership in unions." Franks Bros. Co. v. NLRB, 321 U.S. 702, 704 (1944). "The deprivation to employees from the delay in bargaining and the diminution of union support is immeasurable." NLRB. v. Electro-Voice, Inc., 83 F.3d 1559, 1573 (7th Cir. 1996). Furthermore, "[a]s time passes, the benefits of unionization are lost and the spark to organize is extinguished." Id.; see Int'l Union of Elec., Radio &

> Mach. Workers, AFL-CIO v. NLRB, 426 F.2d 1243, 1249 (D.C. Cir. 1970) ("Employee interest in a union can wane quickly as working conditions remain apparently unaffected by the union or collective bargaining."). Therefore, any relief a court may provide "must come quickly." In re Am. Fed'n of Gov't Emps., AFL-CIO, 790 F.2d 116, 117-18 (D.C. Cir. 1986) (citation and quotation marks omitted).

Nat'l Treasury Emps. Union v. Trump, 2025 WL 1218044, at *17. Outside of the effects on union membership, "the loss of representation and status as an exclusively recognized labor organization creates 'obstacles [that] make it more difficult for the [plaintiff] to accomplish [its] primary mission,'" which "in itself constitutes irreparable harm." Id. (quoting League of Women Voters v. Newby, 838 F.3d at 9). In sum, the loss of bargaining power and statutory protections for the right to collectively bargain represent irreparable harm. See id.; see also Donohue v. Mangano, 886 F. Supp. 2d 126, 152 (E.D.N.Y. 2012) (finding irreparable harm where union could "no longer represent their members in any meaningful way . . . ."); Moore-Duncan ex rel. NLRB v. Horizon House Developmental Svcs., 155 F. Supp. at 396-97 ("An interim injunction requiring that the employer bargain in good faith may be therefore be necessary to prevent irreparable damage to the union's position and to the bargaining process."); SEIU Health Care Michigan v. Snyder, 875 F. Supp. 2d 710, 725 (E.D. Mich. 2012) ("Plaintiff will be irreparably harmed by being deprived its contractual rights, its ability to advocate and bargain for its members, and the loss of revenue to operate effectively and exercise its First Amendment rights . . . .").

Significant losses in revenue like the ones suffered by AFSA – approximately 86% loss of its operational revenue – cause irreparable harm both because they threaten the very existence of the union, see Pl.'s Reply at 21, and because "the loss of revenue creates a serious obstacle for [AFSA] to 'accomplish [its] primary mission' of representing its members." Nat'l

Treasury Emps. Union v. Trump, 2025 WL 1218044, at *19 (quoting League of Women Voters v. Newby, 838 F.3d at 9). Furthermore, layoffs of AFSA staff that result from the loss of dues revenue threaten to have a lasting impact on AFSA's effectiveness given the "wealth of legal and other experience and knowledge representing Foreign Service members" AFSA's staff possess. See Yazdgerdi Decl. ¶ 18. In sum, the "'crippling losses' that threaten AFSA's existence" represent irreparable harm. Pl.'s Reply at 21; see Nat'l Treasury Emps. Union v. Trump, 2025 WL 1218044, at *19.

The government's arguments in opposition were addressed and rejected in the Court's earlier opinion in Nat'l Treasury Emps. Union v. Trump, 2025 WL 1218044, at *16-19. Accordingly, AFSA has established that it will suffer irreparable harm absent a preliminary injunction.

### D.  Equities and Public Interest

The remaining preliminary injunction factors – the balance of the equities and assessment of the public interest – weigh in AFSA's favor. These factors "merge when, as here, the Government is the opposing party.'" Singh v. Berger, 56 F.4th 88, 107 (D.C. Cir. 2022) (quoting Karem v. Trump, 960 F.3d 656, 668 (D.C. Cir. 2020)).

As the Court explained in Nat'l Treasury Emps. Union v. Trump, Congress's unequivocal identification of collective bargaining rights and federal unions as being "in the public interest," coupled with the public interest "in ensuring that the laws enacted by their representatives are not imperiled by executive fiat," compel the conclusion that AFSA satisfies the remaining preliminary injunction factors. Nat'l Treasury Emps. Union v. Trump, 2025 WL 1218044, at *20. The government's primary argument in response – that "[a] preliminary injunction would displace and frustrate the President's decision about how to best address issues

of national security," Opp. at 40 – must be rejected because it "presuppose[s] that the President's decisions are in fact "national security" determinations, rather than a recasting of decisions related to "the general welfare" as "national security" determinations." Nat'l Treasury Emps. Union v. Trump, 2025 WL 1218044, at *20 (quoting Cole v. Young, 351 U.S. at 544).

Accordingly, the balance of the equities and assessment of the public interest weigh in favor of granting a preliminary injunction. Indeed, each of the preliminary injunction factors weighs in favor of granting AFSA's motion.

## IV. SECURITY AND SCOPE OF INJUNCTION

The government requests that the Court impose a bond pursuant to Rule 65(c) of the Federal Rules of Civil Procedure. See Opp. at 41. While the government does not provide any analysis of the "costs and damages" it will suffer as a result of the preliminary injunction in its opposition memorandum, see FED. R. CIV. P. 65(c), the government subsequently has requested that bond be set at $120,000. See Defendants' Response to Proposed Order ("Response to Prop. Order") [Dkt. No. 30] at 2 n.1. This amount represents the costs the government will need to pay in "union time" assuming a one-year duration for the preliminary injunction. See id.

Courts have "broad discretion" in determining "the appropriate amount of an injunction bond, including the discretion to require no bond at all." Simms v. D.C., 872 F. Supp. 2d 90, 107 (D.D.C. 2012) (internal citation and quotation marks omitted). As the Court explained in Nat'l Treasury Emps. Union v. Trump, requiring a significant bond "would conflict with both the Court's findings that each of the preliminary injunction factors weigh heavily in [AFSA's] favor and the principles of the right to seek judicial review of unlawful government action." Nat'l Treasury Emps. Union v. Trump, 2025 WL 1218044, at *21; see Plaintiff's

Response to Defendants' Response to Proposed Order ("Pl.'s Reply to Prop. Order") [Dkt. No. 32] at 2. While the total amount requested by the government is unwarranted, the Court, in its discretion, orders AFSA to post a bond in the amount of $100 pursuant to Rule 65(c) of the Federal Rules of Civil Procedure.

In addition to the imposition of a bond, the government requests that the Court limit the scope of the preliminary injunction in two respects: first, the Court should exempt agency subdivisions from the preliminary injunction order that meet the criteria in Section 4103(b); and second, the Court should exempt OPM from the order because "Plaintiff has failed to identify any basis for injunctive relief against OPM . . . ." Response to Prop. Order. The Court denies both of the government's requests. As to the request to exempt particular agency subdivisions from the preliminary injunction order, the Court denies this request for the reasons explained in Nat'l Treasury Emps. Union v. Trump – namely, the Court's "conclusions all speak to the fact that [Section 3] of the Executive Order is entirely ultra vires." Nat'l Treasury Emps. Union v. Trump, 2025 WL 1218044, at *22. As to the government's request to exempt OPM from the order, AFSA has shown that the preliminary injunction should include OPM because OPM has issued guidance to agencies on how to implement the Executive Order. See Pl.'s Reply to Prop. Order at 2; see also OPM Guidance.

## V.  CONCLUSION

For the foregoing reasons, AFSA's Motion for a Preliminary Injunction [Dkt. No. 10] is hereby GRANTED.

An Order consistent with this Opinion will issue this same day.

SO ORDERED.

PAUL L. FRIEDMAN
United States District Judge

DATE: 5/14/25