UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN FOREIGN SERVICE ASSOCIATION,<br><br>*Plaintiff,*<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, et al.,<br><br>*Defendants.* | Civil Action No. 25-1030 (PLF) |

**DEFENDANTS' MOTION TO STAY PENDING APPEAL**

By Order and Memorandum Opinion dated May 14, 2025, this Court enjoined the President's national-security determination pursuant to 22 U.S.C. § 4103(b) that subdivisions of the Department of State and the United States Agency for International Development ("USAID") employing Foreign Service Officers should be excluded from the coverage of Subchapter X, Chapter 52 of the Foreign Service Labor Management Relations Statute (the "Foreign Service Act"). *See* Order (ECF No. 36); Mem. Op. (ECF No. 37). Defendants have appealed that decision and, for reasons stated herein, now move for a stay pending appeal.[1]

Defendants' stay request should be granted because Defendants have made a strong showing of a likelihood of success on the merits, irreparable injury in the absence of a stay, and that a stay is in the public interest and will not substantially injure the Association. *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987). Indeed, the D.C. Circuit recently stayed the preliminary injunction that this Court entered in the related case *National Treasury Employees Union v. Trump*,

---

[1] Federal Rule of Appellate Procedure 8(a)(1) provides that "a party must ordinarily move first in the district court" for an order staying an injunction pending appeal. Defendants are accordingly seeking that relief in this Court.

Civ. A. No. 25-0935 (PLF) (D.D.C.). *See Nat'l Treasury Emps. Union v. Trump* (*"NTEU"*), No. 25-5157, 2025 U.S. App. LEXIS 11952 (D.C. Cir. May 16, 2025).

Pursuant to Local Rule 7(m), undersigned counsel sought the position of Plaintiff's counsel on the relief requested in this motion and counsel for Plaintiff has advised that Plaintiff opposes the relief requested.

## ARGUMENT

**I.     The Balance of Harms and Public Interest Favor a Stay.**

As in *NTEU v. Trump*, the balance of harms—whether Defendants will be irreparably harmed absent a stay and whether issuance of the stay will substantially injure the other parties interested in the proceeding—and the public interest all favor a stay in this case.

**A.     Defendants and the Public Will Be Harmed Absent a Stay.**

The injunction impinges on Defendants' ability to redirect their employees to mission-oriented work that advances national security. As the D.C. Circuit observed in *NTEU* where a similar injunction was issued, "the preliminary injunction ties the government's hands" by transferring control "from the Executive to the Judiciary" in an area—national security—"'in which the President generally enjoys 'unique responsibility.'"" *NTEU*, 2025 U.S. App. LEXIS 11952, at *5-6. Further, the injunction undermines Executive Branch governance and irreparably undermines the President's authority to "prescribe regulations for the conduct of employees in the executive branch." 5 U.S.C. § 7301. That encroachment on the President's prerogatives is especially "problematic" in the national-security context, where the President must be able to act swiftly and decisively. *See id.; see also Chicago & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948) ("executive decisions" in the national-security realm require "delicate, complex" assessments and rapid responses from agencies and employees).

2

For similar reasons, the public interest favors a stay pending appeal because "preserving the President's autonomy under a statute that expressly recognizes his national-security expertise is within the public interest" and "[t]o hold otherwise would give to the courts what the Constitution gave to Congress and the President." *NTEU*, 2025 U.S. App. LEXIS 11952, at*6. The preliminary injunctive relief granted by this Court constitutes an extraordinary intrusion into the President's authority specifically conferred by 22 U.S.C. § 4103(b) to make determinations as to whether subdivisions of the State Department and USAID that the President determines have a primary national security function should be excluded from Foreign Service Act coverage.  *See id.*

      **B.**      **The Association Will Not Be Harmed by a Stay.**

As established during oral argument, it is speculative whether employees will leave the Association while this litigation is ongoing. The Association is far more than the exclusive bargaining representative for members of the Foreign Service. As it emphasizes on its website, it is a professional association that provides a range of services to its members, over twenty percent of which are retired. Notice of Exhibits (ECF No. 28) at 4; *see also* https://afsa.org/about-afsa (last visited May 22, 2025).  Those services include providing "guidance and individualized assistance . . . on employment-related issues." Notice of Exhibits (ECF No. 28) at 4.  The Association also has failed to provide any evidence that it has lost members. The assertion to that effect in the Association's motion for preliminary injunction is not supported by the cited declaration and is at best vague and conclusory. Pl. Mot. (ECF No. 10-1) at 38 (citing Parikh Decl. ¶¶ 5, 7)

Although the Association claims to have temporarily not received due payments based on disruptions caused by the cancellation of automatic dues deductions from paychecks (Yazdgerdi Decl. (ECF No. 10-2) ¶ 17), that does not equate to the loss of members or mean that dues will not be paid through other means. Indeed, the Association has implemented a portal system where

members can resume payment of dues online (Def. Notice of Exhibits (ECF No. 28) at 7), and insufficient time has passed from its implementation for the Association to conclude that the system will prove ineffective.  Tr. at 41 (stating that the payment portal was "[p]ut on the website last week").  References by its declarants to potential layoffs if dues are not received is equally speculative.  *See Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297-98 (D.C. Cir. 2006) (to warrant a preliminary injunction, movant must show an injury that is "both certain and great," "actual and not theoretical," and "speculative" injury will not suffice (quotation marks omitted)).

Moreover, "economic loss does not, in and of itself, constitute irreparable harm," *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985).  And should the Association prevail on the merits, the Foreign Service Labor Relations Board would have broad discretion to fashion appropriate remedies to make the Association whole, including by requiring Defendant agencies to compensate for revenues lost from the failure to withhold dues.  Indeed, such relief has issued in the past.  *E.g.*, *U.S. Dep't of Def., Ohio Nat'l Guard*, 71 F.L.R.A. 829, 830 (2020); *U.S. Dep't of the Treasury, U.S. Mint*, 35 F.L.R.A. 1095, 1100-1102 (1990).  For similar reasons, allegations of irreparable harm based on economic loss were deemed insufficient in *NTEU,* and the same result should apply here.  *NTEU*, 2025 U.S. App. LEXIS 11952, at *3-4.

The Association's arguments for irreparable harm based on the loss of the right to collectively bargain also fail.  The Association acknowledged in its motion that USAID had not communicated to the Association that it had revoked its Framework Agreement with the Association.  Mot. (ECF No. 10-1) at 16 n.16.  The harms that it alleges, therefore, "are speculative" as they relate to USAID "because they would materialize only *after* an agency terminates a collective-bargaining agreement, and the Government directed agencies to *refrain* from terminating collective-bargaining agreements or decertifying bargaining units until after the

litigation concludes." *NTEU*, 2025 U.S. App. LEXIS 11952, at *2-3 (emphasis in original).  Thus, irreparable harm has not been established on this basis as to USAID.

Although the State Department had rescinded its Framework Agreement with the Association prior to the Association's preliminary injunction motion (Compl. (ECF No. 1) ¶ 39), the Association still has failed to establish that any resulting harms from that rescission are non-speculative or would be substantial and irreparable.  Mot. (ECF No. 10-1) at 37.  Matters related to assignment procedures, tenure and promotion, grievance procedures, time-in-class and time-in service rules, and disciplinary procedures—the claimed product of the Association's past efforts as the exclusive bargaining representative—are reflected in the Foreign Affairs Manual, not the Framework Agreement.  *See generally* https://fam.state.gov/ (last visited May 22, 2025); Framework Agmt. (ECF No. 10-2) at 14-39.  Consequently, the Association has failed to establish "non-speculative, irreparable harm" to support the broad injunction issued by the Court.  *See NTEU*, 2025 U.S. App. LEXIS 11952, at *3 n.3 (recognizing that, even if an agency deviates from the "self-imposed rule" to refrain from terminating collective-bargaining agreements, the union still would have to establish "non-speculative, irreparable harm" to support "an appropriately tailored" injunction).

**II.     The Government is Likely to Succeed on Appeal.**

A stay also should be granted because the government is likely to succeed on appeal.  As an initial matter, jurisdiction is precluded in this case. Congress made clear that the Foreign Service Act was the proper channel for the types of claims the Association raises here. *See* 22 U.S.C. § 4109(a); *id*. § 4116.  That the Federal Labor Relations Board might decline to decide an unfair labor practice complaint initiated at the request of the Association for want of jurisdiction does not confer jurisdiction in this Court. Indeed, in *American Federation of Government Employees, AFL-CIO v. Trump*, 929 F.3d 748 (D.C. Cir. 2019), the D.C. Circuit observed that its jurisdiction is not

5

"derivative" of the jurisdiction of the Federal Labor Relations Authority ("FLRA"), the counterpart to the Board under a related provision of the Federal Service Labor Management Relations Statute (the "Civil Service Act"). *Id.* at 758.  The D.C. Circuit "may review the unions' broad statutory and constitutional claims on appeal from an FLRA proceeding *even if the FLRA cannot*." *Id.* (emphasis added).  The D.C. Circuit reiterated that the statutory review scheme is "exclusive" and "the unions may not bypass [this scheme] by filing suit in the district court." *Id.* at 761; *see also Am. Fed'n of Gov't Emps., Nat'l Council of HUD Locs. Council 222, AFL-CIO v. Fed. Lab. Rels. Auth.*, 99 F.4th 585, 593 (D.C. Cir. 2024) (describing "unbroken line of circuit precedent dealing with [5 U.S.C.] § 7123(a)," which has consistently held that district courts lack jurisdiction over disputes arising under the Civil Service Act); *see also Am. Foreign Serv. Ass'n v. Baker,* 895 F.2d 1460, 1463 (D.C. Cir. 1990) (dismissing for lack of jurisdiction claim for breach of the "duty to bargain imposed by the Foreign Service Act" based on the statutory channeling provision "identical" to that in the Civil Service Act).

As Defendants advanced at oral argument and in their briefing, Congress created a special administrative review scheme that this Court must respect. Moreover, in evaluating jurisdiction, this Court should not have assumed the validity and enforceability of the Executive Order that the Association contends is invalid (and which this Court proceeded to enjoin).  In assessing its own jurisdiction, this Court instead should have assumed that the Association would prevail on the merits just as it would do in assessing the Association's standing to sue and other threshold jurisdictional questions.  *Cf. City of Waukesha v. EPA*, 320 F.3d 228, 235 (D.C. Cir. 2003) (per curiam) ("in reviewing the standing question, the court must . . . assume that on the merits the plaintiffs would be successful in their claims"); *Sandpiper Residents Ass'n v. HUD*, 106 F. 4th 1134, 1141 (D.C. Cir. 2024) ("Further, in evaluating mootness, we must assume that Plaintiffs will prevail on the merits of their claims"). Had the Court done so, it would have found that the

6

Association's own theory dictates that the Association must first bring its claims through a process for resolution by the Foreign Service Labor Relations Board and, if the Board concludes that it does not have jurisdiction to reach those claims, *see Am. Fed'n of Gov't Emps.*, 929 F.3d at 759, appeal the Board's dismissal to the D.C. Circuit. *Id.*; 22 U.S.C. § 4109(a). Because Defendants are likely to succeed on this question on appeal, the Court should grant Defendants' stay on this basis.

Even assuming jurisdiction, Defendants are likely to succeed on the merits of their appeal. The Court cites the White House Press Office Fact Sheet's reference to union efforts to impede the President's agenda, *see, e.g.*, Mem. Op. at 19-20, to conclude that the Association has rebutted the presumption of regularity afforded to Presidential actions. The Fact Sheet, however, neither references the Association nor Section 3 of the Executive Order and thus cannot constitute "clear evidence" to rebut the presumption of regularity regarding the President's distinct determinations under 22 U.S.C. § 4103(b) related to the Foreign Service function of the State Department and USAID. Moreover, the Fact Sheet merely explains how other unions' activities have impaired the functioning of agencies in a manner that could undermine national security, the very consideration underlying the purpose of the national security exclusion in both the Civil Service Act and Foreign Service Act. The White House, *Fact Sheet: President Donald J. Trump Exempts Agencies with National Security Missions from Federal Collective Bargaining Requirements*, https://perma.cc/Y7HR-4W3H (Mar. 27, 2025) (Fact Sheet). Defendants' observation in its opposition brief that Section 4103(b) "exists to allow the President to address such concerns" does not "directly conflict[]" with the equally accurate observation made by Defendants that the Fact Sheet is limited on its face to determinations made by the President under 5 U.S.C. § 7103(b), as reflected in Section 2 of the Executive Order. *Compare* Opp. (ECF No. 23) at 36 *with* Mem. Op. at 20 n.6.

7

The Court nevertheless has treated the language in the Fact Sheet as "clear evidence" of a "retaliatory motive towards federal unions broadly" sufficient to rebut the presumption of regularity with respect to the entire Executive Order. Mem. Op. at 20 n.6.  But even were that interpretation one possible reading of the Fact Sheet (which Defendants do not concede), the observations in the Fact Sheet are equally consistent with the underlying purpose of the national security exclusions in Sections 7103(b) and 4103(b).  Those exclusions exist because Congress recognized that the collective bargaining rights they were granting could be exercised in a manner that was inconsistent with national security requirements and considerations.  It is well-settled that, when the challenged conduct is consistent with a lawful purpose as here, a plaintiff's advancement of a contrary inference from that conduct fails to cross "'the line between possibility and plausibility.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554 (2007) (finding insufficient to avoid dismissal allegations that are "consistent with conspiracy, but [also] just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market").  Failing the *Iqbal* pleading standard, the Association's allegations based on the Fact Sheet necessarily fall short of the "clear evidence" required to rebut the presumption of regularity, particularly in the context of a preliminary injunction motion where the Association bears the burden not merely of establishing the plausibility of its allegations but of establishing a likelihood of success on the merits.

The Court similarly erred in drawing an inference of retaliatory motive based on the alleged favorable treatment of a single union that allegedly endorsed President Trump in the last election. Mem. Op. at 20.  The Court estimated that the collective bargaining rights of one-third of the federal workforce were unaffected by the Executive Order (*id.* at 2), and the Association presented no evidence that all unions representing those employees had endorsed President Trump.  Without such evidence, the example of a single union, potentially among many that received similar

8

treatment, cannot raise a plausible inference of retaliatory motive. The cited union, moreover, does not represent Foreign Service Officers and so is not a proper comparator from which to draw any inference concerning the President's determinations under Section 3 of the Executive Order. *Cf. Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 301 (D.C. Cir. 2015) (for comparator evidence to raise an inference of discrimination, all relevant aspects of the situation between groups being compared must be "nearly identical"). More relevant are the three agencies identified in 22 U.S.C. § 4103 that employ Foreign Service Officers that the President did not include in Section 3 of the Executive Order. Their omission demonstrates that the President acted with discernment in making the determinations in the Executive Order.

The Court otherwise cites to the actions by the Secretary of Veterans Affairs in implementing the Executive Order but that is not evidence of whether the President discharged his duties properly. Mem. Op. at 21. Because Section 4103(b) clearly contemplates actions like the Executive Order, the Association has failed to establish "clear evidence" that can rebut the presumption of regularity.

Further, no *ultra vires* action occurred here. Section 4103(b) entrusts the relevant determinations to the President alone, without interference from courts or other actors. This Court's Memorandum Opinion remarks on the inadequacy of the descriptions provided in Defendants' briefing for each subdivision of the State Department and of USAID referenced in Section 3 of the Executive Order. Mem. Op. at 23-24. Not even these descriptions—which set forth reasonable explanations of how each subdivision meets the relevant statutory criteria—are necessary. Indeed, the President need not even "insert written findings in an exempting order[]" under Section 4103(b). *See AFGE v. Reagan*, 870 F.2d 723, 727 (D.C. Cir. 1989). Any other conclusion would be flatly inconsistent with the deference regularly due the President's national security-related determinations. *See, e.g.*, *Trump v. Hawaii*, 585 U.S. 667, 686 (2018) (dismissing

as "inconsistent with the broad statutory text and the deference traditionally accorded the President in th[e national security] sphere" an argument "for a searching inquiry into . . . the President's justifications" for a finding about national interests).

To the extent the Court is suggesting that the terms "national security" and "national security work" in the statute are not sufficiently expansive to encompass the State Department and USAID (Mem. Op. at 27-28), that is inconsistent with *Cole v. Young,* 351 U.S. 536 (1956), the very authority cited by the Court. *Id.* at 541, 544-45 (recognizing the State Department as an agency "affected with the 'national security'" based on its role in "international relations"). Indeed, such a conclusion would be contrary to the language of Section 4103, which by specifically referencing the State Department and USAID necessarily intended the term "national security" in that section to encompass the work of those agencies. 22 U.S.C. § 4103(a); *Cole*, 351 U.S. at 544 (construing the meaning of "national security" in a statute based on the character of the agencies specifically enumerated in the statute). The Association admits on its website that the State Department "protects and promotes U.S. security" and that USAID "advances U.S. national security." Notice of Exhibits (ECF No. 28) at 4.

Section 4103(b) represents Congress's assessment that union activity, though potentially beneficial in some circumstances, may impede agency operations and thereby pose risks to national security that the President must be able to mitigate by exempting subdivisions of the State Department and USAID from collective-bargaining requirements. The President did more than "point[] to the general national security and foreign policy 'character' of the departments and agencies that Congress included in the Statute." Mem. Op. at 28. The President determined that subdivisions of the State Department and USAID, specifically identified in the Executive Order, had investigative or national security work as a primary function and that union activity pursuant to the provisions of Chapter 52, Subchapter X of the Act as applied to those subdivisions was

incompatible with his assessment of national security requirement and considerations. The Court's inquiry should have ended there. *See Changji Esquel Textile Co. v. Raimondo*, 40 F. 4th 716, 726 (D.C. Cir. 2022) ("*ultra vires* review is limited to ''facial' violations' of statutes" and "[c]onsidering the adequacy of the [government's] explanation, or degree of support for its factual findings, would contravene these basic principles").

For all of the above reasons, Defendants have demonstrated a likelihood of success on appeal with respect to Plaintiff's *ultra vires* claims.

## CONCLUSION

For the foregoing reasons, this Court should enter a stay pending appeal.

Dated: May 22, 2025

Respectfully submitted,

YAAKOV M. ROTH
Acting Assistant Attorney General
EMILY M. HALL
SARAH E. WELCH
Counsel to the Assistant Attorney General
Civil Division

ERIC HAMILTON
Deputy Assistant Attorney General
Civil Division, Federal Programs Branch

ALEXANDER K. HAAS
Director
JACQUELINE COLEMAN SNEAD
Assistant Branch Director
LISA ZEIDNER MARCUS
Senior Counsel
LYDIA JINES
JEREMY MAURITZEN
Trial Attorneys
U.S. Department of Justice, Civil Division
Federal Programs Branch

JEANINE FERRIS PIRRO
United States Attorney

By:  */s/ Jeremy S. Simon*
JEREMY S. SIMON, D.C. BAR #447956
Assistant United States Attorney
601 D. Street, N.W.

Washington, D.C. 20530
(202) 252-2528
Jeremy.simon@usdoj.gov

*Attorneys for the United States of America*