IN THE UNITED STATE DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

AMERICAN FOREIGN SERVICE
ASSOCIATION,

   Plaintiff,

  v.           C.A. No. 25-1030 (PLF)

DONALD J. TRUMP, et al.,

   Defendants.

**PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTION TO STAY PENDING APPEAL**

   In 1971, President Nixon issued an Executive Order granting collective bargaining rights to Foreign Service employees because "the effective participation by the men and women of the Foreign Service in the formation of personnel policies and procedures affecting the conditions of their employment is essential to the efficient administration of the Foreign Service." Exec. Order 11,636, *Emp.-Mgmt. Rels. in the Foreign Serv.* (Dec. 17, 1971). In 1980, Congress enacted Subchapter X of the Foreign Service Act ("FSA"), also known as the Foreign Service Labor-Management Relations Statute, to guarantee those rights in law. Through ten (10) presidencies (including the first Trump Administration), seventeen (17) Secretaries of State and twenty-one (21) Administrators/ acting Administrators of U.S Agency for International Development ("USAID") have recognized and bargained with the American Foreign Service Association ("AFSA") during the Vietnam War, the Cold War, the fall of the Soviet Union, 9/11, and the War on Terror, as well as during the

war in Afghanistan, which is the longest war the United States has ever fought. Even though America is at peace, President Trump issued Executive Order No. 14,251 on March 27, 2025 terminating the Foreign Service's statutory collective bargaining rights, ostensibly because, somehow, they are no longer "consistent with national security requirements and considerations." On May 14, 2025, this Court issued a preliminary injunction directing the State Department ("State") and USAID to continue doing what they have been doing without issue for over a half-century: collectively bargain with AFSA.

The Defendants now seek a stay of the injunction pending an appeal. However, they have failed to meet the criteria in *Nken v. Holder*, 556 U.S. 418, 434 (2009) for obtaining such a stay. The Defendants have not demonstrated that they will suffer any injury, let alone irreparable injury, if they are required to continue to bargain with AFSA and adhere to established collective bargaining agreements until their appeal is decided. Further, they have not shown that they are likely to prevail on the merits of their appeal or that a stay is in the public interest. Finally, AFSA will demonstrate that a stay will cause it substantial injury.

## I.   The Defendants Have Not Shown That They Suffer any Injury if They are Required to Continue to Recognize and Bargain with AFSA during the Pendency of an Appeal.

"Although the plaintiffs must show irreparable injury to secure an injunction, it is now the defendant who – seeking relief from an injunction so obtained – must show irreparable injury absent a stay of the injunction." *J.G.G. v. Trump.*, No. 25-5067, 2025 WL 914682, at *11 (D.C. Cir. Mar. 26, 2025) (Henderson, J. concurring). A

failure to demonstrate irreparable injury "is fatal to the [movant's] stay request because a showing of irreparable harm is a necessary prerequisite for a stay." *KalshiEX LLC v. Commodity Futures Trading Comm'n,* 119 F.4th 58, 63–64 (D.C. Cir. 2024). But, in this case, the Defendants make only vague, unsupported claims of injury  such as claiming that the preliminary injunction "ties the government's hands," Defs.' Mot. to Stay Pending Appeal ("Defs.' Mot.") at 2, which can be said about any injunction against the Executive branch.

The Defendants argue that "[t]he injunction impinges on Defendants' ability to redirect their employees to mission-oriented work that advances national security," adding the injunction also "undermines Executive Branch governance and irreparably undermines the President's authority to 'prescribe regulations for the conduct of employees in the executive branch.'" Defs.' Mot. at 2 (quoting 5 U.S.C. § 7301). These hyperbolic claims are both factually and legally incorrect; the injunction does nothing of the sort. It simply precludes the Defendants from enforcing Executive Order No. 14,251 and from failing to recognize and bargain with AFSA, while the parties litigate this case. In other words, the injunction maintains the state of affairs that has existed for over a half century.

The Defendants also incorrectly claim that this "encroachment on the President's prerogatives is especially intolerable in the national security context, where the President must be able to act swiftly and decisively." *Id.* However, Subchapter X *already* provides the President with the flexibility "to act swiftly and decisively" within a collective bargaining framework. *First*, § 4105(a) excludes a wide

range of "management's rights" from collective bargaining, including "the determination of the mission, budget, organization and internal security practices," as well as to "hire, assign, direct" employees and to "assign work." 22 U.S.C. § 4105(a)(1). *Second*, management can "take whatever actions may be necessary to carry out the mission of the Department during emergencies." 22 U.S.C. § 4105(a)(7). *Third*, § 7103(c) provides that the President may even suspend a provision of Subchapter X "with respect to any post, bureau, office or activity of the Department, if the President determines in writing that the suspension is necessary in the interest of national security because of an emergency." 22 U.S.C. § 4103(c).

Thus, the Defendants' claimed injury is totally nonspecific, prospective, and theoretical. But to obtain a stay pending appeal, "the injury must be both certain and great; it must be actual and not theoretical." *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985). As the D.C. Circuit has observed:

> Bare allegations of what is likely to occur are of no value since the court must decide whether the harm will *in fact* occur. The movant must provide proof that the harm has occurred in the past and is likely to occur again, or proof indicating that the harm is certain to occur in the near future.

*Id.* (emphasis in original). "Simply showing some possibility of irreparable injury" is not sufficient to obtain a stay. *Nken*, 556 U.S. at 434 (internal quotation and citation omitted).

The bottom line is that the Defendants' irreparable injury is nonexistent. Congress already protected the President's authority within the FSA itself. As noted above, history has shown how Presidents (including Defendant Trump) have "acted

4

swiftly and decisively" while our country faced the Cold War, arms control, terrorism, weapons of mass destruction, Gulf War, trade agreements, 9/11 attacks, Afghanistan, Iraq, cybersecurity, religious extremism, Ukraine, and countless events in the Middle East. To quote a popular song, "it was always burning, since the world's been turning." Billy Joel, *We Didn't Start the Fire*, on Storm Front (Columbia 1989). Yet, through it all, ten Presidents have been able to protect and advance our country's national security interests, while complying with the FSA's obligation to recognize and bargain with AFSA.

The Defendants quote *Nat'l Treas. Emps. Union v. Trump*, No. 25-5157, 2025 WL 1441563 (D.C. Cir. May 16, 2025) ("*NTEU*") for the proposition that "preserving the President's autonomy under a statute that expressly recognizes his national-security expertise is within the public interest" and "[t]o hold otherwise would give the courts what the Constitution gave to Congress and the President." Defs.' Mot. at 3 (quoting *NTEU*, 2025 WL 1441563, at *3). There is much more to say about both this Court's role and the public's interest.

Long before *NTEU*, the D.C. Circuit recognized that "… the Constitution is largely silent on the question of the allocation of powers associated with foreign affairs and national security." *United States v. American Tel. & Tel. Co.*, 567 F.2d 121, 128 (D.C. Cir. 1977). "These powers have been viewed as falling within a zone of twilight in which the President and Congress share authority or in which its distribution is uncertain." *Id.* (internal quotation marks omitted). Congress exercised its authority within that zone when it enacted Subchapter X of the Foreign Service

Act. Congress found that protecting Foreign Service employees' rights to organize and bargain collectively "safeguards the public interest" and "contributes to the effective conduct of public business." 22 U.S.C. §§ 4101(1)(A),(B). Congress then drafted the FSA to cover the members of the Foreign Service who work for the State Department, USAID and other foreign affairs agencies. 22 U.S.C. § 4103(a). Congress also provided the President with the authority to exclude a subdivision of a department (but not the entire department) from the FSA's coverage only if certain requirements are met. 22 U.S.C. § 4103(b).

This Court also has a role in this case. "When confronting a statutory question touching on subjects of national security and foreign affairs, a court does not adequately discharge its duty by pointing to the broad authority of the President and Congress and vacating the field without considered analysis." *Ctr. for Biological Diversity v. Mattis*, 868 F.3d 803, 827 (9th Cir. 2017). "To deny inquiry into the President's power in a case like this, because of the damage to the public interest to be feared from upsetting its exercise by him, would in effect always preclude inquiry into the challenged power…." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 596 (1952) (Frankfurter, J. concurring). "Presidential claim to power at once so conclusive and preclusive must be scrutinized with caution, for what is at stake is the equilibrium established by our constitutional system." *Id.* at 638 (Jackson, J. concurring).

Defendants disrupted that equilibrium with the issuance and enforcement of Executive Order No. 14251. They have effectively amended or repealed in part

Subchapter X of the FSA by removing whole Departments from the statute's coverage when § 4103(b) only authorizes the exemption of particular subdivisions and then only when specific criteria are met. While the Constitution empowers the President to execute the laws faithfully, it does not provide him with the power to amend or repeal legislation, directly or indirectly. *Clinton v. City of New York*, 524 U.S. 417, 488 (1998) ("There is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes.") If courts turned away, then "no barrier would remain to the executive ignoring any and all Congressional authorizations if he deemed them, no matter how conscientiously, to be contrary to the needs of the nation." *Local 2677, Am. Fed'n of Gov't Emps. v. Phillips*, 358 F. Supp. 60, 77 (D.D.C. 1973). Such an outcome "would undermine public confidence in the very edifice of government as it is known under the Constitution." *Youngstown Sheet & Tube Co. v. Sawyer*, 103 F. Supp. 569, 577 (D.D.C. 1952), *aff'd*, 343 U.S. 579 (1952).

## II.   AFSA Will Suffer Substantial Injury if a Stay is Granted.

The Defendants offer three reasons for why AFSA will not suffer any harm if the Court grants the stay of its preliminary injunction. Defs.' Memo. at 3-4. None withstand scrutiny.

The Defendants first claim that their deprivation of AFSA's right to bargain collectively fails to give rise to a "non-speculative, irreparable harm…." Defs' Memo. at 4.[1] To the contrary, the exclusion of employees from a labor-management relations

---

[1] Defendants assert that USAID has not repudiated its Framework Agreement. Defs.' Mot. at 4. True, USAID has not sent an e-mail taking that action. However, a

statute inflicts immediate, irreparable harm upon both the employees and their collective bargaining representative. *SEIU Health Care of Mich. v. Snyder*, 875 F. Supp. 2d 710, 724-25 (E.D. Mich. 2012) (explaining the extent of the irreparable injury). Federal courts have repeatedly found that employers' refusal to recognize or their withdrawal of union recognition, along with the repudiation of collective bargaining agreements, causes irreparable harm to unions and the employees they represent. *Small v. Avanti Health Sys., LLC*, 661 F.3d 1180, 1191 (9th Cir. 2011); *NLRB v. Electro-Voice*, 83 F.3d 1559, 1573 (7th Cir. 1996); *Asseo v. Centro Medico del Turabo*, 900 F.2d 445, 455 (1st Cir. 1990).

The Defendants try to mitigate that injury by pointing out that the product of collective bargaining can also be found in the Foreign Affairs Manual. (Defs.' Mot. at 5.) Such an argument misses the point. Without a duty to bargain, the Defendants are free to change the Foreign Affairs Manual at their discretion; and, the President has directed that the manual be revised or replaced in Executive Order 14,211, 90 Fed Reg. 9831 (Feb. 18, 2025). *See* ECF No. 23 at 13. The Defendants' ability to change terms unilaterally inflicts *additional* irreparable injury. *Donohue v. Mangano*, 886 F. Supp. 2d 126, 152 (E.D.N.Y. 2012) ("[b]argaining units such as the CSEA can no longer represent their members in any meaningful way, now that any negotiated

---

repudiation can take other forms, such as the complete cessation of communication with the Union and failure to adhere to the Framework Agreements. AFSA provides evidence of such conduct. (ECF No. 10-4, Declaration of Randall Chester, ¶¶ 9, 14, 17-19.) The Defendants have not disputed those allegations or provided any evidence to the contrary, such as evidence to show that USAID is complying with its contractual obligations to AFSA and foreign service employees.

provision they have endeavored to secure in the past can instantly be reduced to a nullity").

More importantly, AFSA has already provided an actual example of the irreparable injury. ECF No. 25 at 27-28. On April 22, Defendants announced a reorganization and their intent to implement reductions in force ("RIFs") at the State Department.[2] Supplemental Declaration of Thomas Yazdgerdi, ECF No. 31, ¶¶ 2-3 & Ex. 3 (FAQs). While the FSA provides management with the right to implement a RIF, 22 U.S.C. § 4105(a)(3), it also provides the union with the right to negotiate procedures that management will observe during the RIF, along with appropriate arrangements for employees who are adversely affected by the RIF. 22 U.S.C. §§ 4105(b)(2),(3). There are a wide range of procedures and arrangements that could be negotiated to address a RIF. *See, e.g., Nat'l Ass'n of Gov't Emps., Local R1-203*, 55 F.L.R.A. 1081, 1090 (1998) (Proposal 7, requiring management to select candidates from reemployment lists for bargaining unit positions after layoff is an appropriate arrangement). None of those procedures or arrangements are possible because, not only has AFSA's chair been removed from the bargaining table, but also the Defendants have taken away the entire negotiating table by excluding State from Subchapter X's coverage through Exec. Order 14,251.

---

[2] *See also* Eric Katz and David Dimolfetta, *State Dep't Cuts Poised to be More Severe Than Previously Outlined with 3,400 Emps. on the Chopping Block* (May 9, 2025), available at, https://www.govexec.com/management/2025/05/state-dept-cuts-poised-be-more-severe-previously-outlined-3400-employees-chopping-block/405171/ (last visited May 26, 2025)

Collective bargaining derives its value in real time, enabling employees to address their conditions of employment through their collective bargaining representative when it matters the most. If a union is unable to bargain on behalf of its members and represented employees as changes unfold, then the employees' interest in and support for collective bargaining will weaken. *Moore-Duncan ex rel. NLRB v. Horizon House Developmental Svcs.*, 155 F. Supp. 2d 390, 396-97 (E.D. Pa. 2001) ("*Horizon House*"). *See, generally, Int'l Union of Elec., Radio & Mach. Workers v. NLRB*, 426 F.2d 1243, 1249 (D.C. Cir. 1970). These losses create a "mutually reinforcing cycle," whereby the union's lack of power and the employees' declining interest further weaken the union's strength as the wheels of justice slowly continue to grind. *Horizon House*, 155 F. Supp. 2d at 396-97. The end result of that cycle is irreparable. *See, e.g., Avanti Health Sys., LLC*, 661 F.3d at 1191-92 (finding order cannot remedy lost support for union).

The Defendants argue that AFSA has failed to establish irreparable harm in other ways. For instance, they argue that AFSA can continue as a professional association. Defs.' Mot. at 3. This argument fails to address the irreparable injuries AFSA suffers from its loss of its status as a labor organization.

The Defendants also take issue with the financial injuries inflicted upon AFSA resulting from the Defendants' cessation of dues allotments. *Id.* at 3-4. AFSA faces a threat of financial ruin if it has to wait for the conclusion of court proceedings (especially when rulings reinstating dues deduction are stayed during the pendency of appeals), as well as the exhaustion of subsequent administrative proceedings

10

before the Foreign Service Labor Relations Board once coverage under Subchapter X has been reestablished, to retain years of lost dues income that may be unrecoverable with other means. And there is little incentive for AFSA's worldwide membership to pay dues directly if it has lost its role as their collective bargaining representative. But the Defendants have obscured the point: It is not so much the loss of income that constitutes the irreparable injury, but it is AFSA's loss of the statutory right in 22 U.S.C. § 4118(a) that prevents AFSA from receiving income on an ongoing basis that it can use *now* to represent and advocate for its members during a period of rapid change and threat to their job security that constitutes irreparable injury. *Snyder*, 875 F. Supp. 2d at 724-25.

## III.   The Defendants Have Failed to Demonstrate That They are Likely to Succeed on the Merits of their Appeal.

### A.   The District Court Correctly Found that It Has Jurisdiction Because AFSA's Challenge to the Executive Order Does Not Fall Within the Foreign Service Labor Management Relations Statute's Remedial Scheme.

This Court has jurisdiction to review the legality of Executive Orders that exclude certain agency subdivisions from the coverage of the Foreign Service Labor-Management Relations Statute on national security grounds. "The validity of the Executive Order is a question of law, and is thus properly before this Court for resolution." *Amer. Fed'n of Govt. Emps., AFL-CIO v. Reagan*, 665 F. Supp. 31, 32 (D.D.C. 1987) (finding Exec. Order No. 12,559 not a proper exercise of authority under 5 U.S.C. § 7103(b), *rev'd on other grounds*, 870 F.2d 723 (D.C. Cir. 1989).

11

The District Court correctly concluded that AFSA cannot avail itself of the administrative channels in the Foreign Service Labor-Management Relations Statute "because the Executive Order at issue removed the agencies and subdivisions in question from the coverage of the Statute." ECF No. 37 at 14. The Federal Labor Relations Authority ("FLRA") has consistently dismissed pending unfair labor practice charges and other cases filed by unions that have lost recognition as a result of executive orders excluding agencies or subdivisions based on "national security" under 5 U.S.C. § 7113(b)(1). *U.S. Attorney's Office, Southern Dist. of Texas*, 57 F.L.R.A. 750 (2002) (dismissing three unfair labor practices cases); *Dep't of the Treasury, Bureau of Alcohol, Tobacco & Firearms, Bos. Dist. Off., Crim. Enf't Activity*, 3 F.L.R.A. 30, 31 (1980) (dismissing representation petition); *Am. Fed'n of Gov't Emps., Loc. 2118*, 2 F.L.R.A. 916, 917 (1980) (dismissing negotiability appeal). "Where the President has specifically excluded an agency or activity from coverage under the Statute by issuing an executive order, the Authority is clearly without jurisdiction." *Dep't of the Navy, Naval Telecom. Ctr., Ward Circle Activity*, 6 F.L.R.A. 498, 500 (1981) (dismissing representation petition). Although these decisions and actions are by the FLRA, the FLRA and the Foreign Service Labor Relations Board ("FSLRB") have the same chairperson. The Foreign Service Labor Management Relations Statute further provides that the FSLRB's decisions "shall be consistent" with the FLRA's decisions under Chapter 71 of Title 5 except in cases where the FSLRB "finds that special circumstances require otherwise." 22 U.S.C. § 4106(a), (b); 22 U.S.C. § 4107(b).

But AFSA would not even get to the stage of having the FSLRB dismiss its unfair labor practice case, because it must first convince the General Counsel of the FLRA to issue an unfair labor practice complaint. The General Counsel's Office has suspended processing of unfair labor practice charges filed by unions subject to the Executive Order. (*See* April 9, 2025 letter in *Dep't of Defense Educ. Activity and Antilles Consol. Educ.* Ass'n, CH-CA-25-01015, attached hereto.) Not only must the General Counsel follow Authority precedent (*Dep't. of Army, U.S. Army Missile Command, Redstone Arsenal*, 25 F.L.R.A. 167, 169-70 (1987)), but despite being part of an independent agency, he or she must now also follow the President's interpretation of the law. Section 7 of Exec. Order No. 14,215, *Ensuring Accountability for All Agencies*, 90 Fed. Reg. 10447 (Feb. 24, 2025).

The availability of meaningful judicial review is the most important factor in determining whether District Court jurisdiction is precluded under *Thunder Basin v. Reich*, 510 U.S. 200 (1994). *Bennett v. U.S. Sec. & Exch. Comm'n*, 844 F.3d 174, 183 (4th Cir. 2016). AFSA would have no meaningful opportunity for judicial review of the Executive Order's national security exclusion because "[t]he Foreign Service Act does not provide for judicial review of a General Counsel decision not to file a complaint." *Amer. Foreign Serv. Ass'n v. Baker*, 895 F.2d 1460, 1461 (D.C. Cir. 1990) ("*Baker*").

And AFSA's claims are not precluded by *Thunder Basin* because they are "wholly collateral" to the Statute's review provisions and outside of the FSLRB's expertise. The "regularity" of the President's decision to exclude the State

13

Department and USAID from the coverage of the Statute is clearly not something that Congress intended a body subordinate to him to determine. Similarly, under the "unified executive" theory enforced by Exec. Order No. 14,215, the Board is not authorized to second-guess the President's determination that the exclusion of the State Department and USAID is necessary for "national security requirements and considerations."

The Appellants' reliance on *Amer. Foreign Serv. Ass'n v. Baker, supra.,* is misplaced for four reasons. *First*, the sole dispute in *AFSA v. Baker* was with the actions of the Secretary of the State, not the President. *Second*, as the court noted in that case, AFSA alleged only a breach of the duty to bargain, which the FSLRB was capable of addressing, and not a constitutional claim (as AFSA raises here). *Baker*, 895 F.2d at 1462-63. *Third*, the FLRA's General Counsel actually issued an unfair labor practice complaint over the matter and was concurrently litigating it on AFSA's behalf. *Id.* at 1461, 1463. The court did note, however, that had the FLRA General Counsel declined to issue a complaint, his decision would be unreviewable. *Id.* at 1461. *Fourth*, the Court of Appeal's decision in *Baker* predated the Supreme Court's decision in *Thunder Basin*. To the extent that the Court opined that Congress's failure to provide a mechanism for judicial review in a particular statute precludes district court jurisdiction (895 F.2d at 1462), *Thunder Basin* and its progeny hold the opposite. The lack of "meaningful judicial review" in a statutory scheme indicates that district courts do in fact have jurisdiction. "The first *Thunder Basin* factor recognizes

that Congress rarely allows claims about agency action to escape effective judicial review." *Axon Enterprise, Inc. v. Fed'l Trade Comm'n*, 598 U.S. 175, 186 (2023).

### B.    The District Court Correctly Determined that the Plaintiffs Are Likely to Demonstrate that the Executive Order is Illegal.

An executive order excluding agencies or their subdivisions from collective bargaining on national security grounds is reviewable in this Circuit, although "the challenged order is entitled to a *rebuttable* presumption of regularity." *Amer. Fed'n of Govt. Emps v. Reagan*, 870 F.2d 723, 724 (D.C. Cir. 1989) (emphasis supplied) ("*AFGE*"). This presumption of regularity "is not a carte blanche. After all, the presumption of regularity is rebuttable." *Romero v. Tran*, 33 Vet. App. 252, 254 (2021). The Court of Appeals suggested that this presumption can be rebutted by showing that "the President was indifferent to the purposes and requirements of the Act, or acted deliberately in contravention of them." *AFGE,* 870 F.2d at 728.

AFSA has presented and the District Court found clear evidence that rebuts the presumption of regularity: the overbroad and indiscriminate scope of the agencies exempted (encompassing at least two-thirds of the Federal government's unionized workforce; the inexplicable exclusion of Customs and Border Protection as well as all police and firefighters regardless of the agencies for whom they work; the timing of the issuance of the Executive Order in the absence of a precipitating national security event that might justify it; and, perhaps above all, the personalized, unhinged, anti-union vitriol contained in the White House "Fact Sheet" issued simultaneously with the Order. The Fact Sheet unabashedly discloses the real reason the President issued the Executive Order. The President did not act to protect national security, rather he

15

sought to punish and disempower those unions (like AFSA) that have opposed his policies, and to protect those unions who have not. This conclusion is evidenced by, among other things:

- The Fact Sheet calls out "hostile Federal unions" who ostensibly "obstruct agency management."

- "Certain Federal unions have declared war on President Trump's agenda."

- "President Trump refuses to let union obstruction interfere with his efforts to protect Americans and our national interests."

- "President Trump supports constructive partnerships with unions who work with him; he will not tolerate mass obstruction that jeopardizes his ability to manage agencies with vital national security concerns."

White House, Fact Sheet, https://www.whitehouse.gov/fact-sheets/2025/03/fact-sheet-president-donald-j-trump-exempts-agencies-with-national-security-missions-from-federal-collective-bargaining-requirements/ (last visited May 23, 2025).

"[C]ourts have not required the party challenging the presumption to supply more evidence of irregularity when the appearance of irregularity is apparent; to do so would be redundant and wasteful of resources." *Romero*, 33 Vet. App. at 261. In issuing a temporary restraining order against application of another Executive Order against a prominent law firm, the words of Judge Leon are equally applicable here: "The retaliatory nature of the Executive Order at issue here is clear from its face ... but also from the Fact Sheet published the same day." *Wilmer, Cutler, Pickering, Hale and Dorr LLP v. Exec. Office of the Pres.*, No. 25-cv-917, 2025 WL 946979, *1

(D.D.C. Mar. 28, 2025). And, like the Administration's ban on transgender troops, Exec. Order No. 14,251 and accompanying Fact Sheet are "soaked in animus and dripping with pretext." *Talbott v. United States*, No. 25-cv-240 (ACR), 2025 WL 842332, at *31 (D.D.C. Mar. 18, 2025) (declining to defer to military judgment).

The Defendants' attempt to disavow the relevancy of the Fact Sheet to the exclusion of the members of the Foreign Service at State and USAID was correctly rejected by the District Court, which noted that "[t]his contention directly conflicts with the government's arguments made in its opposition memorandum, where the government argued that the statements in the Fact Sheet support the President's Section 4103(b) determinations." ECF No. 37 at 20. The District Court observed that the Fact Sheet was published in support of the same Executive Order and "reflects retaliatory motive towards federal unions broadly, not just those falling under [the Civil Service Reform Act]." *Id.* Although it was an overstatement, the White House was referring to AFSA in the "Fact Sheet" when it claimed that "[c]ertain Federal unions have declared war on President Trump's agenda." That agenda has included dismantling Foreign Service agencies and politicizing the Foreign Service, both of which AFSA has vigorously and vociferously opposed in the press and in the courts. ECF No. 10-2 (Declaration of Thomas Yazdgerdi ["Yazdgerdi Decl."], ¶ 25); ECF No. 10-4 (Declaration of Randy Chester ["Chester Decl."], ¶¶ 21-23). AFSA and another union filed a lawsuit in the District Court on February 6, 2025 that seeks a declaratory judgment that the President's dismantling of USAID is unconstitutional, as well as injunctive relief directing the defendants to cease shutting down USAID,

to reopen the agency, and to recall employees to work. *Am. Foreign Serv. Ass'n et al. v. Trump*, No. 1:25-cv-00352 (CJN). On March 21, 2025, AFSA and others filed suit to enjoin the disbandment of the U.S. Agency for Global Media, which employs AFSA-represented Foreign Service members. *Widakusawara v. Lake*, No. 1:25-cv-1015 (RCL). A preliminary injunction was granted on April 22, 2025 and is on appeal in this Court in Case No. 25-5144. Since January 20, AFSA USAID Vice President Randall Chester has repeatedly spoken to the media and the public about the devastating consequences of dismantling USAID. ECF No. 10-4, Chester Decl. ¶ 21. He has appeared in his capacity as a union officer on CNN, PBS, CBS 60 Minutes. *Id.* ¶¶ 21-23. He has also given on the record interviews to Canadian Broadcasting Service, BBC, ABC, and NBC. *Id.* AFSA President Thomas Yazdgerdi similarly appeared for an interview with CNN about the lawsuit seeking to prohibit President Trump from dismantling USAID. ECF No. 10-2, Yazdgerdi Decl. ¶ 25. Thus, the statement in the Fact Sheet that "President Trump refuses to let union obstruction interfere with his efforts" is an admission that he invoked the national security exemption in retaliation for the constitutionally protected activities of AFSA and other unions.

Aside from the anti-union animus, the "Fact Sheet" demonstrates the irrationality of the President's exclusions and that "the President was indifferent to the purposes and requirements of the Act, or acted deliberately in contravention of them." *AFGE*, 870 F.2d at 728. The *only* rationale offered for excluding the Department of State and USAID was that "President Trump has demonstrated how

18

trade policy is a national security tool." https://www.whitehouse.gov/fact-sheets/2025/03/fact-sheet-president-donald-j-trump-exempts-agencies-with-national-security-missions-from-federal-collective-bargaining-requirements/ (last visited May 23, 2025). This, of course, begs the question of why Subchapter X of the FSA "cannot be applied" to those involved in trade issues "in a manner consistent with national security requirements and considerations." But USAID is not engaged in trade issues, and trade matters at the Department of State are handled by the Division for Trade Policy and Negotiations, which is just one division within the Bureau of Economic and Business Affairs, which is just one of several Bureaus within the Economic Growth, Energy and Environment subdivision, which itself is just one of the ten subdivisions in the State Department, all of which were excluded from coverage of Subchapter X by Section 3 of the Executive Order. https://www.state.gov/bureaus-offices/under-secretary-for-economic-growth-energy-and-the-environment/bureau-of-economic-and-business-affairs/division-for-trade-policy-and-negotiations/ (last visited April 18, 2025). If the President had a *bona fide* belief that Subchapter X could not be applied consistent with national security to those members of the Foreign Service who are involved in trade policy, he could have simply excluded the Division for Trade Policy and Negotiations rather than the entirety of the Department of State.

Furthermore, the justifications given in the Fact Sheet for why collective bargaining is inconsistent with national security requirements reveal the President's fundamental misunderstanding, if not misrepresentation of, both Subchapter X of the

Foreign Service Act and the Federal Service Labor-Management Relations Statutes, further demonstrating that "the President was indifferent to the purposes and requirements of the Act, or acted deliberately in contravention of them." Neither statute allows "Federal unions to obstruct agency management," as the Fact Sheet claims. Nor is it correct to say that because "[a]gencies cannot make most contractually permissible changes until after finishing 'mid-term' union bargaining," or that collective bargaining is "dangerous in agencies with national security responsibilities." Nor is it true that either statute precludes the agencies from "execut[ing] their missions without delay."

The language of the two statutes, as applied by agencies like the FLRA, expose the foregoing inaccuracies in the Fact Sheet. *First*, both statutes have an expansive management rights clause that protects management prerogatives and precludes bargaining over a host of issues, not the least of which includes the right "to determine the mission, budget, organization, number of employees, and internal security practices of the agency," to "assign work," and, importantly, "to take whatever actions may be necessary to carry out the agency mission during emergencies." 22 U.S.C. § 4105(a); 5 U.S.C. § 7106(a). *Second*, an agency need not complete bargaining before changing conditions of employment when immediate implementation is "consistent with the necessary functioning of the agency, such that a delay in implementation would have impeded the agency's ability to effectively and efficiently carry out its mission." *SPORT and Dept. of Air Force, Edwards AFB*, 68

F.L.R.A. 9, 10-11 (2014), *recon. denied*, 68 F.L.R.A. 107 (2014) (agency properly furloughed employees without completing implementation bargaining).[3]

The Defendants argue that Section 4103(b) entrusts the relevant determinations to the President alone "without interference from courts or other actors" and without the need to provide a justification. Defs.' Mot. at 9. That may well be true, *until the presumption of regularity has been rebutted* as it has been in this case. Once a presumption a regularity is rebutted "the Government is put to proof." *Romero v. Tran*, 33 Vet. App. at 261. "If it appears irregular, it is irregular, and the burden shifts to the proponent to show the contrary." *United States v. Roses Inc.,* 706 F.2d 1563, 1567 (Fed. Cir. 1983). The Defendants also cite *Trump v. Hawaii*, 585 U.S. 667, 686 (2018) for the proposition that the Court should defer to the President and take the Executive Order on face value. Mot. at 9. However, in that case the Supreme Court accepted the government's concession "that it may be appropriate here for the inquiry to extend beyond the facial neutrality of the order" and "assume[d] that we may look behind the face of the Proclamation" and consider extrinsic evidence. *Hawaii*, 585 U.S. at 704. And as Justice Kennedy noted in his concurrence, "there may be some common ground between the opinions in this case, in that the Court does acknowledge that in some instances, governmental action may be subject to judicial review to determine whether or not it is 'inexplicable by anything but animus.'" *Id.* at 711 (quoting *Romer v. Evans*, 517 U.S. 620, 632 (1996)).

---

[3] As noted above, the FSLRB must follow FLRA precedent unless it determines special circumstances require otherwise. 22 U.S.C. § 4107(b).

Most of the functions of the State Department identified on page 29 of the Defendant's Opposition Memo – "prosperity and democratic values," emerging technology, global health, economic growth, energy and environment, public diplomacy – do not fall with the limited definition of national security offered by the Supreme Court in *Cole v. Young*, 351 U.S. 536, 544 (1956), that being the "protection of the Nation from internal subversion or foreign aggression."[4] Nor does the work of USAID identified by the Defendants: "economic growth, combat the spread of disease, promote democratic reform, and address food insecurity." "But even if any agency performs *some work* that implicates national security, that does not mean that the entire agency has 'a primary function' of 'national security work.'" *Nat'l Treas. Emps. Union v. Trump*, Case No. 25-cv-935 (PLF) (D.D.C. Apr. 28, 2025), slip. op. at 29 (emphasis in original).

Furthermore, the President lacks authority under the clear text of the FSA to exclude the entirety of the Department of State or the entirety of USAID from coverage. The FSA only permits the President to "exclude *any subdivision* of the Department from coverage ... if the President determines that ... the provisions of this subchapter cannot be applied *to that subdivision* in a manner consistent with national security requirements and considerations." 22 U.S.C. § 4103(b) (emphasis

---

[4] Nor were these functions identified by the President in either Executive Order No. 14,251 or the Fact Sheet. "Post hoc rationalizations by imaginative government counsel do not suffice." *Ace Motor Freight, Inc. v. I. C. C.,* 557 F.2d 859, 864 (D.C. Cir. 1977). "The courts may not accept appellate counsel's *post hoc* rationalizations" for the government's actions. *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168 (1962).

added). There is no statutory authority to exclude the entirety of the Department of State or USAID from coverage. If Congress intended to permit the President to revoke the collective bargaining rights in the entirety of the State Department or USAID, it would have used the same language as found in the corresponding section of the Federal Service Labor-Management Relations Statute, also known as "Chapter 71," which provides that "[t]he President may issue an order excluding any *agency or subdivision* thereof from coverage under this chapter." 5 U.S.C. § 7103(b) (emphasis supplied). Subsection 4103(b) cannot be interpreted as permitting the exclusion of the **entirety** of State or USAID because it defies both the plain text and Congressional findings that collective bargaining by members of the Foreign Service "safeguards the public interest, contributes to the effective conduct of public business and facilitates and encourages the amicable settlement of disputes" and that "the unique conditions of Foreign Service employment requires a distinct framework for the development and implementation of modern, constructive, and cooperative relationships between management officials and organizations representing members of the Service." 22 U.S.C. §§ 4101(1), (3). The complete termination of AFSA's representation of Foreign Service members within State and USAID also cannot be reconciled with Congress's finding that "labor organizations and collective bargaining in the Service are in the public interest and are consistent with the requirement of an effective and efficient Government." 22 U.S.C. § 4101. Congress would never have enacted the Foreign Service Labor-Management Relations Statute had it believed that, as a general rule,

collective bargaining by Foreign Service members is inconsistent "with national security requirements and considerations."

As a matter of statutory construction, the authority to exclude particular subdivisions cannot be read to permit the exclusion of everyone covered by the statute because "[a] statutory exemption cannot swallow the rule." *Sinclair Wyoming Ref. Co. LLC v. Env't Prot. Agency*, 114 F.4th 693, 711 (D.C. Cir. 2024); *accord, Cuomo v. Clearing House Assn.*, 557 U.S. 519, 530 (2009); *Pac. Gas & Elec. Co. v FERC*, 113 F.4th 943, 949 (D.C. Cir. 2024). Section 3 of the Executive Order is "in plain disregard of the elementary rule requiring that exceptions from a general policy which a law embodies should be strictly construed; that is, should be so interpreted as not to destroy the remedial processes intended to be accomplished by the enactment." *Spokane & Inland Empire R.R. Co. v. United States*, 241 U.S. 344, 350 (1916).

Finally, the Defendants incorrectly claim that the inference of retaliatory motive is based on the favorable treatment of a single union. Defs.' Mot. at 8. It was not just the Customs and Border Protection (and its union) that was excluded from the exemptions, but also "any agency police officers" whose unions, like the National Border Patrol Council, endorsed President Trump and are his political supporters.[5]

--------

[5]    The National Border Patrol Council is the exclusive representative of approximately 18,000 Border Patrol agents and support personnel assigned to the U.S. Border Patrol. https://bpunion.org/about-nbpc/ It endorsed President Trump for election in 2024 (as it did in 2020 and 2016). See *National Border Patrol Council Endorses Trump at Arizona Rally*, THE HILL, (Oct 14, 2024) https://thehill.com/latino/4932425-trump-border-patrol-union-endorsement/ . The Fraternal Order of Police and other police unions endorsed President Trump for election in 2024.  *See* Frat. Order of Police, https://fop.net/2024/09/fop-endorses-

All firefighters in any agency were also exempted from the exclusions. The International Association of Fire Fighters ("IAFF") withheld an endorsement sought after by his opponent.[6]

But the Border Patrol, police and firefighter unions were not the only political friends of the President who were exempted from application of the Executive Order. In section 4 of the Executive Order, the President delegated to the Secretary of Veterans Administration authority to amend the order to restore collective bargaining rights to subdivisions of the VA. On April 17, Secretary Collins restored collective bargaining rights, not to particular subdivisions, *but to particular unions* in his Department. 90 Fed. Reg. 16427 (Apr. 17, 2025). A spokesperson for the Department explained that bargaining rights were restored to these unions, not because continued bargaining in their organizational subdivisions were "consistent with national security requirements and considerations," but because these unions were compliant:

> "The unions in the exempted units have posed no or minimal hinderance to VA operations," he said. "They have filed no or few grievances against VA and they have not proved an impediment to the department's ability to effectively carry out its mission . . . AFGE, NAGE, NNU and SEIU by

---

trump/. *See also* Martin Kaste, *Police welcome Trump's return to the White House*, NPR MORNING EDITION (Nov. 15, 2024) https://www.npr.org/2024/11/14/nx-s1-5183142/police-welcome-trumps-return-to-the-white-house.

[6] Alexandra Marquez and Nnamdi Egwuonwu, *Firefighters Union IAFF Declines to Endorse a Candid.* https://www.nbcnews.com/politics/2024-election/firefighters-union-iaff-declines-endorse-presidential-candidate-rcna173918 (last visited April 2, 2025). The firefighters in IAFF locals on military bases retain their collective bargaining rights, but teachers in the Department of Defense dependent schools on those bases, who are represented by unions who are not supportive of the President's policies and who endorsed his opponent, do not. Exec. Order 14,251, Sec. 2.

> contrast are using their authority under the Federal Service Labor-Management Relations Statute to broadly frustrate the administration's ability to manage the agency."

Erich Wagner, *VA is selectively enforcing Trump's order stripping workers of union rights,* GOV'T EXEC. (Apr. 18, 2025), available at, https://www.govexec.com/workforce/2025 /04/va-selectively-enforcing-trumps-order-stripping-workers-union-rights/404694/ (last visited April 25, 2025). The Defendants dispute the relevance of the exemptions granted by the Secretary of Veterans Affairs, arguing that his actions are not attributable to the President. Mot. at 9. But the Secretary acted by delegation from the President and his actions reflect how a senior member of this "unitary Executive" understands the President's goals and policies embodied in the Executive Order.

### C.    The District Court Correctly Determined that AFSA would Suffer Irreparable Injury Pendente Lite and that a Preliminary Injunction is in the Public Interest.

For the reasons stated in Section II, *supra.* at pages 7 -10, and on pages 29 through 33 of its May 14 Opinion, the Court correctly concluded that AFSA would be irreparably injured pendente lite in the absence of a preliminary injunction. For the reasons stated in Section I, supra., at pages 5 – 7, and on pages 33 through 34 of its May 14 Opinion, the Court correctly concluded that a preliminary injunction favored the public interest because of "Congress's unequivocal identification of collective bargaining rights and federal unions being in the public interest coupled with the public interest in ensuring that the laws enacted by their representatives are not imperiled by executive fiat." *Id.* (internal quotations omitted).

## Conclusion

For the foregoing reasons, the Defendants' Motion to Stay Pending Appeal should be denied.

DATED: May 27, 2025                    Respectfully submitted,

By:    */s/ Richard J. Hirn*
         Richard J. Hirn
         D.C. Bar No. 291849
         5335 Wisconsin Ave., NW, Suite 440
         Washington, D.C. 20015
         (202) 274-1812
         richard@hirnlaw.com

         Keith R. Bolek
         Bar No. 463129
         April H. Pullium
         Bar No. 198026
         O'Donoghue & O'Donoghue LLP
         5301 Wisconsin Avenue, Suite 800
         Washington, D.C. 20015
         (202) 362-0041
         kbolek@odonoghuelaw.com
         apullium@odonoghuelaw.com

         Sharon L. Papp
         General Counsel
         D.C. Bar No. 107992
         Raeka Safai
         Deputy General Counsel
         D.C. Bar No. 977301
         American Foreign Service Association
         2101 E Street, NW
         Washington, DC 20037
         (202) 338-4045
         papp@afsa.org
         safai@afsa.org

         *Counsel for Plaintiff*
         *American Foreign Service Association*

27

# ATTACHMENT

April 9, 2025 letter in *Dep't of Defense Educ. Activity and Antilles Consol. Educ. Ass'n*, CH-CA-25-01015



UNITED STATES OF AMERICA
## FEDERAL LABOR RELATIONS AUTHORITY
## CHICAGO REGIONAL OFFICE
224 S. Michigan Avenue, Suite 445 ● Chicago, Illinois 60604-2505
(872) 627-0020; FAX: (312) 281-6500

April 9, 2025

**VIA EMAIL**

███████████

Associate General Counsel
Employment and Labor Law Division
Office of the General Counsel
DoD Education Activity
4800 Mark Center Drive, 04D14-03
Alexandria, VA  22350-1400
██████████@dodea.edu

Richard Hirn, Attorney
Richard J. Hirn Attorney at Law
5335 Wisconsin Ave NW
Washington, D.C. 20015
richard@hirnlaw.com

                Re:    CH-CA-25-0105: Depart of Defense
                Eduaction Activity, Alexandria, Virginia and
                Antilles Consolidated Eduation Association

Dear Parties:

This Office docketed the above-captioned unfair labor practice (ULP) charge on January 21, 2025. The Agent assigned to investigate this charge is ████████████, who can be reached via phone at ██████████ or via email at ██████████████.

On March 27, 2025, President Trump issued an Executive Order titled *Exclusions from Federal Labor-Management Relations Programs*, which amended Executive Order 12171, dated November 19, 1979 (as amended), and excluded a number of Federal agencies from collective bargaining pursuant to Section 7103(b)(1) of the Federal Service Labor-Management Relations Statute (Statute).

Because the Executive Order impacts the processing of this ULP charge, processing of this charge will be deferred so as to afford the Office of the General Counsel time to reevaluate the case in view of the Executive Order and in view of cases pending before the Authority.

Sincerely,

/Timothy Sullivan/

Timothy Sullivan
Acting Regional Director